EXHIBIT

3

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

JOSEPH WANG,

        Movant,

        v.

UNITED STATES OF AMERICA

Case No.

**DECLARATION OF BRIAN J. FISCHER IN SUPPORT OF MOTION FOR AUTHORIZATION TO FILE SECOND OR SUCCESSIVE PETITION FOR HABEAS CORPUS**

I, BRIAN J. FISCHER, hereby declare as follows:

1.    I am a partner at the law firm Jenner & Block LLP, *pro bono* counsel for Movant Joseph Wang.

2.    I submit this declaration in support of Mr. Wang's Motion For An Order Authorizing the District Court to Consider A Successive Or Second Motion To Vacate, Set Aside Or Correct Sentence Pursuant to 28 U.S.C. §§ 2244(b), 2255(h) by a Prisoner in Federal Custody (the "Motion").

3.    Attached hereto as Exhibit A is a memorandum of law in support of Mr. Wang's Motion.

4.    Attached hereto as Exhibit B is a copy of Petitioner Joseph Wang's July 28, 1995 amended Judgment and Conviction.

5.    Attached hereto as Exhibit C is the October 2, 1992 transcript of Mr. Wang's sentencing hearing.

6.    Attached hereto as Exhibit D is a copy of the January 18, 1992 transcript of the hearing on criminal cause for motion to transfer Mr. Wang to adult status pursuant to 18 U.S.C. § 5032.

7.      Attached hereto as Exhibit E is a copy of *United States v. Wong*, 40 F.3d 1347 (2d

Cir. 1994), the decision ruling on Mr. Wang's direct appeal.

8.      Attached hereto as Exhibit F is a redacted copy of Mr. Wang's Presentence

Investigation Report ("PIR").[1]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        June 20, 2013

By: _____
        Brian J. Fischer

---

[1] We have redacted from the PIR those paragraphs concerning Mr. Wang's family background, financial condition, or other personal characteristics. While this information may bear on the petition for habeas corpus to be pursued before the district court, and to the potential resentencing of Mr. Wang, we do not believe it is necessary to decide the limited legal issue before this Court of whether Mr. Wang has made a prima facie showing of entitlement to relief. If the Court would like to review this information, we respectfully request leave to file under seal an unredacted copy of Mr. Wang's PIR.

# EXHIBIT A

No. 13-

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

JOSEPH WANG,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent.*

On Motion for Leave to File a Second or Successive Motion to Vacate, Set Aside or Correct
Sentence Pursuant to 28 U.S.C. §§ 2244(b), 2255(h) By a Prisoner in Federal Custody

# MEMORANDUM OF LAW

Anthony S. Barkow
Brian J. Fischer
Michael W. Ross
Jenner & Block LLP
919 Third Ave., 38th Floor
New York, New York 10022-3908
Telephone: 212-891-1600
Facsimile: 212-909-0815

*Pro Bono Counsel for Movant*

# TABLE OF CONTENTS

Jurisdictional Statement ..................................................................................................... 1

Statement of the Issues ...................................................................................................... 1

Request for Oral Argument ................................................................................................ 1

Summary of the Argument .................................................................................................. 2

Statement of the Facts ........................................................................................................ 3

    A.   The Underlying Conduct ......................................................................................... 3

    B.   Mr. Wang's Life Sentences .................................................................................... 4

    C.   Mr. Wang's Direct Appeal ..................................................................................... 6

    D.   Mr. Wang's Prior Collateral Applications ............................................................. 6

    E.   This Motion ............................................................................................................ 6

Standard of Review ............................................................................................................. 6

Argument ............................................................................................................................ 7

    I.   THIS COURT HAS GRANTED AUTHORIZATION TO FILE A
        SUCCESSIVE HABEAS PETITION BASED ON *MILLER* ............................. 7

    II.  MR. WANG'S HABEAS PETITION IS BASED ON
        A NEW RULE OF CONSTITUTIONAL LAW. ............................................... 8

        A.   *Miller* Announced that a Mandatory Life Sentence for
            a Juvenile Homicide Offender Violates the Eighth Amendment ................................. 8

        B.   *Miller* Announced a "New Rule" of Constitutional
            Law Previously Unavailable To Mr. Wang. ......................................................... 10

    III.  THE SUPREME COURT HAS MADE *MILLER* RETROACTIVE. ............................ 11

        A.   *Miller* Itself Makes the New Rule Retroactive. ................................................ 11

        B.   *Miller* is Retroactive Based on Multiple Supreme Court Holdings. ........................... 12

    IV.  MR. WANG'S SENTENCE VIOLATES *MILLER*. ...................................................... 15

        A.   The Federal Sentencing Regime at the Time of Mr. Wang's Sentencing ................. 15

        B.   The Mandatory Nature of Mr. Wang's Life Sentences .............................................. 17

        C.   The Court's Orders Denying the Request of Mr. Wang's Co-
            Defendant Are Not Controlling ............................................................................. 19

Conclusion ........................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Atkins v. Virginia*
  536 U.S. 304 (2002)...................................................................................13

*Beard v. Banks*
  542 U.S. 406 (2004)..........................................................................10, 11, 13

*Bell v. United States*
  296 F.3d 127 (2d Cir. 2002)..............................................................................6

*Bousley v. United States*
  523 U.S. 614 (1998)...................................................................................13

*Burns v. United States*
  501 U.S. 129 (1991)...................................................................................16

*Butler v. McKellar*
  494 U.S. 407 (1990)...................................................................................11

*Chambers v. United States*
  106 F.3d 472 (2d Cir. 1997)............................................................................7

*Coleman v. United States*
  329 F.3d 77 (2d Cir. 2003).............................................................................13

*Craig v. Cain*
  No. 13-30035, 2013 U.S. App. LEXIS 431 (5th Cir. Jan. 4, 2013)...........................7

*Danforth v. Minnesota*
  552 U.S. 264 (2008)...................................................................................13

*Forbes v. United States*
  262 F.3d 143 (2d Cir. 2001)............................................................................12

*Geter v. State*
  No. 3 D 12-1736, 2012 Fla. App. LEXIS 16051 (Fla. Dist. Ct. App. Sept. 27, 2012).............7

*Graham v. Florida*
  130 S. Ct. 2011 (2010)..................................................................................9

*Haouari v. United States*
  510 F.3d 350 (2d Cir. 2007)............................................................................7

*Hill v. Snyder*
  No. 10-14568, 2013 U.S. Dist. LEXIS 12160 (E.D. Mich. Jan. 30, 2013) ...............7

ii

*Horn v. Quarterman*
    508 F.3d 306 (5th Cir. 2007) ...................................................................15

*In re James*
    No. 12-287, Dkt. No. 36 (4th Cir. May 10, 2013) ...................................7

*In re Landry*
    No. 13-247, Dkt. No. 5 (4th Cir. May 30, 2013) .....................................7

*In re Morgan*
    No. 13-11175-D, 2013 U.S. App. LEXIS 7523 (11th Cir. Apr. 12, 2013)............................7

*In re Moss*
    703 F.3d 1301 (11th Cir. 2013) ..............................................................15

*Jackson v. Norris*
    No. 09-145, 2013 Ark. LEXIS 201 (Ark. Apr. 25, 2013)........................12

*LeCroy v. Sec'y, Fla. Dept. of Corr.*
    421 F.3d 1237 (11th Cir. 2005) ..............................................................15

*Liriano v. United States*
    95 F.3d 119 (2d Cir. 1996)........................................................................6

*Miller v. Alabama*
    132 S. Ct. 2455 (2012) ................................................................... passim

*Penry v. Lynaugh*
    492 U.S. 302 (1989)...........................................................................13, 14

*People v. Carp*
    828 N.W.2d 685 (Mich. Ct. App. 2012) .................................................7

*People v. Morfin*
    981 N.E.2d 1010 (Ill. Ct. App. 2012) .....................................................7

*Roper v. Simmons*
    543 U.S. 551 (2005)..................................................................................9

*Saffle v. Parks*
    494 U.S. 484 (1990)...........................................................................13, 14

*Schriro v. Summerlin*
    542 U.S. 348 (2004)................................................................................13

*State v. Simmons*
    99 So. 3d 28 (La. 2012) ...........................................................................7

*Stinson v. United States*
    508 U.S. 36 (1993) ....................................................................................16

*Stone v. United States*
    No. 13-1486 (2d Cir. 2013) ...............................................2, 7, 8, 21

*Teague v. Lane*
    489 U.S. 288 (1989) .............................................................8, 11, 12, 13

*United States v. Booker*
    543 U.S. 220 (2005) ...........................................................................4, 5, 16

*United States v. Floyd*
    945 F.2d 1096 (9th Cir. 1991) .............................................................17

*United States v. Haynes*
    985 F.2d 65 (2d Cir. 1993) ...........................................................17, 19

*United States v. Wong*
    40 F.3d 1347 (2d Cir. 1994) ......................................................... passim

*Whorton v. Bockting*
    549 U.S. 406 (2007) ..........................................................................13

*Wong v. United States*
    No. 12-4985 (2d Cir. 2013) ...............................................................20

*Wong v. United States*
    No. 13-1670 (2d Cir. 2013) .........................................................8, 21

## STATUTES

18 U.S.C. § 1959 ...........................................................................................3

18 U.S.C. § 1962 ...........................................................................................3

18 U.S.C. § 3553 .................................................................................4, 5, 16

18 U.S.C. § 3561 ...........................................................................................4

28 U.S.C. § 2244 ................................................................................. passim

28 U.S.C. § 2255 ................................................................................. passim

Sentencing Reform Act of 1984 ("SRA"), Pub. L. No. 98-473, 98 Stat. 1987 ...........................16

**OTHER AUTHORITIES**

*Key Legislative Issues in Criminal Justice: Mandatory Sentencing,*
  *Nat'l Inst. Of Justice: Research in Action*, at 1 (1997)............................................................14

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to rule on this motion pursuant to 28 U.S.C. § 2244(b)(3)(A), which provides that "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application."

## STATEMENT OF THE ISSUES

Whether movant Joseph Wang has made a prima facie showing under 28 U.S.C. § 2244(b)(3)(C) that *Miller v. Alabama*, 132 S. Ct. 2455 (June 25, 2012) announced "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" to Mr. Wang. 28 U.S.C. § 2255(h)(2).

Whether Mr. Wang's sentence violates *Miller*.

## REQUEST FOR ORAL ARGUMENT

Because oral argument would aid the Court in ruling on Mr. Wang's motion, we respectfully request that the Court schedule oral argument.

# SUMMARY OF THE ARGUMENT

In *Miller v. Alabama*, 132 S. Ct. 2455 (2012), the Supreme Court held that a mandatory sentence of life without the possibility of parole for a juvenile offender violates the Eighth Amendment's prohibition on "cruel and unusual punishments." U.S. Const. amend. VIII. This new rule of constitutional law renders unconstitutional the mandatory life sentences imposed on Joseph Wang for crimes he committed when he was 16 years old.

Although this is not Mr. Wang's first request for habeas relief, he is entitled to invoke *Miller* since that case announced "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" to Mr. Wang. 28 U.S.C. § 2255(h)(2).

*First*, *Miller*'s holding that juvenile offenders could not be sentenced to a mandatory term of life imprisonment constitutes a "new" and "previously unavailable" rule of constitutional law, since it was not "dictated" by previous decisions of the Supreme Court. *See infra*, Section II.

*Second*, Mr. Wang is entitled to the benefit of that ruling because it was made retroactive to cases on collateral review by the Supreme Court. *See infra*, Section III. Indeed, this Court has recently determined that a prima facie case had been made showing that *Miller* is a new rule of constitutional law retroactive on collateral review. *See Stone v. United States*, No. 13-1486, Dkt. No. 25 (2d Cir. Jun. 7, 2013). The Court should make the same determination here.

*Third*, Mr. Wang's life sentences violate the Eighth Amendment rule announced in *Miller* because they were imposed under a mandatory sentencing regime that violated the Court's substantive holding in *Miller* that a life sentence may be imposed on a juvenile offender only after a meaningful and individualized assessment of the youth-oriented considerations the Eighth Amendment requires. *See infra*, Section IV.

At the very least, Mr. Wang has made the requisite "prima facie" showing that this application satisfies 28 U.S.C. § 2244(b). Accordingly, we respectfully request that this Court grant Mr. Wang leave to file a habeas petition that can be fully considered by the district court.

## STATEMENT OF THE FACTS[1]

### A.    The Underlying Conduct

In the spring of 1988, when he was 15 years old, Joseph Wang joined the "Green Dragons," a youth gang that operated in the Elmhurst and Flushing neighborhoods of Queens. *See United States v. Wong*, 40 F.3d 1347, 1374 (2d Cir. 1994). Mr. Wang was arrested in 1990, and, with six co-defendants, was convicted after trial of eight criminal charges in connection with his participation in the gang. *See Wong*, 40 F.3d at 1353–56; 1/18/92 Tr. 5:19–22.[2]

Mr. Wang was sentenced to life in prison on each of four counts. Count 1 was a substantive charge of racketeering, in violation of 18 U.S.C. § 1962(c). Count 2 was a charge of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Counts 6 and 7 were charges of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). *See* Am. Judgment (Ex. B).[3] Underlying each of these charges were two murders: one of a restaurant manager and the other of a restaurant patron who witnessed the first murder. *Wong*, 40 F.3d at 1357–58. Mr. Wang was 16 years old at the time of these crimes. 1/18/92 Tr. 5:23–6:1.

---

[1] The facts set forth here are based on Mr. Wang's January 18, 1992 hearing before the U.S. District Court for the Eastern District of New York on the Government's application to transfer Mr. Wang to adult status ("1/18/92 Tr.") (Ex. D); Mr. Wang's October 2, 1992 sentencing hearing ("10/2/92 Tr.") (Ex. C); and this Court's opinion in *United States v. Wong*, 40 F.3d 1347 (2d Cir. 1994) (Ex. E), which affirmed Mr. Wang's convictions on direct appeal.

[2] Mr. Wang was born on January 5, 1973. 1/18/92 Tr. 5:19–22.

[3] The remaining charges carried less than a life sentence. *See* Am. Judgment at 3. Mr. Wang has served the terms of those sentences and they are not at issue here.

3

## B.    Mr. Wang's Life Sentences

For these murders, the district court sentenced Mr. Wang to four concurrent terms of life in prison.[4]  *See* 10/2/92 Tr. 118:15–19:5 (sentencing Mr. Wang to life in prison on counts 1, 2, 6 and 7); *see also id.* at 116:11–13 ("In Joseph Wang's case, the reason this Court is considering life sentences is because he was involved in wanton murders."); Presentence Investigation Report (Ex. F) ("PIR") ¶¶ 3–4, 52, 58, 96–97.  Under the 1991 U.S. Sentencing Guidelines applied in his case, the base offense level for each of Mr. Wang's four murder-based offenses was 43, which corresponded to a Guidelines sentence of life imprisonment.[5]  *See* 10/2/92 Tr. 100:24–01:6; PIR ¶ 120.  This Guidelines sentence of life in prison was mandatory under 18 U.S.C. § 3553(b).  *See United States v. Booker*, 543 U.S. 220, 234 (2005) ("Because they are binding on judges, we have consistently held that the Guidelines have the force and effect of laws.") (citing 18 U.S.C. § 3553(b)).

At Mr. Wang's sentencing hearing on October 2, 1992, his counsel pursued the only avenue of potential relief from these mandatory sentences:  a downward departure.  Counsel argued that it would be "fundamentally unfair that" Mr. Wang was "facing mandatory sentence of life without any parole for deeds that . . . occurred at a time when he was 16 years old . . . ." 10/2/92 Tr. 103:2–8.  With no specific grounds for departure expressly available, counsel argued that the only basis "that seems truly available is an argument that it's the result of either lack of youthful guidance or his simple youth in and of itself."  *Id.* at 103:12–14.  The Government responded that Mr. Wang's was a "typical case under the guidelines," and not one that included any factor that warranted a deviation from the mandatory Guidelines sentence of life, including on the basis of youth. *See id.* at 110:11–22.

---

[4] Mr. Wang was not eligible for probation. *See* 18 U.S.C. § 3561(a)(1).

[5] Mr. Wang also received a two-point upward adjustment to his base offense level, bringing his total offense level to 45. Mr. Wang's criminal history was category II, but his sentence would also have been life at category I.

Federal law at the time required that any departure be based on a factor not adequately considered by the Guidelines. *See* 18 U.S.C. § 3553(b) (Supp. III 1988); *see also Booker*, 543 U.S. at 234 ("In most cases, as a matter of law, the Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible."). Youth was not such a factor, as the Guidelines provided that "youth" was "not ordinarily relevant" to sentencing. *See* U.S. Sentencing Guidelines Manual § 5H1.1 (1991).[6]

The district court denied the application, and that ruling correctly reflected the state of the law at the time. *See* 10/2/92 Tr. 115:14–15 (finding that a departure from the Guidelines would be appropriate if "there was some factor present in this case that the [sentencing] commission did not adequately deal with); *id.* at 115:21–22 ("I simply do not find this to be a case for sentencing outside the guidelines in light of that rationale."). The court explained that it was "not imposing any sentence with respect to any defendant in this case simply because it is required by the guidelines," *id.* at 115:5–7, and concluded that it found "no facts that fairly require departure in order to do justice in the case." *Id.* at 116: 3–4.

Although the court stated that it was considering the youth of each offender,[7] as detailed below, it did not – and at the time, could not – consider any of the factors *Miller* found essential to sentencing for juveniles, including the effect of a juvenile's "immaturity, recklessness, and impetuosity" on a sentence's deterrent effect or whether a life sentence was consistent with a judgment that the offender "forever will be a danger to society." *Miller*, 132 S. Ct. at 2464 (quotation marks omitted); *see infra*, Section IV. The district court had no reason to do so in

---

[6] As discussed below, neither the Guidelines nor the Second Circuit had explained what type of extraordinary case might allow consideration of youth, and the applicable law rendered youth irrelevant. In any event, *Miller* made youth a central concern of sentencing, not a factor relevant only in an extraordinary case. *See* Section IV, *infra*.

[7] *See* 10/2/92 Tr. 71 (explaining that "defendants' youth should not play any part here," but that the court had "weighed it in considering each and every defendant in this case").

1992, and also denied applications by four of Mr. Wang's co-defendants based on lack of youthful guidance or youth.

### C.    Mr. Wang's Direct Appeal

This Court agreed with the district court's rejection of youth as a relevant factor in sentencing, and affirmed the sentence imposed on Mr. Wang. *See Wong*, 40 F.3d at 1381 ("This court has not recognized 'youthful lack of guidance' as a valid basis for downward departure.") (citing *United States v. Haynes*, 985 F.2d 65, 68 (2d Cir. 1993)).

### D.    Mr. Wang's Prior Collateral Applications

After his direct appeal, Mr. Wang filed two unsuccessful collateral challenges to his conviction:  one in 1996 and one in 2005.  *See* No. 96-cr-1453, Dkt. Nos. 8 & 10 (E.D.N.Y.).

### E.    This Motion

The announcement of *Miller* on June 25, 2012 gave Mr. Wang a new claim for habeas relief.  *See* 28 U.S.C. § 2255(h)(2).  Accordingly, Mr. Wang is filing a successive habeas petition in the district court at the same time as this motion.  That petition is being filed now because 28 U.S.C. § 2255(f)(3) imposes a one-year statute of limitations, and the filing of the petition in the district court appears to be the relevant date for determining its timeliness.  *See Liriano v. United States*, 95 F.3d 119, 123 (2d Cir. 1996) (identifying district court filing date as relevant date for statute of limitations).  Mr. Wang is requesting that the district court hold the petition in abeyance pending this Court's resolution of this motion.

## STANDARD OF REVIEW

To grant Mr. Wang's motion, this Court need only find that Mr. Wang has made a "prima facie showing" that he is entitled to habeas relief.  *See* 28 U.S.C. § 2244(b)(3)(C); *Bell v. United States*, 296 F.3d 127, 128 (2d Cir. 2002).  "A prima facie showing is not a particularly high standard," since an applicant "need only show a sufficient likelihood of satisfying the strict

standards of § 2255 to warrant a fuller exploration by the district court." *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) (quoting *Bell*, 296 F.3d at 128) (quotation marks omitted). As set forth below, Mr. Wang's application comfortably meets this standard.

Indeed, this is not a case that falls within the purpose of the screening function entrusted to this Court by 28 U.S.C. § 2244: to prevent the "abuse of the writ" by a petitioner who asserts claims that were, or could have been, asserted previously. *See Chambers v. United States*, 106 F.3d 472, 475 (2d Cir. 1997). This Court has already permitted a second or successive habeas petition to proceed based on the retroactive application of *Miller*, which makes clear that Mr. Wang's invocation of the new rule announced in *Miller* is not abusive and should not be prevented from proceeding in the district court. *See Stone v. United States*, No. 13-1486, Dkt. No. 19 (2d Cir. May 30, 2013); *see also In re James*, No. 12-287, Dkt. No. 36 (4th Cir. May 10, 2013) (granting permission to file successive habeas petition based on *Miller*); *In re Landry*, No. 13-247, Dkt. No. 5 (4th Cir. May 30, 2013) (same).[8]

## ARGUMENT

## I.  THIS COURT HAS GRANTED AUTHORIZATION TO FILE A SUCCESSIVE HABEAS PETITION BASED ON *MILLER*.

This Court recently granted a motion authorizing a successive habeas petition sought by an individual currently serving a life sentence for a juvenile crime, and found that a threshold case of *Miller*'s retroactivity had been made. *Stone v. United States*, No. 13-1486, Dkt. No. 25 (2d Cir. Jun. 7, 2013) ("*Stone II*"). The Court should do the same here.

---

[8] Several courts have found that *Miller* announced a new rule that is applicable retroactively on collateral review. *See Hill v. Snyder*, No. 10-14568, 2013 U.S. Dist. LEXIS 12160, at *4–6 & n.2 (E.D. Mich. Jan. 30, 2013) (observing that court would find *Miller* retroactive); *State v. Simmons*, 99 So. 3d 28 (La. 2012) (*Miller* retroactive); *People v. Morfin*, 981 N.E.2d 1010 (Ill. Ct. App. 2012) (*same*); *but see In re Morgan*, No. 13-11175-D, 2013 U.S. App. LEXIS 7523 (11th Cir. Apr. 12, 2013) (*Miller* not retroactive); *Craig v. Cain*, No. 13-30035, 2013 U.S. App. LEXIS 431 (5th Cir. Jan. 4, 2013) (same); *People v. Carp*, 828 N.W.2d 685 (Mich. Ct. App. 2012) (same); *Geter v. State*, No. 3 D 12-1736, 2012 Fla. App. LEXIS 16051 (Fla. Dist. Ct. App. Sept. 27, 2012) (same).

Specifically, on June 7, 2013 this Court granted the motion of Dwayne Stone to file a second habeas petition based on *Miller*. The Court only days earlier had denied Stone's *Miller*-based application, *see Stone v. United States*, No. 13-1486, Dkt. No. 13 (2d Cir. May 13, 2013) ("*Stone I*"), but that petition, filed *pro se*, was not accompanied by complete briefing by counsel. With the assistance of counsel, Stone filed a motion for reconsideration that set forth a more complete showing of the retroactive application of *Miller*. The Government joined that application and argued convincingly that *Miller* is retroactive and that Stone had made the required showing for relief, *see Stone v. United States*, No. 13-1486, Dkt. No. 19 (2d Cir. May 30, 2013). The Court vacated its prior order in *Stone I* and authorized Stone to present his case to the district court. *See Stone II*. Mr. Wang merely seeks the same authorization here.[9]

## II.  MR. WANG'S HABEAS PETITION IS BASED ON A NEW RULE OF CONSTITUTIONAL LAW.

*Miller* announced a new rule of constitutional law. Under *Teague v. Lane*, 489 U.S. 288 (1989), "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government," or "if the result was not dictated by precedent." *Id.* at 301. The rule announced in *Miller* is "new" under this standard.

### A.  *Miller* Announced that a Mandatory Life Sentence for a Juvenile Homicide Offender Violates the Eighth Amendment.

*Miller* addressed consolidated petitions by two fourteen year olds, Evan Miller and Kuntrell Jackson, each convicted of murder and each sentenced to mandatory life imprisonment

---

[9] *Stone II* is the most recent statement by this Court on *Miller*'s retroactivity, notwithstanding its earlier order in *Wong v. United States*, No. 13-1670, Dkt. No. 24 (2d Cir. May 29, 2013), which does not control the outcome here. *See infra,* Section IV.C.

without parole.[10]  The Supreme Court vacated both sentences.  Writing for the Court, Justice Kagan identified "two strands of precedent" implicated by these mandatory life sentences.

The first line of cases established a substantive rule under the Eighth Amendment: "children are constitutionally different from adults for the purpose of sentencing." *Miller*, 132 S. Ct. at 2464.  These cases – *Roper v. Simmons*, 543 U.S. 551 (2005) and *Graham v. Florida*, 130 S. Ct. 2011 (2010) – adopted "categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." 132 S. Ct. at 2463.[11]  The second line of cases prohibited the "mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Id.* at 2463–64 (citing *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion) and *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion)).  It was the "confluence of these two lines of precedent" that led to the new rule in *Miller* that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id.* at 2464.

The Supreme Court's analysis in *Miller* focused primarily on the first line of cases: *Graham* and *Roper*.  Those cases established that the specific characteristics of children – including diminished culpability and greater prospects for reform – made them "less deserving of the most severe punishments." *Id.* (quotation marks omitted); *see also* at 2465 ("[Y]outh matters in determining the appropriateness of a lifetime of incarceration without the possibility of

---

[10] Evan Miller participated in the murder of Cole Cannon when he was 14 years old.  Miller was convicted after trial of murder in the course of arson, which carried a mandatory life sentence. *Miller*, 132 S. Ct. at 2463–64.  Kuntrell Jackson was charged with capital felony murder and aggravated robbery, after he robbed a video store; one of his co-defendants killed its clerk.  Jackson was found guilty and sentenced to mandatory life imprisonment. *Id.* at 2461.

[11] *Roper* held that the Eighth Amendment "forbid[s] the imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." 543 U.S. at 578.  *Graham* ruled that the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." 130 S. Ct. at 2034.

9

parole."). That is because there are "significant gaps between juveniles and adults" in various aspects of maturity, responsibility, and character, *id.* at 2464, and a growing body of science and social science has now shown the "fundamental differences between juvenile and adult minds." *Id.* (quotation marks omitted). As a result, the unique attributes of youthful offenders undermined the core penological goals (retribution, deterrence, incapacitation, and rehabilitation) that would otherwise be advanced by a life sentence. *Id.* at 2465.

Applying these considerations to homicide offenses, the Supreme Court found that the "occasions for sentencing juveniles to this harshest possible penalty will be uncommon," but might, in certain circumstances, be appropriate. *Id.* at 2469. Therefore, the Court did not impose a categorical ban on such sentences, as it had done in *Graham* and *Roper*. The Court did require, however, that in order to determine whether a particular case presented the uncommon circumstance in which the Eighth Amendment could allow for a life sentence for a juvenile homicide offender, an individualized sentencing determination would be needed. In reaching this result, the Court relied on the second line of cases requiring individualized sentencing before imposing the death penalty. Building on those cases – and guided by the substantive findings in *Graham* and *Roper* – *Miller* imposed a key substantive limitation (one, notably, lacking from Mr. Wang's own sentencing in 1992): before imposing a life sentence on a juvenile offender, a sentencing court must first consider how *Miller*'s penological findings "counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

**B.**   ***Miller* Announced a "New Rule" of Constitutional Law Previously Unavailable To Mr. Wang.**

The rule announced in *Miller* was "new," as it was not "dictated" by prior holdings or "apparent to all reasonable jurists." *Beard v. Banks*, 542 U.S. 406, 413 (2004) (quotation marks omitted). *Miller* derived from, but was not dictated by, the "confluence of . . . two lines of

10

precedent." *Miller*, 132 S. Ct. at 2464. The first line of cases prohibited a sentence of death for juvenile offenders (*Roper*), and a sentence of life without parole for non-homicide offenses committed by juveniles (*Graham*). The second line of cases (*Woodson* and *Lockett*) required individualized sentencing determinations solely in the context of the death penalty. *See Miller*, 132 S. Ct. at 2464. While these cases provided *Miller* with a foundation, neither "dictated" that a mandatory life sentence for a juvenile who committed a homicide offense was unconstitutional.[12]

*Miller*'s rule, announced on June 25, 2012, was "previously unavailable" to Mr. Wang, 28 U.S.C. § 2255(h)(2), including when he filed his earlier habeas challenges in 1996 and 2005.

## III. THE SUPREME COURT HAS MADE *MILLER* RETROACTIVE.

Mr. Wang has made a "prima facie showing" that *Miller*'s rule was "made retroactive to cases on collateral review by the Supreme Court." 28 U.S.C. §§ 2244(b)(3)(C), 2255(h)(2).

### A. *Miller* Itself Makes the New Rule Retroactive.

In announcing *Miller*, the Supreme Court applied its ruling retroactively. In the companion case to *Miller*, the Court vacated the life sentence imposed on Kuntrell Jackson, a petitioner whose case had come to the Supreme Court from the Arkansas Supreme Court on collateral review. *See Miller*, 132 S. Ct. at 2461. The Court's application of its newly announced rule to Jackson was a retroactive application of *Miller* to a case that was already final. That retroactive application of the new *Miller* ruling cannot, in fairness, be limited to Jackson himself, but must apply to all others "similarly situated" to Jackson. *See Teague*, 489 U.S. at 300 ("[O]nce a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated."). This includes all individuals – such as Mr. Wang – whose convictions were final when *Miller* was announced.

---

[12] The five-to-four split among the justices also supports the conclusion that *Miller*'s result was not "apparent to all reasonable jurists." *Beard*, 542 U.S. at 413 (quotation marks omitted); *see also Butler v. McKellar*, 494 U.S. 407, 415 (1990).

This is true even though the Supreme Court did not expressly address retroactivity in resolving Jackson's claim. Because the Supreme Court also had Evan Miller's case before it, the Court had no reason to rule for Jackson if it did not intend a retroactive application of the new rule to his case.[13] Had the Supreme Court not intended such retroactive application, it could have denied Jackson's petition or dismissed it as improvidently granted. The Supreme Court's decision to announce its new rule in Jackson's case demands application of that rule to all other individuals on collateral review, including Mr. Wang. *See id.*

    **B.**    *Miller* **is Retroactive Based on Multiple Supreme Court Holdings.**

        1.    The Supreme Court Has Made Substantive Rules Retroactive.

Although the retroactive application of a new constitutional rule requires a Supreme Court holding, such a holding need not appear in the case announcing the rule. *See Tyler*, 533 U.S. at 663, 666. Instead, multiple cases can make a new rule retroactive when the Supreme Court "hold[s] in Case One that a particular type of rule applies retroactively to cases on collateral review and hold[s] in Case Two that a given rule is of that particular type." *Id.* at 668–69 (O'Connor, J., concurring);[14] *see Forbes v. United States*, 262 F.3d 143, 145 n.4 (2d Cir. 2001) (per curiam).

The Supreme Court has held that "substantive rules" are a "particular type of rule" that are retroactive on collateral review. *See Whorton v. Bockting*, 549 U.S. 406, 416 (2007); *Schriro v. Summerlin*, 542 U.S. 348, 351–52 (2004); *Beard*, 542 U.S. at 411 & n.3; *Bousley v. United States,* 523 U.S. 614, 619–21 (1998); *Saffle v. Parks*, 494 U.S. 484, 494 (1990). This Court has also recognized that substantive rules are retroactive. *See Coleman v. United States*, 329 F.3d

---

[13] The Supreme Court's *Jackson* required application of its holding to Jackson himself, as the Arkansas Supreme Court recognized on remand, *see Jackson v. Norris*, No. 09-145, 2013 Ark. LEXIS 201, at *6 (Ark. Apr. 25, 2013).

[14] The analysis in Justice O'Connor's concurrence of the circumstances in which multiple holdings make a new rule retroactive is controlling. *See Forbes v. United States*, 262 F.3d 143, 145 n.4 (2d Cir. 2001) (per curiam).

77, 83 (2d Cir. 2003) (explaining that whether a new rule is retroactive "depends largely on whether the rule is substantive or procedural" (quotation marks omitted)). Since the Supreme Court has already made substantive rules retroactive on collateral review, the question in determining the retroactivity of a new constitutional rule is whether the rule is substantive.

Under Supreme Court precedent, a substantive rule is one that places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe."[15] *Teague*, 489 U.S. at 307 (quotation marks omitted). In particular, the Supreme Court has held that new rules prohibiting certain *categories of penalties* for certain *classes of defendants* are substantive – and therefore retroactive – rules of constitutional law. *See Penry v. Lynaugh*, 492 U.S. 302, 329–30 (1989)[16] (holding that "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense" are substantive).

## 2. *Miller* Announced a Substantive Rule.

*Miller* is retroactive because it is a substantive rule. The Supreme Court has described substantive rules as those that "prohibit[] a certain category of punishment for a class of defendants because of their status or offense." *Saffle*, 494 U.S. at 494 (quotation marks omitted); *see Penry*, 492 U.S. at 330. *Miller* held that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." 132 S. Ct. at 2464. *Miller* thus prohibits "a certain category of punishment" (mandatory life sentences) for "a class of defendants" (juveniles), "because of their status" (age). *Miller* is the type of rule already made retroactive.

A mandatory life sentence is a category of sentence substantively different from a discretionary life sentence. Mandatory sentences reflect an *a priori* determination that a

---

[15] Justice O'Connor's opinion in *Teague* "set[s] forth the holding of the Court" in *Teague*. *Coleman*, 329 F.3d at 82 n.3. Although the Supreme Court has not expressly held that *Teague* applies to petitions under § 2255, *see Danforth v. Minnesota*, 552 U.S. 264, 269 n.4 (2008), numerous courts of appeals, including this Court, have applied *Teague*'s analysis to § 2255 petitions. *See, e.g., Coleman*, 329 F.3d at 83–90.

[16] *Overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

particular type of crime must result in life imprisonment, without any regard for the specific facts of the crime or the individual offender. Mandatory sentences are designed to deter crimes, and incapacitate offenders, by imposing severe punishments without regard for mitigating factors, including age. *See* Dale Parent et al., U.S. Dep't of Justice, *Key Legislative Issues in Criminal Justice: Mandatory Sentencing, Nat'l Inst. Of Justice: Research in Action*, at 1 (1997), *available at* https://www.ncjrs.gov/pdffiles/161839.pdf ("Mandatory sentences are based on two goals – deterrence and incapacitation."). Such sentences are substantively at odds with *Miller*'s finding that the penological goals of deterrence and incapacitation are not served by juvenile life sentences. Indeed, the Court observed that the "occasions for sentencing juveniles to this harshest possible penalty will be uncommon," *Miller*, 132 S. Ct. at 2469, leaving no doubt that the Eighth Amendment requires lesser sentences for a substantial number of the approximately 2,500 individuals now serving life for juvenile crimes.

For courts to determine which of these offenders are serving permissible life sentences, and which are not, *Miller* requires that a sentencing court meaningfully analyze as to each individual offender how the special characteristics of youth "counsel against irrevocably sentencing them to a lifetime in prison." 132 S. Ct. at 2469. Thus, *Miller* announced a substantive change in the law that necessarily requires a different outcome for a substantial number of the 2,500 juveniles who were sentenced in violation of the Eighth Amendment. That the Court required this substantive assessment of the Eighth Amendment in sentencing juvenile offenders is clear evidence that *Miller* announced a substantive rule that is retroactive.

Further, a rule is substantive when it alters the range of outcomes available to an offender. Such rules are different from procedural rules that solely alter the method by which an outcome may be reached. For example, the cases underlying *Miller* – *Roper* and *Graham* – are

substantive rules because they altered the range of permissible sentencing outcomes by removing the death penalty (*Roper*) or life in prison in non-homicide cases (*Graham*) from the potential outcomes facing juvenile offenders. *See In re Moss*, 703 F.3d 1301, 1303 (11th Cir. 2013) (prima facie showing *Graham* is retroactive); *Horn v. Quarterman*, 508 F.3d 306, 311 (5th Cir. 2007) (noting retroactive application of *Roper*); *LeCroy v. Sec'y, Fla. Dept. of Corr.*, 421 F.3d 1237, 1239–40 (11th Cir. 2005) (same). Here, the *Miller* rule alters the range of sentencing outcomes by requiring the possibility of less than a life sentence, and is therefore substantive.

## IV. MR. WANG'S SENTENCE VIOLATES *MILLER*.

Mr. Wang's life sentences were mandatory and violate *Miller*. At the time of his sentencing, the Sentencing Guidelines were mandatory and binding on district court judges. And although district courts had limited discretion to depart from the Guidelines, that discretion did not allow for the substantive consideration of the attributes of youth required under *Miller*.

### A. The Federal Sentencing Regime at the Time of Mr. Wang's Sentencing

The Sentencing Reform Act of 1984 ("SRA"), Pub. L. No. 98-473, 98 Stat. 1987, was enacted "to eliminate the 'unwarranted dispari[ties] and . . . uncertainty' associated with indeterminate sentencing" by restricting sentencing courts' discretion. *Burns v. United States*, 501 U.S. 129, 133 (1991) (quoting S. Rep. No. 98-225, at 49 (1983) (alterations in original)) (overruled on other grounds). The SRA inaugurated a regime of mandatory sentencing under the U.S. Sentencing Guidelines by directing that "[t]he court *shall* impose a sentence of the kind, and within the range, referred to in [the Guidelines]." 18 U.S.C. § 3553(b) (Supp. III 1988) (emphasis added). After their introduction, the Supreme Court repeatedly found that the Sentencing Guidelines were mandatory. *See, e.g.*, *Stinson v. United States*, 508 U.S. 36, 42 (1993). The Supreme Court invalidated the mandatory nature of the Guidelines under the Sixth Amendment *precisely because* they were "binding on district judges." *Booker*, 543 U.S. at 233.

Before *United States v. Booker*, 543 U.S. 220 (2005), district courts could depart from the Guidelines only in cases where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b) (Supp. III 1988). But the Sentencing Guidelines themselves explained that departures would be "highly unusual" because the Sentencing Commission had already sought to "take account of those factors" that were important to sentencing. U.S. Sentencing Guidelines Manual, ch. 1, pt. A, intro. cmt. 4(b), at 1.6–1.7 (1987). As the Supreme Court explained in *Booker*, "departures are not available in every case, and in fact are unavailable in most" because "as a matter of law, the Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible." *Booker*, 543 U.S. at 234.

The Sentencing Guidelines made clear that age was *not* a factor that the Sentencing Commission had failed to consider. The Guidelines in effect at the time of Mr. Wang's sentencing expressly stated that "[a]ge (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guidelines range." U.S. Sentencing Guidelines Manual § 5H1.1 (1991). And, as of 1992, neither the Guidelines themselves, nor this Court, had found any unusual circumstances in which youth might be relevant.

Thus, the nature of a district court's discretion when Mr. Wang was sentenced in 1992 was fundamentally at odds with the Eighth Amendment under *Miller*. Under this pre-*Booker* regime, a Guidelines sentence was presumed absent extraordinary factors that the Sentencing Commission did not consider. This rendered downward departures extraordinary and rare. And by treating sentences imposed on juvenile offenders in precisely the same manner as those imposed on adults, the Guidelines were premised on a view that the penological aims of sentencing would be advanced to the same extent for youthful offenders as for adults. This

16

premise is inconsistent with *Miller*'s conclusion that the key penological aims of sentencing are not advanced by a sentence of life imprisonment imposed on a juvenile. *See* 132 S. Ct. at 2464.

And, although at the time of Mr. Wang's sentence at least one court had concluded that "lack of youthful guidance" was a category of departure available in some cases, in this Circuit a defendant's "lack of guidance" as a youth was never a lawful ground of departure from a Guidelines sentence.[17] *See United States v. Haynes*, 985 F.2d 65, 68 (2d Cir. 1993) ("[Y]outhful lack of guidance [as a basis for departure] has not been adopted as the law in this Circuit."); *Wong*, 40 F.3d at 1381–82 (rejecting downward departure based on youth).

## B.   The Mandatory Nature of Mr. Wang's Life Sentences.

The district court's application of the Guidelines to Wang reflected the law as it existed in 1992.   The district court recognized that, under the Guidelines in place at the time, "the defendants' youth should [not] play any part here." 10/2/92 Tr. 71:17–20.  On appeal, this Court concurred in that understanding. *See Wong*, 40 F.3d at 1382.

The district court's life sentences would not survive *Miller* scrutiny today.  In imposing Mr. Wang's sentence, the district court did not meaningfully consider the "significant gaps" between juveniles and adults in various aspects of maturity, responsibility, and character, nor could the district court consider the "growing body" of science and social science that has come to show the "fundamental differences between juvenile and adult minds." *Miller*, 132 S. Ct. at 2464.  The district court also did not consider that the core penological goals of sentencing – deterrence, retribution, incapacitation, and rehabilitation – are not served, as they would be for an adult, when a life sentence is imposed on a juvenile offender. *Id.* at 2465.

---

[17] Even the court that recognized certain youthful characteristics as grounds for departure only endorsed consideration of "[l]ack of guidance and education, [and] abandonment by parents," *United States v. Floyd*, 945 F.2d 1096, 1099 (9th Cir. 1991), *overruled by United States v. Atkinson*, 990 F.2d 501 (9th Cir. 1998).  This entailed a materially more limited inquiry than the analysis required by *Miller*.  132 S. Ct. at 2465.

Nor did the mere possibility of a discretionary departure render Mr. Wang's sentence compliant with *Miller*. Indeed, in *Miller* the respondents pointed to juvenile transfer statutes in jurisdictions that gave discretion to courts to transfer juvenile offenders from adult proceedings that required mandatory life sentences. The Supreme Court rejected the claim that this discretion was sufficient to defeat the mandatory nature of the life sentences in those jurisdictions. *Miller*, 132 S. Ct. at 2474. Those transfer statutes did not give courts a meaningful opportunity to fully consider the characteristics of youth or the range of sentencing options that must be considered for juvenile offenders under the Eighth Amendment. *See id.* So too here, where the possibility of a departure in Mr. Wang's case did not give the court meaningful discretion to consider less than life. Before the court could consider a departure, Mr. Wang first needed to – but could not – satisfy a legal standard that did recognize youth as a reason to depart.[18]

At the same time, the district court did consider Mr. Wang's downward departure motion, and did display concern about his young age. *See* 10/2/92 Tr. 71:19–20 (noting that court had "weighed it in considering each and every defendant in this case"). But the district court's consideration of youth as a sentencing factor – although diligent under the law in place in 1992 – occurred under a regime in which a defendant's age could not be considered except in a rare and unusual case. *See, e.g., id.* at 115:12–15 (explaining that departure would require "some factor present in this case that the [sentencing] commission did not adequately deal with."). Mr. Wang's youth clearly did not meet that standard, and so the district court could not find that factor to have been inadequately considered by the Sentencing Commission.

---

[18] Although the district court stated that it was "not imposing any sentence with respect to any defendant in this case simply because it is required by the guidelines," 10/2/92 Tr. 115:5–7, the district court in 1992 had no legal authority to impose a non-Guidelines sentence, or to depart on a basis not recognized under governing law. The court's statement that its sentence would have been appropriate in spite of its obligation to impose a Guidelines sentence cannot substitute for meaningful consideration of youth that *Miller* requires.

To be sure, there was no reason in 1992 for a sentencing court to have concluded that the Eighth Amendment required material distinctions between an adult and a child. But to say that the district court had no reason to act otherwise is not to say that the sentence it imposed on Mr. Wang did not violate the Eighth Amendment. Indeed, the pronouncement of a new and previously unavailable rule is precisely the circumstance in which a successive habeas petition is appropriate. *Roper* and *Graham* recognized a fundamentally different sentencing calculus for juveniles under the Eighth Amendment, and that calculus was newly applied to a sentence of mandatory life without parole for homicide offenders in *Miller*. Those rulings are irreconcilable with Mr. Wang's life sentence because they replace a sentencing framework in which youth is not a factor with one in which youth is the prevailing factor. It would violate the Eighth Amendment to allow Mr. Wang's sentence to stand.

### C.    The Court's Orders Denying the Request of Mr. Wang's Co-Defendant Are Not Controlling

This Court previously addressed, and denied, an application by one of Mr. Wang's co-defendants, Alex Wong, to invoke *Miller* as a basis for vacating his life sentences, on grounds that Wong was not sentenced under "a mandatory life-without-parole sentencing scheme," and that the district court "considered relevant factors" in imposing a life sentence. *Wong v. United States*, No. 12-4985, Dkt. No. 24, at 1–2 (2d. Cir. Feb. 13, 2013). But that denial is not dispositive here. Wong's motion was filed *pro se* with no briefing and without presenting the arguments and legal support discussed above detailing the mandatory nature of a Guidelines sentence and the differences between a court's consideration of youth under a 1992 sentencing

regime and the consideration required by *Miller*. *Wong v. United States*, 12-4985, Dkt. No. 12 (2d Cir. Jan 16, 2013).[19] *Wong* should not control here.

At the very least, Mr. Wang has made a prima facie showing that his sentence was a mandatory life sentence in violation of *Miller*, as there is, at minimum, a substantial question whether Mr. Wang's mandatory Guidelines sentence violates *Miller*. Thus, this is just the sort of petition this Court should allow the district court to consider on a full record. This is because, should this Court deny Mr. Wang's motion, it will not be subject to further review by this Court *en banc* or by the Supreme Court. *See* 28 U.S.C. § 2244(b)(3)(E). Yet, should the Court grant this motion, Mr. Wang will still need to make a full showing of entitlement to relief before the district court, *see* 28 U.S.C. § 2244(b)(4), a decision that will be subject to full appellate review. The Court should not preclude that full review of Mr. Wang's petition by denying this motion.

## CONCLUSION

We respectfully request that this Court grant Mr. Wang's motion.

Date: June 20, 2013

Respectfully Submitted,

Anthony S. Barkow
Brian J. Fischer
Michael W. Ross
Jenner & Block LLP
919 Third Avenue
New York, New York 10022
Telephone: 212-891-1600
Facsimile: 212-909-0815

*Pro Bono Counsel for Movant*

---

[19] Mr. Wong also filed a subsequent motion (with the aid of counsel) invoking *Miller*. *See Wong v. United States*, No. 13-1670, Dkt. No. 1 (2d Cir. Apr. 30, 2013). This Court also denied that motion, including on the grounds that *Miller* is not retroactive (*Wong v. United States*, No. 13-1670, Dkt. 42, at 1 (2d Cir. May 29, 2013)), a finding seemingly abrogated by the more recent *Stone II* Order.

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
..................................................

UNITED STATES OF AMERICA,

vs.                                                    AMENDED
                                                       JUDGMENT    INCLUDING
                                                       SENTENCE    UNDER    THE
                                                       SENTENCING REFORM ACT OF
                                                       1984                CASE
JOSEPH WANG                                            NO.: CR 90-1019 (RR)
..................................................

CHANGE REFLECTED: FINE VACATED


CATHERINE PALMER, ESQ.                                 MICHAEL PADDEN, ESQ.
Assistant United States Attorney                       Defendant's Attorney


THE DEFENDANT: JOSEPH WANG
  ___      Pleaded guilty to Count(s)
   X       was found guilty on Count(s) 1-2,5-7,17,27-28,   after a plea of not guilty.

Accordingly, the defendant is ADJUDGED guilty of such Count(s), which involve the following offenses:

| TITLE AND SECTION | NATURE AND OFFENSE | COUNT NUMBERS |
|---|---|---|
| 18 U.S.C. 1962 (c) | RACKETEERING | COUNT 1 |
| 18 U.S.C. 1962 (d) | RACKETEERING CONSPIRACY | COUNT 2 |
| 18 U.S.C. 1959 (a) (1) | CONSPIRACY TO MURDER | COUNT 5 |
| 18 U.S.C. 1959 (a) (1) | MURDER IN AID OF RACKETEERING | COUNTS 6,7 |
| 18 U.S.C. 1959 (a) (6) | CONSPIRACY TO COMMIT ASSAULT | COUNT 17 |
| 18 U.S.C. 894, 1951 | CONSPIRACY TO COMMIT EXTORTION | COUNT 27 |
| 18 U.S.C. 894 | EXTORTION | COUNT 28 |


The defendant is sentenced as provided in pages 2 through 5 of the Judgment. The sentence is imposed pursuant
to the Sentencing Reform Act of 1984.

  ___      The defendant has been found not guilty on count(s)   and discharged as to such count(s).
   X       The underlying Indictment is dismissed on the motion of the United States.
  ___      The mandatory special assessment is included in the portion of Judgment that imposes a fine.
   X       It is ordered that the defendant shall pay to the United States a special assessment of $400.00 which
shall be due immediately.

(256)

It is further ORDERED that the defendant shall notify the United States Attorney for this District within 30 days of any change of residence or mailing address until all fines, restitution, costs and special assessments imposed by this Judgment are fully paid.

_____
JULY 28, 1995
Date of Imposition of Sentence

_UNKNOWN_
Defendant's Soc. Sec. Number

_____
Hon.  Reena Raggi  U.S.D.J.

_METROPOILTAN CORRECTIONAL CENTER_
_150 PARK ROE, NEW YORK, NEW YORK_
Defendant's mailing address

_____
AUGUST 1, 1995
Date
A TRUE COPY ATTEST
DATED:
ROBERT C. HEINEMANN
ElVIS TAVERAS

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:   LIFE ON COUNTS 1-2,6-7; TWENTY (20) YEARS ON COUNTS 27,28; TEN (10) YEARS ON COUNT 5; AND THREE (3) ON COUNT 17, ALL TO RUN CONCURRENTLY WITH THE SENTENCE IMPOSED ON COUNT 1.

___     The Court makes the following recommendations to the Bureau of Prisons:


 X      The defendant is remanded to the custody of the United States Marshal.
___     The defendant shall surrender to the United States Marshal for this District,
            _____ at _____ a.m./p.m. on _____.

___     The defendant shall surrender for service of sentence at the institution designated by the Bureau of
        Prisons.
            ___    Before 12:00 noon on _____.
            ___    As notified by the United States Marshal.
            ___    As notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

_____

_____

_____

Defendant delivered on _____ to _____ at _____
with a certified copy of this Judgment.

_____
United States Marshal

By:_____

### SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: FIVE (5) YEARS ON COUNTS 1-2,6-7; THREE (3) YEARS ON COUNTS 5,27,28; AND ONE (1) YEAR ON COUNT 17, ALL TO RUN CONCURRENTLY WITH THE SENTENCE IMPOSED ON COUNT 1.


    While on supervised release, the defendant shall not commit another Federal, State, or Local crime and shall comply with the standard conditions that have been adopted by this Court (setforth on the following page). If this Judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:


\_\_\_    The defendant shall pay any fines that remain unpaid at the commencement of the term of supervised release.

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on probation or supervised release pursuant to this Judgment:

1) The defendant shall not commit another Federal, State, or Local crime;
2) The defendant shall not leave the judicial district without the permission of the court or probation officer;
3) The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and completed written report within the first five days of each month;
4) The defendant shall answer truthfully, all inquiries by the probation officer and follow the instructions of the probation officer;
5) The defendant shall support his or her dependents and meet other family responsibilities;
6) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons:

7) The defendant shall notify the probation officer within seventy-two hours of any change in residence or employment;
8) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a Physician;
9) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
10) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
13) The defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court;
14) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

THESE CONDITIONS ARE IN ADDITION TO ANY OTHER CONDITIONS IMPOSED BY THIS JUDGMENT

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------x

UNITED STATES OF AMERICA

        -vs-

CHEN I. CHUNG, et. al.,

        Defendants

---------------------------x

DOCKET NO.: CR-90-1019
Brooklyn, New York
October 2, 1992
10:00 a.m.

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING

BEFORE THE HONORABLE REENA RAGGI
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:        CATHERINE PALMER, ESQ.
                              LORETTA LYNCH, ESQ.
                              U.S. Attorney's Office
                              225 Cadman Plaza East
                              Brooklyn, NY  11201

For the Defendants

Chung:                  MICHAEL HANDWERKER, ESQ.
                              60 Hudson Street
                              New York, NY  10013

Audio Operator:          Jeffrey Howell

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE
- - - - - - - - - - - - - - - - - - - - - - - - -
PARSLEY ASSOCIATES INC.
328 Flatbush Avenue, Suite 251
Brooklyn, NY  11238

K. Rusin

ADDITIONAL APPEARANCES:

For the Defendants

Tran:                    SUSAN KELLMAN, ESQ.
                         225 Broadway, Suite 2100
                         New York, NY  10007


Kwok:                    ALAN DREZIN, ESQ.
                         26 Court Street, Suite 1600
                         Brooklyn, NY  11242

Wong:                    LLOYD EPSTEIN, ESQ.
                         Epstein & Weil
                         225 Broadway
                         New York, NY

Wang:                    MICHAEL PADDEN, ESQ.
                         Federal Defenders
                         50 Court Street, Suite 1103
                         Brooklyn, NY  11201

Cheng:                   CHARLES LEVINE, ESQ.
                         108-18 Queens Boulevard
                         Forest Hills, NY

Chan:                    LAWRENCE SCHOENBACH, ESQ.
                         425 Park Avenue, 26th floor
                         New York, NY  10022

Ngo:                     GERALD E. BODELL, ESQ.
                         Chrysler Building, Suite 3300
                         405 Lexington Avenue
                         New York, NY  10174

K. Rusin

1    THE COURT: -- after that, for those of you who want

2 to know what I am planning, I will deal with Joseph Wang and

3 Alex Wong, then Cheng T. Chung and Brian Chan, and finally,

4 Steven Ng and Danny Ngo. Now, all defense counsel are welcome

5 to stay for the entire sentencing proceeding, but that's the

6 order in which I expect to take the defendants. All right,

7 marshals, if we could have Mr. Tran and Mr. Chung, and then

8 we'll wait for Mr. Kwok until his lawyer arrives. Ms. Palmer,

9 you wish to be heard on something?

10    MS. PALMER: Your Honor, I just had a question for

11 the Court with respect to Mr. Steven Mack's request and how

12 the Court would want --

13    THE COURT: Yes.

14    MS. PALMER:    -- to deal with that in terms of

15 timing.

16    THE COURT: Mr. Mack has asked to be heard by the

17 Court. He had first expressed that desire at the time of the

18 trial. I will hear from Mr. Mack. What I would like to do,

19 however, is first work through these reports for the

20 defendants who are charged with the crime, namely, of killing

21 Mr. Mack's brother, and then before I hear from counsel with

22 respect to their sentences, I will also hear from Mr. Mack

23 with  respect  to that crime.

24    MS.  PALMER: Thank you, Your Honor.

25    THE  COURT:  In order not to put Mr. Mack through

K. Rusin

1  this more than once, he'll be recorded, and for instance, with
2  respect to Mr. Schoenbach's client, we'll simply play back his
3  statement for Mr. Chan and for Mr. Schoenbach when they
4  arrive.  All right, if we could -- Mr. DeForest, if you could
5  help get seats for the defendants who are here.   Perhaps
6  counsel whose clients are not being sentenced would be willing
7  to sit in the spectators' section during this time.

8          Now, Ms. Kellman, you indicated that you wished to
9  be heard before we started, is that right?

10         MS. KELLMAN:  Your Honor, it was on the issue of Mr.
11 Mack's statement and the propriety of that statement, and I
12 would just voice, on behalf of the defense, opposition to that
13 statement.

14         THE COURT:  Why is that, Ms. Kellman?  I hear from
15 almost anybody on anything they want to tell the Court.  Why
16 shouldn't I hear from a family member and give it whatever
17 consideration I think is appropriate?

18         MS. KELLMAN:  But Your Honor, there is -- I can
19 understand the Court hearing from people where there are
20 contested issues or where there are issues of fact that
21 require findings by the Court, but there has been a jury
22 verdict that's resulted in convictions of all the defendants
23 in connection with this particular act, and there being no
24 open question on the liability of that act, Mr. Mack not being
25 a party to this proceeding, it seems to me that there is no

K. Rusin

1 legal basis for him to be testifying.

2 THE COURT: I'm not sure I agree with that in any
3 event, but I'll also note that Mr. Tran engaged in conduct
4 during the trial that was directed to Mr. Mack and his family,
5 basically ridiculing the crime for which he has now been
6 convicted, by laughing over photographs of Mr. Mack and Ms.
7 Scham's dead bodies. While I am not sure that that conduct
8 would in any event alter the guideline calculations in this
9 case, and while I kept it from the jury during the trial in
10 order to avoid undue prejudice, I was satisfied that it
11 happened and I am not prepared to just ignore it in this
12 proceeding, nor to deny Mr. Mack, who was, after all, the
13 party on whom this unnecessary hurt and further anguish was
14 inflicted, I am not prepared to tell him that a United States
15 district court has closed ears to whatever it is he wishes to
16 say, so I'll hear him. I'm not sure what, if any, weight it
17 will be given.

18 Now, what I want to turn to first, though, is the
19 reports that have been written in this case and the
20 submissions that both sides have made. Mr. Handwerker, if I
21 could begin with you and with your client, Chen I. Chung, just
22 note your appearance for the court recorder, please.

23 MR. HANDWERKER: Michael Handwerker, 60 Hudson
24 Street, for the defendant Chen I. Chung.

25 THE COURT: Thank you. And would the Government

K. Rusin

1  counsel please note their appearances for the record?

2  MS. PALMER:  Catherine Palmer.

3  MS. LYNCH:  And Loretta Lynch.

4  THE COURT:  All right.  Now, I have reviewed the

5  presentence report and your letter, Mr. Handwerker.  I have

6  also received a letter from the Government dated September

7  29th.  Have you had a chance to see the Government's recent

8  letter, the sentencing report, and to go over all of this with

9  your client?

10  MR. HANDWERKER:  I have, Your Honor.

11  THE COURT:  Mr. Chung, have you had a chance to see

12  the presentence report in your case?

13  THE DEFENDANT CHUNG:  Yep.

14  THE COURT:  All right.  Mr. Taveras, would you move

15  the microphone at the table close to Mr. Handwerker and Mr.

16  Chung?  Thank you.  Now, Mr. Handwerker, I noted from your

17  letter that you do raise questions about the propriety of

18  giving your client a leadership enhancement for various of the

19  crimes charged.  Other than that, are there any other factual

20  statements in the report to which you wish to take exception?

21  MR. HANDWERKER:  Factually or legally, Judge, no.  I

22  think my letter covers the grounds that I wish to contest the

23  report.

24  THE COURT:  And I'm right that it's on the

25  leadership enhancement?

K. Rusin

1          MR. HANDWERKER: That's correct, Your Honor.

2          THE COURT: I don't think there are any other

3    outstanding legal issues to be resolved in this case, are

4    there?

5          MR. HANDWERKER: Not that I'm aware of, Your Honor.

6          THE COURT: All right. With respect to the

7    leadership enhancement, I have considered both your argument

8    and the Government's submission. I am, of course, prepared to

9    hear both sides further on this. I will tell you both that in

10   reviewing the full report, in light of the trial evidence, I

11   am satisfied that the leadership enhancement is more than

12   appropriate with respect to virtually every crime charged,

13   except perhaps the Fook Ching gang kidnaping, only because the

14   evidence did suggest that this was not a crime planned or

15   conceived of by Mr. Chung, but rather by Mr. Wong, who

16   testified at trial.

17         In an abundance of caution, I would consider not

18   enhancing his role on that particular crime. I recognize what

19   the Government has said, that after the kidnaping was

20   committed by Mr. Wong and after the victim was brought to one

21   of the Green Dragon locations, that Mr. Chung did make

22   decision about how it would continue, but that would be the

23   only one in which, in an abundance of caution, I would

24   consider not enhancing.

25         In virtually every other area, Mr. Handwerker, I

K. Rusin

1   would have to say that the evidence at trial was overwhelming
2   that your client basically conceived of most of the criminal
3   conduct, directed it, and received most of the profits to the
4   extent there were profits.  If it is important to you, I
5   will go through each and every crime in that regard, but it's
6   supported not only by the testimony of Mr. Wong, who I know
7   was subject to vigorous cross examination and attacked in
8   summations but whom I did find credible, but also by the
9   testimony of your client's own cousin, Mr. Yim, who, for
10  instance, testified that it was your client who wanted the
11  location of homes and other places that would be likely
12  robbery sites.  Now, do you want to be heard any further on
13  this enhancement?

14       MR. HANDWERKER:  Judge, I don't want to delay the
15  proceedings further.  I do want to --

16       THE COURT:  Though you do know I have set aside all
17  morning for these sentences, so I don't want anyone to feel
18  rushed.

19       MR. HANDWERKER:  Right.  I do just want to make a
20  brief record regarding what the Court just addressed.  With
21  regard to -- I believe the Court said Yim.  It's Alan Lin.

22       THE COURT:  I'm sorry, Alan Lin, of course.

23       MR. HANDWERKER:  That's okay.  That's the relative
24  of my cousin, and I believe the trial testimony was that Alan
25  Lin was the person interested in making a so called score, and

K. Rusin

1   he went to individuals with addresses or locations that he

2   felt he could derive a benefit from some form of illegal

3   conduct.

4       THE COURT: Mr. Handwerker, I don't agree with that,

5   and I'll get my trial notes if I have to, but Ms. Palmer, Ms.

6   Lynch, wasn't the testimony of Mr. Lin that Mr. Chung came to

7   him and asked him if he knew sites where people would be

8   likely targets for robberies?

9       MS. PALMER: Yes, Your Honor. That was the

10  testimony.

11      THE COURT: Now, Mr. Handwerker, do you want to

12  point me to any trial transcript? Because I have it all in

13  chambers, and if it's necessary for me to review anything,

14  I'll be prepared to do that.

15      MR. HANDWERKER: No, I don't think that's necessary,

16  Your Honor. I just want to bring the Court's attention to one

17  other matter. With regard to the bribery of the corrections

18  officer, my recollection, and I reviewed my notes last night,

19  was that there was a defendant in this case that was

20  incarcerated that reached out to other defendants to have a

21  benefit conveyed upon a law enforcement person.

22      THE COURT: This is Alex Wong.

23      MS. LYNCH: That's correct, Your Honor.

24      MR. HANDWERKER: That's correct, and Santana is the

25  name of the corrections officer.

K. Rusin

1     THE COURT:  Yes.

2          MR.   HANDWERKER:    There   were   court   authorized

3     wiretaps.   We listened to phone conversations.   The only

4     evidence against Chen I. Chung in that criminal venture, so to

5     speak, that  his  name  was  used  by  a  codefendant  with

6     reference  to  speaking  with  him  or  mentioning  it  to  him  or

7     however the Government chooses to describe it.   There was no

8     direct  evidence  of  his  knowledge,  of  his  --  any  decision

9     making capacity to do it, any evidence of procuring money to

10    pay anyone.   There's merely a reference to E. Chung, and we

11    don't know whether he ever knew about it or was even involved

12    in it.   I thought it was --

13          THE COURT:   The coconspirators, however, in their

14    discussions  of  it,  talk  about  it  as  something  that  was

15    approved by him, and given all of the other evidence about how

16    this  enterprise  operated,  where  virtually  no  crime  was

17    committed without your client's approval, I would be prepared

18    to rely on that discussion among the conspirators that he was

19    approving and authorizing the payment of these monies.

20          MS. LYNCH:   Your Honor, if could just add to that.

21          THE COURT:   I also note that even if I were to

22    decrease that particular racketeering act by taking out the

23    enhancement for role in the offense on that one, it would have

24    no impact on the ultimate guideline calculation for Count 1 or

25    2.  Ms. Lynch.

K. Rusin

1    MS. LYNCH: Yes, Your Honor. In that regard, as the
2   Court relies on those taped conversations, I just want to
3   remind the Court of another record reference to support that,
4   which was that after the bribe was conveyed, Chen I. Chung was
5   intercepted in a conversation with Alex Wong asking if even
6   more money was needed to be paid to the corrections officer,
7   so even after the event, he was still checking on the progress
8   of that. That is further record citation for Your Honor's
9   benefit.

10    THE COURT: Thank you, Ms. Lynch. Anything else
11   with respect to the enhancement for role, Mr. Handwerker?

12    MR. HANDWERKER: Nothing further, Your Honor.

13    THE COURT: I do want to say as emphatically as I
14   can, particularly with the crimes of violence that were
15   committed by this organization with respect to the robberies
16   and with respect to the extortions, that the evidence at trial
17   left me not simply with a view that your client was the head
18   of this operation by a preponderance of the evidence, I
19   thought the evidence was overwhelming in this regard.

20    All right, now, that leaves us, then, to calculate
21   the guidelines. Having rejected the requests to not treat him
22   with leadership enhancement, is there any other challenge to
23   the guideline calculations as noted by the probation
24   department?

25    MR. HANDWERKER: No other objections on those

K. Rusin

1 calculations. Judge, --

2 THE COURT: Yes.

3 MR. HANDWERKER: -- are you going to -- can I

4 respond to the letter submission by the Government that I

5 received yesterday?

6 THE COURT: Of course.

7 MR. HANDWERKER: I really won't respond to any of

8 the factual allegations, because the Court is well aware of

9 the testimony here, and I've made my record by way of my

10 submission, but the last paragraph in that letter, the

11 Government --

12 THE COURT: With respect to downward departure?

13 MR. HANDWERKER: Yes.

14 THE COURT: Because I will deal with that after I

15 calculate the guidelines, if you'd just let me do that first.

16 Then I was going to address the downward departure request.

17 MR. HANDWERKER: Okay, Your Honor.

18 THE COURT: All right. I would calculate the

19 guidelines to find that Chen I. Chung has a total offense

20 level of 52, the highest ever known to this Court in any

21 sentence it's had to impose. With a criminal history category

22 of one, he would be required to be given a lifetime term of

23 incarceration under the guidelines, a three to five year term

24 of supervised release, a $25,000 to $250,000 fine, and a $1400

25 order of special assessment, $50 on each of the 28 counts of

K. Rusin

1    conviction.

2           There, I believe, is an error in the presentence

3    report because it calculates Count 9 as a count of conviction,

4    which is an error, so it's 28 rather than 29 counts of

5    conviction.   All right, Mr. Handwerker, your request for

6    downward departure is based primarily on consideration of your

7    client's youth and this being his first offense.      The

8    Government has opposed downward departure.   Let me hear from

9    you.

10          MR. HANDWERKER:   Once again, Judge, the guideline

11   calculation I'm not taking exception to.    What I'm taking

12   exception to is the constitutionality of the guidelines in and

13   of themselves, specifically with regard to --

14          THE COURT:   On grounds other than have been argued

15   to the Supreme Court and the Second Circuit already?

16          MR. HANDWERKER:   No new grounds, Judge.

17          THE COURT:   All right, because of course, I am bound

18   to follow those decisions upholding the constitutionality of

19   the guidelines.

20          MR. HANDWERKER:   I'm aware of that.    Judge, the

21   defendant sits here.   He's 23 years of age.    He has

22   essentially led a law abiding life up until this conviction.

23   I understand the Court has heard evidence of violent heinous

24   crimes, but the Court has not heard evidence of Chen I.

25   Chung's involvement in violent activity.   There is no question

K. Rusin

1   that he associated with people who were accused and convicted

2   of criminal activities, but this defendant -- there has been

3   no evidence that he ever put a gun to anyone's head, that he

4   assaulted anyone.

5       THE COURT: No, he ordered others to do it. That's

6   the evidence at trial.

7       MR. HANDWERKER: Most respectfully, Judge, that

8   evidence came through the form of Sonny Wong, and I believe,

9   contrary to the Court's finding, that he wasn't a credible

10   witness.

11       THE COURT: Well, the jury found to the contrary,

12   and as I said, I would find similarly. Mr. Wong certainly

13   gave the full picture, but it was not the Government's sole

14   evidence in this case. The wiretaps reveal your client's

15   involvement in this enterprise as much as Mr. Wong's

16   testimony. Go ahead, Mr. Handwerker.

17       MR. HANDWERKER: Judge, my objection is -- my

18   request for a downward departure based upon his age has been

19   noted in my letter. What I was asking the Court to address

20   very briefly is the last statement in the Government's

21   response to my request for a downward departure states that my

22   client's callous disregard and cavalier attitude displayed

23   throughout the trial certainly mitigates any downward

24   departure.

25       Most respectfully, Your Honor, you sat here as well

K. Rusin

1 as I did.  Mr. Chung sat next to me.  Mr. Chung never spoke

2 out, never threatened anyone.  He helped me conduct the trial

3 and I would just take exception to that and ask the Court to

4 note it for the record.

5       THE   COURT:    While   I'll   agree   that   certain

6 defendants' conduct at the trial was more disruptive than your

7 client's, all of the defendants engaged in conduct during this

8 trial that I suspect made the lawyers' roles very difficult,

9 because they made it clear that as testimony was being offered

10 about the most violent, disturbing and horrendous type of

11 criminal activity, that they were actually enjoying listening

12 to their escapades.  And to that extent, I saw no evidence of

13 remorse by your client at all during the trial.

14       I  have  no  need  to  consider  this  to  enhance  his

15 sentence, and I do not.  The crimes speak for themselves, and

16 it is for those crimes that I intend to punish him, not for

17 the conduct during the trial.  But certainly nothing about his

18 conduct during the trial operates in his favor.  Now, Ms.

19 Palmer, you're standing, so I assume you want to be heard in

20 response.

21       MS.  PALMER:   Just  briefly,  Your  Honor.   The

22 Government, as is evidenced by its letter, believes there is

23 absolutely no basis whatsoever for a downward departure motion

24 with respect to Mr. Chung.  The only basis proffered is his

25 age and lack of criminal history.  Clearly, if anything was

K. Rusin

apparent from this trial, it was apparent that Mr. Chen I. Chung was the leader of a very, very violent gang that did inflict, as we said in our letter, a reign of terror on the Asian community in Elmhurst, and Chen I. Chung may not have had a prior conviction, but it was clear from the course of the testimony that at least since the middle of 1989 through the time of their arrest he was involved in numerous heinous crimes, ordering those crimes to be committed.

He ordered the cold blooded killing of Tina Scham and Tommy Mack. He ordered the killing of the owner of the Tian Chow restaurant. He ordered the killing of the owner of the Broadway Noodle. He had a plan to kill Carol Wong, one of the witnesses, and to burn her body so that the evidence would not be found. There is absolutely no basis for this Court to consider Mr. E. Chung's age as a reason for a downward departure, given his very knowing, and indeed, apparently very enjoyable reign as the operational leader of the Green Dragons.

And his attitude during the trial, although we're not asking the Court to upwardly depart on the basis of that, was certainly reflected in at least a few instances, one of which Chen I. Chung drew a picture of Linda Peng's husband, one of the very first civilian witnesses to testify in this court. He drew a picture of that witness during the middle of the witness's testimony. That, of course, was made a court

K. Rusin

exhibit.

He also made some comments directed, apparently, at Sonny Wong in connection with the comments that Tung Tran made. The Court did not allow those to go to the jury, but Chen I. Chung made those comments. And that's the reason for the last line in the Government's letter. Those are just some instances of the attitude that Chen I. Chung displayed and continued to display even throughout the last status conference here. We believe very strongly there is absolutely no basis for a downward departure, given his role in the offense.

THE COURT: I do not find this an appropriate case for downward departure. The age of the defendant is considered by the Court, although age is generally not a factor for downward departure. Nevertheless, I recognize that a life sentence for someone who is 23 years old is very different from a life sentence for someone who is 73 years old. I have given this careful consideration, but the horrible crimes ordered by this defendant require a sentence at the level the guidelines provide. Indeed, even without the guidelines, I would think that such a sentence was mandated with respect to Mr. Chung.

Therefore, I will not downwardly depart. Now, before hearing from you and your client, Mr. Handwerker, I do wish to afford Mr. Mack the opportunity to speak. He did ask

K. Rusin

1  for it, and your client is, after all, convicted of ordering

2  the murder of his brother and of Tina Scham.  Is Mr. Mack

3  here?

4      MS. PALMER:  Yes, Your Honor.

5      THE COURT:  Mr. Mack, if you'd like to come forward

6  and say anything, you can come right to the front of the

7  court.  Marshals, could you also bring Mr. Kwok out?  Mr.

8  Mack's comment pertains to him, and his lawyer is now here.

9  I'd appreciate it.  Just one moment, Mr. Mack.

10     (Pause in proceedings)

11     THE COURT:  Mr. Kwok, I'm going to be dealing with

12  your sentencing probably sometime in the next half hour.  One

13  of the crimes for which you are convicted is the murder of

14  Tina Scham and Tommy Mack.  Mr. Mack's brother has asked to

15  address the Court.  I am now in the middle of Mr. Chung's

16  sentence, but so that you can hear it and I don't have to ask

17  Mr. Mack to repeat himself, I've asked the marshals to bring

18  you out.  Mr. Mack, what is it that you wish to say to the

19  Court?

20     MR. MACK:  It's basically how the whole case have

21  impacted my family and our feelings, and also it's not just

22  that my brother has been -- his life has been terminated

23  abruptly, but it's much more than that.  The suffering goes on

24  forever, and I'd like to address that, if I may.

25     THE COURT:  Yes.

K. Rusin

MR. MACK:  Your Honor, I wish I could say thank you to you for the opportunity for me to speak here in your court, but I can't, for it was such a great, great family tragedy that brings me and my family here today.  It was a tragedy which has inflicted so much pain and suffering on us that even though it's been two years and seven months, the sorrow and pain has not subsided a bit, nor has the nightmares stop at all.

All this excruciating pain, as you now clearly know, and everybody in this court knows, was the direct consequence of the brutal, senseless and cold blooded murder of my beloved brother, Tommy Mack, by this bunch of terrorists.  Many a night since the incident I wake up from nightmares realizing that my brother Tommy is forever gone from my life.  It just tore my heart and my soul thousands and thousands of pieces, and there were many, many times I come home from work seeing the puffy red teary eyes of my parents.  It just -- the pain is just unbearable.  And all this is for what they have done.

I remember years ago that my family have just arrived in America.  We were very, very poor and desolate, and at that time, Tommy was only 10 years old.  Without any friends and also handicapped to language, as everybody in the whole family, Tommy has not only not backed down from all these difficult challenges ahead, he actually strive very, very hard to first overcome the language barrier and then

K. Rusin

1   many, many other obstacles onto achieving the academic

2   excellence, at least in my mind.

3       At the age of 17, Tommy has achieved four federal

4   licenses qualifying him to work in practically all areas in

5   the aircraft maintenance field, and at that same age, he

6   launched his career in the aviation industry maintaining jumbo

7   jets. As our father has always speak -- or spoke proudly of

8   his most beloved son, Tommy is a boy who maintains jumbo jets,

9   but yet he is still too young to qualify fully to operate a

10   land vehicle. That's how proudly that we felt for this boy.

11       And through the years, Tommy has brought a lot of

12   joy and laughter to my family, especially during holiday

13   seasons like Thanksgiving and Christmas. There was always

14   festivity in our home during these occasions. And I myself

15   have many, many occasions enjoyed the time that I spent

16   together with Tommy decorating the Christmas trees in our home

17   and going skiing together and doing many, many other

18   activities together. We grew up together. And all this --

19   all this -- come to an abrupt end on February 23, 1990.

20       I still remember very, very vividly the shock and

21   disbelief when we first heard of Tommy's disappearance,

22   because he was such a kind and well liked boy, young man, who

23   not only dearly loved by the family, but also adored by anyone

24   who ever acquainted him. It was extremely, extremely

25   difficult for us to comprehend what could have happened to

K. Rusin

such a fine, fine young man. The ensuing two weeks was so agonizing that it felt like an eternity.

During the 15 days between February 23rd, 1990 and March 10, 1990, my family had literally went through hell, if there is such a place. I remember those days that I and my other siblings driving endlessly for hours and hours and hours around New York City and its suburb, hoping, no matter how remote it is, that we can actually find my beloved brother Tommy and bring him home safely. Then came the devastating moment that I and my family would never, ever forget for the rest of our life. It was March 10, 1990, I think around 3:00 a.m. in the morning.

We were informed of what we feared the most. Tommy has been found brutally murdered along with Tina Scham in Long Island. At that instance, the whole universe around us just collapse on us. Why? Why, I ask. What kind of creature on earth could have committed such an atrocity? Your Honor, Tommy was only 22 years old at that time. He was so young, so bright, and so full of life. [Pause] And he has every, every single right, as every individual in this courtroom, every decent individual in this courtroom, to live and enjoy life to the fullest.

But no. No longer. Tommy can no longer do that. Tommy's been robbed of his most basic human right that is guaranteed by the constitution of this country, by this bunch

K. Rusin

of cold blooded trigger happy terrorists. My heart aches every time I think of how my brother must have gone through for the last hour of his life, first, being abducted at gunpoint by a bunch of strangers whom he did not even know, and then forced to listen to the most gruesome, gruesome details of the kidnapers' plan to drive them to a secluded area and then have them killed.

I cannot imagine how any decent human beings could subject another human being to such a cruel psychological and physical torment, and what has my brother done to deserve all this? Nothing. Nothing! Your Honor, I and my family come to you today in this court to seek justice. Even though my brother has fallen victim to this society that is becoming increasingly desensitized of the violence against fellow human beings, but I still believe firmly that my adopted country, America, is still -- still -- the land of justice for all, and I have faith, no matter how people tell me to the contrary, I still insist that and I have faith that our legal system still works, and I believe deep down in my heart that justice will always prevail.

Your Honor, I plead to you that this bunch of despicable characters should deserve the most severe punishment of the land, for if, god forbid, if they were left to roam the street again, I am very sure -- and I am positively sure that there will be many, many more innocent

K. Rusin

1  victims and families who will have to face what our family had

2  faced, the inhumane treatment and what we have endured for the

3  past two years and for the rest of our life.

4  And in your deliberation for sentencing for these

5  beings, I plead to you once more that please keep in mind or

6  bear in mind that these are beings lacking the least bit of

7  conscience or decency, and through their blood stained hands,

8  they have caused too many tragedies, and finally, and most

9  important of all, please, please take into consideration of

10  the inhumane sufferings that I, my family, my brothers, all

11  the victims and their families who have to suffer from this,

12  and we are the one who have to bear all this anguish and agony

13  for the rest of our days.

14  THE COURT: Mr. Mack, before you go and sit down

15  again, let me thank you for your remarks. Let me also say

16  that having heard the evidence at trial, I think I appreciate

17  the seriousness of the crime that involved the death of your

18  brother, but to say that I understand the pain and suffering

19  of your family would be inaccurate. I am sure that no one can

20  fully appreciate what you and your family have had to endure.

21  If perfect justice were mine, I would be able to give you back

22  your brother. That I cannot do. No one can ever do that. I

23  have to do justice according to the law, considering all of

24  the facts before me. That I can promise you I will try to do

25  consistent with all my obligations. Thank you very much for

K. Rusin

1 speaking to the Court.

2        Mr. Handwerker, if you and Mr. Chung would step

3 forward, please. Mr. Handwerker, I'll be happy to hear you as

4 to anything you'd like to say on behalf of your client.

5     (Off the record discussion)

6        THE COURT: Mr. Chung is asking for something?

7        THE DEFENDANT CHUNG: Why do you cut out the tape

8 that you wiretap my telephone?

9        THE COURT: I'm sorry. I don't understand the

10 defendant's question.

11        MR. HANDWERKER: I think, Judge, what the defendant

12 is referring to, and a point that will be raised on appeal, is

13 his contention that the court authorized conversations which

14 were overheard by the Court, that there were pieces taken out

15 by the Government and not played at trial. He's discussed

16 this with me. I have told him that we had an opportunity to

17 look at the tapes, and best efforts were made to inspect them

18 for their authenticity, but I believe it's a ground that he

19 wishes to pursue for appellate purposes.

20        THE COURT: Was a challenge made to me as to the

21 authenticity of the tapes or tampering with them? I don't

22 recall, Mr. Handwerker.

23        MS. LYNCH: No, Your Honor. There was no challenge

24 at trial. My recollection is that there was a stipulation,

25 not to the accuracy. We had the translator testify. The only

K. Rusin

1  information I can offer the Court is that there were portions

2  of the tape that dealt with fairly obscene references to young

3  women that were usually calls from the prison facilities that

4  were redacted, and I believe we did discuss those at a number

5  of status conferences.

6  In fact, there was a motion made by another defense

7  counsel to have further just obscene statements per se deleted

8  that the Court considered was too late to allow it to be done

9  in a timely fashion.  So the only portions of tapes that were

10  not played -- in fact, the tapes were played, but the only

11  portions of transcripts that were not translated and given to

12  the jury were fairly obscene references.  However, they were

13  only redacted after a full version had been shown to defense

14  counsel in discovery well before the trial.

15  THE COURT:  Well, let me say, of course, to Mr.

16  Chung that he has the right to appeal, and to the extent he

17  believes that the Court committed any errors at trial, he can

18  raise that with the Court of Appeals.  I do not recall there

19  being any challenge made to me suggesting any kind of

20  tampering with the tapes, for instance, sections of

21  conversation that were absolutely omitted on the copies given

22  to the defense.

23  To the extent the Government did not play each and

24  every tape that was recorded in this case, I can only say that

25  I was grateful for that, and that if the defense thought that

K. Rusin

1  there were other tapes that had information that would have
2  been useful to the defense, the defense was in a position to
3  play them.    Now, Mr. Handwerker, is there something else
4  that's being argued to me that perhaps I'm not appreciating?

5          MR. HANDWERKER:    I'm prepared to go forward with
6  what I would like to address the Court with.

7          THE COURT:    Why don't you take a moment with your
8  client, just to make sure that if there's anything else along
9  these lines he wants me to address today that I give it
10  consideration?

11         MS. PALMER:    Judge, just along those regards --
12  along those lines, the Court may well recall that because
13  there were difficulties with getting copies of tapes to
14  defense counsel, under the Court's order the Government made
15  numerous copies of all the wiretap tapes that were done here,
16  and turned over to various floors of the MCC, as the Court may
17  recall.

18         THE COURT:    I do recall that.    I think there were
19  four or five copies in the end.

20         MS. PALMER:    There were at least four or five copies
21  provided.    There was another set for defense counsel provided,
22  and there has never been a challenge raised throughout all of
23  the pretrial proceedings, or even, in fact, during the trial
24  as to any allegations of tampering or any questions about
25  tapes not being fully played that counsel had any question

K. Rusin

1   about whatsoever, and there was a stipulation as to

2   authenticity of the tapes, so this is certainly the first time

3   that the Government is hearing any of these allegations, and

4   in fact, there was just one instance with respect to

5   translation of one of the tapes that was, in fact, raised by

6   Mr. Padden, as Your Honor may recall, and we had Mr. Lau come

7   back and translate.

8   So there was even some attempts by defense counsel

9   to question some of the accuracy of the translation, but there

10   was never an issue as to tampering or authenticity of the

11   tapes.

12   THE COURT: All right, Mr. Handwerker, is there

13   anything else your client wants to pursue in this regard?

14   (Off the record discussion)

15   MR. HANDWERKER: Judge, I've just conferred with my

16   client, Chen I. Chung, and he's asked me to speak on his

17   behalf. At this moment, he has no other matters to raise with

18   this Court. Judge, the most important thing I could stress to

19   Your Honor on this important day on behalf of Chen I. Chung is

20   that he too is a human being, and he is a young man. It's

21   very difficult to stand up here now after hearing the

22   emotional speech we just heard from a relative of a deceased

23   and a victim of this case, but I must -- it's my obligation,

24   and I feel strongly about raising the issue to the Court that

25   our society is not one of revenge and an eye for an eye.

K. Rusin

1        Our society is not one where we have a death

2 penalty. This is someone -- as Your Honor indicated earlier,

3 this Court is bound -- I understand it's bound by the

4 guidelines, but essentially, this is a death sentence that

5 this Court would have to impose under these guidelines to this

6 defendant. And that's why --

7        THE COURT: Mr. Handwerker, you perhaps know that I

8 am the Judge to whom the argument that a life sentence is a

9 death sentence is perhaps most inappropriately made, having

10 only recently tried a case in which it was argued to me that a

11 life sentence was far more humane than a death sentence, but I

12 do understand your point.

13        MR. HANDWERKER: Judge, just speaking to the case

14 itself, and I don't want to relive the facts. We're all very

15 much aware. The Government's essential theory was that this

16 defendant became a leader of a gang in 1986. As is plainly

17 clear from the accusations in this case, the criminal conduct

18 alleged here took place from a period of 1989 and forward.

19 Most respectfully, the testimony that we heard from Sonny

20 Wong, and I don't want to beat a dead horse, because

21 apparently the jury did find him credible based upon their

22 verdict, but this defendant continues to profess his

23 innocence, and we'll vigorously appeal the case.

24        But I'm asking this Court to depart from the

25 guidelines based on the fact that he is young, that he has

K. Rusin

never been in trouble. Your Honor, every week on Friday I would get a call from his mother. His family owns a restaurant in Buffalo, New York. She's here in the court today. This is a human being with a working class family. Perhaps he went astray. Perhaps he was used by someone who is a fugitive in a different country.

Judge, I would just ask you to take all the facts into consideration, and just one little indication of why I think he's different than what the Government is making him out to be, a few moments earlier, the Government mentioned an incident with Special Agent Becky Chan and the defendant Chen I. Chung. I think the Court recalls some -- a witness had -- I think it was Sonny Wong who left the witness stand, and there was some type of an incident regarding his leaving, the defendants being taken out --

THE COURT: Oh, I recall the incident.

MR. HANDWERKER: There was some form of an allegation against Chen I. Chung regarding misconduct, and what we heard from Special Agent Becky Chan is that the defendant Chen I. Chung looked at the Government agent and said can you believe what he's doing to me. This is not an indication of someone threatening a witness, cursing at the Government. This is someone who is in disbelief that this man was testifying in the fashion he did.

THE COURT: Mr. Handwerker, your client does have

K. Rusin

1   the right to appeal, and if he wishes to pursue appeal on the

2   grounds that the Government failed to meet its burden of

3   proof, he can raise that. But I must tell you that to argue

4   to me that your client professes his innocence and that he's

5   not guilty of this crime is not likely to get a receptive

6   hearing. Not only am I bound by the jury's verdict, but I

7   simply have no doubt about his involvement as the leader of

8   this organization. But I am prepared to hear you as to

9   anything else you wish to say on his behalf.

10          MR. HANDWERKER:  Judge, I don't have anything else

11  to address the Court, other than what's already down in the

12  record.

13          THE COURT:  Thank you.

14          MS. KELLMAN:  Your Honor, I apologize for the

15  interruption, but with the interpreter at the podium, there's

16  nobody translating.

17          THE COURT:  Well, in any event, this is a matter

18  unique to Mr. --

19          MS. KELLMAN:  Yes, Your Honor.

20          THE COURT:  -- Chung, and I would be prepared to

21  have an interpreter for your client. Indeed, I could have

22  your client excused during this time, so I'm not going to tie

23  up interpreters, but we have an extra one, and I'll ask for

24  translation. But this is unique to Mr. Chung.

25          MS. KELLMAN:  Yes, Your Honor. I was just pointing

K. Rusin

1   -- as long as there are two, I'd appreciate it if my client

2   could hear the translation.

3           THE COURT:  Mr. Chung, you have the right to be

4   heard by the Court before I sentence you, and if there's

5   anything you would like to say, I am prepared to listen to

6   you.

7           THE DEFENDANT CHUNG:  I feel it's not fair.  There's

8   no law.  What this called law?  There are Green Dragons, but

9   there are many different groups of Green Dragons.  Things done

10  by someone else you cannot put the whole responsibility to us.

11  And can you -- Judge, can you give me back my car?

12          THE COURT:  I'm sorry, I didn't hear the last part.

13          MS. PALMER:  I think he wants his car back, Judge.

14          THE DEFENDANT CHUNG:  Can you return the bail money

15  and my car to me?

16          THE COURT:  Once you are sentenced, the Government

17  will be able -- or your lawyer can apply for the release of

18  bail.  Was there money posted?  The defendant's in custody.

19          MS. PALMER:  No, Judge.

20          THE COURT:  All right.  There's no bail money

21  posted, Mr. Chung.

22          MR. HANDWERKER:  He's talking about -- not this

23  case, a related matter.  The subject matter of this indictment

24  -- one of the cases that some defendants were being held on on

25  state charges, which was -- it's not an issue for this Court.

K. Rusin

1   THE COURT: It's not a concern of mine, Mr. Chung.

2   Is the Government forfeiting the automobile that it seized?

3   MS. LYNCH: Your Honor, I've consulted with the FBI

4   agent and I don't believe they will be forfeiting the

5   automobile, but I cannot say definitely at this time.

6   THE COURT: Would you have the decision made on that

7   by the end of this month, and if the Government's not going to

8   institute forfeiture procedures, contact Mr. Handwerker as to

9   who in Mr. Chung's family will accept receipt of the car. You

10  see, Mr. Chung, you are going to have no use for it, but I

11  will see to it that if the Government is going to release the

12  car, that some member of your family has the opportunity to

13  recover it. Now, is there any other concern you want to raise

14  with me?

15  THE DEFENDANT CHUNG: No.

16  THE COURT: Ms. Palmer, Ms. Lynch, does the

17  Government wish to be heard?

18  MS. PALMER: Your Honor, I don't think that the

19  Government could say anything more than what Steven Mack had

20  to say and what the Government has to say in its letter with

21  respect to Mr. E. Chung, but just briefly, to respond to Mr.

22  Handwerker's allegation that somehow Chen I. Chung was just

23  being used by Fu Chow Paul, I would call the Court's attention

24  to the very last tape that was played at this trial, which was

25  a tape of a conversation intercepted between Chen I. Chung and

K. Rusin

1  Fu Chow Paul after Chen I. Chung had been arrested on the
2  instant offense, where Chen I. Chung, through his girlfriend
3  Katie, was speaking to Fu Chow Paul in China about having Fu
4  Chow Paul use his influence to try to find Sonny Wong's
5  family. And that's all we'd like to say with respect to that,
6  Judge.

7          THE COURT:  Mr. Chung, in sentencing you today, I
8  wish to make certain things very clear to you. First of all,
9  I consider you today, as I have considered you on each and
10  every occasion when you have appeared before the Court, as a
11  unique human being, and to that extent, sentencing you is a
12  very difficult matter for the Court. I recognize your youth.
13  I recognize the severity of the sentence the law calls for and
14  what that will mean to you.

15          I also want to emphasize that this sentence is not
16  imposed in order to work any kind of revenge. Mr. Handwerker
17  is right that that is not the function of the law. But the
18  law does seek to make statements through the punishment the
19  courts impose, statements that reflect a society's view of
20  certain criminal conduct, and there is no criminal conduct
21  that society can make as strong a statement of abhorrence
22  about as murder. Now, throughout this trial, the Court's
23  focus has been somewhat singular. It has been on you and on
24  the other codefendants in the case. The Court's focus has
25  been on ensuring fairness to you, ensuring justice to you

consistent with the law of this country.

Today, I still focus on you, but there are others who demand to be heard by the Court today, and I do not mean simply Mr. Mack who spoke a few moments ago. There are people who demand to be heard today whose voices will not actually be heard in the courtroom, but who nevertheless speak to me. I must listen to Mr. Yan, Mr. Ting, Mr. Galavan, Mr. Chan, Ms. Scham and Mr. Mack, none of whom will ever speak to anyone again, in large part as the result of the orders you gave to have them killed.

Mr. Chung, the sentence in this case is necessarily complicated by virtue of the fact that there are 28 counts of conviction. Let me say it will be, however, a life sentence. Dealing with each count, let me note as follows. With respect to Count 1, I sentence you to life incarceration, a five year term of supervised release, and a $250,000 fine. With respect to Count 2, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 3, I sentence you to ten years incarceration, three years supervised release, and a $250,000 fine. With respect to Count 4, I sentence you to life incarceration, five years supervised release, and a $250,000 fine.

With respect to Count 5, I sentence you to ten years incarceration, three years supervised release, and a $250,000 fine. With respect to Count 6, I sentence you to life

K. Rusin

incarceration, a five year term of supervised release, and a $250,000 fine. With respect to Count 7, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 8, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine.

With respect to Count 11, I sentence you to ten years incarceration, three years supervised release, and a $250,000 fine. With respect to Count 12, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 13, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 14, I sentence you to ten years incarceration, three years supervised release, and a $250,000 fine. With respect to Count 15, I sentence you to ten years incarceration, there years supervised release, and a $250,000 fine.

With respect to Count 16, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 17, I sentence you to three years imprisonment, one year supervised release, and a $250,000 fine. With respect to the following counts, Counts 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32 and 35, I sentence you on each to 20 years incarceration, three years supervised release, and a $250,000 fine.

K. Rusin

All terms of incarceration will run concurrently as will all terms of supervised release and the fines.  I do further impose a $1400 order of special assessment which represents $50 special assessment on each of the $28 counts of conviction.  I am required to do that under the law.  Is there anything else?

MS. PALMER:  Judge, there are, I believe, underlying indictments.  This was a superseding indictment.  The Government would move to dismiss those at this time with respect to Mr. Chung, as well as the related indictment that was superseded shortly before trial.  We would move to dismiss those counts also with respect to Mr. Chung at this time.

THE COURT:  That would be granted.  All right, Mr. Chung has the right to appeal.  Mr. Handwerker, you'll file timely notice of appeal for him?

MR. HANDWERKER:  I will, Your Honor.

THE COURT:  Thank you very much.  Marshals, Mr. Chung is excused.

(Pause in proceedings)

THE COURT:  I'd like to turn now to the sentencing report for Tung Tran.  I have had the opportunity to review it as well as your letter, Ms. Kellman, of August 21st and the Government's of September 29th.  Before we actually begin, Ms. Kellman, can I get you to formally note your appearance for the record?

K. Rusin

1        MS. KELLMAN:  Susan Kellman for the defendant Tung

2   Tran.

3        THE COURT:  All right.  Ms. Kellman, have you had an

4   opportunity to see the Government's letter and the presentence

5   report and to go over it them with your client?

6        MS. KELLMAN:  Yes, Your Honor, I have.

7        THE COURT:  Mr. Tran, have you had a chance to see

8   these documents and to discuss them with your lawyer?

9        THE DEFENDANT TRAN:  Yes, Your Honor.

10       THE COURT:  All right.  Are there -- Ms. Kellman,

11  with respect to your letter, I did note that there are certain

12  objections, for instance, the use of a 1989 youthful offender

13  conviction with respect to your client's criminal --

14       MS. KELLMAN:  Your Honor, may I have just a moment?

15  I'm sorry to interrupt the Court, but there seems to be some

16  difficulty with the interpretation.  I just want to find out

17  what it is.

18       THE COURT:  Take a moment with your client,

19  certainly.

20     (Pause in proceedings)

21       MS. KELLMAN:  I apologize for interrupting.

22       THE COURT:  Not at all.  I was noting the objections

23  I had seen in your letter.  You object to the use of a 1989

24  youthful offender conviction for purposes of your client's

25  criminal history record.  The Government agrees that this

K. Rusin

should not be calculated and I'm prepared to calculate the guidelines without that. I do not think it makes a difference to the guideline calculation.

There was also a question on whether your client had been convicted of a robbery as reported in paragraph 185. Your letter suggested you might be submitting more information in that regard.

MS. KELLMAN: I have checked into that, Your Honor. We have had an investigator pull the file, and in fact, he was convicted of that.

THE COURT: All right, so that would remain, and that would mean that his criminal history category would stay at three?

MS. KELLMAN: Yes, Your Honor.

THE COURT: All right, thank you. There is also the objection to the inclusion of paragraph 44 in the report, since Mr. Tran was acquitted on that charge. Am I correct in noting that objection?

MS. KELLMAN: Yes, Your Honor.

THE COURT: All right. I would simply ask the probation department to note his acquittal. Otherwise, I'll allow the paragraph to remain, but I would ask the probation department to note that Mr. Tran was acquitted on that charge. The other arguments that you make I wasn't sure were really objections. For instance, with respect to the extortion

K. Rusin

1 crimes of which your client was convicted, you ask me to view

2 your client as Sonny Wong's messenger in doing that crime, is

3 that right?

4 MS. KELLMAN: Some of the other arguments, Judge,

5 really go to sentencing and weight, although there is the

6 conspiracy to kill a female witness, the Court may recall.

7 That's dealt with in paragraph 42 of the report. That -- Mr.

8 Tran was not charged in that count.

9 THE COURT: Yes. Now, does the Government wish to

10 be heard on whether or not there should be any reference to

11 Mr. Tran in paragraph 42?

12 MS. PALMER: Your Honor, if there is a reference, we

13 would not object to his name being deleted.

14 THE COURT: All right, I'll ask the probation

15 department to delete Mr. Tran's name from paragraph 42

16 respecting the attempt to murder a female witness, Carol Wong.

17 MS. KELLMAN: Just so that it's clear, Judge, the

18 Government says 'if' it's included. It says between October

19 and --

20 THE COURT: Oh, it is. It is.

21 MS. PALMER: It is, yes.

22 THE COURT: And I'll ask for its deletion. All

23 right. Now, there's also some argument made with respect to

24 paragraphs relating to the Hampton Street robbery and the

25 treatment of the rape -- or rapes, I should say, that took

K. Rusin

place in the course of that robbery. Ms. Kellman, let me say something about my position at trial and perhaps then hear you on what your concern is here.

At trial, there was an -- I believe a second degree assault charge that was dismissed by the Court at the Rule 29 stage because I found that there was no evidence of assault proved. In fact, however, as I heard at the suppression hearing, there was a rape committed. Had the Government before trial proffered the rape in support of its assault theory, I might very well have allowed it to come into evidence at trial. I excluded the rape testimony under the mistaken impression, perhaps, that it did not pertain to any charged crime, and it was not argued to me, I don't believe, that it related to the necessity to prove injury in the assault charge, and so it was dismissed.

But now for purposes of sentencing and considering the Hampton Street robbery, I don't think I can ignore the fact that there were rapes committed in the course of that robbery. What is it that the defense is asking with respect to that?

MS. KELLMAN: Well, I would say at the outset, Judge, we would argue that the probation department requests four point departure because of the infliction of serious bodily injury, and in the strictest sense, serious bodily injury is injury that is designed to or could, because of

K. Rusin

reckless disregard, cause death.

THE COURT: No, I don't think that's how it's defined in the guidelines, which are 1B1.1. Now, the Government is prepared to treat this simply as bodily injury, but I'm not sure that I agree with that. Bodily injury in the guideline means any significant injury, example, an injury that is painful and obvious or is of a type for which medical attention ordinarily would be used.

And it points out as used in the guidelines, the definition of this term is somewhat different than that used in various statutes. By contrast, serious bodily injury is defined under the guidelines to mean injury involving extreme physical pain or the impairment of the function of a bodily organ, member or mental faculty, or requiring medical intervention such as surgery, hospitalization or physical rehabilitation.

Finally, the guidelines also define permanent or life threatening bodily injury, meaning injury involving a substantial risk of death, loss or substantial impairment of the function of a bodily member, organ or mental faculty that is likely to be permanent, or an obvious disfigurement that is likely to be permanent. The three types of injury result in, I believe, two, four and six point enhancements under the guideline for robbery.

Now, dealing just with the bodily injury and serious

K. Rusin

bodily injury categories, since bodily injury means an injury

that is painful and obvious, I would assume smacking someone

in the face would constitute bodily injury, since the pain

would be obvious.  But to call a rape the equivalent of that

as opposed to serious bodily injury I think is to denigrate

the severity of that crime.  Serious bodily injury is supposed

to involve extreme physical pain.  Now, if you'd like a

hearing on this, Ms. Kellman, I guess I could hold a hearing,

but I did hear from Ms. Peng during the suppression hearing

and I do recall her testifying with great difficulty about the

rape and about being in tears when I asked her to describe

what happened to her.

I didn't push her on it, but if this is really the

issue, I guess I could ask you whether you want a hearing on

it.  I don't think either affects the guidelines, but I'm not

prepared to call a rape anything less than serious bodily

injury.

MS. KELLMAN:  I'd ask the Court just to note my

objection, Judge.  I don't think that it meets the standard

under serious bodily injury.

THE COURT:  Well, perhaps the Court of Appeals will

discuss that, but as I said, I am not prepared to call a rape

something less than serious bodily injury.  You do not want a

hearing, however, is that right?

MS. KELLMAN:  That's correct, Judge.

K. Rusin

1 THE COURT: Anything else with respect to a factual
2 objection to the guidelines?

3 MS. KELLMAN: Judge, there are some technical
4 objections.

5 THE COURT: Please.

6 MS. KELLMAN: I don't know if the Court's dealt with
7 them, but page 21, paragraph 100 refers to guideline 3B3.2(a).
8 It's actually 2B3.2(a).

9 THE COURT: All right. It's probably a
10 typographical error. It doesn't affect anything. Thank you
11 for noting it.

12 MS. KELLMAN: And you'll find that same error in
13 paragraph 108 and paragraph 116, paragraph 124.

14 THE COURT: All right, the same typographical error
15 appears?

16 MS. KELLMAN: Yes, Your Honor.

17 THE COURT: All right, I'll ask for that to be
18 corrected.

19 MS. KELLMAN: It's a reference to an improper
20 guideline.

21 THE COURT: All right.

22 MS. KELLMAN: And with respect to the report itself
23 and the accuracy of the report, that's all I have.

24 THE COURT: All right. Now, I don't think there are
25 any outstanding legal issues to resolve before sentence, are

there, Ms. Kellman?

MS. KELLMAN: No, Your Honor. I did make a motion pursuant to Rule 29(c), but think that the Court denied that at our last status conference, so there are no other outstanding legal matters.

THE COURT: All right. In this case, I would have to calculate the guideline level, based on all the information contained in the report and adduced at trial, at a total offense level of 47. With a criminal history category of three, the defendant faces a life term of imprisonment, a three to five year term of supervised release, a $25,000 to $250,000 fine, and an $850 order of special assessment representing $50 on each of the 17 counts of conviction. Ms. Kellman, if you and Mr. Tran would like to step forward, I'll be happy to hear from you.

There is, first, the request for a downward departure made in your case by citation to the statement in the probation report that the Green Dragons were involved in basically recruiting young teenagers almost out of school to form a paramilitary organization, and I should almost consider that as grounds for a departure because of the type of people who were brought into this criminal enterprise. The Government in response suggests that even if that were true as to some defendants, it does not appear to be true with respect to your client. Ms. Kellman, why don't I hear you first on

K. Rusin

this question of departure?

MS. KELLMAN: Your Honor, I think that the departure issue that I raise is one that's more generic than just my particular client, but one that really is generic to the kind of prosecution this is. It seems that -- I don't think it would be incomprehensible for this Court or any of us to believe that for as many Tung Trans as are incarcerated for life sentences, there will be Fook Ching, Fu Chow Pauls back in China who will send 20 more young men and 20 more young men and continue this process.

And it is the nature of that process, of the coming, enlisted or drafted or somehow -- however it is that one is encouraged to participate and to really leave behind whatever human decency each of us has at birth, that calls into question, really, the sort of departure that I'm speaking to, and that is this -- and I think I used the term paramilitary, but that is what it appears to be. This is -- we all spent a day in this courtroom, a full day in this courtroom, looking at automatic weapons and semi automatic weapons and rounds, and I don't think that my client or any of these defendants is certifiably insane.

I don't think any of them were incompetent to stand trial, but I do think that they have a different connection with the reality that each of us who is human has to human life, and I don't know whether it's appropriate to

K. Rusin

characterize it as unaware or incapable of being aware, but it seems to me that to the extent that these are recurring offenses, not by these defendants so much as by the people who will follow them, the people who have preceded them -- five years ago, I was involved in a case in the Southern District.

It was the Ghost Shadows case. That was a Chinatown group, and it was the same allegations and not the same number of homicides, but it was people from China, young men being enlisted or engaged by people from China who remained in China and these young men were sent to prison for long periods of time. With pleas, they got 35 and 40 years, and to the extent that this is a sort of almost infinite kind of plague -- I think plague is a word that comes into my mind, that there is some level of recognition that I ask the Court to make that these young men acted not really out of viciousness but out of a total lack of connection, the likes of which I have never experienced and can't really relate to.

And for whatever -- however the Court -- I mean, this Court sat and observed my client. In the Court's perception and others' perceptions, observed my client making gestures at one witness who testified about severe sexual encounters with these young men and who the Court and others observed mocking -- I apologize for that -- being entertained or taunting the members of the families of the decedents who were here in the court, and I can only relate to that by

K. Rusin

saying that they're either so vicious that they should be chained or they're not connected to what's happening, because I sat next to my client for all those months of trial and he laughed.

He laughed, and I don't think it was the laugh of arrogance, and I don't think it was the laugh of insanity. I think it was a laugh that suggested to me -- all I could make of it was being completely unconnected. I mean, these young men, while they listened to victim after victim testifying about homicide after homicide, sat and drew naked women. They're unconnected. And I don't know how the Court factors that in or if the Court feels that that's even an explanation that's plausible, but having lived with this case for a year now, it's the only one that I can sleep with, and that is thinking that there is something missing here.

These men, these young men, are not connected to the consequences of what they're doing, and I don't mean to suggest that they're insane in any legal status, but if there is something in between that, it's that that I hope to address in my application for downward departure.

THE COURT: Ms. Palmer, do you wish to respond?

MS. PALMER: Judge, I certainly agree with Ms. Kellman that Mr. Tran is not connected, and it's precisely that reason that Mr. Tran should spend the rest of his life in jail. When Mr. Tran was in the car with Tina Scham and Tommy

K. Rusin

Mack driving to that wooded area, he wasn't listening to Fu Chow Paul. And after Tina Scham and Tommy Mack were killed execution style, it wasn't Fu Chow Paul who said what they should have done to Tina Scham because she was so pretty before they killed her. It was Tung Tran.

And he definitely is not connected, Your Honor, but he's not connected because he's insane or because Fu Chow Paul did something to him, or because there is just an infinite number of young Asian males out there who are unconnected, as evidenced by Steven Mack and other males that the Court saw here, he's unconnected because he doesn't care, Your Honor. He doesn't care, as evidenced by the crimes that he willingly engaged in, by the terror that he inflicted on Tina Scham and Tommy Mack and Linda Peng, and by the acts that he engaged in in this courtroom.

It wasn't Fu Chow Paul who sat here and made fun of Linda Peng's husband, and it wasn't Fu Chow Paul who sat here and threatened Sonny Wong. It was Tung Tran, who is unconnected because he doesn't care, because he's arrogant, and because he never thought -- like most of these defendants ever thought -- that anyone would have the courage to come forward and point the finger, because these defendants lived on suppressing and terrorizing the Asian community, and they're unconnected because they never thought that people would come forward and take the witness stand like Linda Peng

K. Rusin

did and point them out, would have the courage to come forward and say it's enough.

There is absolutely no basis for a downward departure here because people finally have spoke out. The Scham family, the Mack family, Linda Peng. They're here because they've said enough is enough, and we're not going to live with it anymore, we're Asian and we have the right to be heard, and we do not have the right to be intimidated by the likes of Tung Tran, like Ah Lung was intimidated at his restaurant every time Tung Tran came in.

And it's for those reasons, the reasons that the Court heard throughout the trial, the evidence against Tung Tran, the level of his involvement in these very heinous crimes, there's absolutely no basis for a downward departure here. He is unconnected. He will remain unconnected, and he should spend the rest of his life in jail.

THE COURT: Ms. Kellman, you, of course, speak on Mr. Tran's behalf as the result of an appointment by the Court, and in urging downward departure today, you only continue to afford him the vigorous representation you gave him throughout trial. Perhaps no lawyer's task was made more difficult than yours by Mr. Tran's conduct during the trial. In urging me to see it as something that perhaps can be viewed in his favor, you represent all that is finest in the duties of a defense lawyer.

K. Rusin

1    But I must reject your argument. I do not find it
2 based in common sense and reason. Mr. Tran, much of what Ms.
3 Kellman says is correct in the sense that throughout the trial
4 you showed a total lack of remorse or even human sympathy for
5 the crimes that you committed. This is puzzling to almost
6 anyone who thinks that being a human being is a fine and noble
7 thing, something in which one can contribute to one's society,
8 not destroy it. Like Ms. Kellman, I don't purport to
9 understand it, but because I am satisfied that you are not
10 insane as that term is understood in the law, I am not today
11 concerned with trying to find an explanation for your shameful
12 conduct during trial.

13    I am convinced that whatever it is that's lacking in
14 you to make you understand the horrible crimes you have
15 committed and the horrible pain you have inflicted on people,
16 whatever is missing makes it necessary for you not to
17 participate in a society whose rules you are obviously
18 prepared to flout at every opportunity. I will not depart
19 from the guideline sentence. Ms. Kellman, do you wish to say
20 anything further in your client's behalf?

21    MS. KELLMAN: Nothing, Judge.

22    THE COURT: Thank you. Mr. Tran, if you wish to be
23 heard, I'm, of course, prepared to hear from you as well.

24    THE DEFENDANT TRAN: No.

25    THE COURT: Mr. Tran, in sentencing you, let me say

K. Rusin

that while I have just commented on your behavior at trial, I have done that only by way of noting why I find departure inappropriate. That is not the reason why I sentence you as I am obliged to under the guidelines. As I said to Mr. Chung, you are responsible for a number of murders in this case, and those people insist that they be heard today, though I was not able to focus on them during trial.

At trial, in your case, as with respect to every other defendant, the law required me to focus on you and to ensure you a fair and just trial. I sought to do that at every opportunity, but today I focus on the crimes you committed. Your sentence, too, will ultimately be one of life imprisonment, but there are 17 specific counts on which I must impose sentence. With respect to Count 1, I sentence you to life incarceration, five years supervised release, and a $250,000 fine. With respect to Count 2, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine.

With respect to Count 3, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine. With respect to Count 4, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 10, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 11, I sentence you to ten years

K. Rusin

imprisonment, three years supervised release, and a $250,000 fine. With respect to Count 12, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine.

With respect to Count 13, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 17, I sentence you to three years imprisonment, one year supervised release, and a $250,000 fine. On the following counts, Count 21, 22, 23, 24, 27, 28, 31 and 32, I sentence you to -- on each of those counts to 20 years imprisonment, three years supervised release, and a $250,000 fine. I impose an $850 order of special assessment, representing $50 on each of the 17 counts of conviction.

Let me say with respect to the fine that at the present time it does not appear that you or most of the defendants in this case are in any position to pay a fine, but because of the serious harm that the victims suffered in this case, and because of my understanding that they can appeal to the attorney general for some kind of compensation from fines that are collected, I impose a fine. I would not want anyone to buy a lottery ticket, get lucky and then not have to pay the fine, and that's why I impose it. Is there anything else?

MS. PALMER: Your Honor, there are also underlying superseding indictments -- or underlying indictments pending against Mr. Tran that we would move to dismiss at this time.

K. Rusin

THE COURT: Is Mr. Tran also named in that subsequent superseder, and does that have to be -- does dismissal have to be moved on that as well?

MS. PALMER: Yes, Your Honor.

THE COURT: All right, those are all granted. Mr. Tran has the right to appeal. Ms. Kellman, will you file timely notice of appeal on his behalf?

MS. KELLMAN: I'll file it today, Judge.

THE COURT: Thank you. Mr. Tran is excused, marshals. I'd like to proceed next with Roger Kwok. Mr. Drezin, do you want to note your appearance formally for the record?

MR. DREZIN: Alan Drezin, D R E Z I N, 26 Court Street, Brooklyn, New York, 11242, appearing for the defendant Roger Kwok.

THE COURT: All right, Mr. Drezin, you were just a few minutes late coming. At that point, I set a schedule as to the order in which I would take the defendants, and one of the reasons that your client is in the earlier group is because Mr. Mack wished to speak. You and your client were, of course, here while Mr. Mack addressed the Court. I have received and reviewed the presentence report as well as your letter to the Court and the Government's response of September 30th. Can I confirm that you have seen all of this and gone over it with your client?

1    MR. DREZIN:  Yes, I have, Your Honor, but prior to

2  going into that, I'd like to make an application to the Court.

3    THE COURT:  Please.

4    MR. DREZIN:  I had a conversation with the defendant

5  last night.  It had to be close to 5:00 at night, after that,

6  and based upon that conversation, I would ask this Court for

7  an adjournment and to allow me to have a forensic psychiatrist

8  examine this individual and make a report to the Court.

9    THE COURT:  Don't I have a report in this case?

10    MR. DREZIN:  Not from any forensic psychiatrist,

11  Your Honor.

12    THE COURT:  I had a report before trial, is that

13  right, with respect to him?

14    MR. DREZIN:  No, --

15    MS. PALMER:  No, Your Honor.

16    THE COURT:  Oh, I'm sorry.  I'm confusing him with

17  Alex Wong.

18    MS. PALMER:  Joseph Wang, Your Honor, --

19    THE COURT:  Joseph Wang.

20    MS. PALMER:  -- for which there was a report.

21    THE COURT:  Why should I do this at this late stage?

22  This sentence has been adjourned a number of times.  What's

23  the point?

24    MR. DREZIN:  I had discussed Mr. Kwok's case with

25  Dr. Daniel Schwartz back in April.  I had then, if Your Honor

1 recalls, written a letter to the Court. I believe it was the

2 beginning of May. I think it was May 1st, and in May, Your

3 Honor had indicated in a reply that you would consider

4 appointment of a forensic psychiatrist if I made formal

5 application, and I indicated the cost also.

6      I discussed that on or about May 5th with the

7 defendant and indicated to him my conversation with Dr.

8 Schwartz, and I indicated that what Dr. Schwartz would require

9 of him. The defendant indicated to me at that point that he

10 would think it over and get back to me as to whether or not he

11 was willing to comply with Dr. Schwartz's requirements. Last

12 night is when he got back to me, Your Honor.

13      THE COURT: I'm not prepared to adjourn the

14 sentence, Mr. Drezin. I was thinking, I guess, of the fact

15 that you had at one point brought to my attention this

16 possibility, and I told you to provide me with more

17 information, but I don't think the eve of sentence is an

18 appropriate time. There's a downward departure motion made in

19 this case based on your client's extraordinary childhood

20 experiences and the claim that he has had a lack of guidance.

21      I have given these very serious consideration. I

22 have to tell you from everything I have seen I am not

23 particularly inclined to be receptive to this. If, in the

24 course of hearing you, I think that a psychiatric report would

25 be helpful, I'll reconsider, but at this point, I simply don't

K. Rusin

1   see it.  After all, I have to deal with the fact that your

2   client is one of the people who killed Tina Scham and Tommy

3   Mack by putting a gun to the back of their heads and was also

4   involved in various of the other activities that this group

5   was involved in.

6           I'm not sure I've heard what a psychiatrist or

7   psychologist could really contribute.  I have the background.

8   I have the problems of his youth, and I think I am in a

9   position to consider it.  I don't know what more a

10  psychiatrist or psychologist could add at this point.

11          MR. DREZIN:  Your Honor, --

12          THE COURT:  I mean, do you wish to share with me any

13  of your conversation with either the doctor or your client

14  that would give me an idea of where we would be going with

15  this?

16          MR. DREZIN:  I had spoken to Dr. Schwartz in

17  reference to examining this young man, and I had wanted to

18  have Dr. Schwartz examine him to see whether or not -- whether

19  at the time of the commission of the crime where Tina Scham

20  and Tommy Mack were murdered that this defendant had the

21  ability to comprehend right from wrong at that particular

22  time.  In my conversation with Dr. Schwartz, he had indicated

23  to me that he would be willing to undertake this examination,

24  but he also indicated that the only way he would be willing to

25  undertake it were if the defendant were to indicate to him

K. Rusin

1 that he, indeed, participated in that crime and fully discuss

2 that crime.

3      I broached this to the defendant, and at that time,

4 the defendant maintained to me that he still had not committed

5 this crime. Therefore, the -- it would have been a futile

6 exercise to have Dr. Schwartz examine him at that point, and I

7 didn't really want to make an application to this Court where

8 I knew the exercise would have been futile. I have discussed

9 it with the defendant --

10      THE COURT: Well, what is it about your client or

11 his history that makes you think that he didn't know that

12 putting a gun to the back of somebody's head and pulling the

13 trigger was "wrong?" What is it that makes you think there's

14 even a colorable basis for that?

15      MR. DREZIN: Well, Your Honor, based upon the

16 defendant's history in growing up and the way he was forced,

17 with his family, to take a 200 mile forced march across

18 Cambodia in the face of the Khmer Rouge takeover of that

19 country, and in the face of the Khmer Rouge internment or

20 murder of all of the merchant class of which his parents were

21 part of that merchant class. He spent time, I believe that it

22 was seven or eight months, in an internment camp in Thailand.

23      I think that all of this had severe psychological

24 and traumatic effects on this particular individual. I think

25 that it colored the way he was able to comprehend the world

K. Rusin

1 and the nature of his fact and circumstances and I think that

2 that is, or large part, the reason why he became involved with

3 these individuals in this conduct.

4 THE COURT: Mr. Drezin, in your case as well, I am

5 going to commend you for doing what you can as a defense

6 lawyer to make every argument to put the facts in the light

7 most favorable to your client, but I do not intend to order a

8 psychiatric report. First of all, this very difficult part of

9 your client's life, where he fled from Cambodia, was, after

10 all, shared with his family. His older brother is presently

11 attending college, and therefore, the same experience has not

12 had the effect on him of having him going around shooting

13 people in the back of his head.

14 Moreover, as the report points out and as the

15 Government highlights in its letter, this was not a family

16 that abandoned him. When your client ran away, his father

17 went and found him and tried to bring him back home.

18 Arrangements were made for him to live at one time with

19 another family to try and provide him with counseling. His

20 father and mother are employed and apparently working very

21 hard at responsible positions. There is nothing in this

22 family background to lead me to think that Mr. Kwok had any

23 experience in his life so traumatic that he does not

24 understand the difference between right and wrong in the most

25 elemental type of conduct, namely the taking of another human

K. Rusin

1 life. I am not going to order a psychiatric report, asked

2 for, for the first time, now at the time of sentencing.

3 All right, having so ruled, let me ask you again,

4 have you had a chance to go over the presentence report with

5 your client and to discuss it with him?

6 MR. DREZIN: Yes, I have, Your Honor.

7 THE COURT: Mr. Kwok, have you see the presentence

8 report prepared in your case?

9 THE DEFENDANT KWOK: Yes, I have.

10 THE COURT: All right. Now, Mr. Drezin, the

11 objections that I noted from your letter pertained to certain

12 Green Dragon enterprise activity that was alleged to have

13 occurred before Mr. Kwok became a member. I would not delete

14 that from the report. It's not attributed to your client. It

15 was part of the enterprise's activities and it's not in any

16 way something that I am holding him accountable for. I'm

17 thinking, for instance, of the attempt to murder the Tung An

18 leader, the murder of Mr. Yan, the murder of Mr. Ting and Mr.

19 Galavan, the attempt to murder Mr. Chan. None of that is

20 attributed to your client.

21 Now, is there anything further, though, that you

22 want to note on those points?

23 MR. DREZIN: Not on those points, Your Honor. There

24 were additional points --

25 THE COURT: Yes, I was going to get to those. You

K. Rusin

1 did ask that it be noted that the charges with respect to your
2 client pertaining to the murder of Mr. Jin Li Sook and his
3 involvement in the Fa Chung Fa extortion were dismissed, and I
4 will ask that that be noted in the presentence report.
5 Anything else, any other factual objections that you have to
6 the report?

7     MR. DREZIN: No, Your Honor.

8     THE COURT: All right. Now, I don't believe there
9 are any outstanding legal issues at this point, are there?

10     MR. DREZIN: No, I don't believe so, Your Honor. At
11 our prior session in this court, Your Honor ruled on my Rule
12 29 motion.

13     THE COURT: Yes. All right, in this case, I would
14 find that the total offense level is 43. With a criminal
15 history category of three, the defendant faces a life term of
16 imprisonment, a three to five year term of supervised release,
17 a $25,000 to $250,000 fine, and a $500 order of special
18 assessment, representing $50 on each of the ten counts of
19 conviction. Now, there has been an application for downward
20 departure.

21     Mr. Drezin, if you and Mr. Kwok want to step
22 forward, I'll hear you on that.

23     The request for departure asks me to consider the
24 defendant's extraordinary childhood experiences, namely
25 fleeing with his family from Cambodia during a very difficult

K. Rusin

war situation. He was very young at the time. The departure
motion also asks me to consider his lack of youthful guidance.
This is attributed to his having left home twice. Now, I
recognize that in another circuit in the case of <u>United States</u>
versus <u>Floyd</u>, lack of youthful guidance was accepted as a
ground for downward departure.

I too think that there might be a case in which a
total lack of guidance or extraordinary lack of guidance
might, under certain circumstances, be grounds for departure.
I have difficulty with this case, Mr. Drezin, because unlike
Floyd, where the parents abandoned the child, it was Mr. Kwok
who, on a number of occasions, left his home. It appears that
his parents were more than willing to provide him with
guidance, assistance, love, support, anything that could have
helped him. It was he who rejected it. Having expressed to
you my concern, let me hear you as to why you think departure
is nevertheless appropriate.

MR. DREZIN: Judge, I think it's -- in my letter to
you of July 29th, that I have indicated that that is indeed
the case, that the defendant did abandon his parents rather
than the other way around. I think that whichever way it
happened, I think that what occurred, the end result, is that
this defendant had a lack of guidance and that this defendant,
when he took to the streets, was 14 years old, 15 years old,
and that when the crimes were committed, he was 16 years old.

K. Rusin

I think that he was under the wrongful guidance of certain other people associated in this particular matter. I don't think at his age that he had the ability, both mentally and emotionally, to withstand that type of pressure from the people that he was associated with. I have heard the speech of Mr. Mack's brother, and I have to tell you that, you know, it tore my heart out also. I just would ask this Court to look at this individual. I'd ask this Court to take into consideration the age at which the crimes for which he stands convicted were committed.

And you know, I understand that this defendant has to be punished for the crimes for which he is convicted. I would say to this Court that I think that there is something that can be redeemed in this defendant. I have been with him constantly in the last year, both in court, at MCC and on the telephone, and I have noted a certain change that has transpired over the period of my representation of him, where he had begun to take on an awareness of the fact that he has broken society's rules and that he does regret it.

I think that he should be imprisoned, and I think that his imprisonment should be a lengthy imprisonment. But I would ask this Court, please, don't put somebody in jail for the rest of his life that committed the crimes of which he was charged when he was age 16. I think that it is possible to rehabilitate somebody, and I think that Roger Kwok is one of

K. Rusin

1  those that it is possible to rehabilitate, and I would simply

2  ask that the Court take all of that into consideration before

3  it passes sentence.

4      THE COURT:  Does the Government wish to be heard on

5  the motion for downward departure?

6      MS. LYNCH:  Just briefly, Your Honor.  We have set

7  forth most of our argument in our submission to the Court, but

8  just to respond to Mr. Drezin's argument of today, he asserts

9  that this defendant simply fell in with bad friends.  I mean,

10  this is an argument essentially that he succumbed to the peer

11  pressure that led him to a life of crime.  That certainly is

12  no basis for a departure, nor is there any factual basis for

13  it in either the record or what Mr. Drezin has proffered.

14      This defendant chose to abandon his family.  He

15  chose to leave both his own home and the other family that

16  tried to take him in, and he chose the life of the gang.  I

17  believe the Court will recall that Sonny Wong testified that

18  he, Mr. Wong, had brought Mr. Kwok into the Green Dragons and

19  very quickly Mr. Kwok, through his own abilities and through

20  his own ambition and his own drive, rose within Green Dragons.

21  No one pressured him to join.  No one pressured him to kidnap

22  Tina  Scham and Tommy Mack.

23      When the order was given to take them, Mr. Kwok went

24  along with everyone else.  And also, in the car, when the

25  ·defendant Tung Tran gave the directions to let the new guy do

K. Rusin

it, as the Court will recall Alec Yim testified, which everyone understood to refer to Mr. Kwok, Mr. Kwok didn't back down. He didn't protest. He willingly put two bullets into the heads of Tina Scham and Tommy Mack, and he was rewarded for that.

That killing occurred in February of 1990. As the Court will recall, by the time of the arrest in November of 1990, as Sonny Wong testified, this defendant, Roger Kwok, was in charge of a Green Dragon apartment. The apartment on Ithaca Street from which the Green Dragons were arrested, prior to going to assault the White Tigers, was the apartment that was "run by Roger Kwok." Yes, he's young, but he's lived hard and fast in those years, and he used those years to rise within the Green Dragons very, very far.

There were other members older than him who were not supervising apartments. This is an ambitious, aggressive young man who chose the lifestyle that he now stands to be sentenced for. The Government submits there is no basis for a downward departure in this case. The mitigating factors are simply not present. In fact, this is a defendant who was somewhat more privileged than many individuals who I'm sure this Court has had the opportunity to see. He chose to reject all those opportunities and instead live a life on the streets, and now the Government submits he should face the full penalty for that life.

K. Rusin

THE COURT: Mr. Kwok, the departure question in your case is a more difficult one for me. I recognize how young you were at the time these crimes were committed, and I do recognize that the early part of your life was spent under very difficult conditions, but it does seem to me that your family tried very hard to get you to understand that your future lay in living a law abiding, responsible life. Your father's efforts are apparent from the report, and it was you who decided that you didn't want any part of that, that you preferred the life of the gang for whatever reason.

Now, I'm not naive, and I recognize that there is, in gang existence, a form of peer pressure, but I have to weigh that against the type of crime you committed. We are not talking here about the extortions, bad enough as they were, or the conspiracies to get into some kind of gang fight with White Tigers, serious as I view that. We're talking about the fact that you killed two human beings and that while you stand in front of me and while I find it very difficult to think that someone as young as you could be going to jail for the rest of your life, I cannot shut out of my mind the picture of Tina Scham in a car, crying and begging for her life, or of Tommy Mack, stunned by this whole experience because he didn't know any of you and had no idea what was happening.

But the next thing that was happening was that they

K. Rusin

were out at Sand Points, Long Island, with their hands tied behind their back and you all pumping bullets into the back of their heads. As I said with respect to Mr. Chung, part of the purpose of punishment is to make a societal statement about the crime that's been committed. These murders were horrible crimes. These people cannot stand before the Court and ask for any consideration or any more time to live their life.

I do not think that I can reflect society's horror about this crime if I downwardly depart in this case, and therefore, I deny the motion. Mr. Drezin, do you wish to be heard on your client's behalf any further?

MR. DREZIN: No, Your Honor.

THE COURT: Mr. Kwok, if there's anything you'd like to say in your own behalf, I'll hear from you.

THE DEFENDANT KWOK: No.

THE COURT: Anything further that the Government would like to say?

MS. LYNCH: No, Your Honor.

THE COURT: In this case, the sentence will be life imprisonment. There are, however, a number of individual counts. Let me go through each of them. With respect to Count 1, the sentence is life incarceration, five year term of supervised release, and a $250,000 fine. With respect to Count 2, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine. With respect to

K. Rusin

Count 11, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine.

With respect to Count 12, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 13, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. With respect to Count 17, I sentence you to three years imprisonment, one year supervised release, and a $250,000 fine. On counts 23, 24, 31 and 32, I sentence you to on each to 20 years imprisonment, three years supervised release, and a $250,000 fine.

The terms of incarceration, supervised release and fine will all run concurrently. I impose a $500 order of special assessment to reflect $50 on each of the ten counts of conviction. Is there an application, Ms. Lynch?

MS. LYNCH: Move to dismiss the underlying and related indictments against this defendant.

THE COURT: That's granted. Mr. Drezin, will you file timely notice of appeal on behalf of Mr. Kwok?

MR. DREZIN: Yes, I will, Your Honor.

THE COURT: That's granted, all right, and thank you very much. Marshals, if you would bring Joseph Wang and Alex Wong up, we'll take -- they're here already? All right. If they can come out and if their lawyers would come up to counsel table. [Pause] I'd like to deal first with Mr. Wong.

K. Rusin

1  Counsel, do you want to note your appearance formally for the

2  record?

3         MR. EPSTEIN:  Yes, Your Honor.  Lloyd Epstein,

4  Epstein & Weil, 225 Broadway, New York, New York.

5         THE COURT:  All right.  Mr. Epstein, I have had a

6  chance to review the presentence report, your submission and

7  the Government's response of September 30th.  Have you had a

8  chance to see all of these documents and to go over them with

9  your client?

10         MR. EPSTEIN:  Your Honor, I have seen the documents.

11  I have reviewed them.  I reviewed my submissions and the

12  probation report with my client.  As you may note from the

13  date on the Government's response, I received it yesterday

14  afternoon at approximately 1:30.  I did have a conversation

15  with my client about it over the telephone in which we

16  discussed basically the downward departure issues that were

17  raised.  We didn't discuss the technical details about the

18  guideline calculations, in fact, but however the Court rules

19  on them it will not affect the guideline calculations.

20         THE COURT:  Do you need some more time, because I

21  can take Mr. Wang first if you want to talk to your client for

22  a few moments.

23         MR. EPSTEIN:  I'd like to have a few moments, Your

24  Honor.

25         THE COURT:  All right, take some time.  I'll deal

K. Rusin

1 with Mr. Wang's sentencing first.

2       MR. PADDEN: Your Honor, I don't mean to cut you

3 short, but we're in essentially the same position in terms of

4 receiving the submissions of the Government. I have

5 synopsized them for my client, but we want to just take a

6 couple of minutes to --

7       THE COURT: Sure. We'll take --

8       MR. PADDEN: -- avoid that problem here.

9       THE COURT: -- ten minutes, and then proceed.

10 Marshals, can the defendants stay with their lawyers here in

11 court just to go over this material? Thanks.

12     (tape off/tape on)

13       THE COURT: Mr. Epstein, are we ready to proceed

14 with your client?

15       MR. EPSTEIN: Yes, Your Honor.

16       THE COURT: Mr. Epstein, you have now had a chance

17 to review the presentence report and the Government's letter

18 with your client?

19       MR. EPSTEIN: Yes, we have, Your Honor.

20       THE COURT: Mr. Wong, you have seen the presentence

21 report in your case and the Government's letter?

22       THE DEFENDANT WONG: Yes, I have.

23       THE COURT: All right. I noted from your letter,

24 Mr. Epstein, that you raise no factual challenge. Rather, you

25 urge me to consider the guidelines not applicable in this

K. Rusin

1  case, for a variety of reasons, citing Judge Weinstein's

2  recent decision in Concepcion. Before I discuss that matter,

3  am I right that there are no factual objections?

4       MR. EPSTEIN: That's correct, Your Honor.

5       THE COURT: Let's deal with the question of

6  guideline applicability in this case. Is there anything

7  further you want to add to your written submission in this

8  regard?

9       MR. EPSTEIN: Not really, Your Honor. I think what

10  I focus on there is the atypical nature of this case, that the

11  guidelines, it appears to me, were not designed to deal with,

12  you know, the nightmare situation of teenagers running wild

13  and the possibility of a person who is 17 years old at the

14  time of a homicide actually facing life imprisonment.

15  Usually, the RICO guidelines and the homicide guidelines deal

16  with people who have severe pathological motives, and in terms

17  of RICO, people who have led a life of crime, and certainly

18  although Mr. Wong's involvement with crime was very intensive

19  during a period of his life, two years, it seems to me that's

20  significantly different from what was intended by the

21  guidelines.

22       In addition, Your Honor, I have many arguments to

23  make about why Mr. Wong himself is atypical, even of the

24  people involved in this type of organization, that --

25       THE COURT: And those you've argued primarily in

K. Rusin

1 urging departure --

2       MR. EPSTEIN: Correct.

3       THE COURT: -- if I were to apply the guidelines.

4       MR. EPSTEIN: That's correct, Your Honor, but it

5 seems to me that taking Judge Weinstein's opinion in the

6 broadest sense, and given that it was approved, at least in

7 spirit, by the Second Circuit, it seems to me that the

8 arguments tend to flow one into the other.

9       THE COURT: All right. I have given careful

10 consideration to the propriety of applying the guidelines in

11 this case to Mr. Wong specifically, to all of the defendants

12 generally. It is a difficult question when the Court is

13 confronted with so many young people who before reaching even

14 their 21st birthday are capable of such violent crimes. But I

15 do think that the guidelines are meant to focus primarily on

16 the criminal conduct.

17       To the extent that the defendants' youth should play

18 any part here, I recognize the guidelines say that youth is --

19 or age is generally not a factor, but I have weighed it in

20 considering each and every defendant in this case. It has

21 sometimes made the decision to impose lengthy sentences

22 difficult for the Court, as I noted a moment ago when I

23 sentenced Mr. Kwok, but I have balanced against it the

24 terrible, terrible crimes committed.

25       Certainly, Mr. Wong is charged with one of the most

K. Rusin

1   terrible scenarios to have come out in the course of the

2   trial, the murder of Mr. Galavan and Mr. Ting, along with the

3   wounding of Mr. Hyde and another individual -- is it Mr. Chen

4   who was also wounded?

5           MS. PALMER: Mr. Chen, yes.

6           THE COURT: Under these circumstances, I would find

7   that even though there is a principled argument for not

8   applying the guidelines in all cases as outlined by Judge

9   Weinstein in Concepcion, that this is not a case where I think

10   that justice warrants a sentence outside the guidelines, and

11   so I am going to apply the guidelines in the case. Now,

12   calculating the guidelines in Mr. Wong's case, I would have to

13   find that there was a total offense level of 45. With a

14   criminal history category of two, he faces a life term of

15   imprisonment, a three to five year term of supervised release,

16   a $25,000 to $250,000 fine and a $150 order of special

17   assessment, $50 on each of the three counts of conviction.

18           Mr. Epstein, is there any challenge to that being an

19   accurate guideline calculation given the facts of the case?

20           MR. EPSTEIN: No.

21           THE COURT: All right. If you and Mr. Wong would

22   step forward, I'll be happy to hear you on the departure

23   motion. [Pause] All right, let me hear you with respect to

24   departure, Mr. Epstein. I note that you urge that I consider

25   his lack of youthful guidance, his age and the strong

K. Rusin

1 potential for rehabilitation that I should see in him.

2     MR. EPSTEIN: That's correct, Your Honor. I would

3 like to open my argument by noting that the arguments I make

4 are not really generic arguments, that unlike some of the

5 other defendants' counsel were seeking time for a psychiatric

6 report, I think I presented one to the Court by a very

7 reputable psychiatrist, --

8     THE COURT: Yes.

9     MR. EPSTEIN: -- who has done considerable work with

10 victims and other people who have been -- had trauma in their

11 life, and I believe that he raised very substantial issues

12 concerning Mr. Wong's potential for rehabilitation. I'd also

13 note that Mr. Wong's family is in the courtroom, that he has

14 reached out to them over the past few weeks, and he has had

15 considerable contact with them over the time -- and I believe

16 that also tells you something about the direction that we

17 might expect from Mr. Wong in the future.

18     Now, even though I am going to talk about

19 rehabilitation, this is not meant, really, to minimize in any

20 way the nature of Mr. Wong's crime or to any way suggest that

21 the Court should not impose extremely severe punishment, that

22 in the letter I wrote to the Court last month, I suggested

23 that an appropriate sentence would probably be in the area of

24 25 years, and that's hardly the type of punishment that the

25 Government describes as warranted for a defendant who is

K. Rusin

attempting to avoid punishment in the case.

I mean, if Mr. Wong is sentenced to a sentence in the area of 25 years, he'll be 45 years old, 46 years old at the time that he is released. I think it's very difficult not to -- you know, for someone who is in my position not to appreciate the severity of that. I am a little less than 40 right now, and Mr. Wong would be far older than I am before he ever would see the streets again, if the Court were to impose that type of sentence.

What I think is important to note in Mr. Wong's life over the last year or so is that whenever there have been moments that he has been free from the other members of the gang, he has consistently made efforts to reach out and form more appropriate types of social relationships, that when he was at Riker's Island, for instance, he reached out to a social worker there named Burt May, with whom he formed a fairly strong therapeutic relationship.

Our psychiatrist, Dr. Kleinman, interviewed Mr. May and confirmed more or less what Mr. Wong had stated, that Mr. Wong had reached out to Mr. May, and that Mr. May, who deals with -- solely deals with prisoners, found Mr. Wong to be much more receptive to treatment, much more receptive to rehabilitation than almost anyone that he had seen during --

THE COURT: Mr. Epstein, let me interrupt you just to ask you how I consider that in light of the fact that the

1 Government has now submitted tapes that suggest to me that, at

2 the same time, Mr. Wong was talking about using his

3 psychiatric counseling to his advantage in his court

4 proceeding, and that during that same period is when he's

5 talking in truly disturbing terms about killing Carol Wong,

6 the witness to the crime?

7 MR. EPSTEIN: I think those are two separate issues,

8 and I'd like to address them --

9 THE COURT: Please.

10 MR. EPSTEIN: -- separately. Firstly, Your Honor, I

11 feel I was somewhat remiss in not pulling the tapes out of the

12 discovery material, because you know, I came in really to do

13 the appeal in this case, and I had gone over all of the tapes

14 that were introduced at trial, but in fact, if I had seen that

15 tape before, I would have sent it myself to the Court, because

16 it seems to me that the Government's characterization of that

17 as an effort by Mr. Wong to subvert the criminal justice

18 system is really off base, that if you look at the transcript

19 closely -- and I recognize the Court may not have had an

20 opportunity to do so, since I take it the Court received it

21 yesterday afternoon, at the moment it was sent to me.

22 THE COURT: But I have read all of the submissions

23 carefully. I spent a good part of yesterday doing this in

24 order to be prepared today.

25 MR. EPSTEIN: Well, then I'll focus in on some of

K. Rusin

the details, that if you'll notice, Mr. Wong is in a conversation with Sonny Wong, and that Mr. Wong mentions that he has gone for psychiatric help and the reason why he's gone for psychiatric help is because he's depressed and he wants somebody to preach to him, that he specifically told the person, Mr. May, that he was not crazy, that he was not suffering from any type of mental disability, but he wanted someone to talk to.

It's Mr. Wong, Sonny Wong, who introduces the notion that this can somehow be useful in the case, and for sure, --

THE COURT: But then almost right away your client says that's what I'm trying to do, like, you know, my father passed away, you know, my family -- it's not like he needs Mr. Wong to give him the script.

MR. EPSTEIN: Well, Your Honor, it seems to me that this is perfectly consistent with the type of behavior that Mr. Wong has exhibited throughout his existence with the Green Dragons, that when he is with the Green Dragons, he's significantly different than he is when he's alone. I have to say that I observed that myself coming into this case rather late, and when I observed my client in the pens, there was one type of behavior, and I think there was sort of a macho front that has to be put on.

When he's alone with me, he seems to be very, very different, and it seems to me, Your Honor, that it was Mr.

K. Rusin

Wong's position that he wanted somebody to preach to him, that he wanted someone to talk to him. The fact that when he speaks to Sonny Wong he says something a little bit different is not at all inconsistent. In fact, it fits with the profile, and it fits with the prescription of rehabilitation that Dr. Kleinman gives, which really includes his complete isolation from anyone involved in the gang. I would add, Your Honor, --

THE COURT: Where can that be achieved, except in prison?

MR. EPSTEIN: I'm not suggesting that he shouldn't be incarcerated, Your Honor. I opened my argument by saying that at least in my view, a sentence in the area of 25 years would be appropriate.

THE COURT: All right.

MR. EPSTEIN: So it seems to me that -- and I don't want to minimize the nature of the crime, but the statute and the guidelines do authorize the Court, and in fact, encourage and perhaps compel the Court to consider other factors as well, and it's within the context of Mr. Wong facing a life sentence under the guidelines that I'm making all of these arguments.

I mean, certainly, Your Honor, if there was any evidence that Mr. Wong was attempting to manipulate his meetings with Burt May, that could have been adduced in terms

K. Rusin

of subpoenaing Mr. May's records, in terms of interviewing Mr. May, in terms of bringing Mr. May into court. Now, I will say that we did speak to Mr. May. I spoke to him. Dr. Kleinman spoke to him.

There has been some difficulty in obtaining Mr. May's records, that I issued a subpoena and I know that Mr. Hill of the probation department issued a subpoena, and he expects the records to arrive within several days. I didn't press the issue of the subpoena since it wasn't until yesterday afternoon that I learned the people were going to make an issue of what exactly the nature was of Mr. Wong's relationship with Mr. May, and if the Court feels that that really is a substantial issue, you know, I would ask the Court to postpone sentencing just for a few days.

THE COURT: I don't think it's necessary.

MR. EPSTEIN: I don't think it's necessary either, because I think a close review of the tape indicates that the arguments raised, you know, by the Government over here are really quite insubstantial, that Mr. May is somebody who regularly deals with people in Mr. Wong's position. He's somebody -- and I think from all of our experience, all of us, you know, who deal regularly with people in the criminal justice system -- I know from my own experience, where I spent several years with the Legal Aid Society, and on the CJA panel, that there is a certain cynicism that comes upon us.

K. Rusin

And certainly, people like Mr. May, who are keenly aware that people are trying to manipulate them, are very well trained in making judgments in this area. And it seems to me that if the Government really believes that Mr. Wong was trying to subvert the criminal justice system, then they could bring in Mr. May. They could bring in his reports, but I don't think they'll make any effort to do so because I believe that as one tape indicates, Mr. Wong wanted somebody to preach to him.

Now, as far as the Carol Wang incident is concerned, again, I'm not going to minimize that at all, and I'm not going to try to, you know, force the fantasy on the Court that Mr. Wong has undergone any type of jailhouse conversion, that he's been rehabilitated already and that the Court should therefore impose a very light sentence. I think that would be, if nothing else, degrading to the Court. It would be degrading to the bar for me to make any type of argument like that.

If you'll note what Dr. Kleinman says, that Mr. Wong is a very torn personality, that he's somebody who experienced dissonance, he experienced some discomfort with what he did, did it prevent him? No. He didn't have that type of conscience and super ego sufficiently developed that it would stop him from doing things. Therefore, Dr. Kleinman recommends intensive psychotherapy over a period of ten or 15

K. Rusin

years, because he feels this will complete a rehabilitation
process.  Has it started?  I believe it has started, but I
think it would be fanciful, and I really wouldn't -- really,
it would distort my argument to say that Mr. Wong has been
completely rehabilitated now, much less back in 1990 when he
was dealing with Carol Wang.

I would say that, you know, like many teenagers, he
was proceeding in different directions at the same time, and
it seems to me that it would be unrealistic to view his
conduct in any other way.  In addition, Your Honor, the
Government makes a big deal out of the fact that Mr. Wong
maybe even now thinks that he's using the psychiatric reports
to better his position.  Now, to a certain degree, it would
seem to me that we'd be imposing or at least imputing a degree
of naivete to any defendant -- you know, if we were going to
say that he didn't realize that this might help him in some
way before the Court.

Certainly, I explained that to Mr. Wong, and
certainly I'm being very -- I think we're being very up front
about it, that we believe that the psychiatric report does
tell you something about Mr. Wong, that he does have a level
of conscience, that he does have a level of decency and a
potential for rehabilitation that may well be missing in other
places.  It seems to me also, Your Honor, that if you look at
his behavior since he's been further isolated from the Green

K. Rusin

Dragons, that further corroborates at least my view that isolation from the Green Dragons tends to bring out a different side of Mr. Wong's personality.

The Government brought to your attention a complaint that may be filed next week in the Southern District involving an altercation between Mr. Wong and an employee at the MCC. After that occurred, and I don't want to dwell on that to any great length, for obvious reasons, since we may be facing the complaint next week, and I don't think that in the context of the numbers that we're talking about of years or a life sentence that really has all that much significance, but in any event, once he was isolated from the Green Dragons, and placed in a different wing of MCC, his response was to reach out to his family, that he began calling his uncles, that he began calling his aunts, that he began reestablishing a family relationship.

And I can say, Your Honor, this is nothing that I encouraged him to do, since I didn't know Mr. Wong at that time. It was only after his family was contacted that I came into the case, but it seems to me that this is consistent with Mr. Wong's behavior, that when isolated from the Green Dragons he'll exhibit conscience. He'll exhibit a sense of dissonance with his past behavior. And Dr. Kleinman makes it clear that Mr. Wong -- he argued with Mr. Wong about Mr. Wong's past conduct, that Mr. Wong did not attempt to present a front

K. Rusin

that, oh, I'm very sorry about everything, everything was bad
and now I'll be a good boy -- that Mr. Wong had some real ties
to the Green Dragons, some very strong emotional ties, that in
many ways the Green Dragons were like an idealized family for
him, and those are very difficult ties to break, that I think
the Court -- I think all of us have some understanding of
those types of ties, if only because at one point we were
teenagers.

And certainly this is, in many ways, a perversion of
what occurs for teenagers, but one thing that really stands
out about Mr. Wong -- and I really can't say whether this is
typical of anybody else in the case. You know, I don't know
if they have been examined psychiatrically. I certainly
haven't been made privy to any reports. But if you read Dr.
Kleinman's report closely, what stands out about Mr. Wong is
that he, in fact, is an adolescent, that he had adolescent
fantasies, that he would feel invulnerable, that he would feel
that his family would rescue him at some point.

These are very, very typical of teenagers, that very
much what Dr. Kleinman sees -- and Dr. Kleinman is somebody
who works in Manhattan criminal courts, and he's regularly
dealing with people who may be feigning incompetency for the
purpose of avoiding prosecution, you know, that what he saw in
Alex was somebody who was really struggling, even right now,
to form his identity, and that in many ways, it was a perverse

K. Rusin

thing that happened through the Green Dragons. It was a tragic thing that happened through the Green Dragons, but unlike many of the other people, there is some potential here for rehabilitation.

And that within the context of a sentence of 25 years, with a potential, I imagine, since there are three counts, two RICO counts plus one ten year count, of 13 years of supervised release, that the Court can essentially maintain control over Mr. Wong until he's well into his 50s. And it would seem to me that where the guidelines, especially as interpreted by the Second Circuit, strongly encourage the Court to take other factors aside from punishment into account, Mr. Wong stands in a slightly different position from some of the other defendants in the case.

On that basis, Your Honor, I would ask the Court to depart downward, both on the basis of Mr. Wong's lack of youthful guidance and on the basis of his potential for rehabilitation. There's one point I guess I overlooked, and I wanted to talk a little bit about the lack of youthful guidance, that I know the Court focused in with some of the other defendants on whether or not they had been abandoned by their parents.

You'll notice from Dr. Kleinman's report that although Mr. Wong was not abandoned by his father physically, he was abandoned by his mother, and that from a psychological

K. Rusin

1 point of view, certainly, his relationship with his father was

2 virtually nonexistent.  His father was outside of the house

3 virtually the whole day.  Mr. Wong was completely unsupervised

4 while he was growing up, and at the time that he entered the

5 Green Dragons, certainly, that was the time in which some sort

6 of guidance was clearly the most appropriate.  That the

7 Government suggests that this is a weaker case than Floyd for

8 a departure, I would suggest, Your Honor, if anything, it's a

9 stronger case.

10     We know from contemporary psychology and certainly

11 from a case like this that when teenagers are let loose on

12 their own, as much as teenagers may like to believe that

13 they're free, what results is the worst type of group thing,

14 that even though teenagers may believe that their parents or

15 their teachers or their coaches or their priests or their

16 rabbis are nagging them and intervening, in fact, those are

17 the voices that allow teenagers to experience a little freedom

18 to understand their different points of view and to eventually

19 come to decisions by themselves.

20     Now, I'm not suggesting that Mr. Wong did not

21 voluntarily involve himself in this, but what I'm saying is

22 that you don't see in Mr. Wong the same type of deep seated

23 pathology that I know this Court has seen in many other cases,

24 you know, where people are consistently sadistic, vicious and

25 where their actions are completely inexplicable.  I don't mean

K. Rusin

to say that we can explain Mr. Wong's actions, justify them. Just again, I urge the Court to impose a lengthy prison sentence, but something short of life.

What I am saying is that the consideration of rehabilitation, the fact that Mr. Wong has exhibited conscience and has exhibited a sense of decency, gives this Court reason to think -- and we're talking, really, 25, 30 years down the line, Your Honor, when the better part of his life, the heart of his life, will already have been taken away from him, that he'll be able to return to society and function as a normal human being.

THE COURT: Thank you, Mr. Epstein. Does the Government wish to be heard?

MS. LYNCH: Yes, Your Honor. The Government strongly opposes this motion for downward departure for the reasons set forth in our submission to the Government. Mr. Epstein essentially argues -- and he argues very strongly, and he points to several factors to indicate that this defendant has not tried to and is not trying to subvert the criminal justice system. The Government feels that ever since this defendant first had contact with the law, that is all he has been trying to do, is subvert the criminal justice system.

As soon as he was arrested for the murders at the Tian Chow restaurant, he was sent to Riker's Island, stayed there some time. The Court will recall that this defendant,

K. Rusin

Alex Wong, set in progress the bribery scheme of corrections officer Santana and received a job to which officer Santana would have given to someone else in exchange for that money.

The defendant was constantly scheming within the prison to obtain a better life for himself, and we think that the transcripts submitted as Exhibit A of our letter does strongly set forth the fact that, in fact, no matter what his initial reason for going to see the psychiatrist or the psychologist, and in fact, depression, I would imagine, is common in prison, that once he was there, he saw a potential and he again tried to use it to his benefit, and the story that he sets forth in this transcript as to how he's going to relay certain -- actually, certain facts he has already relayed to -- Mr. May, I believe, is the name, and what he intends to have Mr. May do with these reports.

The whole theme of it is mocking of the entire criminal justice system as evidenced by the fact that there are chuckles and laughs throughout that very portion of the transcript. Now, I would also point out, as we point out in our submission, this was right in the middle of the taped conversations wherein this defendant is literally begging Brian Chan, his codefendant, to have Chen I. Chung give the order to kill Carol Wang. That does not -- that is not consistent with someone who is leaving the Green Dragons and striving for a therapeutic relationship and striving to

K. Rusin

understand themselves and better themselves.

What it is consistent with is this defendant trying every angle he can to get out of the mess he has gotten himself into by committing those murders. If he cannot get the witness killed, he will try and have the psychologist at Riker's Island submit a favorable report to him. While he's on Riker's Island, he will try and have a corrections officer take care of him. I would also remind the Court that in several of the taped conversations wherein this defendant Alex Wong is calling out from prison, he's also repeatedly asking for razor blades to be brought into the prison system.

That is totally inconsistent with any rehabilitative efforts or any efforts to steer one's life on to a better course of conduct than what it's already been on. Now, if there's anything that totally destroys the Riker's Island psychiatrist visits -- would be two facts. First, the defendant has not chosen to continue any kind of treatment, absent that that he submitted himself to for the purposes of sentencing. That also indicates, at least to the Government, that he's not serious about pursuing any kind of therapy unless it can serve him some kind of substantial benefit.

Also, his subsequent criminal conduct, as we've pointed out to the Court, and we've attached the copy of the complaint and arrest warrant in the action in the Southern District matter, that action occurred some short weeks after

the defendant was convicted. The arrest warrant and complaint were signed some weeks ago. We received them yesterday, actually, in our offices, and as I indicate, I had been informed by the assistant in charge of that case, they do intend to have Mr. Wong produced in the Southern District in the early portion of next week to answer those charges.

So we're not asking you to rely on those charges here. We bring that matter to your attention because pending charges are filed against him now, and the Court should be aware of that, but it also indicates that he's not on any rehabilitative course. Mr. Epstein argues that the defendant is a much better person, so to speak, when he's separated from the Green Dragons. This complaint and arrest warrant indicate that when he's separated from the Green Dragons, what he does is he finds some other individual to associate with and he commits violent acts with them, because, in fact, the individual also named with Mr. Wong in the Southern District complaint is not a Green Dragon member. He's another Asian inmate at the MCC, but he's not a Green Dragon member.

So some short weeks after his conviction for these activities, the defendant -- yes, separated from his Green Dragon brothers -- finds someone else, hooks up with them, and begins a violent act again with another individual. This is a defendant who presents a different side of himself to different people when it would be to his advantage. I have no

K. Rusin

doubt that Mr. Epstein has sincerely seen the defendant being calm and courteous toward him, because that's to his advantage.

The Government submits the true face of Alex Wong is seen on the tapes, his own voice, when he was totally unaware he was being scrutinized or watched, or that he'd come under Government supervision. When he is heard begging Brian Chan to have Carol Wang killed, when he is heard begging for razor blades, when he is heard describing how he's got this scheme with the corrections officer going, that is the true Alex Wong. It continued after his adult years.

On this issue -- and I would also note that what the defendant exhibits is a strong sense of self preservation, which no one can deny anyone for having, but that is what the defendant's actions are consistent with, not remorse, not feeling sorry for what he has done, and certainly not any rehabilitative efforts sufficient to allow this Court to downwardly depart. Mr. Epstein argues that this defendant is not consistently vicious or sadistic. I think the evidence that this Court has heard so far contravenes that as to be obvious.

This Court has heard what happened in the Tian Chow restaurant. This defendant may have adopted the ways of the Green Dragons as some kind of surrogate family. He was sent there to kill one person. He ended up killing two. Because

K. Rusin

of him, Christine Galavan lost her husband and the chance to have a family with him. Because of this defendant, Gregory Hyde will have pain for every day of his life, and Mr. Chan has a scar on his arm, and the other people in that restaurant were also terrorized also.

He was not forced to do these actions by some surrogate family. Chen I. Chung was not in the background saying oh, kill more people. He took it upon himself, and I think the evidence, as we point out, the description of the defendant's behavior in that restaurant as cool, calm and very, very cold blooded shows that he took these actions independently. He took them for his own gain within the Green Dragons, and he took them knowingly. He acted as an adult at that time. He should be punished as one now.

Just on the issue of the lack of youthful guidance, I think that to say that because the defendant remained with a parent who worked long and hard to support him he was abandoned in some way is ludicrous. Yes, his mother left him, but she left him with a stepfather who remained a custodial parent despite not being a blood relative to this defendant, who provided a home for him, a roof over his head and food and clothing for his back, and this defendant chose to abandon that.

To say, as Mr. Epstein argues in his letter, that there was some kind of negative relationship there, in fact

K. Rusin

the presentence report indicates that the defendant and his stepfather had a very good relationship. The negative relationship is with the absent mother, but the defendant and his stepfather had a very good relationship. Now, the stepfather apparently discouraged him from playing sports. That hardly constitutes abuse, abandonment or deprivation, or anything sufficient to rise to the level that would allow this Court to downwardly depart, to find that there was any significant deprivation in this defendant's life, when in fact, what his life indicates is a family that had difficulties but where in -- at least one person of that family, the father, was trying to hold them together.

This defendant chose to walk away. I would also remind the Court that during the testimony of Alec Yim, one of the cooperating witnesses here, Mr. Yim testified that when he, Mr. Yim, was joining the Green Dragons, after having run away from home, he was introduced to the defendant Alex Wong as a representative of the Green Dragons, and it was Mr. Yim's impression that Mr. Wong, in fact, had to approve of him, and Mr. Wong, in fact, did introduce Mr. Yim and his two friends who had run away with him to other members of the Green Dragons, some who were not on trial, one of whom, Danny Ngo, was on trial.

So the defendant Alex Wong, having voluntarily left this custodial parent, who spent every day of the week working

K. Rusin

to support him, then moved into a leadership position within the Green Dragons. Mr. Yim also testified that when he, Mr. Yim, moved into his first Green Dragon apartment, that Mr. Alex Wong was the Green Dragon in charge of that apartment and responsible for, for example, storing firearms in that apartment and doling them out to the younger Green Dragon members when they went out on their various missions to terrorize people all through the streets of Queens.

And that's what this defendant is truly like. That's the true personality of Mr. Alex Wong. He hasn't shown any rehabilitative efforts, and the Government doesn't feel that he ever will. I think his behavior in the Tian Chow restaurant is illustrative of exactly how he goes about his criminal activity. His behavior since then, trying every angle he can get to avoid responsibility for it, is indicative of the true face of Alex Wong. We strongly oppose this motion for a downward departure and request that it be denied.

MR. EPSTEIN: Your Honor, could I just make one brief comment?

THE COURT: I have seen two written submissions and now oral submissions. I don't want to go on all afternoon. I'll give you a brief opportunity to respond, but I don't want to go on for a half an hour here.

MR. EPSTEIN: I have no intention of going on for a half hour, Your Honor. It just seems to me -- I am not a

1  psychiatrist, but I do find it somewhat disturbing that we can

2  submit a substantial report which talks about Mr. Wong's

3  potential for rehabilitation and the Government can so

4  vehemently oppose it without having their own psychiatrist

5  either examine Mr. Wong or examine the report itself.

6       THE COURT:  Mr. Epstein, perhaps because you come

7  into this case late, you see this as the opportunity to try

8  and help your client, who is in a very difficult situation,

9  and I applaud you for that, but I do not find it grounds for

10  downward departure, nor do I feel a need to have any other

11  psychiatrist examine your client.  The Government takes the

12  position that Mr. Wong is eternally unrehabilitatable.  I am

13  not so pessimistic as that.

14       I find it difficult to think that there is any human

15  being who, given intensive and extensive medical treatment and

16  assistance could not get back on the road to humanity, though

17  I will say this case tests that view more than any other, but

18  I'll assume that there is some potential for rehabilitation,

19  even in Alex Wong.  I'll also assume -- indeed, I accept the

20  fact -- that that is a factor that this Court must consider in

21  imposing sentence.  It is a factor.  It is not the factor.

22       Sentence is not imposed solely with the purpose of

23  picking a date by which a defendant is rehabilitated.  It is a

24  factor for consideration.  Other factors that must be

25  considered, as I have said in sentencing other defendants, are

K. Rusin

1. adequately reflecting society's view of how much it abhors the
2. crime committed, and here I have Mr. Wong before me because of
3. the commission of the most heinous type of crime, murder.
4.       Now, having said that, I will say that why I do not
5. depart for rehabilitative purposes is that even the respected
6. psychiatric report that's been submitted to me recognizes a
7. number of problems that Mr. Wong has. What I am being asked
8. to do is gamble, and what I'm being asked to do is gamble
9. with the safety of society. As Ms. Lynch properly points out,
10. Mr. Wong didn't have a particular target when he went and
11. shot. Unexplainable, unforgivable as that would be, he went
12. and randomly shot up a restaurant, causing pain and horror to
13. people that I'll discuss in a moment.
14.       Under those circumstances, to talk about the
15. potential for rehabilitation is very different from talking
16. about the potential for rehabilitation with someone who
17. involves themselves in a serious crime but not one involving
18. murder. Now, I also have to say in this regard, with respect
19. to the potential for rehabilitation, that it hinges not only
20. on the present psychiatric report but on the fact that Mr.
21. Wong had once before sought psychiatric guidance.
22.       At best, viewing this in the light most favorable to
23. him, that attempt to reach out for a psychiatrist or
24. psychologist at Riker's Island suggests mixed motives at that
25. time. If his view was genuine, which I have to express some

K. Rusin

skepticism about, because I recognize that given the boredom of prison life, any break from the routine is sometimes welcome, that help was sought at the same time that he was bribing a prison official, and most horribly, seeking to kill the one witness in his case.

Mr. Epstein, this is a case in which overuse of the word chilling is easy for the Court, but if there is evidence that was chilling in this case, it was listening to the tape recordings of your client urging his fellow Green Dragon members to kill Carol Wong for the simple reason that she could identify him as one of the people who committed murder in that restaurant that night. And his willingness to kill another human being, to take a third life, in order to avoid any kind of punishment for his crimes is so disturbing to this Court that I am not prepared to depart on the theory that he is capable of rehabilitation.

Now, with respect to the lack of youthful guidance, here again, I recognize that there are situations where perhaps a Court would appropriately depart because of a lack of youthful guidance. This is not such a case, in my view, and I say it for this reason. This was not a defendant who was abandoned. I recognize the difficulty that his mother did not play the role in his life that a mother should have. But he did have a responsible adult, his stepfather, who took care of him, and to suggest that his father, because he had to work

K. Rusin

1   very hard, very long hours, and a very long week, abandoned

2   him in the same sense as occurred in the Floyd case is to

3   insult the hundreds of thousands of families who remain

4   strong, responsible and law abiding under similar

5   circumstances.

6          Indeed, your client expressed on at least one

7   occasion the view that what he should have felt because of his

8   father's hard work was some debt to him, some obligation to

9   turn his own life into something better. Instead, he chose,

10  at least on one occasion, to take a number of lives. I do not

11  think that I can adequately deal with the severity of the

12  criminal conduct here by departing in the way you suggested,

13  and so I do not intend to do so. Do you wish to be heard any

14  further with respect to sentence, Mr. Epstein?

15         MR. EPSTEIN: No, Your Honor. It seems once the

16  Court refuses to depart, then the Court's discretion is more

17  or less limiting.

18         THE COURT: Mr. Wong, do you wish to say anything in

19  your own behalf?

20         THE DEFENDANT WONG: No, I don't.

21         THE COURT: Ms. Lynch, is there anything further

22  you'd like to say?

23         MS. LYNCH: No, Your Honor.

24         THE COURT: Mr. Wong, in some ways it may seem that

25  because you're before the Court for only three counts of

K. Rusin

conviction that somehow your conduct is less serious than that of other defendants whom I have sentenced this morning. I do not view it that way at all. Certainly, among the more horrible crimes that this Court heard were the witnesses who testified about the killing of Mr. Ting, the killing of Mr. Galavan. His wife's testimony in this regard will stay with me for many years.

Whether it had any effect on you I cannot say, but no one who heard her testify could feel that they had anything but a horror and distress about what that evening must have been like, and a horror and a distress that any human being could have turned a gun on people the way that had to have happened for her husband to die. I also will have to remember as I think about a sentence in this case that Greg Hyde will never walk again without considerable difficulty, and that Carol Wong is alive today only because you were unable to complete the plans you had for her.

All of these factors lead me to think that the appropriate sentence in your case is life imprisonment. I sentence you to on Count 1 to the term of life incarceration, a five year term of supervised release, and a $250,000 fine. On Count 2, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine. On Count 3, I sentence you to ten years imprisonment, a three year term of supervised release, and a $250,000 fine. The terms of

K. Rusin

1   incarceration, the supervised release and the fines will run

2   concurrently.  I impose a $150 order of special assessment to

3   reflect  the  three  counts  of  conviction.    Is  there  an

4   application, Ms. Lynch?

5           MS. LYNCH:  Move  to  dismiss  the  underlying  and

6   related indictments.

7           THE COURT:  That's granted.  Mr. Epstein, you will

8   file --

9           MR. EPSTEIN:  Yes.

10          THE COURT:  -- timely notice of appeal?

11          MR. EPSTEIN:  I will.  Thank  you  very  much,  Your

12  Honor.

13          MS. LYNCH:  Your Honor, I just want to make one

14  thing -- I think you may have said Count 3.  I believe it was

15  --

16          THE COURT:  I'm sorry.

17          MS. LYNCH:  -- Count 14 --

18          THE COURT:  Count 14.

19          MS. LYNCH:     --  was  the  substantive  count  of

20  conviction.

21          THE COURT:  I'm sorry, it's the third count of

22  conviction.  Count 14.  Thank you, Ms. Lynch.

23          MS. LYNCH:  Thank you, Your Honor.

24          THE COURT:  I'd like to turn now to Joseph Wang.

25          MR. PADDEN:  For  the  defendant,  Michael  Padden,

K. Rusin

1   Legal Aid Society, Federal Defender Services Unit. Good

2   afternoon, Your Honor.

3       THE COURT: Good afternoon. Mr. Padden, you have

4   now had a chance to review the Government's submission and

5   you've already reviewed the presentence report and the

6   addendum with your client?

7       MR. PADDEN: Yes, Your Honor.

8       THE COURT: Mr. Wang, you've seen these documents

9   and talked them over with your lawyer?

10      THE DEFENDANT WANG: Yes, Your Honor.

11      THE COURT: All right. Now, Mr. Padden, I noted a

12  number of objections that you had. You did say that they

13  would not affect guideline calculation, --

14      MR. PADDEN: Right.

15      THE COURT: -- but nevertheless, let us discuss

16  them. With respect to the discussion of Counts 5, 6 and 7, it

17  does have to be amended to reflect that it's Count 5 that's

18  the conspiracy count and Counts 6 and 7 that are the

19  individual homicide counts. The probation department's

20  already taking care of that.

21      MR. PADDEN: Right.

22      THE COURT: With respect to paragraph 67, you note

23  that your client was not involved in the rape of anyone at the

24  Hampton Street apartment. I don't think there's any claim to

25  the contrary.

K. Rusin

MR. PADDEN:  That's correct, Your Honor, but I thought the original recantation of the offense left that unclear, and I wanted to --

THE COURT:  All right, well, if you do have a concern in that regard, I'll ask that it be noted specifically that your client was not alleged in the rapes that occurred that evening.

MR. PADDEN:  Only because this document will follow him to whatever place he's designated.

THE COURT:  Yes.  All right, I'll ask --

MR. PADDEN:  I think it should be --

THE COURT:  -- the probation department to amend it to that extent.  Now, with respect to paragraphs 121, 124, 127 and 131, these relate to personal history matters, and I gather there's no challenge to the facts as the defendant submits them, is that correct?

MS. LYNCH:  That's correct.

THE COURT:  All right, so I'll ask that those amendments all be made as the defense has requested.

MR. PADDEN:  Thank you.

THE COURT:  Are there any other factual statements that you want to take exception to?

MR. PADDEN:  Not any factual statements, no.

THE COURT:  Now, here, too, I have to calculate the guidelines before considering the application for departure.

K. Rusin

1. In this case, I would have to find a total offense level of
2. 45. With a criminal history category of two, the defendant
3. faces a life term of incarceration, a three to five year term
4. of supervised release, a $25,000 to $250,000 fine and a $400
5. order of special assessment, reflecting $50 on each of the
6. eight counts. Any challenge to those as the guideline in the
7. case?
8.      MR. PADDEN: There would be one, Your Honor.
9.      THE COURT: Yes.
10.      MR. PADDEN: It was addressed earlier in connection
11. with the Hampton Street incident, where the adjusted offense
12. level was given an extra two points on the issue of the
13. seriousness of the physical injury connected with the rape. I
14. know you addressed it in connection with one of the other
15. defendants. I would just simply want to note my objection to
16. the added two points and take a position that the correct
17. offense level for that, which would be reflected in paragraph
18. 71 of the presentence report, should be 25 rather than 27.
19.      THE COURT: In that regard, do you wish a hearing as
20. to whether Ms. Peng only sustained bodily injury as opposed to
21. serious bodily injury in a crime as aggressive as a rape?
22.      MR. PADDEN: No. I don't request a hearing. I just
23. want to note my objection.
24.      THE COURT: All right, fine. For the reasons I have
25. already stated, I would leave it as serious bodily injury.

K. Rusin

Anything else with respect to guideline calculation?

MR. PADDEN: No, Your Honor.

THE COURT: All right, Mr. Padden, if you and your client wish to step forward, I'll hear you as to the issue of departure. [Pause] Mr. Padden, I gather that you're asking for it based on the lack of youthful guidance. I would find this difficult, given his father, his brother's presence in his life, but perhaps you'd like to be heard further on this.

MR. PADDEN: I would, Your Honor, and with regard to a couple other matters as well. Inasmuch as it fits into, I think, my argument on this point as well, I'd first like to adopt the arguments that Mr. Epstein made previously with regard to the applicability of the guidelines to a case like this in light of Judge Weinstein's opinion in Concepcion, and I believe my arguments with regard to why there should be a departure will cover my reasons for that application as well.

THE COURT: All right.

MR. PADDEN: I think that -- to jump ahead to what I guess we'd call the bottom line here, Your Honor, is a feeling and a contention that in spite of everything that we've heard here today, in spite of everything we've heard in the course of this case, in spite of what the United States Supreme Court and the Court of Appeals of this circuit have said with regard to the constitutionality and the applicability of the guidelines, whether it be to cases like this or to any other,

K. Rusin

I still contend that it just -- simply stated, it's fundamentally unfair, I think, that a person at my client's age, 19 now, 16 at the time that the alleged most serious offense occurred, the murder that occurred in the Tian Chow restaurant, that the fact that he is now facing a mandatory sentence of life without any parole for deeds that -- without minimizing their seriousness -- occurred at a time when he was 16 years old, strikes me as fundamentally unfair.

The only way that that can possibly be addressed, other than an attack on the constitutionality of the guidelines, is through some application for a departure. The only departure that seems truly available is an argument that it's the result of either lack of youthful guidance or his simple youth in and of itself. And I make that application because of that. Were this case prosecuted in the state court, the charge of murder would carry with it a sentence range of anywhere from 15 to 25 years at a minimum to the same life sentence at a maximum.

But at least there, somewhere along the line, someone would take another look at Joseph Wang. I think it's fundamentally unfair under our guideline system that Your Honor doesn't have that opportunity to do so, and finally, that some type of parole board won't have that opportunity to do so sometime in the future. As you said earlier in connection with one of the other defendant's sentences, a life

K. Rusin

1 sentence for someone, a mafia kingpin who has led a life of
2 crime and at some advanced years is sentenced to life
3 imprisonment is one thing. It may mean 10, 20 years.

4 For my client, it could mean 60 years, quite
5 frankly, in terms of his sentence, and the idea that no one is
6 ever going to take a second look at what may have occurred 50
7 years prior, at the tender age of 16, -- and again, I don't
8 mean to minimize now what the seriousness of it is. I find it
9 extremely unfair and inappropriate in this case, and that is
10 fundamentally why I attacked the guideline application and
11 asked for a departure in this case.

12 My client's life circumstances may not be the same
13 kind of abandonment that occurred in the Floyd case in the
14 Ninth Circuit. There are no other cases that I could find
15 reported that addressed this and pointed to other issues. My
16 client did, as I noted in my letter, suffer the loss of his
17 mother at a very young age. It may not seem, given the fact
18 that he still had a father and a brother, that that resulted
19 in any loss of guidance whatsoever, but it did for my client,
20 based upon my knowledge of his experiences and my relationship
21 with him over the past year.

22 It was something that was a tremendous blow to him.
23 It was her that I think that he had the only affection to at
24 that point in his life. Although his father was around, he
25 just didn't simply share the same kind of affection and

K. Rusin

relationship with his father, and in fact, for I think the first six or eight months in this case, his father didn't even know where he was. He didn't want me to contact his father and even tell him that he was incarcerated. He didn't want his father to know about that.

As the case progressed, as we got closer to trial, there was contact made with his father and there has been some reaching out to him in the last several months, but the fact of the matter is I think that says something, that when incarcerated as he was for crimes like this, he preferred to have his father think that he was either lost or went back to China than to know that he was incarcerated for these charges. I think that says something about the relationship there and certainly the lack of what we would hope that any young man would have in his life in terms of some kind of guidance.

Beyond that, I can only say what I said in my letter, Your Honor, is that I've known Joseph Wang since November of 1990, and I've certainly -- you know, well acquainted with all the facts surrounding this case, both the testimony at trial and everything that we read in the 3500 material and everything I know about the Government's case, and at times, I frankly think I'm reading and hearing about two different people, and I think that's a point I tried to impress in my letter, because the Joseph Wang that I have known is just simply not the kind of person that I would have

K. Rusin

expected to have been involved in the kinds of crimes that he was charged with here.

What that means? Subject to many interpretations, but something went wrong here. Something along the way took someone who I have come to know as a respectful, pleasant, polite, cooperative individual, and I have to represent that to Your Honor as an officer of this court and someone who has practiced here for a couple years before you. I've seen him almost every -- at least once every two weeks in the course of the last -- almost two years. Never a problem with him. Never any antagonism, always a pleasure to deal with, and you know, I know that the Government's going to say but look at the crimes he's charged with, and look what we've heard about him from the witnesses.

All I can say is, Your Honor, there's another side to Joseph Wang here, and the fact that that side is going to be wasted for the rest of his life troubles me, and, I submit, should trouble the Court and even the Government, that our system of sentencing under the guidelines is so restrictive that that can't be taken into account but for some kind of departure. I think if you look at -- just a couple more comments on that before I move to the actual offense of conviction.

Just to bolster that, I mean, I don't know what Your Honor saw during the trial. I know you were certainly

K. Rusin

observant and you saw many things that many defendants did.    I

only know that from my observations of my client, I can say

that I thought that -- and this may be a strange comparison,

but compared to the other defendants in this case, I thought

my client distinguished himself in terms of his behavior in

this courtroom as being unlike the other defendants in this

case.

I thought that he was certainly -- I don't know if

he was perfectly behaved.   I guess that you had a better

vantage point than I did during the trial, but I certainly saw

nothing that he did during the course of the trial that in any

way resembled the conduct of some of the other defendants that

I know concerned Your Honor.   It concerned all of us, and to

the extent I think we even at some point made motions to sever

based on the behavior of other individuals in the court

fearing that it might prejudice my client and I think a couple

of other of us made similar motions.

I spoke to the jury shortly after the conviction for

a short while.   I had jurors say to me that they thought

that Joseph Wang was the best behaved during the course of the

trial.   I'm not sure what that's worth, but I think it says

something.   I know that when I go to the MCC and I encounter

officials over there, guards that have daily contact with my

client, and then when I say I'm here to see Joseph Wang, they

say oh, Joseph, he's a good guy.   Now, I know in the context

K. Rusin

1  of the prison, that may be a relative term, but it's

2  something, I think, that says something about Joseph Wang.

3  I have had other clients that have been on the same

4  unit as him at MCC tell me, when I've had them both -- when

5  I've gone to see more than one client at a time, and they've

6  sort of passed each other as either Joseph was going up and

7  the other client was coming down or vice versa, say to me oh,

8  you represent Joseph, he's on my unit, they said he's a good

9  guy. I've had other Asian clients tell me that when they were

10  brought into the MCC tell me how Joseph helped them in terms

11  of telling them how to get things, how to go to the

12  commissary, particularly those that didn't speak English.

13  Joseph, as you know from the trial, speaks both Chinese and

14  English.

15  I offer that because I just -- it may seem, in the

16  context of everything else that's gone on here, the tension in

17  the courtroom this morning, the very emotional appeal on

18  behalf of the Government with respect to the Mack incident,

19  and all the horrible things that we all heard of and

20  encountered in this case, I think it's nonetheless relevant

21  that we know something about the person that Joseph Wang is,

22  at least the person that I've dealt with over the course of

23  the past couple of years, and I think it's a factor that I

24  want Your Honor to be aware of before imposing any kind of

25  sentence, and I think that, again, to wrap it up, where it

K. Rusin

fits in, as it only can under our guidelines system, is in the context of my application for a departure based on his youthful lack of guidance.

If I can't say specifically what went wrong or where it went wrong, I can only say that, obviously, something did go wrong that led Joseph to be in the predicament that he's in, and I can only offer his association with these other individuals as the reason for it, but certainly, as an individual, the conduct that is alleged against him doesn't fit the individual that I have come to know, separate and apart from the evidence in this case and the other individuals in this case. And I'd ask Your Honor to consider that in considering my application for a downward departure.

THE COURT: Ms. Lynch, do you wish to be heard?

MS. LYNCH: Yes, Your Honor. Mr. Padden raises, at the outset, a similar argument that Mr. Alex Wong raises, that the guidelines should not be held applicable to his client, relying on Judge Weinstein's decision in <u>U.S.</u> versus <u>Concepcion</u>. The Government obviously disagrees with that. We think that in the Concepcion case, Judge Weinstein recognized that the very case with which he was dealing, which I believe was a welfare and food stamp fraud case, had not been specifically considered very much by the guidelines when they were promulgated some ten years ago.

That was a primary basis for his finding that that

K. Rusin

case was, in and of itself, atypical. Certainly, murder was considered by the drafters of the guidelines, with a lot of consideration when they went into the guidelines, and that's obvious from the guideline themselves. Certainly, extortion and the other crimes for which the defendant has been involved in were considered by the guidelines, and also in Concepcion, Judge Weinstein was dealing with defendants who were themselves committing a crime that wasn't -- in fact, partly facilitated by a very lax administrative system, as he found. They were almost, in effect, working within a lax system.

This defendant chose to absent himself from the rules of society and then turn around and attack society again by firing those shots in the Tian Chow restaurant. The two cases are totally distinguishable, and the reasoning of Concepcion is not applicable here, because we do have what is a typical case under the guidelines, I submit to you. On the issue of departure, essentially, defense counsel argues it's just not fair. Well, -- and that the defendant's life could certainly be another 60 years. That is certainly 60 years that Anthony Galavan will not have, and certainly him being cut down in the prime of his life is also not fair. But it exists, and it is a reality that must be dealt with.

The guidelines have chosen to deal with it with a certain sentence, and we submit that it's fair and it's applicable. I would also remind the Court, and just briefly,

K. Rusin

as we've set forth in our letter, that Mr. Joseph Wang, in fact, went back to Sonny Wong and told him that he, too, had shot at Mr. Ting to ensure that he was dead, and we provide a transcript cite for that purpose. We note that bullets from both types of guns used were found all over the Tian Chow restaurant, indicating that Joseph Wang was fully involved, as was the defendant Alex Wong, in firing at random in the restaurant.

Also, the jailhouse references notwithstanding, defense counsel argues that the defendant has somehow distinguished himself from his other codefendants, which is not saying very much. Given that he went to the Tian Chow restaurant and participated in a random, senseless act of violence, given that this defendant, as Mr. Mark Mah testified, was with Sonny Wong when Sonny Wong went to the Grand Elmhurst restaurant and initiated the extortion therein, and given that he was an active participant in the gang activity outside of prison, to say that now that he is in prison, because he is more well behaved than the others, simply does not rise to the level of consideration that would support departure in this case, or almost in any other case.

Mr. Padden's argument essentially boils down to because he cannot set forth -- as he concedes -- the significant factors found in Floyd for departure that simply something must have gone wrong. Well, the Government

K. Rusin

certainly recognizes that something is very wrong when people commit murder, as we set forth in another submission, because it's not a social norm. But the issue is does it rise to the level of departure, and does it rise to the level of a consideration that would lead this Court not to apply the guidelines, and in this case, it does not.

The defendant came from a stable family. He suffered the loss of his mother, but he remained with his living father and living brothers who were actively involved in his life. He, like these other defendants, chose to leave his home. He was not thrown out. He was not abandoned by anyone. He chose to remove himself from certain circles and to join others, and once in those circles, he participated avidly, actively and aggressively.

I would also remind the Court of some of the taped conversations involving the Long Island Dumpling -- I'm sorry, I misspoke, Your Honor -- involving the robbery at Yorktown, wherein after certain individuals, certain other Green Dragons, were arrested, this defendant Joseph Wang is overheard talking to his girlfriend about that and being upset because it was one of the things that he had helped plan, so not only did the defendant leave his home and choose another lifestyle, he worked within that lifestyle to support it, to plan, to support the Green Dragons financially by robberies, to plan to uphold their name by going to the Tian Chow and

K. Rusin

1 killing not just the manager but anyone else he might have

2 happened to shoot when he sprayed the restaurant with bullets,

3 and he planned to participate in the extortionate schemes of

4 the Green Dragons.

5     Something may have gone very wrong with the

6 defendant, but after that, he committed several very, very

7 grave wrongs. We think that nothing that has been adduced

8 here supports a downward departure or the non applicability of

9 the guidelines, and we would request that the motion be denied

10 and this defendant be sentenced under the guidelines.

11     MR. PADDEN: Your Honor, I'm sorry, but if I could

12 just respond to one point very briefly, because Ms. Lynch --

13     THE COURT: Briefly.

14     MR. PADDEN: -- and that's with regard to the Tian

15 Chow, and I'm not here to relitigate what happened there. We

16 made our arguments at trial, but with regard to the Anthony

17 Galavan homicide, I just want to remind the Court that no

18 witness in this case was in the Tian Chow, and there were

19 witnesses that came in and talked about what individuals did

20 what in that restaurant. No one ever said that Joseph Wang

21 pointed a gun at any individual in that restaurant or sprayed

22 that restaurant with bullets.

23     In fact, the only testimony from any eyewitnesses

24 who were -- that there was only one gunman, one shooter, and

25 that was identified as another individual. Now, I don't --

K. Rusin

1    THE COURT:  Mr. Padden, --

2    MR. PADDEN:  I know.

3    THE COURT:   -- there were 11 shots fired, and the
4  ballistics shows two separate weapons.  I mean, the fact that
5  the people in that restaurant, with guns being sprayed, didn't
6  spend their time trying to get an ID of people is not
7  something I'm about to fault anyone for.  That Carol Wang
8  looked at anybody instead of hitting the floor I find
9  positively amazing.  But 11 shots and two separate types of
10  guns -- what other conclusion can I draw than that your client
11  was shooting as well?

12    MR. PADDEN:  Well, I mean, like I said, Your Honor,
13  I'm not here to engage in speculations to what other scenarios
14  could have occurred.  It's just the fact of the matter is that
15  I think there's just something lacking there in the -- when
16  they claim that my client -- they want to claim that he aimed
17  and fired at other individuals in that restaurant.  I don't
18  think that is supported by evidence in the case.

19    THE COURT:  I'm prepared to find by a preponderance
20  of the evidence that your client fired.  There are two
21  separate ballistics -- the ballistics report shows two
22  separate weapons, and there are a total of 11 shots fired.
23  It's so unlikely that that all would have been attributable to
24  Alex Wong as to be ludicrous.  I'm prepared to find by a
25  preponderance of the evidence that there were two shooters and

K. Rusin

1   that your client was the other one.

2   All right, let me deal with the question of
3   departure. First of all, let me be emphatic, because this
4   deals with the Concepcion type argument that's been made to
5   me, that I am not imposing any sentence with respect to any
6   defendant in this case simply because it is required by the
7   guidelines. I do not consider myself a notary public, and
8   particularly not in a case such as this. I am not imposing
9   any sentence in this case that I consider to be unjust or
10  contrary to my own view of what my obligations are under my
11  oath.

12  If I did think that any guideline sentence worked a
13  serious injustice, I would suspect it would have to be because
14  I thought that there was some factor present in this case that
15  the commission did not adequately deal with. I would
16  articulate that factor and I would discuss the propriety of
17  departure, so to the extent Concepcion speaks of the need of a
18  district court Judge always to consider the particular case
19  before him or her, and to consider whether the guidelines, in
20  light of the statute that enacts them, warrants application, I
21  accept that. I simply do not find this to be a case for
22  sentencing outside the guidelines in light of that rationale.

23  Now, with respect to the issue of departure, as I've
24  said, I consider myself empowered to depart if I were to find
25  circumstances of lack of youthful guidance or other such

K. Rusin

circumstances that warranted departure, so this is not a case where I don't think I'm empowered to depart. It is a case where I find no facts that fairly require departure in order to do justice in the case.

That is not to say that I reach that issue easily or that conclusion easily. No court, I would think, and certainly not this one, imposes life sentences on any person, and especially not on young people such as these defendants, without considerable thought and consideration of the propriety of such a sentence. But what I cannot do here is ignore the crimes that bring the defendants before me. In Joseph Wang's case, the reason this Court is considering life sentences is because he was involved in wanton murders. There is no crime for which society demands as clear a statement of abhorrence as murder.

Now, in this case, Mr. Ting was the target of the shooting, was killed for one simple reason, because he wasn't paying the extortion money that the Green Dragons considered their due. Mr. Wang and Alex Wong did not go to this restaurant simply to frighten Mr. Ting, or even to beat him up as a message, not that I would condone that by any means. They went there to kill him for the simple reason that he wasn't paying the couple of hundred dollars a week that every restaurateur was expected to pay the Green Dragons in this neighborhood. Now, when I consider that as the crime that

K. Rusin

1  brings Joseph Wang before me, I have to consider what chance I

2  have to look at his life or his future when I'm asked to

3  consider Joseph Wang's life and his future.

4          Indeed, Mr. Padden, you have argued very forcefully,

5  as have the other defense counsel, that it's important to look

6  at Joseph Wang.  I can assure each and every one of you I've

7  spent time doing almost nothing else for the last week except

8  when I've been in court.  I have read and reread these

9  reports, and wrestled with the facts of these defendants'

10 lives, trying to understand how they got from their families

11 to a position where they would commit wanton murders.

12         But about Mr. Ting I realize I know very little.  No

13 family member testified for him, and yet I know he has no

14 life.  There is no future for him.  With respect to Anthony

15 Galavan, of course, I don't know Mr. Galavan and never will,

16 but he was a man out having dinner with his wife.  He was a

17 young man, an Irish immigrant, and his wife testified.  She

18 was his wife for only a few years.  There will be no future

19 for them, no chance to look at their lives.

20         I said earlier that her testimony was among those

21 that would stay with me.  That was actually an understatement.

22 Her testimony will haunt me.  I do not think that I can do

23 justice to the crimes that were committed in this case by

24 departing downward, and that is the reason that I choose not

25 to do so.  All right, Mr. Padden, is there anything else you'd

K. Rusin

1  like to say to the Court before I impose sentence?

2        MR. PADDEN:  Well, without the downward departure,

3  Your Honor, there is no discretion, and I would just rely on

4  the same arguments I've made consistently.

5        THE COURT:  Mr. Wang, is there anything you'd like

6  to say on behalf of yourself?

7        THE DEFENDANT WANG:  Yes.  I would like to ask Your

8  Honor to put on the record there's any way that you can apply

9  for me to a penitentiary or jail that's near New York, because

10  my father had a stroke in 1989.  He had a heart attack in

11  1991, so I don't know when I'm going to see him again.

12        THE COURT:  All right.  Is there anything that the

13  Government would like to add?

14        MS. LYNCH:  No, Your Honor.

15        THE COURT:  All right, Mr. Wang, for the reasons

16  I've already stated, I impose a life sentence with respect to

17  you.  Let me detail it as to each count.  With respect to

18  Count 1, I sentence you to life imprisonment, a five year term

19  of supervised release, and a $250,000 fine.  With respect to

20  Count 2, I sentence you to life imprisonment, a five year term

21  of supervised release, and a $250,000 fine.  With respect to

22  Count 10, I sentence you to three years -- I'm sorry, ten

23  years incarceration -- it's Count 5.  Count 5, a ten year term

24  of incarceration, three years of supervised release, and a

25  $250,000 fine.

K. Rusin

1    With respect to Count 6, I sentence you to life
2  incarceration, a five year term of supervised release, and a
3  $250,000 fine.  With respect to Count 7, I sentence you to
4  life imprisonment, a five year term of supervised release, and
5  a $250,000 fine.  With respect to Count 17, I sentence you to
6  three years imprisonment, one year supervised release, and a
7  $250,000 fine.  With respect to Count 27, I sentence you to
8  20 years imprisonment, three years supervised release, and a
9  $250,000 fine.  With respect to Count 28, I sentence you to 20
10 years imprisonment, three years supervised release, and a
11 $250,000 fine.

12    I impose a $400 order of special assessment,
13 representing $50 on each of the eight counts of conviction.
14 The other terms of incarceration, supervised release and fine
15 will all run concurrently.  Ms. Lynch, is there an
16 application?

17    MS. LYNCH:  Move to dismiss the underlying and
18 related indictments against this defendant.

19    THE COURT:  That's granted.  Mr. Padden, you'll file
20 timely notice of appeal for Mr. Wang?

21    MR. PADDEN:  Of course, Your Honor.

22    THE COURT:  I'll also ask the probation department
23 to note that Mr. Wang has asked to be designated to a facility
24 in the New York area because of his father being ill.  Mr.
25 Wang, I'll tell you that whether or not this will be honored,

K. Rusin

1  I cannot say, and the reason for that is that the northeast,

2  this area, is very crowded right now, but I will at least ask

3  that it be considered in your case.

4       THE DEFENDANT WANG:  Thank you, Your Honor.

5       THE COURT:  You're welcome.

6     (Pause in proceedings)

7       THE COURT:  Counsel in the remaining matters, we

8  have obviously been going since 10:00 this morning and taken

9  up considerable time, but I would like to deal with the

10  remaining defendants.  We are going to take a short lunch

11  recess.  Mr. Schoenbach, you were, of course, at the Court of

12  Appeals this morning.  This morning, Mr. Mack asked to address

13  the Court.  That is recorded.  It does pertain to a charge on

14  which your client stands to be sentenced.  I'm going to ask

15  the court recorder to play it back for you and your client so

16  that you can hear it.  Let me --

17       MR. SCHOENBACH:  Perhaps I can do that at the break,

18  Your Honor.

19       THE COURT:  That's what I was going to ask, if that

20  could be done now during the break.  And then I will resume at

21  quarter of 2:00.  I have a 2:00 calendar on civil matters, but

22  I'm just going to ask those lawyers to wait so that we can

23  deal with you all.  I still have Mr. Chan, Mr. Cheng, Mr. Ngo

24  and Mr. Ng to do.  I probably will go with Mr. Chan and Mr.

25  Cheng at quarter to 2:00, and then Mr. Ngo and Mr. Ng

K. Rusin

1  thereafter.

2      MR. LEVINE:  Can my client be brought up now so that

3  he can hear it as well?

4      THE COURT:  Mr. Levine, the one problem we have is

5  Mr. Chan, who is Mr. Schoenbach's client, also needs to hear

6  that tape recording.  Perhaps sometime during this 45 minute

7  break we could spare some of your deputies to let Mr. Chan

8  listen to that tape, Brian Chan.

9      MARSHAL:  Yes, Your Honor.

10     THE COURT:  All right, Mr. Schoenbach, you work it

11 out whether you want to do that with the marshals now, at

12 1:30, whatever is convenient for you gentlemen, all right?

13 All right, thank you.

14     MS. PALMER:  Judge, are you aware of Mr. Cohen's

15 situation with respect -- I'm sorry, it was communicated -- I

16 spoke with his office yesterday, who left a message with --

17 I'm not sure.  They said on a recording with chambers.  In any

18 event, his father passed away yesterday.

19     THE COURT:  Oh, no, I did not know that.  I knew

20 that his father was very ill.  Again, I heard that a couple of

21 weeks ago.

22     MS. PALMER:  Yes, and --

23     THE COURT:  All right, so obviously we're not going

24 to go forward with his client.

25     MS. PALMER:  With Mr. Ng.  I'm sorry, I thought the

K. Rusin

1 Court was aware of that.

2 THE COURT: Mr. Ng, N G, his attorney's father has

3 passed away. That we are going to have to adjourn, and I

4 don't know when right now, marshals, but we will go forward

5 with the other three.

6 (The Court stands in recess)

7 (tape off/tape on)

8 (The Court resumes in session)

9 THE COURT: Mr. Schoenbach, do you want to note your

10 appearance for the record?

11 MR. SCHOENBACH: Yes. For the defendant Brian Chan,

12 Laurence Schoenbach, 425 Park Avenue, New York.

13 THE COURT: Mr. Schoenbach, have you had a chance to

14 see both the presentence report and the Government's recent

15 submission of September 29th and to discuss both of these with

16 your client?

17 MR. SCHOENBACH: I have, Your Honor.

18 THE COURT: Mr. Chan, you've seen the Government's

19 submission and the presentence report in your case?

20 THE DEFENDANT CHAN: Yes.

21 THE COURT: Okay. I did note in your submission,

22 Mr. Schoenbach, a number of objections. Let me go through the

23 ones I note and you can tell me if I overlooked any. You

24 object to paragraph 195, the treatment of the youthful

25 offender conviction in calculating your client's criminal

K. Rusin

1    history.   The  Government  concedes  that  that  should  not  be

2    used, and I will not use it in this case, all right?

3             MR. SCHOENBACH:  Fine.

4             THE COURT:  You object to a two point enhancement of

5    his  criminal  history  category  for  the  fact  that  he  was  on

6    probation  at  the  time  he  committed  the  crimes  here  charged.

7    Now, let me make sure I have the facts right on this.   Your

8    client's entry into the Green Dragons enterprise predates his

9    probation,   but   his   commission   of   other   predicate   acts

10   postdates his probation term, doesn't it?

11            MR. SCHOENBACH:  I believe that's correct.

12            THE COURT:  My understanding of the reason for this

13   enhancement is that someone who is prepared to commit crimes

14   even  while  on  probation  should  be  viewed  differently  than

15   someone who is committing crimes without the benefit of that

16   supervision.   To  that  extent,  it  would  seem  to  me  that  it

17   would  be  appropriate  to  treat  this  fact  as  a  two  point

18   enhancement,  but  I'll  be  happy  to  hear  you  as  to  why  that's

19   not an appropriate analysis.

20            MR. SCHOENBACH:  Very briefly, Your Honor, I don't

21   believe  it  appropriate  because  the  guidelines  speak  to  the

22   date   of   the   criminal   offense.    The   offense   here   is

23   racketeering and conspiracy to commit racketeering.   The date

24   of  the  offense,  by  law,  is  the  date  alleged  in  the  indictment

25   that precedes the date of the probation period that Mr. --

K. Rusin

1    THE COURT:  Well, racketeering, though, is something

2    of a continuing crime, because it straddles over the various

3    predicates.  To that extent, why isn't it appropriate to

4    recognize that his being on probation for any of the period of

5    the enterprise warrants this enhancement?

6    MR. SCHOENBACH:  Well, Judge, the logic of the

7    argument is, to take your example, if Mr. Chan had committed

8    no racketeering acts whatsoever, post date his probationary

9    sentence, then he would still, with all due respect, by your

10   argument, be given the two point enhancement.

11   THE COURT:  If that were the case, I think I would

12   have to consider whether a departure was appropriate because

13   of the failure of the commission to consider the particular

14   aspects of racketeering in providing for that enhancement, but

15   in this case, where there are predicate acts committed while

16   on probation, I am inclined to follow the probation

17   department's recommendation.  I do not think it makes a

18   difference as to the actual --

19   MR. SCHOENBACH:  The guideline calculation's still

20   the same.

21   THE COURT:  Right, but I will note that I'm going to

22   reject your application on that part of the guideline

23   calculation for that reason.  Now, the next objection that I

24   noted was you say that your client is not an illegal alien,

25   and I gather that is, in fact, correct, that he is lawfully in

K. Rusin

1 the United States, so I'll ask that the report reflect that.

2 You then indicate on paragraph 42 that your client

3 did not drive the various individuals to Sands Point at the

4 time of the killing of Tommy Mack and Tina Scham. That is

5 correct. The evidence at trial showed that Mr. Tran was the

6 driver. I'll ask that that be amended, though I do have to

7 say, Mr. Schoenbach, that what the Government submitted in

8 their letter as to what the trial evidence showed your

9 client's involvement was did comport with my own recollection.

10 MR. SCHOENBACH: As it does with mine, as far as the

11 transcript is concerned.

12 THE COURT: So that's the amendment that I'll ask be

13 made. All right, paragraph 44 is an amendment I've already

14 made with respect to Mr. Tran that he did not communicate Mr.

15 Wang's name to -- Ms. Wang's name to any of the Green Dragons,

16 so that amendment will be made. Finally, you object to

17 paragraph 46 where there is alleged involvement by your client

18 in the Fook Ching kidnaping. Now, your client was acquitted

19 --

20 MR. SCHOENBACH: That's correct.

21 THE COURT: -- on this charge, and so to that

22 extent, I have to say that I do not intend to use any

23 involvement in calculating sentence, but my recollection of

24 the evidence is that he was not involved at the start, but

25 later, when the victim was brought to a Green Dragons

K. Rusin

1  location, he was among the people present during that

2  discussion. That was what the evidence suggested.

3      MR. SCHOENBACH: I don't want to belabor the point,

4  Your Honor. He was certainly acquitted of it. He was not in

5  the car. The tapes proved that. In fact, Mr. Wong had to

6  retract the original statement that he made, naming Mr. Chan

7  as a participant in the kidnaping itself.

8      THE COURT: All right.

9      MR. SCHOENBACH: The testimony also showed that Mr.

10 Chan was present at one of the houses when a victim or when

11 the victim was taken there. Whether Mr. Chan participated in

12 that or not, I think the record is void of any conversation.

13 There is certainly argument that could be made by both

14 counsel. I think it academic, frankly.

15     THE COURT: I was going to agree with you in that

16 respect, Mr. Schoenbach, unless Ms. Palmer wants to take a

17 different view. I could go back and reread this portion of

18 the transcript. I did not because it did not seem to me to

19 have any effect on sentencing.

20     MS. PALMER: Your Honor, the Government agrees with

21 that. It would not have an effect on sentencing. I would

22 just state that there had been testimony about Mr. Chan

23 participating with the others in the house about the various

24 alternatives, but it's --

25     THE COURT: And as I said, I'm not going --

K. Rusin

1    MS. PALMER:   -- not something that the Government is

2  --

3    THE COURT:   -- to consider it in sentencing.

4    MS. PALMER:  -- pushing.  All right.

5    MR. SCHOENBACH:   If I could just have one moment,

6  Judge.  My client wishes --

7    THE COURT:   Yes.   In fact, Mr. Chan can come

8  forward, because it's probably easiest if he does that.

9    (Pause in proceedings)

10    THE COURT:   Mr. Chan, why don't you come forward?

11  It will be easier this way.   Yes, Mr. Schoenbach, anything

12  else?

13    MR. SCHOENBACH:  No, Your Honor.

14    THE COURT:  All right.  I don't think there are any

15  legal issues in dispute.   I know there's a request for

16  downward departure, but I'll consider that after I calculate

17  the guidelines.   Am I right that there are no other legal

18  issues outstanding?

19    MR. SCHOENBACH:  That's correct.

20    THE COURT:  All right.  Based on all of the facts

21  submitted, I would find that there is a total offense level of

22  46.  With a criminal history category of two, the defendant

23  faces a life term of imprisonment, three to five year term of

24  supervised release, a $25,000 to $250,000 fine, and a $700

25  order of special assessment, $50 on each of the 14 counts of

K. Rusin

conviction.   Mr.  Schoenbach,  with  the  exception  of  the
objection you've already noted, is there any other challenge
to those guideline calculations?

        MR. SCHOENBACH:  No, there is not.

        THE COURT:  All right.  The request for departure --
before I ask about the request for departure, let me note on
the record I did give the defense the opportunity to listen to
the recording of the statement Mr. Mack asked to make to the
Court this morning with respect to the murder of his brother
and Tina Scham.  Mr. Schoenbach, I gather you have listened to
it?

        MR. SCHOENBACH:   I have listened to it.   Mr. Chan
and I discussed the matter.  He was allowed the opportunity to
listen.  He has elected not to hear the tape.

        THE COURT:  All right.  Mr. Schoenbach, you have
asked that I consider downward departure because of your
client's youth.  Is there anything you'd like to add to your
submission as to why I should downwardly depart?

        MR. SCHOENBACH:   Your Honor, I have sat here for
quite some time.  I have heard what the Court has said with
regard to other defendants and other pleas for leniency.
Obviously, I make the same pleas.  I do not wish to belabor
the point.  I think I have as adequately as possible stated my
position in the papers submitted to Your Honor, and therefore
would ask for a downward departure.

        K. Rusin

THE COURT: Is there anything the Government would like to add to its papers in opposition?

MS. PALMER: No, Your Honor. The Government strongly opposes the downward departure motion for the reasons set forth in its letter. Primarily, Mr. Schoenbach starts on the issue of age, and as we point out, it was after Mr. Chan turned 18 that he engaged in some of the most heinous offenses for which he stands convicted, and he turned 18 on January 4th, and on January 23 is the day that -- the night that he went to the Hampton Street with several other codefendants.

He forcibly threw Linda Peng's husband into the apartment, pulled Linda Peng out of the bathroom at knife point. That was on January 23rd. On February 23rd, of course, he was involved in the brutal execution style murder of Tina Scham and Tommy Mack. On February 27th, just four days later, he was involved in the gunning down of Jin Sook Li in the streets of Elmhurst, Queens. All of those acts were engaged in after Brian Chan turned 18, and Brian Chan's family history, as is evident not only from the presentence report but from the letters that were submitted -- here is an individual who was given opportunities that many people in this courthouse never had.

His family took time to send him to a military academy, sent him to some very fine institutions for education. This is an individual who has had more

K. Rusin

opportunities in life than a lot of people who stand before this Court, and he threw them away. And after he turned 18, he engaged in a spree of terror and crime that is virtually unmatched in this case. After turning 18 he did that.

THE COURT: Well, let me say that I don't really understand Mr. Schoenbach's argument to be based on some line distinction between a juvenile and an adult. An 18 year old is still a very young person, and to that extent, I consider very seriously the propriety of sentencing someone who was so young at the time of the crime, who is so young as he stands before me, to a life term of imprisonment. But I also recognize that there was a time in Mr. Chan's life when he did have many opportunities and a very supportive family, and I also recognize that that was disrupted at the time his father died.

But I do not see the kind of lack of supervision or lack of family support that was present in the Floyd case or that would warrant a departure here. I only note all these facts to emphasize that in Mr. Chan's case, as with every other defendant being sentenced today, I have sought to consider him as a unique individual and to consider all relevant facts about him in making any decision about such a severe sentence. But Mr. Schoenbach, you are right. For reasons I have already stated with respect to other defendants, I must impose a life sentence in this case.

K. Rusin

Mr. Chan's involvement in multiple homicides, all of them brutal, many of them proved in this court through evidence that was most disturbing, and I am, of course, referring to the facts and circumstances of the murders of Tina Scham and Tommy Mack, are ones that I cannot treat lightly. I recognize that Mr. Chan was not the shooter in the Scham and Mack murders, but nevertheless, the involvement of any person in that crime where two people were driven for a considerable period of time, literally begging for their lives the entire way, is so shocking and disturbing that to sentence lower than the guidelines simply does not adequately deal with the seriousness of the crime.

I'm also very affected by Mr. Chan's willingness to participate in the plan to murder Carol Wang. He was not involved in the shooting of Mr. Galavan and Mr. Ting in the restaurant where Alex Wong and Joseph Wang shot those individuals, but Carol Wong was the person who was going to implicate Alex Wong in that murder, and Mr. Chan was willing to participate in the discussions about killing her in order to avoid a fellow Green Dragon being charged with those crimes. All of these lead me to decide not to downwardly depart. Mr. Schoenbach, is there anything more you'd like to say on behalf of your client?

MR. SCHOENBACH: No, there is not, Your Honor.

THE COURT: Mr. Chan, is there anything you'd like

K. Rusin

1   to say in your own behalf?

2           THE DEFENDANT CHAN:  No.

3           THE COURT:  Ms. Palmer, anything else?

4           MS. PALMER:  No, Judge.

5           THE COURT:  Mr. Chan, you were not here this morning

6   when I sentenced some of the other defendants, and so I repeat

7   some of what I said at that time.  This sort of sentence is

8   never undertaken lightly by a Court, and is never imposed

9   without considerable thought.    In your own case, I have

10  considered the fact that you were involved in some truly

11  disturbing crimes, and that throughout this trial, I have

12  tried very hard to focus on you and to ensure that you were

13  given a fair trial and all of the procedures and protections

14  that you were entitled to under United States law.

15          But as I sentence you today, I cannot think just

16  about you.   Justice requires that I listen to people who

17  cannot speak to me with their own voices because they are no

18  longer alive, but who speak to me nevertheless and do ask that

19  their deaths not be trivialized or treated as anything other

20  than the serious and horrible events they were.   And because I

21  am persuaded that that is exactly what you participated in

22  here, wanton and inexcusable taking of human life, and because

23  society demands that that kind of crime be dealt with most

24  severely, I sentence you, as I am required to do by law, to a

25  life term of incarceration.

K. Rusin

Because there are 14 separate counts, some of which provide for lesser sentences, I will go through each of the counts. With respect to Count 1, I sentence you to life incarceration, a five year term of supervised release, and a $250,000 fine. With respect to Count 2, I sentence you to lifetime imprisonment, a five year term of supervised release, and a $250,000 fine. With respect to Count 10, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine. With respect to Count 11, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine.

With respect to Count 12, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine. With respect to Count 13, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine. With respect to Count 14, I sentence you to ten years imprisonment, a three year term of supervised release, and a $250,000 fine. With respect to Count 17, I sentence you to three years imprisonment, a one year term of supervised release, and a $250,000 fine.

With respect to Counts 21, 22, 25, 26, 29 and 30, I sentence you to on each of those counts to a term of 20 years imprisonment, three years supervised release, and a $250,000 fine. Those terms of incarceration, the supervised release terms and the fines will all run concurrently. I sentence you

K. Rusin

1    to $700 special assessment, representing $50 on each of the 14

2    counts.  Ms. Palmer, is there an application?

3        MS. PALMER:  Yes, Your Honor.  At this time, the

4    Government would move to dismiss the underlying indictments

5    with respect to Mr. Chan as well as the related indictment.

6        THE COURT:  That's granted.  Mr. Schoenbach, will

7    you file timely notice of appeal on behalf of Mr. Chan?

8        MR. SCHOENBACH:  I will do that this afternoon.

9        THE COURT:  Thank you.

10       MR. SCHOENBACH:  There is a -- I don't know if it's

11   an open count or the indictment --

12       MS. PALMER:  That's the related indictment.

13       THE COURT:  The related indictment is being

14   dismissed.

15       MS. PALMER:  It's being dismissed.

16       MR. SCHOENBACH:  Fine.  Okay.

17       THE COURT:  Thank you.

18       MR. SCHOENBACH:  Thank you, Your Honor.

19       THE COURT:  Mr. Chan is excused, Marshals, thank

20   you.  I'd like to turn next to Mr. Cheng.

21       MR. LEVINE:  Good afternoon, Your Honor.

22       THE COURT:  Good afternoon.

23       MR. LEVINE:  For the defendant, Charles Levine, 108-

24   18 Queens Boulevard, Forest Hills, New York.

25       THE COURT:  Mr. Levine, I have reviewed the

K. Rusin

1    presentence report, your submission and the Government's

2    letter of September 30th.  Have you had a chance to see all

3    these documents and to go over them with your client?

4         MR. LEVINE:  Yes, I have, Your Honor.

5         THE COURT:  Mr. Cheng, have you had a chance to see

6    the presentence report in your case, the Government's letter

7    and to talk it over with your lawyer?

8         THE DEFENDANT CHENG:  Yes, Your Honor.

9         THE COURT:  Now, Mr. Levine, I noted a number of

10   objections that you made, and then I have a question myself

11   about the guideline calculation.  You raise the question of

12   whether the Chan -- Kan Tai Chan conspiracy to murder should

13   be calculated only at level 20 rather than 31, which is, I

14   believe, what the probation department has --

15        MR. LEVINE:  In essence, yes, Your Honor.  Actually,

16   they have -- the bottom line calculation for that racketeering

17   act turns out to be a level 43, as they --

18        THE COURT:  Yes.

19        MR. LEVINE:  -- as the probation department sees it.

20        THE COURT:  Because they treat it also as the murder

21   being proved by a preponderance of the evidence.

22        MR. LEVINE:  Yes, Your Honor.

23        THE COURT:  All right, we'll discuss that more in a

24   moment.  You also ask that I should not use the two crimes

25   which were predicates to enhance his criminal history, and I

K. Rusin

1  believe that amendment has already been effected.

2      MR. LEVINE:  That has been made, Your Honor.

3      THE COURT:  All right.  Mr. Cheng was not convicted

4  with respect to the substantive charge of murdering Mr. Chan,

5  but only the conspiracy to murder.  The probation department

6  indicates that I could perhaps find by a preponderance of the

7  evidence that he was guilty of this charge.  I recognize that

8  there is authority for considering even acquitted counts, but

9  it does not make any difference, I do not believe, to the

10  guideline calculation, and in an abundance of caution, I would

11  not be inclined to consider a count that the jury acquitted

12  Mr. Cheng on, at least for purposes of this sentence, where it

13  makes no difference.

14      Now, does the Government wish to pursue this any

15  further?

16      MS. PALMER:  Judge, just to -- we had not received a

17  copy of -- why the Court has -- and somewhat an abbreviated

18  letter from us, is we did not receive a copy of Mr. Levine's

19  objections.  We did respond to Mr. Ng's motion that addressed

20  the Kan Tai Chan thing, but with respect to Mr. Cheng, I don't

21  --

22      THE COURT:  I can let you look at my copy, --

23      MS. LYNCH:  Thank you.

24      THE COURT:  -- if you want to take a few moments.

25      MS. PALMER:  I don't think for present purposes with

K. Rusin

1 respect to Mr. Cheng's sentencing that we would push the
2 issue.

3     THE COURT: Why don't you nevertheless take a look
4 at the letter in case it alters your view at all?

5     MR. LEVINE: Your Honor, just so that the assistants
6 don't feel that the fault is with the United States post
7 office, I had delivered it by hand to the fifth floor and left
8 it there that day, so the post office is not to blame.

9     (Pause in proceedings)

10     MS. LYNCH: Thank you, Judge.

11     THE COURT: Ms. Lynch, does the Government want to
12 oppose what I have proposed here?

13     MS. LYNCH: No, Your Honor.

14     THE COURT: Now, Mr. Levine, then, perhaps having
15 previewed that that's what I intended to do, I use the 31
16 calculation that the department recommends for the conspiracy
17 count. You suggest it should only be 20, but the guideline
18 does suggest that if a death occurs in connection with that
19 homicide, it should be enhanced.

20     MS. PALMER: It should be a level 43. Your Honor,
21 just to make the record clear, we are not waiving that issue
22 with respect to Mr. Ng in terms of what --

23     THE COURT: Yes, and I'm not --

24     MS. PALMER: -- the offense level --

25     THE COURT: -- really resolving it. As I said, --

1    MS. PALMER: Okay, fine.

2    THE COURT: -- I do it more because it makes no
3 difference to the guideline calculation, and so I'm giving him
4 the benefit in light of that. I'm looking now, Mr. Levine, at
5 guideline 2A1.5, which talks about a conspiracy to commit
6 murder, and says at subsection (b)(1) if the offense involved
7 -- I'm sorry. Let me start over. Subsection (c) -- yes, this
8 is really where I began to think about this as more -- if the
9 offense resulted in the death of a victim, apply 2A1.1. It
10 almost suggests that we're back where we started, even on a
11 conspiracy. Now, do you have a different view from that?

12   MR. LEVINE: Yes, Your Honor. I think that this
13 applies to a conspiracy to commit a murder which -- the
14 eventual result of which is the actual murder. I think we
15 have a little qualitative distinction here. The jury
16 acquitted him of the murder.

17   THE COURT: But isn't the point there that -- to
18 convict him of the murder, the jury would have had to find
19 that he actually committed or aided and abetted the murder.
20 For whatever reason, the jury found that the Government had
21 not proved that beyond a reasonable doubt, but they were
22 satisfied beyond a reasonable doubt that he had entered into a
23 conspiracy to murder, and the guidelines basically suggest
24 that, you know, while talk may be cheap, if there's talk and
25 actual death, it's as bad as if there were a conviction for

K. Rusin

the substantive crime. And for that reason, even on a conspiracy, it goes to the higher level.

I think that I would have to apply that in this case. As I said, I myself thought at first that it would be 31, but on reviewing that, think that what the commission is basically saying is that if the conspiracy resulted in death, almost on a Pinkerton type theory or something in that vein, which the Government did not pursue here in order to achieve the substantive charge, that the defendant is guilty as if there was a conviction on the substantive crime. It does not make any difference to the ultimate outcome, but I think that that's the rationale for treating it the same.

MR. LEVINE: Your Honor, if I could just be heard very briefly.

THE COURT: Please.

MR. LEVINE: I think I appreciate the way the Court views and interprets that section, but I think that I could argue, just as I believe Mr. Cohen does in his submission to the Court, and will when he appears before you, that the proof at trial, at least as it was weighed and determined by the jury, did not establish that the conspiracy of which Ng and Cheng were convicted did, in fact, result in the death of Mr. Kan Tai Chan, and I think that -- just to trouble you for another couple of moments, the evidence that was brought forth before the jury included the testimony or evidence of

K. Rusin

1   testimony of eyewitnesses to the effect that it was not Asians

2   who had committed the actual murder, but I think, as I recall,

3   some of the witnesses who spoke with the police immediately

4   after the incident described them as being non Asian, and I

5   believe they were described by some as being Hispanic, and I

6   think that that's the qualitative distinction.

7       THE COURT:  The witness who testified at the trial

8   acknowledged that he had said Hispanic and then explained the

9   testimony by saying that he meant was not white, and then he

10  figured on Hispanic.  The evidence from others who identified

11  the people as non Asians, that came in only through the police

12  reports, and I don't believe those witnesses ever appeared or

13  testified in this case, so I'm not in a position to assess

14  their testimony.

15      What seems more telling to me is that there was

16  evidence of the conspiracy.  That was established through

17  other unrelated proof, and the crime when committed had

18  striking similarities to other Green Dragon homicides,

19  including the car used in the crime being linked, if not

20  absolutely, at least through strong circumstantial evidence,

21  to your client, and one of the things I noted in reading his

22  report was how his role was always the driver, and so to that

23  extent, his involvement in this case seems to me to be

24  established by a preponderance of the evidence, if not indeed

25  more so.

K. Rusin

1    If it is indeed necessary for me to distinguish

2  between that part of the conspiracy that was the talk and then

3  the actual death, I don't think that I would say in this case

4  that there was a question that that death was the result of

5  some unknown third parties.   I would say that there was a

6  preponderance of the evidence that it was committed by the

7  Green Dragons.   This death was certainly foreseeable to your

8  client from all of the other evidence that was adduced, so I

9  find it sufficient to bring that guideline that I've just

10 cited into play in this case.

11    Now, the one thing, though, that I must discuss with

12 the parties is because Mr. Cheng was almost universally the

13 driver rather than the shooter in these homicides, I don't

14 think it will make any difference to guideline calculation,

15 but I really do wonder whether there ought to be an adjustment

16 for his role in the offense.   It's not that I think that a

17 driver of others who are going to commit homicide is not

18 culpable for the crime, but I do not know whether I can say

19 that he plays the same role as those who actually shoot the

20 victim.

21    It occurs to me that it may be appropriate to adjust

22 the subtotal offense levels to 41.   When that's done in this

23 case, and all of the unit adjustment is done, it would mean

24 that it would come out to 44 rather than 47.   I say that only

25 because there is no case, I gather, in which Mr. Cheng is the

K. Rusin

1  shooter.

2       MR. LEVINE:  That's correct, Your Honor.

3       THE COURT:  Does the Government want to be heard on

4  that?

5     (Pause in proceedings)

6       MS. PALMER:  Your Honor is correct that he was not

7  the shooter in any of the homicides.

8       THE COURT:  You see, in the end, I think that this

9  achieves -- this is a just result for the Court, because it

10  recognizes Mr. Cheng's lesser role, but it recognizes also

11  that it occurred on so many occasions that to treat him as

12  less culpable of homicide to those who actually shot, when he

13  drove on so many different homicides, is to ignore the

14  severity of the crime when committed over and over again.  Mr.

15  Levine, I intend to amend the guidelines to reflect a lesser

16  role for your client, but ultimately to have him with a total

17  offense level of 44.  I assume you have no objection to

18  anything that lessens that total offense level.

19       MR. LEVINE:  You are correct, Your Honor.

20       THE COURT:  All right.  Anything else with respect

21  to guideline calculation?

22       MR. LEVINE:  No, Your Honor.

23       THE COURT:  All right.  There is a request for

24  departure in this case.  It's premised on the lack of youthful

25  guidance that the defendant experienced, the fact that he left

K. Rusin

1  home at a young age, had no contact with his mother, and

2  experienced some abuse by his stepfather.  Is there anything

3  you'd like to add to what you've said in your written

4  submission, Mr. Levine, on behalf of your client?

5       MR. LEVINE:  Thank you, Judge.  Judge, the

6  presentence report relates that he was placed in a boarding

7  school at, I think, the age --

8       THE COURT:  Three.

9       MR. LEVINE:  The age of three, and when I questioned

10  him with respect to the boarding school, because that's

11  subject to a lot of different interpretations, some of them

12  positive and constructive, it turns out that the boarding

13  school is not really what we would consider to be a boarding

14  school.  This was something much more akin to what we might

15  consider an orphanage.

16       THE COURT:  That's how I understood it, --

17       MR. LEVINE:  All right.

18       THE COURT:  -- frankly, from reading the report, Mr.

19  Levine.

20       MR. LEVINE:  This was a state institution that was

21  run through the Government of Taiwan, and he stayed there from

22  when he was, for all intents and purposes, an infant until his

23  early teen years when he returned to his mother, and she had

24  remarried or established a relationship with another man.  He

25  was -- the defendant was then the intruder in that

K. Rusin

1 relationship, and was, we might say, exposed to as much

2 physical abuse once he went back to his mother as he had been

3 in this so called boarding school, and as he describes it to

4 me, the abuse was constant and was taken for granted and was

5 part of the regimen and orientation of that institution.

6       The family then -- family, if we can call it that --

7 then came to the United States where they remained in Virginia

8 for a short while, and everyone then went their separate ways

9 when he was about 18 or 19 years of age. Yes, he was over the

10 golden age of 19 for purposes of us considering a youthful

11 threshold, but I don't think that that changes what had

12 happened to him, and this is not meant or offered to excuse

13 what he did at all, or to minimize it, but it would seem that

14 an analysis of his experiences as little more than a baby are

15 as telling as those in the Floyd case, and perhaps even more

16 compelling.

17       I do not ask you to consider releasing him in any

18 short period of time, but it would be my hope that perhaps 25

19 or even 30 years from now this man might at that point expect

20 or hope to have some years to spend in relative freedom, and

21 hopefully, he at that point might be able to warn those

22 younger than him not to follow the same road as he had, and I

23 know it's not an easy thing to ask of the Court, but I'm

24 asking you for consideration with respect to that request.

25       THE COURT: Ms. Lynch, does the Government wish to

K. Rusin

with his natural mother and a stepfather, both of whom were
employed, not making very much money, but both of whom were
actively supporting him.

He was in school until -- it appears to be the ninth
grade, and after reaching the age of majority, he then moved,
on his own, it appears, to the New York area where he hooked
up with the Green Dragons here. However, I think we have a
situation that, unfortunately, is all too common in this
country, where families are not able to stay together, but do
make serious efforts to do so, and in fact, the majority of
children in those circumstances do not turn to gang life as
any kind of compensation.

And they most certainly do not actively engage in
aiding and abetting in committing several homicides. There's
nothing in the defendant's background to indicate that these
events, per se, led him into criminal behavior as opposed to
other types of behavior, as opposed to his wanting to, for
example, better himself, or to have a better life than his
mother and stepfather were able to give him. We're somewhat
hampered by lack of information about the nature of his infant
years.

I had read it initially as a boarding school, which,
you know, is the way that I took it until Mr. Levine has given
me a different interpretation, but without more information on
that, and I just submit that given the fact that his family

K. Rusin

1 be heard?

2     MS. LYNCH: Yes, Your Honor. I knew initially --

3 and I said I apologize for not responding to this motion

4 beforehand, but I had not received a copy and I do not blame

5 Mr. Levine for that. Just one of those flukes. The

6 Government submits that a downward departure is not warranted

7 in this case either, even given this defendant's somewhat

8 different circumstances from the other members of the Green

9 Dragons.

10     Certainly, his stay in whatever type of institution

11 he was in from the ages of three to about 14, and having no

12 information on that, we simply cannot characterize it in any

13 particular way, was unfortunate, but I do note that after this

14 particular point in time in his life ended, his family did

15 take him back. I mean, he was returned to the family at the

16 age of 14, apparently not with his natural father, who was

17 deceased, but with his mother and a stepfather, so I do think

18 that there clearly, at that level, was an attempt by his

19 mother and her new husband to create a home life that included

20 this defendant.

21     Unfortunately, things did not go well. However, I

22 don't think that Mr. Levine has pointed to anything that was

23 so unusual for many of the unfortunate situations families

24 find themselves in to warrant a departure in this case. In

25 fact, the defendant at the age of 14 was placed into his home

K. Rusin

1   did try and remain together for several years of his
2   adolescence, that we don't have the kind of wholesale
3   abandonment that was set forth in Floyd, and in fact, we have
4   a situation that is unfortunately all too common, with a
5   teenage boy not being apparently able to get along with a
6   stepfather, but that is not a basis for a departure.  If it
7   were, more defendants in this courthouse would certainly be
8   subject to one.

9        I think also that the defendant's behavior as a
10  member of the Green Dragons is important as an indication of
11  his character overall, and how he as an adult continued to
12  engage in severely antisocial behavior.  I'm sure this Court
13  will recall that it was the defendant Mr. J. Cheng who held a
14  knife to Linda Peng's neck and throat as he assaulted her,
15  robbed her and raped her.  It was the defendant J. Cheng who
16  also was another driver on another occasion at the Yorktown
17  robbery, and actively participated in that to bring it about.

18       The Government has not opposed the finding of a role
19  reduction in the homicides, but we do note that this is a
20  pattern of behavior that this defendant didn't engage in when
21  he was in an abusive home with an abusive stepfather, but when
22  he was on his own, with friends, who presumably were not
23  beating him, and presumably were not inflicting punishment and
24  pain on him, but he actively chose this role, and I think that
25  the testimony at trial was that the gold Honda that was

K. Rusin

somewhat an issue in the Kan Tai Chan homicide was the defendant J. Cheng's car, and one of the reasons he drove so often on these homicides was he didn't want anyone else to drive his car.

And that is a deliberate step. That is a deliberately involving himself in those homicides, and that cannot be explained away by having, some years in the past, had a negative relationship with a stepfather, a stepfather whom it does appear was at least trying to support him and certainly taking on a very difficult task in bringing an adolescent into the home for several years whom he had not been acquainted with beforehand.

THE COURT: Of the defendants who I have sentenced thus far today, Mr. Cheng's request for departure based on lack of youthful guidance seems to have the most facts to support it. Whatever the conditions were in this boarding school, as I said, I'm prepared to assume today, anyway, that they were the functional equivalent of an orphanage, and that basically, for nine years of his very young life, he did not have the support of a mother or a father, that thereafter, within a short time, his family life broke up and that therefore he was without any of the kind of stable family situation that most of the other defendants had for a good portion of their life, and that is indeed the ideal.

In the Floyd case, the defendant's lack of youthful

K. Rusin

1 guidance was considered in the context of his narcotic
2 dealing. The scope of his activity was such that I believe
3 his guideline range would have required a sentence of 360
4 months to life. The Court, of the view that the lack of
5 youthful guidance played some part in the defendant's
6 commission of that crime, departed downward, imposing a very
7 severe sentence nevertheless, but not the 360 month to life
8 term called for by the guidelines.

9 If this case were one in which the crimes in which
10 Mr. Cheng were involved were other than murder, I would
11 discuss and consider the degree to which the lack of youthful
12 guidance may have played a part in him thinking that that was
13 his only alternative, his only means of supporting himself.
14 But as I said in connection with another defendant earlier
15 this morning, it is so elemental that the taking of human life
16 is wrong that anyone who engages in it has to have had an
17 extraordinary lack in his youth or some truly horrific
18 experience for me to think that that could have robbed the
19 person of the basic human instinct that all life is precious.

20 Because I don't see anything in the defendant's
21 background to rise to that level as to explain away the
22 natural abhorrence to murder, I cannot give him a downward
23 departure, or rather, I choose not to give him a downward
24 departure for lack of youthful guidance. I make this decision
25 after considerable consideration, and only because of the

K. Rusin

1  horrible nature of the crimes and the defendant's repeated

2  willingness to engage in homicidal crimes.

3  I also do take into account what Ms. Lynch cites

4  about there being other acts of violence, perhaps not treated

5  as severely under the guidelines, but nevertheless,

6  sufficiently severe for me to think that they are not

7  explained even in part by the defendant's youth. I am

8  thinking, of course, of the vicious rape of Linda Peng and of

9  the way the victims were treated in the Yorktown robbery. I

10  decline to depart in this case.

11  Having said that, Mr. Levine, is there anything more

12  you'd like to say on behalf of your client?

13  MR. LEVINE: Your Honor, I don't think there is

14  anything that I could add to what's already been mentioned.

15  THE COURT: Mr. Cheng, would you like to be heard in

16  your own behalf?

17  THE DEFENDANT CHENG: No.

18  THE COURT: Ms. Lynch, does the Government wish to

19  say anything more?

20  MS. LYNCH: No, Your Honor.

21  THE COURT: Mr. Cheng, the seriousness of the crimes

22  you committed I hope is finally dawning on you. Certainly, it

23  did not occur to any of you during the trial, as was evidenced

24  by the behavior that many of you engaged in, but in your own

25  case, you played a part and are responsible for the murders of

K. Rusin

at least four people. And no crime requires as strong a statement about society's refusal to condone that kind of conduct as murder does. It is for that reason that I sentence you to life imprisonment.

You are convicted on nine counts. Some of them have statutory maximums less than life, and so I will go through each count. On Count 1, I sentence you to a term of life imprisonment, five years supervised release, and a $250,000 fine. On Count 2, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine. On Count 3, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine. On Count 4, I sentence you to life imprisonment, five years supervised release, and a $250,000 fine.

On Count 6, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine. On Count 7, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine. On Count 8, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine. On Count 21, I sentence you to 20 years imprisonment, three years supervised release, and a $250,000 fine. On Count 22, I sentence you to 20 years imprisonment, three years supervised release, and a $250,000 fine.

Those terms of imprisonment, the terms of supervised

K. Rusin

1  release, and the fines will run concurrently. I sentence you

2  to a $450 special assessment, representing $50 on each of the

3  nine counts of conviction. Ms. Lynch, is there an

4  application?

5         MS. LYNCH: Move to dismiss the underlying and

6  related indictments as against this defendant.

7         THE COURT: That's granted. Mr. Levine, will you

8  file timely notice of appeal on behalf of your client?

9         MR. LEVINE: Certainly, Your Honor.

10        THE COURT: Thank you. Marshals, Mr. Cheng is

11  excused. For those lawyers who are here for my 2:00 civil

12  calendar, obviously, we are running late. I have one more

13  criminal sentence to deal with in this matter. I would think

14  it would be about another 20 minutes before we'll be able to

15  deal with the civil calendar. You're welcome to stay if you

16  want. On the other hand, if you'd like to be excused until

17  3:00, that's certainly acceptable.

18        United States versus Danny Ngo. [Pause] Mr.

19  Bodell, do you want to note your appearance for the record?

20        MR. BODELL: Yes, Your Honor. Gerald Bodell

21  appearing for Danny Ngo. Good afternoon, Your Honor.

22        THE COURT: Why don't you and your client come

23  forward? It will be easier for the recorder to pick you up on

24  these microphones.

25        MR. BODELL: Sure.

K. Rusin

1     THE COURT: Mr. Bodell, I have received and reviewed

2 the probation report and addendum prepared to it, your

3 objections, the Government's letter of September 29th and your

4 more recent letter of October 1st. Let me ask you whether you

5 have had a chance to review the probation report and the

6 Government's letter with your client.

7     MR. BODELL: Yes, I have.

8     THE COURT: All right. Mr. Ngo, have you had a

9 chance to see the presentence report, the Government's letter

10 and to talk it over with Mr. Bodell?

11     THE DEFENDANT NGO: Yes, I do.

12     THE COURT: All right, now, Mr. Bodell, you did ask

13 in your October 1st letter about a possible adjournment. I'm

14 not sure I really see why it's necessary. I'll be happy to

15 hear you orally as to what the Government says in its letter,

16 but is there some particular reason that requires more time?

17     MR. BODELL: The time request, Your Honor, was

18 based upon the fact that when I had received the objections

19 from the probation department to my objections, they indicated

20 that -- I thought they indicated therein that they would

21 reserve on the factual discussion to the Government. When I

22 received the Government's letter, I felt that I had to take

23 issue with some of the factual things that were contained in

24 that letter.

25     In addition, while the probation officer did discuss

K. Rusin

1  certain cases on the applicability of the guidelines to the

2  offense of the murder -- or the attempted murder of the leader

3  of the Tung An gang, citing cases that involved straddling,

4  the Government has seen fit to cite some further cases, and

5  all of these cases, I wanted an opportunity to brief to the

6  Court that I felt that they were distinguishable with respect

7  to this client.

8  THE COURT:  I'm not sure I do understand.  I mean,

9  with respect to the Tung An murder, the substantive count was

10  dismissed with respect to your client.

11  MR. BODELL:  That's correct.

12  THE COURT:  But even with respect to the conspiracy,

13  it occurred when -- before the guidelines, but RICO is viewed

14  as a straddle crime.  I don't think you can argue to me that

15  because it occurred before the guidelines went into effect

16  it's not counted at all, that it just disappears from the

17  scene.  I mean, the Court would have to consider it in some

18  way, don't you agree?

19  MR. BODELL:  I agree, Your Honor, but it's difficult

20  to explain because it comes across another point.  If this

21  offense occurred preguidelines, and it would be considered a

22  straddle type of offense, then I would be looking at it to see

23  what the connection would be in the conspiracy or in the

24  racketeering enterprise in terms of what I see in the cases,

25  which seem to be continuation, and I find that that incident

K. Rusin

having occurred in 1987, two years later, 1990, is the first
instance which appears to be unrelated where Danny Ngo is
accused of a crime.

Now, also, while the case was originally brought,
part of the racketeering activity included a charge against
Danny Ngo that he was involved in the extortion scheme, which
would have put him into 1989, but that count was dropped as
against him, so as I read the cases of U.S. Butler, and the
McCall case, it appears that the crimes that were referred to
there that were preguideline and were considered to be
straddled offenses, were connected on a very continuing and
regular basis, bringing it into the time frame, so that they
were considered straddle offenses, and I don't see that
continuation with Danny Ngo. As far as the --

THE COURT: But continuity was an element of the
crime that the jury had to find. Continuity is a requirement
of the RICO statute, and indeed, if the issue were before me,
I would have to say that as a factual matter the evidence did
show that this murder of the Tung An leader or the plans to
effect it was one in a series of murders committed by members
of the Green Dragon in furtherance of the enterprise. Now,
your client is not charged with any of those other murders, I
don't believe.

MR. BODELL: No, he's not, Your Honor.

THE COURT: But he is charged with various of the

K. Rusin

other acts of racketeering engaged in: the Hampton Street robbery, the extortion with respect to Mr. Tran, the White Tiger assault. All of these were other violent crimes, perhaps not ending in murder, and that, of course, is reflected in your client's lower guideline level, but nevertheless, part of the continuing Green Dragon enterprise.

I don't think there's any question about continuity here, Mr. Bodell, at least not for the Court, and I don't think for the jury given that I charged them that they had to find it. Ms. Palmer, you want to be heard?

MS. PALMER: Yes, Judge. I didn't understand that that was specifically Mr. Bodell's objection when we were going over his letter, because clearly the evidence is that Danny Ngo -- he was one of the older members of the Green Dragons. The testimony was that Danny Ngo joined the Green Dragons in early January of 1987, and he was involved in the Tung An incident as one of the newer people, along with Sonny Wong and Billy Kim, newer members of the Green Dragons. That was in 1987.

Alec Yim testified, if the Court will recall, that he joined the Green Dragons sometime, I believe in the spring of 1989. He wasn't sure exactly, but it was before Sonny Wong got out of jail, which was March of '89. At the time that Alec Yim joined the Green Dragons, Danny Ngo was in charge of the apartment that Alec Yim lived in. So there is no issue.

K. Rusin

1   If Mr. Bodell is trying to suggest some kind of cessation and
2   then starting again, the evidence -- the record clearly does
3   not support that.

4          Mr. Ngo then continues and engages in several
5   activities in furtherance of the RICO enterprise.   He was
6   involved in the Jack Tran extortion.   He was involved in the
7   very vicious incident that occurred at Hampton Street.

8          THE COURT:  Though not in the rape.

9          MS. PALMER:  Though not in the rape, but he was one
10  of the people who was armed in the apartment.

11         THE  COURT:   I  don't  mean  to  minimize  his
12  involvement, --

13         MS. PALMER:  But I'm just saying, Judge, --

14         THE COURT:  -- I'm just noting it wasn't --

15         MS. PALMER:   -- in terms of his continuing in the
16  enterprise, he stands somewhat different than, in fact, some
17  of the other defendants who joined at a later time.   He is
18  someone who has been a member of the Green Dragons since at
19  least January of 1987 and continued as a member up until the
20  time of the arrest.   He was involved in the planned assault on
21  the White Tigers.   There is clearly not -- the case law makes
22  it very clear that for somebody to make an argument that the
23  guidelines would not apply in connection with some kind of
24  straddle, you have to have an act of withdrawal.

25         We have nothing here but an act of continuity on

K. Rusin

1  Danny Ngo's part, and continuity that ran from January of 1987

2  up to the time of his arrest in November of 1990.

3  THE COURT:  Well, Mr. Bodell is asking for some

4  time, and perhaps it's appropriate only because I have another

5  question that I have to raise on this.  With respect to the

6  guideline calculation for the conspiracy to murder the Tung An

7  leader, I gather that at the time that the attempt was made to

8  kill the leader, a number of people were wounded in the

9  restaurant on that occasion, is that right?

10  MS. PALMER:  That's correct, Your Honor.

11  THE COURT:  Though no one died.

12  MS. PALMER:  That's correct.  The testimony was that

13  five people were wounded.

14  (Pause in proceedings)

15  THE COURT:  All right, no, I misunderstood, and

16  that's why it's guideline 28, because there was an assault or

17  intent to murder.  All right, I don't have any further

18  questions.  Mr. Bodell, what more do you need to brief, then?

19  MR. BODELL:  First of all, I'd like to respond just

20  briefly on the continuity question, Your Honor.  I'm not

21  suggesting that, as the jury found, Mr. Ngo was not involved

22  in the continuing enterprise.  As I read the case,

23  particularly the McCall case, the language seems to indicate

24  that the offenses in aid of the racketeering constitutes a

25  continuing offense, and I think -- at least I see that I might

K. Rusin

interpret that to mean that when you have a case where -- this case occurred in, I believe, February 1987, and then he next is charged with the only activity in 1990, nearly three years later, the continuity does not seem to be regular and continuous, and it was with that respect that I was interested in trying to brief this in further.

The juvenile question comes into focus as well, because the Government responded with a case which I just took a brief look at in the library while I was waiting for the Court, in the United States versus John G., I believe it's called. It's a Sixth Circuit case, where it indicates that a youthful person can be charged as an adult in a conspiracy case even though he was a youth at the time the action occurred, and I think that -- I'm not trying to say that Mr. Ngo would be insulated from that charge by virtue of being a youth, but I'm concerned with the fact that it's racketeering activity and if you were to dismiss the substantive count of that by virtue of his being a youth and then pursue it as part of the racketeering activity while he is a youth, in fact, how that means -- how that flies.

In other words, would he then -- is it possible then to have a racketeering RICO case against youthful activity if that was --

THE COURT: The difference is --

MR. BODELL: -- the only thing --

K. Rusin

1    THE COURT:  -- that the --

2    MR. BODELL:  -- he could be found for.

3    THE COURT:  We cannot view racketeering as a number

4  of separate crimes.  It is a continuing crime, one element of

5  which requires multiple predicate acts bearing a relationship

6  to one another and continuity.  That's different from trying

7  to prosecute him for the substantive crime committed when he

8  was a youth, which ran into trouble only because of the

9  Government's obligations under the youthful offender statute.

10    Ms. Palmer, you have to refresh my recollection.

11  Was this the attempt to amend right before trial on Mr. Ngo?

12    MS. PALMER:  With respect to Mr. Ngo?  No.

13    MS. LYNCH:  No, Mr. Ngo was not involved in that

14  then, Your Honor.

15    MS. PALMER:  No.  No, Your Honor.

16    THE COURT:  All right.  I wasn't certain of that.

17  In any event, Mr. Bodell, these were arguments that were made

18  to me before trial as well about the propriety of including in

19  a racketeering charge predicates committed while someone was a

20  juvenile.  I ruled on that, and rather than delay this any

21  further, I'll let you pursue that with the Court of Appeals.

22    MS. PALMER:  I'd also note, Your Honor, that at the

23  time that we had post trial motions, there were submissions at

24  the time by Mr. Ngo as well as several others, including Alex

25  Wong, who raised precisely that issue in terms of the

K. Rusin

applicability of the guidelines, --

THE COURT:  Right.

MS. PALMER:  -- since he had been a juvenile at the time, and --

THE COURT:  And I understand that it's --

MS. PALMER:  -- that the Court again ruled that -- in post trial motions that it --

THE COURT:  I understand the issue, and as I said, it's preserved for appellate review, so I don't think we need to delay it now.  I'm satisfied that there's sufficient continuity between this act and the other acts of racketeering and the overall proof of involvement in this enterprise to warrant including it in the guideline calculation.  The next thing that I noted in your submission was that your client should get minimal participation credit for his involvement in this, and I think that's, in essence, because he was not one of the shooters in the restaurant.  That role was played by Sonny Wong and Billy Kim.  Is that correct?

MR. BODELL:  Well, yes, that plus the fact that there seems to be a discrepancy, at least as I read the testimony, and the grand jury minutes, over Sonny Wong's indication that he, meaning Danny Ngo, in fact was told to kill the leader of the Tung An gang.  I believe the communication, as I read it, was between Chen I. Chung and Sonny Wong, or at least instructions directly to make a kill

K. Rusin

1  were not given to Danny Wong. I'm not saying he -- whether he
2  heard them or not, but I don't believe that the evidence
3  showed that.

4     THE COURT: Even if I were to find that all of the
5  men who went were told to effect the murder, there's no
6  evidence that Mr. Ngo ever fired, is there, that all the
7  firing was done by Mr. Kim and Mr. Wong?

8     MS. PALMER: By Mr. Kim and Mr. Wong.

9     THE COURT: Why isn't it appropriate to view him as
10 less significantly involved than the other two, who, after
11 all, shot up the restaurant?

12    MS. PALMER: Because, Your Honor, Mr. Ngo and Chris
13 had very specific duties to perform in connection with what
14 was hoped to be the successful shooting of the Tung An leader.
15 As the Court may recall, all four of them were sent from the
16 gang apartment to accomplish the killing of the Tung An
17 leader. There were discussions there by Chick Ng and Chen I.
18 Chung that that's what was supposed to be done. Each of them
19 were given those instructions, and then there was a decision
20 made how to best carry out that plan, and that decision was
21 made by Sonny Wong, Billy Kim, Danny Ngo and Chris as to how
22 they would accomplish that.

23    And the decision was that two of the individuals
24 would go forward to do the shooting, since the people were
25 sitting in the back of the restaurant. The other two -- a

K. Rusin

1    very important and critical part of the plan was to make sure

2    of two things, first, that their escape route would be kept

3    open, and also would be there as guards if other individuals,

4    other Tung An members, were to have come in.

5           So we think that although they weren't involved in

6    the shooting, they were critical parts of the plan, ultimately

7    unsuccessful, to kill the Tung An leader.  It's something that

8    they -- all four of them were sent out to do.  They went out,

9    and it was not successfully accomplished, but Danny Ngo and

10   Chris had a very important job to fulfill in connection with

11   the plan attempt.

12          THE COURT:  I don't view Mr. Ngo as a minimal

13   participant in this, primarily for the reasons Ms. Palmer

14   stated, but I do view him as playing a less significant role

15   than that of the shooters, who were the prime people

16   attempting to murder this individual.  I am going to reduce

17   his role by two points.  That would mean that paragraph 57,

18   his offense level in this case, would be 26 rather than 28 for

19   that particular crime.

20          Now, the next objection I noted related to the

21   Hampton Street incident, where it's urged that your client be

22   given a minor or minimal role adjustment.  The reasons for

23   this are not obvious to me, Mr. Bodell.  Do you want to be

24   heard further?

25          MR. BODELL:  Yes, Your Honor.  First of all, with

K. Rusin

1 respect to the face of the presentence report, having read

2 that, would not -- that in and itself would not indicate that

3 Mr. Ngo played any substantial role at all.

4 THE COURT: Well, the evidence at --

5 MR. BODELL: But the evidence --

6 THE COURT: -- trial makes clear --

7 MR. BODELL: -- is, to --

8 THE COURT: -- his involvement.

9 MR. BODELL: -- be perfectly candid, with the

10 evidence, the evidence, as I understand it, the only

11 connection to Mr. Ngo with this was a -- I believe an eight

12 second observance by Mrs. Peng as she was passing from one

13 room to another, and her identification of Mr. Ngo is standing

14 somewhere near the entrance or he could have been in the hall,

15 and that was the total evidence with respect to Danny Ngo on

16 that subject.

17 Now, he did not participate in any of the violence,

18 obviously. He did not participate in these terrible things

19 that were discussed by Mrs. Peng, and also, her husband, who

20 had plenty of time to observe everybody that was involved

21 going into the place, did not identify Danny Ngo as being one

22 of the persons involved.

23 THE COURT: Well, the jury has found him guilty of

24 the crime, --

25 MR. BODELL: Of course.

K. Rusin

1    THE COURT:   -- and I cannot disagree with their
2  verdict.  Indeed, I would not, based on my own assessment of
3  the evidence.  Now I'm only concerned with his role.  Ms.
4  Palmer, do you wish to be heard any further on this?

5    MS. PALMER:  Yes, Your Honor, that we would note
6  again, as we did in our letter, that Mr. Ngo just wasn't
7  standing in this apartment.  He was there with a weapon.  He
8  was there with a weapon when these brutal activities were
9  transpiring to Ms. Peng and her husband and her mother in law
10 and her roommate, and certainly, the apartment was ransacked.
11 They were in there for approximately two hours, terrorizing
12 these people and ransacking their apartment.

13    There simply is no basis.  He was not physically
14 involved in the rape, but he was there with a weapon
15 terrorizing this family for two hours.

16    THE COURT:  Yes.  I'm not inclined to give role
17 adjustment in this.  This was a very serious crime, even
18 putting aside the rape.  I mean, it was a serious crime as
19 presented to the jury, where I kept out all of the rape
20 evidence, about how this family was terrorized, forced to
21 strip while people armed with guns and knives basically
22 ransacked the apartment.

23    The degree to which all of the defendants or most of
24 them were armed, and Mr. Ngo was one of those alleged to be
25 armed, created the likelihood that one of the people would be

K. Rusin

1 hurt I think is evidenced from just the facts of the crime --

2 when it's put together with all of the other evidence, showing

3 the tendency of the members of this enterprise to engage in

4 random acts of violence, I cannot say that the violence that

5 was perpetrated here was unforeseeable to any of them, and to

6 that extent, I refuse to grant any downward adjustment on

7 this.

8 Indeed, I think given the severity of the conduct

9 that occurred in Hampton Street, the guidelines are relatively

10 low, and I see no reason to adjust. I'm not enhancing either,

11 based on that, but I'm not adjusting downwardly. All right,

12 the next issue that was raised related to the Tran extortion,

13 and again, minor or minimal role adjustment is sought. In

14 this case, Mr. Bodell, my sense of the evidence was that each

15 and every person who went to Jack Tran's room on that occasion

16 was there to intimidate him, and I didn't see any need to

17 distinguish roles, but do you want to be heard?

18 MR. BODELL: Yes, Your Honor. Again, with respect

19 to the evidence, you may recall that the officer testified --

20 and also, there were tape recordings that were set up inside

21 the room. None of those recordings had anything with Danny

22 Ngo on them, and that the extortion was not completed, and he

23 was arrested while being at the scene. The other --

24 THE COURT: But no one's -- well, all right, go

25 ahead. It's an attempted extortion that is the crime of

K. Rusin

1  conviction.

2      MR. BODELL:  That's correct, Your Honor.  But I'm

3  going to the threat of violence and force.  There's no

4  indication that he was anything but there.  His name is --

5  he's not heard on any of the tapes, and the officer didn't

6  testify to him committing any particular activity.

7      THE COURT:  All right.  I'm satisfied that everyone

8  who was there was there to intimidate Mr. Tran and extort the

9  payment of monies from him.  Now, I'll say, there was some

10  evidence suggesting that perhaps he did owe someone some

11  money, but the law cannot tolerate this as a means of debt

12  collection, and so to that extent, I'm not going to effect any

13  adjustment.  I think all of the participants were basically

14  fully responsible for that conduct.

15      The next challenge is to the guideline calculation

16  with respect to the assault on the White Tigers, is it?  The

17  suggestion is made that it should be a level six, not a level

18  14.  I'm not sure I follow that, Mr. Bodell.  Do you want to

19  explain to me more how you got to that?

20      MR. BODELL:  Yes, Your Honor, because as I read it,

21  I felt that he did not possess any particular weapon at the

22  time, and that he was -- the assault never occurred, although

23  it's an attempted as alleged, and --

24      THE COURT:  Right.  I mean, no one's been convicted

25  of assault.  It's an attempted assault.

K. Rusin

1    MR. BODELL:  As I say, attempted, yeah.

2    THE COURT:  And there were members who were armed.

3    MR. BODELL:  Yes, others were armed.  Danny Ngo was

4    not armed, and he was arrested in the car and he had nothing

5    on him.

6    THE COURT:  Well, why should that adjust it, though?

7    I mean, there wasn't -- I think the evidence does establish

8    that the whole plan here was to go and assault their enemies,

9    the White Tigers.  Some people were armed.  Some were along

10   just for manpower, so to speak, but the tapes certainly

11   suggested that this was not going to be a chat.  Does the

12   Government wish to be heard any further on this?

13   MS. PALMER:  No, Your Honor.  We believe that there

14   is no basis for a downward -- or a departure based on his

15   role, any role adjustment, and we think that the guideline

16   offense was correctly calculated.

17   THE COURT:  All right.  I think, in fact, it's

18   guideline 15.  It's 15.

19   MS. PALMER:  15, that's correct, Your Honor.

20   THE COURT:  And so I'm going to leave it at that,

21   which I think is the appropriate guideline.  I note that that

22   one I don't think makes any difference to the guideline

23   calculation in any event, since it doesn't get a unit

24   adjustment.  Because I've given Mr. Ngo an adjustment on

25   racketeering act number seven, his guidelines would have to be

K. Rusin

1   recalculated.    That   would   be   26,   which,   when   the   unit

2   adjustment  is  made,  makes  the  total  offense  level  30  rather

3   than  31,  and  that  would  apply  as  well  to  the  substantive

4   counts,  that  they  would  come  up  with  a  total  offense  level  of

5   30  rather  than  31.   Does  anyone  view  my  --  at  least  my  math  as

6   in  error?

7          MS.  PALMER:   No,  Judge.

8          MR.  BODELL:   No,  Your  Honor.

9          THE  COURT:   All  right.   Based  on  the  facts,  then,

10  and  having  considered  the  objections  made,  I  would  find  that

11  the  total  offense  level  in  this  case  is  30.   With  a  criminal

12  history  category  of  two,  it  means  that  the  defendant  faces  a

13  108  to  135  month  term  incarceration,  a  three  to  five  year  term

14  of  supervised  release,  a  $15,000  to  $150,000  fine,  and  a  $250

15  order  of  special  assessment,  $50  on  each  of  the  five  counts  of

16  conviction.   Now,  I  don't  believe  there  was  a  request  made  for

17  downward  departure.   Is  that  correct,  Mr.  Bodell?

18         MR.  BODELL:    I  didn't  specifically  get  to  that

19  point,  Your  Honor,  and  I  didn't  write  in  my  objections  the

20  lack  of  youthful  guidance  in  this  particular  case.   I  would

21  like  to  make  that  point  at  this  --  in  the  interest  of  justice

22  for  this  client.

23         THE  COURT:   Let  me  hear  you  on  that.

24         MR.  BODELL:   His  record  --  as  you  know,  he  came  to

25  this  country  not  voluntarily.   His  family  remains  and  resides

K. Rusin

1  in Vietnam, and he, being the oldest child, came to this

2  country, although at that time he was 11 years old, through

3  Thailand and came and is now a resident alien, and lived with

4  an aunt for a short period of time, when he left the aunt.

5  His connection with the Green Dragons appears --

6  took place when he left -- he met in high school certain

7  people and then became associated with him.  While he was with

8  the Green Dragons, he was there as a boarder, a person who is

9  being taken care of, and that he was -- he did what he was

10  told to do under certain circumstances.  He was an object of

11  control by a lot of these other people that he lived with.  He

12  never rose to the occasion where he would be a leader or an

13  organizer in this group, although it is alleged, and the fact

14  is that he was kind of a hopeless character and had no place

15  to go, and he lived with them and did not have any particular

16  guidance at that young age.

17  He came -- from the time that he was about 15 years

18  old on, became involved, and did not really have any

19  opportunities to obtain any success.  He, of course, has a

20  language barrier, and I must say that throughout this case, I

21  have observed and I've been able to communicate with him, but

22  I must say, he does not speak or understand the English

23  language in the real sense of the word, and that had been a

24  constant barrier from the day that he came over here into this

25  strange country.

K. Rusin

1    It doesn't excuse his activity, and I don't mean to
2  imply that it does, but if there is a lack of guidance in a
3  particular case, I think that he certainly didn't have any.

4    THE COURT:  Ms. Palmer, does the Government wish to
5  be heard on this request for departure?

6    MS. PALMER:  Just briefly, Your Honor.  We don't
7  think in terms of lack of youthful guidance that there's a
8  basis.  As the presentence report indicates, his parents sent
9  him to the United States to get him out of the terrible
10 conditions that he was in, and sent him to live with an aunt
11 in the hope that once he got himself established living here
12 with his aunt, the rest of the family could follow.  It's not
13 a situation of abandonment at all.  It was situation where it
14 was hoped that Mr. Ngo could be the leader for many of his
15 family members to come here after he successfully settled.

16   And as Alec Yim testified, once Danny Ngo joined the
17 Green Dragons, he did become, at one point, at the very least,
18 when Alec Yim joined the Green Dragons, he was someone who was
19 in charge of one of the Green Dragons' apartments.  So he's
20 not somebody who just kind of went along.  He was in charge of
21 one of the apartments.  He was one of the individuals trusted
22 enough to have a weapon when they went to the Hampton Street
23 apartment and committed the offenses that were committed
24 there, and he's also someone who, when he got arrested on the
25 Jack Tran thing, and I think the Court may recall this, there

K. Rusin

1 were several intercepted conversations from Danny Ngo back to

2 the gang house -- safe house apartment.

3 Danny Ngo was expressing no remorse for the fact

4 that he was arrested, in fact, took great pleasure in

5 announcing to Sonny Wong and Chen I. Chung how he had fooled

6 the people in central booking because he had given a false

7 name so they wouldn't be able to find his criminal history.

8 And there were several conversations about how he had given a

9 false name, and that led to some discussions at the gang

10 apartment, because it made it difficult for them to get him

11 out on bail.

12 So he's not someone who just naively went along with

13 things. He was an integral member of the Green Dragons, and

14 somebody who was a member for several years. He joined this

15 gang in January of 1987 and continued being involved in their

16 activities right up until the time of the arrest. We don't

17 think there's a basis for a downward departure, and in fact,

18 we would urge the Court to consider sentencing him at the

19 highest level of the guideline range.

20 THE COURT: Mr. Ngo is the first defendant to appear

21 before me today for sentence in this case who does not have a

22 guideline range of life imprisonment. In large part, that's

23 because no predicate act or substantive count of which he's

24 been convicted involves a homicide, and I take that into

25 account. The request for downward departure, though, is based

K. Rusin

1  on lack of youthful guidance.

2  As I've said with respect to other defendants, I am

3  prepared to recognize that there may be cases where a lack of

4  youthful guidance contributes in a very real way to a

5  defendant's criminal activity and may appropriately warrant

6  departure from a very high sentence, as it did in the Floyd

7  case from the Ninth Circuit. Here, I am not persuaded that a

8  departure is warranted.

9  The defendant was not abandoned by the adults in his

10  life. Rather, the defendant left Vietnam at age 11 because

11  his family was able to afford sending one member of the family

12  out of the country. They were a poor family. They chose to

13  pin their hopes on Mr. Ngo. It's easy to understand how

14  parents would not abandon a child but rather pin all their

15  hopes on him and seek to give him a better future. Moreover,

16  they didn't simply ship him out without any guidance. They

17  entrusted him to the care of his aunt and uncle who brought

18  him first from Thailand to the Philippines, and ultimately

19  from the Philippines to the United States.

20  Those circumstances, where close family members

21  undertook responsibility for taking care of the defendant, I

22  don't view as a lack of youthful guidance. Rather, the

23  defendant, at the age of 16, chose to leave his aunt and

24  uncle's home and join up with the gang that brings him before

25  the Court today. Mr. Ngo, though not involved in the most

K. Rusin

1 violent acts of that gang, continued to be a member for a

2 number of years. It is inconceivable to me that he could have

3 been a member of this organization without appreciating its

4 violent acts, particularly since so many members were happy to

5 brag about them.

6 Mindful that the group he was involved in was

7 engaged not only in the kind of activities that he

8 participated in, but in even more horrendous conduct, he

9 nevertheless chose to remain with them, remaining with them

10 until the day the Government shut the organization down by

11 arresting people the day of the planned assault on the White

12 Tigers. Under these circumstances, I find no grounds for

13 downward departure.

14 Now, Mr. Bodell, a question, of course, arises as to

15 where within the guidelines to sentence your client. The

16 Government urges the upper end of the guideline range. I'll

17 be happy to hear you as to anything you'd like to say in his

18 behalf.

19 MR. BODELL: Well, again, Your Honor, with respect

20 to his participation, you may recall that this investigation

21 did take place in the beginning of 1986, and there were

22 hundreds of pages of testimony involving surveillance on a

23 regular daily basis, and Danny Ngo does not appear during the

24 course of this trial to be seen driving a car. He does not --

25 seen with a weapon. He is not seen in any particular activity

K. Rusin

1 that's unlawful by anybody who has observed him during the

2 course of the entire case. With respect --

3     THE COURT: Who are you talking about, the

4 surveillance agents? Because otherwise, he was seen at the

5 Hampton Street address in possession of a weapon, and he's

6 seen engaging in other criminal conduct. Those are the

7 predicate acts of which he's been proved guilty.

8     MR. BODELL: Yes, Your Honor.

9     THE COURT: I don't think we can say I have a man

10 standing before me who no one has seen engaged in criminal

11 conduct.

12     MR. BODELL: No, I say the person who testified with

13 respect to the surveillance, the police officer.

14     THE COURT: I see, all right.

15     MR. BODELL: That's all I was referring to. He was

16 certainly identified by others. I certainly agree with that.

17 I'm just pointing out that throughout the whole thing that he,

18 of all the people involved in this case, he was the least

19 involved, and there is such a category, and then for those

20 reasons, I would respectfully ask the Court to consider the

21 lower end of the guideline.

22     THE COURT: Mr. Ngo, is there anything you'd like to

23 say in your own behalf? The interpreter will happily

24 translate anything you wish to say to me.

25     THE DEFENDANT NGO: No.

K. Rusin

1      THE COURT:  Ms. Palmer, do you wish to add anything

2 to what you've already said?

3      MS. PALMER:  No, Judge.

4      THE COURT:  Mr. Ngo, as I said, you're the first

5 defendant to stand before me today whose guideline range does

6 not suggest a required sentence of life imprisonment.  Ms.

7 Palmer urges that I sentence you at the upward end of the

8 guideline range, and certainly there's reason to think that

9 that would be appropriate.  I am instead going to opt for a

10 sentence somewhere in the middle of the range.  Let me say

11 that the reason I do that is the following.

12      You were a member of this gang for a lengthy period

13 of time, and that requires a lengthy sentence.  I don't view

14 you as standing before me simply to be sentenced on the

15 discrete predicate acts that bring you before the Court.

16 Those acts were committed as part of membership in a very

17 violent and vicious gang, even though you were not engaged in

18 the most violent activities.  The gang survived by virtue of

19 having  a large membership.

20      Your willingness to be a member requires a severe

21 sentence.  But because you yourself were not involved in

22 homicidal acts, except to the extent that you were involved

23 very early on in your involvement in the gang with respect to

24 the attempt on the Tung An leader, I do think that perhaps

25 some consideration in giving you an opportunity to start your

K. Rusin

life over again is appropriate. I sentence you to the custody of the attorney general for a sentence that will be the equivalent of ten years. Now, again, I must sentence you on discrete counts, at least one of which has a lesser sentence.

On Count 1, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine. On Count 2, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine. On Count 3, I sentence you to three years imprisonment, one year supervised release, and a $250,000 fine. On Count 21, I sentence you to 20 years imprisonment, three years supervised release, and a $250,000 fine.

On Count 22, I sentence you to ten years imprisonment, three years supervised release, and a $250,000 fine. The terms of incarceration will run concurrently. The terms of supervised release will run consecutively. I do that because of the particularly vicious aspects of this gang. Your lesser sentence is only justifiable if you can turn your life around, and as a result, I think it's necessary for there to be a long term of supervised release. The fine terms will run concurrently. There's a $250 special assessment to reflect the five counts of conviction.

MS. PALMER: Your Honor, you started off by saying you were sentencing him to a period of 120 months, but on Count 21, you sentenced him to 20 years.

K. Rusin

1    THE COURT:  I misspoke.  That's the maximum provided
2  by law.  It's ten years on that count as well.  I misspoke.
3  Thank you, Ms. Palmer.  It's a total of 13 years supervised
4  release because of the consecutive aspects of the supervised
5  release that I am imposing, to give the defendant the maximum
6  possible deterrent to ever engaging in this kind of conduct
7  again.  All right, Ms. Palmer, is there an application?

8    MS. PALMER:  Yes, Your Honor.  With respect to the
9  underlying indictments against Mr. Ngo, the Government would
10  move to dismiss them at this time.

11    THE COURT:  That's granted.  Mr. Bodell, will you
12  file timely notice of appeal on behalf of Mr. Ngo?

13    MR. BODELL:  Yes, Your Honor.

14    THE COURT:  Thank you very much.

15    MR. BODELL:  Thank you, Your Honor.

16    THE COURT:  With respect to Mr. Ng, we will have to
17  adjourn because of the death in Mr. Cohen's family.  I'd like
18  to put it down for October the 23rd at 12:30.  My office will
19  contact his office to make sure that that's acceptable, but if
20  the Government wants to note that date and time.  Thank you
21  very much, marshals, I appreciate all your efforts today.

22    MARSHAL:  You're welcome, Your Honor.

23        *        *        *        *        *

24

25

K. Rusin

I, KRISTIN M. RUSIN, do certify that the foregoing is a true and accurate transcript of the proceedings in the matter of USA versus Chen I. Chung, et. al.

_____          _____

# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

   Plaintiff,

    - VS -

JOSEPH WANG,

   Defendant.

Docket No.: 90-CR-1019-7
Brooklyn, New York
January 18, 1992

TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION
BEFORE THE HONORABLE REENA RAGGI
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:

       ANDREW J. MALONEY
       United States Attorney
       By: LORETTA LYNCH, ESQ.
       Assistant U.S. Attorney
       225 Cadman Plaza East
       Brooklyn, NY 11201

For the Defendant:

       MICHAEL PADDEN, ESQ.

Audio Operator:

       Dana A. Beauford

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE

EMPIRE TRANSCRIPTION AND RECORDING SERVICE
225 CADMAN PLAZA EAST, ROOM 487
BROOKLYN, NEW YORK 11201

LASER STOCK FORM FMSRN-94

THE CORBY GROUP 1 800-255-5040

THE CLERK:   <u>United States versus Joseph Wang</u>.
May I have your appearances for the record, please.  The
government?

MS. LYNCH:  For the government, Loretta Lynch.

THE CLERK:  And for the defendant?

MR. PADDEN:  For the defendant, Michael Padden,
Legal Aid Society.  Good morning, Your Honor.

THE COURT:  I apologize for having had to put
this off.  I hope Mr. Hershfeld explained to you that I
unexpectedly had to keep a doctor's appointment this
morning.  But thank you all for your patience.

All right, we'll wait for your client and then
begin.

MR. PADDEN:  I believe he's up...

(Pause in proceedings)

MR. PADDEN:  Good morning, Joseph.

THE DEFENDANT:  Hi.

MR. PADDEN:  How are you?  Want to sit over hear
today?

THE COURT:  Good morning.  This matter is before
the Court now on the government application to transfer to
Joseph Wang to adult status pursuant to 18-USC Section
5032.

The government submitted a brief in support of
this  application  and  asked  to  have  Mr.  Wang's

psychiatrically examined, primarily so that the question
of his present intellectual development and psychological
maturity, one of the factors listed in the statute, is
appropriately considered on this kind of motion so that
that could be assessed.

On Friday, as counsel know, I received oral
reports from a psychologist, Nuftali Burrell, and from a
psychiatrist, Naomi Goldstein, on findings based on their
interviews of the defendant.

All right, Mr. Padden, do you wish to be heard
with respect to this application?

MR. PADDEN: No, Your Honor, other than the fact
that my application was, as you remember, simply a motion
to dismiss the indictment for lack of jurisdiction.

What's transpired since then, I was present at
both psychiatric evaluations of my client, as well as the
reports to the Court. I don't think I can in good faith
argue that their findings were not consistent with the
application that was made.

THE COURT: My own view is that the government
cannot indict a juvenile until there has been a formal
transfer to adult status.

So really, the charges before this Court with
respect to Mr. Wang are those contained in the juvenile
information.

1    I gather, if I were to grant this motion to
2    transfer Mr. Wang to adult status, the government would
3    present an indictment to the Grand Jury today, and that's
4    indeed why it's important for this to be resolved today.

5    Ms. Lynch, do you want to add anything to your
6    written submissions?

7    MS. LYNCH:  No, Your Honor.  Simply, we will
8    stand on our written submissions and refer the Court back
9    to the findings made by both doctors, which we feel
10   supports the arguments set forth in our papers, that this
11   defendant is in fact mature and is in fact an ideal
12   candidate for prosecution as an adult, given consideration
13   of all the factors set forth in the statute, which are
14   outlined in our brief.

15   He was an integral part of the leadership of the
16   Green Dragons.  As the Court will recall, at the initial
17   hearing on whether there was probable cause to arrest this
18   defendant, the government presented evidence that in
19   November, on November 19, this defendant, Joseph Wang, was
20   the one who initially was contacted by the White Tigers,
21   which initiated the violent assault that was planned on
22   them for the next day.

23   So we think that based on all the prior
24   proceedings before this Court, and the prior records, as
25   well as what's been established by the medical

LASER STOCK FORM FMSRN-94

THE CORBY GROUP 1-800-255-5040

examinations, that this Court has ample grounds to grant the transfer application.

THE COURT: The application must be evaluated in light of the interests of justice. This particular application comes pursuant to that section of 5032 that permits transfers by a Court if after hearing the Court finds that it would be in the interests of justice.

In this case, the defense has really not sought to contest any of the factual allegations set forth in the government's papers.

Accordingly, most of the findings that I can make I can make on undisputed facts, as set forth by the government in its various papers.

The statute requires me to consider a number of factors in deciding whether the interests of justice would be served by a transfer. Indeed, I'm required to make findings on the record with respect to these factors. I will do that now.

The first concerns the age and social background of the individual. In this case, Mr. Wang stands before the Court now as a 19 year old, his birth date being January 5, 1973.

His age at the time of the commission of the acts that are here at issue are 16 1/2, when he alleged to have committed two murders in a restaurant in Queens

LASER STOCK FORM FMSRN-94

THE CORBY GROUP 1-800-255-5040

1   pursuant to an extortion scheme.

2           He was alleged to have been 17 when he committed

3   other crimes charged against him in the superseding

4   juvenile information.

5           The age of the defendant at the time of the

6   commission of the crimes, which is, after all, close to

7   the age of majority, has been found by Courts in other

8   cases to weigh in favor of a transfer to adult status.

9           I would not rely on that alone, however, in

10  making any determination.   The next factor that I'm

11  required to consider is the nature of the alleged offense.

12          The offenses have to be described as among the

13  most serious that can be committed.   Not only is the

14  defendant alleged to have been a part of a ring that

15  engaged in racketeering and extortion and type acts, but

16  in conjunction with all of that, he's alleged to have

17  personally have been involved in homicidal acts.

18          The seriousness of these crimes, the toll that

19  they've taken on society if proved, would be strong reason

20  to consider the interests served by having Mr. Wang tried

21  as an adult offender on these charges.

22          The next factor is the extent and nature of the

23  juvenile's prior delinquency record.   This was a little

24  less clear to me.   I gather Mr. Wang has been arrested and

25  indicted on charges of weapons possession, but I wasn't

LASER STOCK FORM FMSRN-94

THE CORBY GROUP 1-800-255-5040

certain if these had been resolved.

Can you give me any more information on these, counsel?

MS. LYNCH: Your Honor, the information that I have, and Mr. Padden can correct me if I'm wrong, was that the defendant was initially indicted in Queens Supreme Court on a weapons charge, but that matter was disposed of with a youthful offender adjudication in the Supreme Court.

And at the time of his arrest in November of 1990, he was on probation for that offense.

THE COURT: Mr. Padden, is that accurate?

MR. PADDEN: That's correct, Your Honor. That is. I believe as a result of this, there may be the added allegation of a violation of probation and that there may have been an issuance of a detainer for that that now makes it an open matter, but that's essentially what's happened with that case, as I understand it.

THE COURT: The nature of that charge suggests to me that it is part and parcel of the conduct that brings the defendant before this Court, namely his willingness to engage in the carrying of firearms in conjunction with other criminal activities.

Is that indeed the government's view of this '89 arrest, Ms. Lynch?

1    MS. LYNCH:   Yes, Your Honor.   It was the

2  attempted possession of a loaded hand-...a loaded firearm.

3    THE COURT:   That too would suggest that the

4  defendant, having been treated as a juvenile offender once

5  before and as one of the other factors the nature of past

6  treatments efforts and the juvenile's response to such

7  efforts, the suggestion being that the defendant has not

8  responded well to being treated simply as a juvenile,

9  suggests that his continued engagement in very similar if

10  not indeed more serious criminal conduct warrants as his

11  being treated as an adult in the interests of justice.

12    Now, I am required to consider the juvenile's

13  present   intellectual   development   and   psychological

14  maturity.

15    The reports of Drs. Burrell and Goldstein

16  suggest that the defendant, now 19 years of age, has the

17  maturity that one would expect of someone of that age.

18  There does not seem to be any reason to think that he is

19  not the type of person who is appropriately transferred to

20  adult status, who would be able to provide a meaningful

21  assistance to his lawyer in the preparation of his

22  defense.

23    The last factor that I am to consider is the

24  availability of programs designed to treat the juvenile's

25  behavioral problems.

If the crimes at issue here were of a different sort, the Court would seriously consider whether other programs were available to treat behavioral problems.

But I think that this factor weighs against adult transfer only when the crimes really fit what we can almost call the colloquial understanding of juvenile delinquency, not when the crimes at issue involve homicides.

Weighing all of these factors, and relying primarily on the seriousness of the charges alleged, I transfer the defendant, Joseph Wang, to adult status.

Ms. Lynch, at this point the government, I gather, will present the charges in the information to a Grand Jury and seek indictment on them?

MS. LYNCH: That is correct, Your Honor.

THE COURT: All right. Is there anything else, Mr. Padden?

MR. PADDEN: Just a couple things, I think for the record more than --

THE COURT: Please.

MR. PADDEN: -- anything else, so that it would -- if it were not clear in this process, because, you know, co-counsel have made several applications with regard to the government's application for an anonymous jury.

1    I wasn't, frankly, sure at the time whether I

2 had even standing at that point as much as I was -- at

3 that point Mr. Wang was being prosecuted under juvenile

4 information.

5    Just in light of the expected indictment, and

6 rather than labor the record later, I would just want to

7 make it clear that I joined in co-counsel's opposition to

8 the anonymous jury, and ultimately that having been

9 granted as to all the other defendants, there were

10 subsequent applications for severance based on that ground

11 among defendants who felt that there was no evidence that

12 their clients had participated in the kinds of acts that

13 -- or one of the factors that the Court considered in

14 granting the anonymous jury.

15    I think my client stands in that same position,

16 and just so that the record is clear, I would voice my

17 opposition now to the anonymous jury, based on the reasons

18 that the co-counsel set forth during the last week when

19 that issue was decided, as well as an application with

20 regard to severance on the grounds that were also stated

21 by co-counsel on Friday, as a result of the anonymous

22 jury, that their clients would be prejudiced. I would

23 feel it -- of course, that Mr. Wang would be as well, and

24 I want to make it clear that I join in those applications.

25    THE COURT: To the extent my reasons are on the

1  record for granting an anonymous jury, I won't repeat

2  them.

3        The severance motions I looked at somewhat

4  discreetly with respect to each defendant.  I do want to

5  ask the government about these two alleged homicides in

6  the Tien Chiau, that's T-I-E-N C-H-I-A-U, Restaurant in

7  Queens.

8        The two individuals allegedly killed in this are

9  who in relation to the extortion scheme?

10        MS. LYNCH:  The first named individual is Mon

11  Hsiung, that's H-S-I-U-N-G, Ting, T-I-N-G, who was the

12  manager of that restaurant.  He was the initial target of

13  murder due to his failure to pay the Green Dragons

14  extortion money.

15        The second murder victim was Anthony Gallivan,

16  G-A-L-L-I-V-A-N, and he was a patron in the restaurant who

17  was eating dinner, situated fairly close to where the

18  manager was shot.  And we believe it was to prevent him

19  from being able to view the shooters that he was shot and

20  killed at that time.

21        THE COURT:  I want to confirm, this is not the

22  shooting -- though it has parallel circumstances -- to the

23  one which I heard the suppression motion with respect --

24  in which Ms. Wang testified.

25        MS. LYNCH:  That --

LASER STOCK FORM FMSRN-94

THE CORBY GROUP 1-800-255-5040

THE COURT:  This is a different shooting.

MS. LYNCH:  No, this is the same shooting.

THE COURT:  The same shooting?

MS. LYNCH:  This is the same shooting.

THE COURT:  This is Ms. Wang's husband who was --

MS. LYNCH:  Ms. Wang's husband was injured in this proceeding.

THE COURT:  And another gentleman was killed.

MS. LYNCH:  Another gentleman was killed.

THE COURT:  All right.  I didn't want to confuse incidents if they were not the same.  But since they are the same about which I've already heard testimony, let me say that I would not sever Mr. Wang in any event.

As I noted in making the anonymous jury findings, the members of this organization have displayed, according to the allegations in the indictment, a willingness to shoot even innocent bystanders whom they thought might be able to identify them as perpetrators of crimes in various restaurants that were the victims of their extortion scheme.

This kind of disregard for the lives even of people who were not their initial target suggests a willingness to engage in desperate conduct that does further add to the Court's concern about the safety of and

LASER STOCK FORM FMSRN-94

THE CORBY GROUP 1-800-255-5040

# EXHIBIT E

40 F.3d 1347
(Cite as: 40 F.3d 1347)

▷

United States Court of Appeals,
Second Circuit.

UNITED STATES of America, Appellee,
v.
Alex WONG, Roger Kwok, Chen I. Chung, Tung
Tran, Danny Ngo, Brian Chan, Joseph Wang, Chiang
T. Cheng, and Steven Ng, Defendants–Appellants.

Nos. 105–112 and 167, Dockets 92–1602, 92–1640,
92–1647 to 92–1652 and 92–1701.
Argued Sept. 13, 1993.
Decided Nov. 8, 1994.

Gang member defendants were convicted of racketeering and related offenses including murder, kidnapping, assault, extortion, and conspiracy, before the United States District Court for the Eastern District of New York, Reena Raggi, J., and defendants appealed. The Court of Appeals, Mahoney, Circuit Judge, held that: (1) witnesses' in-court identification and testimony regarding out-of-court identification was reliable and admissible; (2) district court had subject matter jurisdiction over defendants who were juveniles when some predicate crimes were committed; (3) RICO instruction was proper; (4) trial court did not abuse its discretion in impaneling anonymous jury; (5) trial court's refusal to grant downward sentencing departure was not appealable; and (6) district court erred in imposing fines on indigent defendants.

Convictions and sentences affirmed, except monetary fines vacated and remanded.

West Headnotes

[1] Criminal Law 110 ⟶1130(.5)

110 Criminal Law
    110XXIV Review
        110XXIV(I) Briefs
            110k1130 In General
                110k1130(.5) k. In general. Most Cited Cases

Criminal Law 110 ⟶1801

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)7 Joint Representation of Codefendants
                110k1801 k. Particular cases. Most Cited Cases
                (Formerly 110k1077.3)

Appeal of one codefendant would be deemed to be based upon arguments advanced by counsel at oral argument and set forth in joint brief, even though after motion of counsel, filed at behest of codefendant, to be relieved as counsel on appeal was denied, and codefendant was given leave to file pro se brief, where defendant did not respond to court's query regarding whether codefendant wished counsel to appear on his behalf. F.R.A.P. Rule 28(i), 28 U.S.C.A.

[2] Criminal Law 110 ⟶339.10(1)

110 Criminal Law
    110XVII Evidence
        110XVII(D) Facts in Issue and Relevance
            110k339.5 Identity of Accused
                110k339.10 Effect of Prior Events on Subsequent Identification
                    110k339.10(1) k. Prior impropriety in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

general. Most Cited Cases

If pretrial identification procedures have been unduly suggestive, court may nonetheless admit in-court identification testimony if court determines it to be independently reliable.

**[3] Criminal Law 110 ☞339.6**

110 Criminal Law
    110XVII Evidence
        110XVII(D) Facts in Issue and Relevance
            110k339.5 Identity of Accused
                110k339.6 k. In general. Most Cited Cases

For both pretrial and in-court identifications, the linchpin of admissibility is reliability.

**[4] Criminal Law 110 ☞339.6**

110 Criminal Law
    110XVII Evidence
        110XVII(D) Facts in Issue and Relevance
            110k339.5 Identity of Accused
                110k339.6 k. In general. Most Cited Cases

If impermissibly suggestive procedures are not employed in identification procedures, independent reliability is not constitutionally required condition of admissibility, and reliability of identification is simply question for jury.

**[5] Criminal Law 110 ☞339.8(3)**

110 Criminal Law
    110XVII Evidence
        110XVII(D) Facts in Issue and Relevance
            110k339.5 Identity of Accused
                110k339.8 Out-Of-Court or Pre-Trial Confrontation
                110k339.8(2) Time and Manner of Confrontation; Suggestiveness
                110k339.8(3) k. Lineup procedure in general. Most Cited Cases

**Criminal Law 110 ☞339.9(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(D) Facts in Issue and Relevance
            110k339.5 Identity of Accused
                110k339.9 In-Court Identification in General
                110k339.9(1) k. In general. Most Cited Cases

Witness' in-court identification and testimony relating to out-of-court identification of defendant were admissible, even though detective told witness just before lineup that police "can't just take a 'possibly'," creating risk of prompting identification on something less than total certainty, witness initially described gunman as five feet seven inches tall but defendant was six feet two inches tall, where comment did not suggest that witness choose any particular participant or confirm the correctness of choice after it had been made, where composition of lineup, featuring number of Asian males of similar general appearance, was fair, witness testified that gunman was in crouched position, shooting, at time that she observed defendant, witness observed gunman for two to three seconds at crime scene before he turned away, witness had high degree of attention because she feared gunman would open fire on her, and witness worked with sketch artist in development of composite sketch that bore striking similarity in many respects to defendant.

**[6] Criminal Law 110 ☞339.8(4)**

110 Criminal Law

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

110XVII Evidence
    110XVII(D) Facts in Issue and Relevance
        110k339.5 Identity of Accused
            110k339.8 Out-Of-Court or Pre-Trial Confrontation
                110k339.8(2) Time and Manner of Confrontation; Suggestiveness
                    110k339.8(4) k. Number, character, and appearance of lineup participants. Most Cited Cases

When appearance of participants in lineup is not uniform with respect to given characteristic, the principal question in determining suggestiveness is whether the appearance of the accused, matching descriptions given by the witness, so stood out from all others as to suggest to witness that that person was more likely to be the culprit.

[7] Criminal Law 110 ⟲339.7(3)

110 Criminal Law
    110XVII Evidence
        110XVII(D) Facts in Issue and Relevance
            110k339.5 Identity of Accused
                110k339.7 Photographs and Drawings
                    110k339.7(3) k. Manner of exhibition; suggestiveness. Most Cited Cases

Witness' identification of defendant was admissible, even though witness was asked to sign back of defendant's photograph in array indicating that defendant was one of the people who committed robbery of apartment, and witness' husband had previously signed back of defendant's photograph, and even though witness had not previously provided description of defendant, photo identification did not occur until six months after the incident, and witness was ordered to keep head down by robbers, where witness made positive identification of defendant's photograph before turning it over to sign, and where witness had ample opportunity to view defendant, and displayed

complete certainty about identification.

[8] Infants 211 ⟲2977

211 Infants
    211XVI Rights and Privileges as to Adult Prosecutions
        211XVI(B) Juvenile Transfers and Certifications
            211k2974 Role, Authority, and Discretion of Prosecutor
                211k2977 k. Certification of juvenile or records. Most Cited Cases
                    (Formerly 211k68.5)

Certification by the Attorney General is prerequisite to the exercise of federal jurisdiction over juveniles. 18 U.S.C.A. § 5032.

[9] Infants 211 ⟲2977

211 Infants
    211XVI Rights and Privileges as to Adult Prosecutions
        211XVI(B) Juvenile Transfers and Certifications
            211k2974 Role, Authority, and Discretion of Prosecutor
                211k2977 k. Certification of juvenile or records. Most Cited Cases
                    (Formerly 211k68.5)

Certification by Attorney General under Juvenile Delinquency Act, does not determine whether government must proceed against defendant as juvenile, or as adult in criminal prosecution. 18 U.S.C.A. § 5032.

[10] Infants 211 ⟲2957

211 Infants

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
**(Cite as: 40 F.3d 1347)**

211XVI Rights and Privileges as to Adult Prose-
cutions
211XVI(A) In General
211k2957 k. Jurisdiction of adult or juvenile
court. Most Cited Cases
(Formerly 211k68.5)

Federal district court may convene itself as a ju-
venile court under the Juvenile Delinquency Act. 18
U.S.C.A. § 5031 et seq.

**[11] Infants 211 ⟜2560**

211 Infants
211XV Juvenile Justice
211XV(E) Trial and Adjudication
211k2559 Pleading
211k2560 k. In general. Most Cited
Cases
(Formerly 211k197)

Under the Juvenile Delinquency Act, juvenile
proceedings commence with the filing of an informa-
tion. 18 U.S.C.A. § 5031 et seq.

**[12] Criminal Law 110 ⟜1033.1**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in
Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1033.1 k. Jurisdiction. Most Cited
Cases

Court of Appeals was obliged to address issue of
whether fact that defendant was a juvenile at time that
predicate acts of RICO count were committed prec-
luded RICO conviction, even though defendant did
not raise the argument before district court, as the
argument implicated subject matter jurisdiction over
the case. 18 U.S.C.A. § 1961(5).

**[13] Racketeer Influenced and Corrupt Organiza-
tions 319H ⟜7**

319H Racketeer Influenced and Corrupt Organiza-
tions
319HI Federal Regulation
319HI(A) In General
319Hk4 Racketeering or Criminal Activity
319Hk7 k. Particular acts. Most Cited
Cases

Defendants could be convicted under Racketeer
Influenced and Corrupt Organizations (RICO) provi-
sions, and district court had subject matter jurisdiction
over substantive RICO and RICO conspiracy counts
against defendants, even though one committed pre-
dicate offenses before eighteenth birthday, except for
conspiring to commit murder to maintain or increase
position in RICO enterprise, and other defendant
committed one predicate offense before eighteenth
birthday, and even though government never certified
case for prosecution in district court pursuant to the
Juvenile Delinquency Act (JDA), or moved to have
defendants transferred to adult status; as relevant 'act'
for determining federal jurisdiction under the JDA,
was the crime charged in the indictment, the substan-
tive RICO offenses, rather than the discrete predicate
acts underlying those charges, and RICO offenses
were not committed by the defendants prior to their
eighteenth birthdays because the offenses continued
after their eighteenth birthdays; thus the JDA did not
apply. 18 U.S.C.A. §§ 1961(5), 5032.

**[14] Infants 211 ⟜2959**

211 Infants
211XVI Rights and Privileges as to Adult Prose-
cutions
211XVI(A) In General
211k2959 k. Nature of crime or offense.
Most Cited Cases

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
**(Cite as: 40 F.3d 1347)**

(Formerly 211k68.5)

**Infants 211 🖛2977**

211 Infants
    211XVI Rights and Privileges as to Adult Prosecutions
        211XVI(B) Juvenile Transfers and Certifications
            211k2974 Role, Authority, and Discretion of Prosecutor
                211k2977 k. Certification of juvenile or records. Most Cited Cases
    (Formerly 211k68.5)

To procure federal jurisdiction over a case under the Juvenile Delinquency Act (JDA), Attorney General must certify to court that offense charged, rather than any of the acts comprising that offense, is crime that may be prosecuted under the JDA; thus to determine whether JDA governs prosecution, court should look to defendant's age at time of offense charged in indictment. 18 U.S.C.A. § 5032.

**[15] Infants 211 🖛2959**

211 Infants
    211XVI Rights and Privileges as to Adult Prosecutions
        211XVI(A) In General
            211k2959 k. Nature of crime or offense. Most Cited Cases
    (Formerly 211k68.5)

Federal courts have jurisdiction over conspiracies begun while defendant was minor but completed after eighteenth birthday. 18 U.S.C.A. § 5032.

**[16] Infants 211 🖛2959**

211 Infants

211XVI Rights and Privileges as to Adult Prosecutions
    211XVI(A) In General
        211k2959 k. Nature of crime or offense.
Most Cited Cases
    (Formerly 211k68.5)

Because conspiracy is continuing crime that endures until its objectives are either completed or abandoned, federal court may assume jurisdiction over defendant upon threshold demonstration of posteighteen conspiracy activity, which "ratifies" preeighteen participation in conspiracy. 18 U.S.C.A. § 5032.

**[17] Criminal Law 110 🖛150**

110 Criminal Law
    110X Limitation of Prosecutions
        110k148 Commencement of Period of Limitation
            110k150 k. Continuing offenses. Most Cited Cases

Both Racketeer Influenced and Corrupt Organizations Act (RICO), and RICO conspiracy offenses, are continuing crimes. 18 U.S.C.A. § 1961.

**[18] Criminal Law 110 🖛150**

110 Criminal Law
    110X Limitation of Prosecutions
        110k148 Commencement of Period of Limitation
            110k150 k. Continuing offenses. Most Cited Cases

Because limitations period is measured from the point at which crime is complete, defendant may be liable under substantive Racketeer Influenced and Corrupt Organizations Act (RICO) for predicate acts the separate prosecution of which would be barred by

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

the applicable statute of limitations, so long as that defendant committed one predicate act within the five-year limitations period. 18 U.S.C.A. §§ 1962, 1963.

[19] Conspiracy 91 ⟜40

91 Conspiracy
    91III Criminal Responsibility
        91III(A) Offenses
            91k39 Persons Liable
                91k40 k. In general. Most Cited Cases

Defendant is liable for participation in Racketeer Influenced and Corrupt Organization (RICO) conspiracy for predicate acts the separate prosecution of which would be time barred, so long as defendant had not withdrawn from conspiracy during limitations period. 18 U.S.C.A. § 1951.

[20] Racketeer Influenced and Corrupt Organizations 319H ⟜7

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk4 Racketeering or Criminal Activity
                319Hk7 k. Particular acts. Most Cited Cases

Defendant's criminal acts committed before he reached age of eighteen constituted "racketeering activity" for purposes of Racketeer Influenced and Corrupt Organization Act (RICO), even though the government did not move to transfer defendant's case to adult status, and acts were acts of juvenile delinquency for which defendant would have avoided incarceration, where all of defendant's preeighteen predicate acts were felonies punishable under New York law by imprisonment for more than one year, except for extortion, which was charged under federal law. 18

U.S.C.A. §§ 1951, 1961(1); N.Y.McKinney's Penal Law §§ 70.00, 105.10, 105.15, 125.25, 160.15.

[21] Racketeer Influenced and Corrupt Organizations 319H ⟜4.1

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk4 Racketeering or Criminal Activity
                319Hk4.1 k. In general. Most Cited Cases

"Racketeering activity" element of Racketeer Influenced and Corrupt Organization Act (RICO), is met if charged conduct generally is punishable by one year of incarceration under state law. 18 U.S.C.A. § 1961(1).

[22] Infants 211 ⟜2959

211 Infants
    211XVI Rights and Privileges as to Adult Prosecutions
        211XVI(A) In General
            211k2959 k. Nature of crime or offense. Most Cited Cases
            (Formerly 211k152)

Defendant's age at time substantive Racketeer Influenced and Corrupt Organizations (RICO) or RICO conspiracy offense is completed is relevant age for purposes of Juvenile Delinquency Act (JDA) determination of juvenile status. 18 U.S.C.A. §§ 1961(1), 5032.

[23] Racketeer Influenced and Corrupt Organizations 319H ⟜6

319H Racketeer Influenced and Corrupt Organiza-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

tions
    319HI Federal Regulation
      319HI(A) In General
        319Hk4 Racketeering or Criminal Activity
          319Hk6 k. What are predicate acts; racketeering or criminal activity. Most Cited Cases

Adult defendant may properly be held liable under Racketeer Influenced and Corrupt Organizations Act (RICO) for predicate offense committed as juvenile. 18 U.S.C.A. §§ 1961(1), 5031.

[24] Infants 211 &#128273;2977

211 Infants
    211XVI Rights and Privileges as to Adult Prosecutions
      211XVI(B) Juvenile Transfers and Certifications
        211k2974 Role, Authority, and Discretion of Prosecutor
          211k2977 k. Certification of juvenile or records. Most Cited Cases
    (Formerly 211k68.7(1))

Requirements of record certification provision of statute regarding transfer of defendant for criminal prosecution were satisfied, and district court thus had subject matter jurisdiction over defendant who was minor when arrested, even though government did not provide for the delivery of defendant's juvenile court records to the district court prior to the filing of the information against the defendant, where before arraignment, and long before information was filed, court and defendant were presented with pretrial services report which recited that defendant had been convicted of grand larceny, providing district court with notice of defendant's juvenile record, government provided district court with certified copy of juvenile court records prior to court's determination of government's motion to transfer defendant to adult status, and defendant did not argue that he was prejudiced by

delay in introduction of official records. 18 U.S.C.A. § 5032.

[25] Infants 211 &#128273;2977

211 Infants
    211XVI Rights and Privileges as to Adult Prosecutions
      211XVI(B) Juvenile Transfers and Certifications
        211k2974 Role, Authority, and Discretion of Prosecutor
          211k2977 k. Certification of juvenile or records. Most Cited Cases
    (Formerly 211k68.7(1))

Record certification provision of statute regarding transfer of delinquency proceedings for criminal prosecutions, should be read to afford the government a limited amount of flexibility, rather than strictly interpreted. 18 U.S.C.A. § 5032.

[26] Infants 211 &#128273;2575

211 Infants
    211XV Juvenile Justice
      211XV(E) Trial and Adjudication
        211k2575 k. Time for hearing; speedy trial. Most Cited Cases
    (Formerly 211k204)

Thirty-day speedy trial period of Juvenile Delinquency Act begins to run on date juvenile is taken into federal custody. 18 U.S.C.A. § 5032.

[27] Infants 211 &#128273;2998

211 Infants
    211XVI Rights and Privileges as to Adult Prosecutions
      211XVI(B) Juvenile Transfers and Certifica-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
**(Cite as: 40 F.3d 1347)**

tions

211k2998 k. Time for adult proceedings or trial after transfer. Most Cited Cases
(Formerly 211k204)

Period of time between date that government moved to transfer defendant to adult status, and date that district court determined that such transfer was mandatory, was properly excluded from 30–day speedy trial period under the Juvenile Delinquency Act. 18 U.S.C.A. § 5036.

**[28] Infants 211 ☞2998**

211 Infants
211XVI Rights and Privileges as to Adult Prosecutions
211XVI(B) Juvenile Transfers and Certifications
211k2998 k. Time for adult proceedings or trial after transfer. Most Cited Cases
(Formerly 211k68.7(5))

Once district court granted government's motion to have defendant transferred to adult status, defendant was no longer "an alleged delinquent" for purposes of the Juvenile Delinquency Act, and the speedy trial provision of the Act was no longer applicable to him. 18 U.S.C.A. § 5036.

**[29] Infants 211 ☞2998**

211 Infants
211XVI Rights and Privileges as to Adult Prosecutions
211XVI(B) Juvenile Transfers and Certifications
211k2998 k. Time for adult proceedings or trial after transfer. Most Cited Cases
(Formerly 211k204)

Thirty-day speedy trial provision of Juvenile De-

linquency Act was not violated when defendant was arrested on November 19, 1990, government filed good faith notice of motion to transfer defendant to adult status on December 19, 1990, motion had substantial basis, and was granted on January 31, 1991. 18 U.S.C.A. § 5036; Fed.Rules Cr.Proc.Rule 47, 18 U.S.C.A.; U.S.Dist.Ct.Rules E.D.N.Y., Criminal Rule 3(b).

**[30] Criminal Law 110 ☞1038.1(4)**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1038 Instructions
110k1038.1 Objections in General
110k1038.1(3) Particular Instructions
110k1038.1(4) k. Elements of offense and defenses. Most Cited Cases

Jury instruction, which defendants did not object to, regarding federal statute prohibiting conducting or participating, directly or indirectly, in conduct of criminal enterprises' affairs through pattern of racketeering activity or collection of unlawful debt, was not grounds for reversal of defendants' convictions under "modified plain error" analysis, even though jury instruction did not instruct that defendant must participate in operation or management of enterprise, and thus was not in accordance with Supreme Court decision in *United States v. Reves*, decided during pendency of appeal, where government established that defendants were all thoroughly indoctrinated participants and intimately involved in criminal activity of street gang, were required to leave their homes and take up residence with gang compatriots, and were convicted of one or more crimes at core of criminal activities of gang. 18 U.S.C.A. § 1962(c).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

**[31] Criminal Law 110 ☞1163(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1163 Presumption as to Effect of Error
                110k1163(1) k. In general. Most Cited Cases

"Modified plain error" rule of *United States v. Viola* shifts burden to government to establish that challenged instruction did not result in miscarriage of justice which denied defendant a fair trial. 18 U.S.C.A. § 1962(c).

**[32] Racketeer Influenced and Corrupt Organizations 319H ☞28**

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk28 k. Continuity or relatedness; ongoing activity. Most Cited Cases

To establish that predicate acts are sufficiently "related" and "continuous" to establish "pattern of racketeering activity" under statute prohibiting conducting or participating, directly or indirectly, in conduct of criminal enterprises' affairs through pattern of racketeering activity or collection of unlawful debt, it is only necessary that criminal acts have same or similar purposes, results, participants, victims, or methods or commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. 18 U.S.C.A. § 1962(c).

**[33] Racketeer Influenced and Corrupt Organizations 319H ☞29**

319H Racketeer Influenced and Corrupt Organiza-
tions
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk29 k. Time and duration. Most Cited Cases

Defendant could be convicted under statute prohibiting conducting or participating, directly or indirectly, in conduct of criminal enterprises' affairs through pattern of racketeering activity or collection of unlawful debt, even though events were not closely related in time and subject matter, where predicate acts proved were conspiracy to murder rival gang leader in February 1987, conspiracy to commit and commission or armed robbery in January 1990, and conspiracy to extort and attempted extortion in August 1990, and where all activities were designed to earn money for or increase prestige of gang. 18 U.S.C.A. § 1962(c).

**[34] Criminal Law 110 ☞392.21**

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
            110k392.1 Wrongfully Obtained Evidence
                110k392.21 k. Electronic surveillance; telecommunications. Most Cited Cases
    (Formerly 110k394.3)

Wiretap evidence was admissible, even though recordings were not sealed until three days after authorizing order expired, where records were sealed within two business days of expiration, and there was no suggestion of bad faith, deliberate disregard or the statute, or tampering. 18 U.S.C.A. § 2518(8)(a).

**[35] Criminal Law 110 ☞392.21**

110 Criminal Law
    110XVII Evidence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

110XVII(I) Competency in General
110k392.1 Wrongfully Obtained Evidence
110k392.21 k. Electronic surveillance;
telecommunications. Most Cited Cases
(Formerly 110k394.3)

Wiretap evidence was admissible, even though recordings were not sealed upon the arrest of defendants, where a number of individuals who were targets of investigation were not apprehended at the same time, and thus the objective of surveillance had not yet been attained, and where tapes were sealed three business days following arrests. 18 U.S.C.A. § 2518(5), (8)(a).

[36] Jury 230 ☞144

230 Jury
230VI Impaneling for Trial, and Oath
230k144 k. Designation and identity of jurors.
Most Cited Cases

Competing individual and institutional interests are reasonably accommodated, and use of anonymous jury is constitutional, when there is strong reason to believe the jury needs protection, and district court takes reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected; within these parameters, trial court is accorded broad discretion to determine whether to impanel anonymous jury. U.S.C.A. Const.Amends. 5, 6.

[37] Jury 230 ☞144

230 Jury
230VI Impaneling for Trial, and Oath
230k144 k. Designation and identity of jurors.
Most Cited Cases

Trial court did not abuse its discretion in impaneling anonymous jury, where government pre-

sented evidence that gang to which defendants belonged had extensive history of interfering with judicial process, having murdered two people because one of them testified against gang member, in furtherance of gang leader's policy of killing witnesses, after shooting owner of restaurant for failure to pay for protection, gang member shot at several customers in apparent attempt to eliminate potential witnesses; when gunman was arrested, gang undertook to locate eyewitness in order to kill her before she testified, after gang member began cooperating with government in case, leader of gang spoke with other members about his attempts to locate cooperating member's family in apparent attempt to use them to coerce his silence, some gang members remained at large during trial with means to harm jurors, and case had received significant amount of coverage from print and broadcast media. U.S.C.A. Const.Amends. 5, 6.

[38] Jury 230 ☞144

230 Jury
230VI Impaneling for Trial, and Oath
230k144 k. Designation and identity of jurors.
Most Cited Cases

Prospect of publicity militates in favor of jury anonymity to prevent exposure of jurors to intimidation or harassment. U.S.C.A. Const.Amends. 5, 6.

[39] Jury 230 ☞144

230 Jury
230VI Impaneling for Trial, and Oath
230k144 k. Designation and identity of jurors.
Most Cited Cases

Trial judge took adequate precautions to safeguard defendants' constitutional rights in trial in which anonymous jury had been impanelled, even though court precluded disclosure of jurors' names, addresses, and employers, where court questioned prospective

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

jurors about familiarity with case, defendants, and crime scenes, and inquired about their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service, and other matters. U.S.C.A. Const.Amends. 5, 6.

**[40] Jury 230 ⟨⟩150**

230 Jury
   230VI Impaneling for Trial, and Oath
      230k150 k. Objections and exceptions. Most Cited Cases

Issue of whether judge's comment to jury regarding their anonymous status and government transportation prejudiced defendants because it was not explained to allay jurors' concerns, was waived, where no request was made for explanation regarding comment at trial.

**[41] Criminal Law 110 ⟨⟩661**

110 Criminal Law
   110XX Trial
      110XX(C) Reception of Evidence
         110k661 k. Necessity and scope of proof. Most Cited Cases

**Criminal Law 110 ⟨⟩1153.1**

110 Criminal Law
   110XXIV Review
      110XXIV(N) Discretion of Lower Court
         110k1153 Reception and Admissibility of Evidence
            110k1153.1 k. In general. Most Cited Cases
    (Formerly 110k1153(1))

District court has broad discretion regarding ad-

missibility of evidence and its rulings will be disturbed only for abuse of that discretion.

**[42] Criminal Law 110 ⟨⟩368.20**

110 Criminal Law
   110XVII Evidence
      110XVII(F) Other Misconduct by Accused
         110XVII(F)2 Admissibility in Prosecutions for Particular Offenses in General
            110k368.20 k. Conspiracy, racketeering, and money laundering. Most Cited Cases
    (Formerly 110k369.2(3.1))

Trial court did not abuse discretion in admitting testimony regarding defendants' gang fight with rival gang, which included account of using guns, and existence and nature of Racketeer Influenced and Corrupt Organization (RICO) enterprise was not so established to render evidence surplusage, even though evidence was probative of uncharged crime, and other evidence of violence was presented, where evidence was probative of existence, organization, and nature of enterprise, which was a central allegation in indictment, counsel for one defendant consistently referred to enterprise as the "so-called Green Dragons," indicating that existence of enterprise was still in dispute, and where evidence was useful in connecting one defendant to organization who had not prominently appeared in wiretap evidence presented. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[43] Criminal Law 110 ⟨⟩1036.1(8)**

110 Criminal Law
   110XXIV Review
      110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
         110XXIV(E)1 In General
            110k1036 Evidence
               110k1036.1 In General
                  110k1036.1(3) Particular Evi-

40 F.3d 1347
(Cite as: 40 F.3d 1347)

dence

110k1036.1(8) k. Other of-
fenses and character of accused. Most Cited Cases

Argument, that trial court improperly neglected to
limit evidence of fight with rival gang to discussion of
fist fight to exclude evidence of gun use, was waived,
where defendant failed to object to evidence during
sidebar discussion with judge in which judge dis-
cussed relevance of evidence. Fed.Rules Evid.Rule
403, 28 U.S.C.A.

[44] Racketeer Influenced and Corrupt Organiza-
tions 319H ⟶95

319H Racketeer Influenced and Corrupt Organiza-
tions
    319HI Federal Regulation
        319HI(C) Criminal Remedies and Proceedings
            319Hk92 Evidence
                319Hk95 k. Weight and sufficiency.
Most Cited Cases

Sufficient evidence supported defendants' con-
victions for murder to maintain or increase position in
Racketeer Influenced and Corrupt Organizations
(RICO) enterprise, even though other gang members
drove car at times, and another gang member testified
that defendant told him that he killed victim while
sitting on door of car, but eyewitness testimony did
not corroborate this account, where eyewitness saw
defendant's car stop in area, and then heard shots fired,
and where defendant never told testifying gang
member that he had been wrongly accused. 18
U.S.C.A. § 1959(a)(5).

[45] Racketeer Influenced and Corrupt Organiza-
tions 319H ⟶94

319H Racketeer Influenced and Corrupt Organiza-
tions
    319HI Federal Regulation

319HI(C) Criminal Remedies and Proceedings
    319Hk92 Evidence
        319Hk94 k. Admissibility. Most Cited
Cases

Testimony of former gang member was admissi-
ble in defendants' trial for murder to maintain or in-
crease position in Racketeer Influenced or Corrupt
Organizations Act (RICO), even though he testified as
to what he said in conversation with persons whose
statements would have constituted inadmissible
hearsay, where witness' statements were statements of
coconspirator during course and in furtherance of
conspiracy, and witness did not incorporate any in-
formation derived from other persons, but merely
related what he had told other person, consisting of
information he received from defendant, and relevant
inferences were all to be drawn from statements made
by members of defendant's gang. 18 U.S.C.A. §
1959(a)(5); Fed.Rules Evid.Rule 801(d)(2)(E), 28
U.S.C.A.

[46] Criminal Law 110 ⟶1023(11)

110 Criminal Law
    110XXIV Review
        110XXIV(C) Decisions Reviewable
            110k1021 Decisions Reviewable
                110k1023 Appealable Judgments and
Orders
                    110k1023(11) k. Requisites and suf-
ficiency of judgment or sentence. Most Cited Cases

Sentencing court's refusal to depart downward
from indicated guideline sentencing range is ordina-
rily not appealable, except when sentencing court
mistakenly believed that it lacked authority to depart.

[47] Criminal Law 110 ⟶1023(11)

110 Criminal Law
    110XXIV Review

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

110XXIV(C) Decisions Reviewable
110k1021 Decisions Reviewable
110k1023 Appealable Judgments and Orders
110k1023(11) k. Requisites and sufficiency of judgment or sentence. Most Cited Cases

Court of Appeals was without authority to review court's decision not to depart downward in imposing sentences on defendants convicted of Racketeer Influenced and Corrupt Organizations (RICO) offenses, where district court explicitly considered granting departure to defendants for lack of guidance during upbringing, but declined to do so as an exercise of discretion.

[48] Sentencing and Punishment 350H ⟜650

350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(A) In General
350Hk650 k. In general. Most Cited Cases
(Formerly 110k1239)

District court should consider defendant's potential for rehabilitation in determining sentence, but it is unnecessary and inappropriate to carve out separate "youth gang" exception to sentencing guidelines for Racketeer Influenced and Corrupt Organization (RICO)/homicide prosecutions. 18 U.S.C.A. § 3553(a)(1), (a)(2)(D).

[49] Sentencing and Punishment 350H ⟜865

350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(F) Departures
350HIV(F)3 Downward Departures
350Hk859 Offender-Related Factors
350Hk865 k. Age. Most Cited Cases
(Formerly 110k1302, 110k1300)

Sentencing and Punishment 350H ⟜869

350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(F) Departures
350HIV(F)3 Downward Departures
350Hk859 Offender-Related Factors
350Hk869 k. Rehabilitation. Most Cited Cases
(Formerly 110k1302, 110k1300)

District court did not abuse its discretion in refusing to grant downward departure to defendant in youth gang based on age and amenability to psychological counseling and rehabilitation relative to adults, where court explicitly acknowledged that defendant's potential for rehabilitation was factor for consideration, but determined that prospects for rehabilitation were too speculative to warrant departure, considering wiretap evidence in which defendant spoke about using his psychological counseling to his advantage in sentencing. 18 U.S.C.A. § 3553(a)(1), (a)(2)(D); U.S.S.G. § 5H1.1, p.s., 18 U.S.C.A.App.

[50] Criminal Law 110 ⟜1181.5(8)

110 Criminal Law
110XXIV Review
110XXIV(U) Determination and Disposition of Cause
110k1181.5 Remand in General; Vacation
110k1181.5(3) Remand for Determination or Reconsideration of Particular Matters
110k1181.5(8) k. Sentence. Most Cited Cases

Case would be remanded for resentencing, where district court imposed fines on defendants despite indications in presentence reports that at least some of the defendants did not have adequate financial resources to pay a fine, and would not be likely to be able to pay fine in future as they were sentenced to life

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

in prison, and where fine was imposed based upon remote fortuity of possibility that defendants could win lottery. U.S.S.G. 5E1.2(a, f), 18 U.S.C.A.App.

**[51] Fines 174 ⚷1.5**

174 Fines
    174k1.5 k. Imposition and liability in general.
Most Cited Cases
    (Formerly 174k11/2)

Fine may constitutionally be imposed upon an indigent defendant, who may assert his continuing indigence as defense if government subsequently seeks to collect the fine.

**[52] Fines 174 ⚷1.5**

174 Fines
    174k1.5 k. Imposition and liability in general.
Most Cited Cases
    (Formerly 174k11/2)

Sentencing Guidelines provision regarding fining indigent defendant authorizes, but does not mandate, imposition of lesser fine or waiver of any fine in case of indigent defendant. U.S.S.G. § 5E1.2(f), 18 U.S.C.A.App.

**[53] Fines 174 ⚷1.5**

174 Fines
    174k1.5 k. Imposition and liability in general.
Most Cited Cases
    (Formerly 174k11/2)

Sentencing Guidelines provision regarding fining indigent defendant imposes upon defendant burden of establishing indigence, which may be satisfied either by independent evidence or by reference to defendant's presentence report. U.S.S.G. § 5E1.2(f), 18

U.S.C.A.App.

**[54] Fines 174 ⚷1.5**

174 Fines
    174k1.5 k. Imposition and liability in general.
Most Cited Cases
    (Formerly 174k11/2)

Discretion, vested in sentencing courts by provision regarding imposition of fine on indigent defendant, to waive fine where indigence is shown should generally be executed in favor of such waiver. U.S.S.G. § 5E1.2(f), 18 U.S.C.A.App.

**[55] Sentencing and Punishment 350H ⚷2272**

350H Sentencing and Punishment
    350HXII Reconsideration and Modification of Sentence
        350HXII(C) Proceedings
            350HXII(C)1 In General
                350Hk2272 k. Persons entitled to seek relief. Most Cited Cases
    (Formerly 110k996(1.1))

Government would be unable to move for amendment of sentence to have fines imposed, in unlikely event that any of the indigent defendants sentenced for Racketeer Influenced and Corrupt Organizations (RICO) Act, were to win lottery. 18 U.S.C.A. §§ 3572(c), 3573.

*1353 Lloyd Epstein, New York City (Epstein & Weil, of counsel), for defendant-appellant Alex Wong.

Alan Drezin, Brooklyn, NY, for defendant-appellant Roger Kwok.

Michael Handwerker, New York City, for defen-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

dant-appellant Chen I. Chung.

Susan G. Kellman, New York City, for defendant-appellant Tung Tran.

Gerald Bodell, New York City, for defendant-appellant Danny Ngo.

Gail E. Laser, New York City (Shargel & Futerfas, of counsel), for defendant-appellant Brian Chan.

David A. Lewis, New York City (The Legal Aid Society, Federal Defender Services Unit, of counsel), for defendant-appellant Joseph Wang.

Charles Lavine, Forest Hills, NY, for defendant-appellant Chiang T. Cheng.

Joel Cohen, New York City, for defendant-appellant Steven Ng.

Catherine E. Palmer and Loretta Lynch, Asst. U.S. Atty., E.D. N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Emily Berger and Margaret Giordano, Asst. U.S. Attys., of counsel), for appellee.

Before: OAKES and MAHONEY, Circuit Judges, and MISHLER, District Judge.[FN*]

> FN* The Honorable Jacob Mishler, United States District Judge for the Eastern District of New York, sitting by designation.

MAHONEY, Circuit Judge:

Alex Wong, Roger Kwok, Chen I. Chung, Tung Tran, Danny Ngo, Brian Chan, Joseph Wang, Chiang T. Cheng, and Steven Ng appeal from judgments of conviction entered on various dates in October and November 1992 in the United States District Court for the Eastern District of New York, Reena Raggi, *Judge,* after a ten-week jury trial. Each of the defen-

dants was convicted of a substantive violation of the Racketeer Influenced and Corrupt Organizations ("RICO") provisions of the federal criminal code, *see* *1354 18 U.S.C. §§ 1962(c) and 1963, and of RICO conspiracy in violation of 18 U.S.C. §§ 1962(d) and 1963. Each of the defendants except Alex Wong, Chiang T. Cheng, and Steven Ng was also convicted of one count of conspiracy to commit an assault with dangerous weapons to maintain or increase their positions in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(6).

In addition, Alex Wong was convicted of one count of conspiracy to commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5). Roger Kwok was convicted of one count of conspiracy to kidnap and commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); two counts of kidnapping and murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; two counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and two counts of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Chen I. Chung was convicted of six counts of conspiracy to commit murder (and in one count also to kidnap) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); five counts of murder (and, as to two counts, kidnapping) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of kidnapping to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894; one count of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2; six counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and five counts of extortion in violation of 18 U.S.C. §§ 1951 and 2.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

Tung Tran was convicted of two counts of conspiracy to commit murder (and in one count also to kidnap) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); four counts of murder (and, as to two counts, kidnapping) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894; one count of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2; three counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and three counts of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Danny Ngo was convicted of one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894, and one count of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2. Brian Chan was convicted of two counts of conspiracy to commit murder (and in one count also to kidnap) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); three counts of murder (and, as to two counts, kidnapping) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894; one count of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2; two counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and two counts of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Joseph Wang was convicted of one count of conspiracy to commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); two counts of murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and one count of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Chiang T. Cheng was convicted of two counts of conspiracy to commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); three counts of murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894; and one count *1355 of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2.

Finally, Steven Ng was convicted of one count of conspiracy to commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5). The non-RICO crimes of which defendants-appellants were convicted generally correspond to the predicate acts that the jury found to have been proved under the two RICO counts, but several of the RICO predicate acts were not separately charged as substantive crimes, and one of the non-RICO counts has no counterpart among the RICO predicate acts.

Chen I. Chung, Chiang T. Cheng, and Steven Ng were acquitted of one count of murder to maintain or increase their position in a RICO enterprise. Tung Tran and Brian Chan were each acquitted of one count of kidnapping to maintain or increase their positions in a RICO enterprise.

The district court sentenced all defendants except Ngo and Ng principally to multiple concurrent terms of life imprisonment for their participation in offenses involving murder to maintain or increase their positions in a RICO enterprise. The court sentenced Ngo principally to concurrent terms of ten years imprisonment for his RICO and extortion offenses. Ng was sentenced principally to concurrent terms of 210 months imprisonment for his RICO violations and 120 months imprisonment for conspiracy to commit murder. Each defendant was also accorded a number

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

of shorter sentences to run concurrently with the principal sentences. The district court imposed concurrent fines totalling $250,000 upon each defendant except Ng, who was fined $175,000.

We affirm the judgments of conviction and sentences except for the fines imposed in this case. We vacate the fines and remand for their reconsideration.

Background

We provide only a general factual introduction to our opinion at this preliminary juncture. Further background facts will be detailed in connection with the issues to which they pertain during the discussion of those issues. Factual recitals are based upon trial testimony and other evidence that the jury could reasonably have credited in reaching the verdicts that it rendered, except that some factual recitals (relating to pretrial hearings) are based upon evidence that was presented only to Judge Raggi, and not to the jury.

The defendants were named in a thirty-count superseding indictment that charged them with membership in a racketeering enterprise known as the "Green Dragons." The Green Dragons was a violent gang that operated principally in the predominantly Chinese sections of Elmhurst and Flushing in Queens, New York. The members primarily extorted "protection" money from Chinese-run businesses, but also engaged in periodic armed robberies. They frequently employed violence to defend and expand their turf, assaulting, kidnapping, and murdering rival gang members, potential witnesses, and businessmen who refused to pay protection money. The gang amassed a sizeable arsenal of firearms with which to conduct its criminal activities. As the Green Dragons expanded its operations, its weekly intake of protection money increased from between $400–600 per week during the summer of 1989 to $1,500–1,700 per week in late 1990.

Kin Fei Wong founded the Green Dragons in the

mid–1980's as an offshoot of another Asian gang known as the "Fook Ching," and was the overall "Dai Lo" or "Big Brother" of the gang. Because Kin Fei Wong spent much of his time out of the United States, he delegated day-to-day operational authority to senior gang members. The operational or "street" leader of the Green Dragons in late 1986 was a gang member known as "E.T." After E.T. was killed in November 1986 by the Tung On, a rival Asian gang, Chen I. Chung became the operational leader of the Green Dragons. Kin Fei Wong maintained regular telephone contact with Chen I. Chung, and issued directives concerning Green Dragons policy, specific places to be extorted and amounts to demand, and how to handle conflicts with rival gangs and members of the Chinese community.

*1356 The Green Dragons recruited young Asian men from schools and playgrounds in Queens. Most of the members moved out of their families' homes and into apartments or "safe houses" maintained by the gang, where they lived with other Green Dragons members under the supervision of more senior members. Senior members collected funds derived from the gang's activities, and used the funds to pay the gang's expenses and to pay salaries to younger members.

Sonny Wong, who was one of the government's primary witnesses at trial, joined the Green Dragons when he was sixteen in October 1986, shortly after Steven Ng enlisted in the gang. He and Steven Ng had been approached at their high school by several Asian gangs before they decided to join the Green Dragons. At the time Wong and Ng joined the Green Dragons, E.T. was the gang's operational leader under Kin Fei Wong; Chen I. Chung and Wing Dong Moi were two senior members. Chung and Moi instructed Sonny Wong concerning the operating rules of the Green Dragons, including that he was to follow orders and was not to speak to the police. Danny Ngo joined the gang in January 1987. Aleck Yim, another government witness, joined the Green Dragons in April 1988, after receiving the approval of gang members Alex

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

Wong and Danny Ngo. Joseph Wang and Chiang T. Cheng joined the Green Dragons after Yim. Shortly thereafter, Tung Tran moved to New York from San Francisco and joined the gang. Brian Chan and Roger Kwok enlisted in April 1989.

Sonny Wong was second to Chen I. Chung in the Green Dragons' organizational structure, and his duties included overseeing new recruits, dealing with the gang's lawyers, collecting funds obtained through the gang's various activities, and distributing salaries. The other members of the gang carried out its program, committing acts of extortion, robbery, murder, and assault.

The arrests and indictments in this case resulted from a nine-month joint investigation conducted between March and November 1990 by the Federal Bureau of Investigation (the "FBI") and the New York City Police Department (the "NYPD"), assisted by the Nassau County Police Department. As part of their investigation, the FBI and NYPD conducted court-authorized electronic surveillance, monitoring several telephones used by the Green Dragons from August through November 1990. Through these wiretaps, the authorities learned that the Green Dragons had arranged to fight a rival gang, the White Tigers, to settle a "turf" dispute. The police arrested **Chen I. Chung, Tung Tran, Brian Chan, Joseph Wang, Roger Kwok, Danny Ngo, and other members of the Green Dragons on November 19, 1990, as the gang members massed in preparation for the expected combat.** Alex Wong, Chiang T. Cheng, and Steven Ng had already been incarcerated on November 19 on other charges.

Following these arrests, defendants-appellants were charged, tried, and convicted, as previously summarized. This appeal followed.

Discussion

Defendants-appellants urge numerous grounds

for reversal.[FN1] Tung Tran and Alex Wong argue that impermissibly suggestive pretrial identification procedures tainted identification testimony introduced at trial. Wong, Danny Ngo, and Roger Kwok contend that the district court lacked subject matter jurisdiction over them because the government failed to adhere to the requirements of the federal Juvenile Delinquency Act. Kwok maintains that in his case, the government also failed to comply with the speedy trial provision of that statute. Joseph Wang contends that the district court's instruction on the RICO "pattern" requirement did not satisfy the "operation or management" test set forth in _Reves v. Ernst & Young_, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Wang and Ngo claim that under the _Reves_ standard, the evidence was insufficient to support their convictions for substantive RICO and RICO conspiracy violations. Ngo argues that the evidence was not sufficient to establish that he participated in a pattern of racketeering activity under RICO. Steven *1357 Ng contends that the district court should have suppressed wiretap evidence on the ground that it was not timely sealed. Chen I. Chung and Brian Chan contend that the district court improperly empaneled an anonymous jury. Wang and Chan challenge the admission of evidence of uncharged criminal activities to prove the "enterprise" requirement under RICO. Chan argues that the district court erred in admitting allegedly hearsay evidence regarding, and contests the sufficiency of the evidence implicating him in, the murder of Jin Lee Soek. Kwok, Chung, Chiang T. Cheng, and Wong argue that the district court erred in refusing to grant them downward departures in imposing their sentences. Wong, Tran, and Chan argue that because they are concededly indigent, the district court abused its discretion by imposing fines upon them.

> **FN1.** All appellants except Danny Ngo have joined in the applicable arguments of codefendants pursuant to Fed.R.App.P. 28(i). Accordingly, sponsorship is irrelevant in the case of arguments that are applicable to a number of defendants.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

We address each of these claims below. Other contentions, which are not separately analyzed, are summarized at the conclusion of this opinion.

A. *Identification Testimony.*

[1] Tung Tran [FN2] and Alex Wong raise separate challenges to the admission of identification testimony at trial, arguing that the testimony was tainted by pretrial identification procedures that they claim were unduly suggestive. The identifications stemmed from two incidents involving crimes committed by Green Dragons members in 1989 and 1990.

> FN2. On June 11, 1993, Susan G. Kellman filed a motion to be relieved as counsel on this appeal at the behest of her client, Tung Tran, who was dissatisfied with the brief that she had filed on his behalf. That motion was referred to this panel. In August 1993, we denied the motion on the ground that Tran's codefendants were relying on his brief pursuant to Fed.R.App.P. 28(i), but gave Tran leave to file a *pro se* supplemental brief by September 7, 1993, and indicated at oral argument on September 13, 1993 that such a brief might be filed any time within the ensuing sixty days. On August 27, 1993, this court sought clarification from Tran through Kellman regarding whether Tran wished Kellman to appear at oral argument on his behalf. Tran did not answer this query, but requested a copy of the trial transcript, which Kellman provided. To date, we have received no indication from Tran whether he wishes us to consider Kellman's oral argument, nor have we received any supplemental *pro se* brief from him. Accordingly, we have deemed Tran's appeal to be based upon the arguments advanced by Kellman at oral argument and set forth in her brief, as well as applicable arguments of his codefendants.

1. *The Tien Chiau Restaurant Homicides and Carol Huang's Identification of Alex Wong.*

a. *The Incident.*

On July 16, 1989, Carol Huang and her husband Gregory Hyde had dinner at the Tien Chiau Restaurant in Flushing. After Huang and Hyde finished dinner, they approached the counter to pay the manager, but saw two young Chinese men having an "intense conversation" with the manager, and so returned to their table to wait for the manager to finish the discussion.

After hearing what they thought were firecrackers, Hyde turned and saw one of the young Chinese men with a gun in his hand, in a crouched position and shooting at the manager. Huang also saw the manager being shot. Hyde told his wife to duck under the table. As he tried to do so, Hyde was shot and fell to the floor, his legs paralyzed. After Huang saw her husband fall to the floor, she looked up and stared at the face of the young man with the gun for "[t]wo to three seconds," while he looked at her. Huang described the gunman, whom she later identified as Alex Wong, as "a very nice-looking kid with huge, extraordinary huge eyes," and approximately sixteen to seventeen years of age. Huang continued to stare at Wong for what felt "like ages," because she feared that he would shoot at her or her husband again. Finally, Wong turned away when someone at another table screamed. Huang then saw Wong shoot in the direction of the scream. Both Anthony Gallivan, another customer dining at the restaurant, and Mon Hsiung Ting, the manager of the Tien Chiau, died from gunshot wounds inflicted during this incident.

**Earlier that summer, Chen I. Chung had told Sonny Wong that the manager of the Tien Chiau Restaurant had refused to pay protection money to the Green Dragons, and that he planned to have the manager killed to \*1358 teach the owners of the**

40 F.3d 1347
(Cite as: 40 F.3d 1347)

restaurant "not to mess with the Green Dragons." Joseph Wang and Alex Wong were in charge of collecting protection money from the Tien Chiau Restaurant. The night of the incident, Chen I. Chung contacted Sonny Wong to tell him the Tien Chiau manager was dead, and instructed Sonny Wong to meet him at Chung's apartment. There Sonny Wong met with Alex Wong, Joseph Wang, and Chiang T. Cheng, who were debriefing Chung on the shooting. Cheng had driven Wang and Alex Wong to the restaurant. Alex Wong stated that he had shot the manager and a Caucasian customer. Joseph Wang said that after looking behind the cashier's counter to ascertain whether a security camera had recorded the incident, he had shot the manager again to be certain that he was dead.

b. *Identification Procedures and Ruling Below.*

Huang provided an identification of Alex Wong as the "shooter" at the Tien Chiau Restaurant, and Wong moved unsuccessfully to suppress that evidence prior to trial. Wong claims error in the district court's adverse ruling. Given the nature of Wong's challenge, the next two paragraphs of this opinion describe primarily the testimony at the pretrial suppression hearing, which is generally consistent with the trial testimony on this issue.

Shortly after the incident, on July 25, 1989, Huang met with an NYPD sketch artist, who prepared a sketch based on Huang's description of the gunman's facial features. On September 22, 1989, Huang viewed three different photo arrays, each containing six photographs of Asian men. According to the interviewing NYPD detective, Huang chose Sonny Wong's photo from the first array and Joseph Wang's from the second, stating that their pictures "resembled" the "shooter" she had seen. She also chose Alex Wong's photo from the third array, observing that the photo "look[ed] like the shooter," and that if she saw the subject of the photograph in person she could identify him. Huang's testimony was similar to the detective's, but somewhat more tentative, and emphasized her

desire to see the suspects in person.

On May 3, 1990, the NYPD conducted a lineup before Huang of six or seven Asian men, including Alex Wong. After looking at the lineup for five to ten minutes, Huang indicated that she "wasn't sure." Huang stated that one of the men (number five—Alex Wong) "look[ed] like him, but she can't be sure because of the height." The police then held a second lineup with the same participants standing, dimming the lights to simulate the lighting in the restaurant on the night of the shooting. Huang viewed the lineup for approximately five to ten minutes; just before she did so, a police detective told her that "we can't just take a 'possibly.' " Huang then identified Alex Wong. Although he was taller than she remembered the gunman to be, Huang stated that Wong had "the same facial features, fair skin, [and] rather big, huge eyes."

Based on this testimony, Alex Wong moved to suppress Huang's identification testimony, contending primarily that the detective's statement had pressured her into making an identification and thereby tainted Huang's identification of Wong. Wong also argued that there was not a sufficient independent basis for the testimony to be admissible, claiming that Huang had initially described the shooter as five feet seven inches tall, when his height was six feet two inches tall. The district court denied the motion. Although finding the detective's comment "involve[d] some element of suggestiveness," the court concluded that Huang's identification was independently reliable and that Huang would be allowed to testify at trial. At trial, Huang both made an in-court identification of Wong and testified concerning her out-of-court identification of Wong after the standing lineup.

c. *Wong's Contentions on Appeal.*

On appeal, Wong contends that Huang's in-court and out-of-court identifications of him should have been suppressed, arguing that both the detective's comment and the fact that Wong was taller than the other participants (by six to eight inches, according to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

the police detective's estimate) rendered the standing lineup unduly suggestive. (Wong does not challenge the fairness of *1359 either the photo arrays or the sitting lineup.) Wong notes that Huang testified at trial that she had never seen a photograph of him before picking him out of the standing lineup, although she had in fact done so when shown the photo arrays. Wong argues that Huang's hesitance in identifying Wong in the photo array and the seated lineup contrasts starkly with her certainty after the standing lineup, indicating that the second lineup was suggestive and that her identification was not independently reliable. Finally, Wong argues that the length of time between the shooting and the lineup—ten months—weighs heavily against a finding of independent reliability.

The Supreme Court has established a two-step inquiry for evaluating the constitutional permissibility of in-court identification testimony based on out-of-court identification procedures. That inquiry "requires a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification.' " *Jackson v. Fogg,* 589 F.2d 108, 111 (2d Cir.1978) (quoting *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972) (citing *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968))).

[2][3][4] If pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Jarrett v. Headley,* 802 F.2d 34, 42 (2d Cir.1986). The court should consider the reliability of the identification in light of

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior de-

scription of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *see also Neil,* 409 U.S. at 199, 93 S.Ct. at 382. For both pretrial and in-court identifications, the linchpin of admissibility is reliability. *Manson,* 432 U.S. at 106 n. 9, 114, 97 S.Ct. at 2249 n. 9, 2253. However, if impermissibly suggestive procedures are not employed, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury." *Jarrett,* 802 F.2d at 42 (citations omitted).

[5] We are not persuaded that the standing lineup was unduly suggestive. Wong does not contest the fact that the composition of the lineup, which featured a number of Asian males of similar general appearance, was fair. While the detective's comment created the risk of prompting an identification on something less than total certainty, it did not suggest that Huang choose any particular participant, nor did it confirm the correctness of her choice after it had been made. *See Jarrett,* 802 F.2d at 46 (prosecutor's statement to witness before trial to "stick to [his] guns" about identification not impermissibly suggestive because it could be, and was, taken to mean that witness should speak his mind).

Further, while lineups that unnecessarily contrast the height of a suspect with that of the other participants have been condemned as suggestive, *see, e.g., Foster v. California,* 394 U.S. 440, 442–43, 89 S.Ct. 1127, 1128–29, 22 L.Ed.2d 402 (1969); *McFadden v. Cabana,* 851 F.2d 784, 785, 789–90 (5th Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1541, 103 L.Ed.2d 845 (1989), we do not consider the height discrepancy to have been suggestive in this case. The circumstances of this case seem to indicate that Huang chose Wong *despite* his height, not because of it. In

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

any event, Huang's testimony was that Wong was in a crouched position, shooting, when she observed him in the restaurant, rendering a misestimate of his height understandable without significantly undercutting the reliability of her identification.

[6] When the appearance of participants in a lineup is not uniform with respect to a given characteristic, the "principal question" in determining suggestiveness is whether the appearance "of the accused, *matching descriptions\*1360 given by the witness,* so stood out from all of the other [s] ... as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.' " *Jarrett,* 802 F.2d at 41 (emphasis added, alterations partially added, other alteration added in *Jarrett* ) (quoting *United States v. Archibald,* 734 F.2d 938, 940 (2d Cir.), *modified,* 756 F.2d 223 (2d Cir.1984)); *see also United States v. Jakobetz,* 955 F.2d 786, 803 (2d Cir.) (lineup not suggestive where defendant's moustache was smaller than those of other lineup participants, because witness described man with no facial hair), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *Solomon v. Smith,* 645 F.2d 1179, 1182–84 (2d Cir.1981) (lineup suggestive when suspect was only person meeting description of height and weight provided by witness); *United States ex rel. Cannon v. Montanye,* 486 F.2d 263, 266–67 (2d Cir.1973) (lineup suggestive when defendant directed to wear green sweater, witness had stated that suspect wore green shirt), *cert. denied,* 416 U.S. 962, 94 S.Ct. 1982, 40 L.Ed.2d 313 (1974); *United States v. Fernandez,* 456 F.2d 638, 641–43 (2d Cir.1972) (photo array suggestive when defendant's was only photo matching skin color described by witnesses). According to Wong, Huang initially described the gunman as approximately five feet seven or eight inches tall. Although the other lineup participants more closely fit this description, Huang chose Wong because of his facial features, commenting that he was taller than she remembered.

We conclude that neither the detective's comment, nor the height differential between Wong and the other participants in the lineup, nor the combination of these two factors rendered the lineup at which Huang identified Wong unduly suggestive. Furthermore, in any event, viewing the totality of the circumstances, *see Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Neil,* 409 U.S. at 199, 93 S.Ct. at 382, Huang's pretrial identification was independently reliable and thus admissible.

Huang observed the gunman after she ducked under the table at the restaurant, staring him in the face for "[two] to three seconds" before he turned away. This was sufficient for identification. *See Coleman v. Alabama,* 399 U.S. 1, 4–6, 90 S.Ct. 1999, 2000–02, 26 L.Ed.2d 387 (1970) (plurality opinion) (fleeting but "real good look" at assailant sufficient for identification). Moreover, as the district court found, Huang's degree of attention was very high as she stared at the assailant's face because she feared he would open fire on her and her husband. *See United States v. Concepcion,* 983 F.2d 369, 378 (2d Cir.1992) ("nature of events" in struggle and shooting "was such as to attract and hold [the witnesses'] attention"), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *Gonzalez v. Hammock,* 639 F.2d 844, 847 (2d Cir.1980) (witness' attention "would be riveted on a man who was pulling a shotgun from a bag"), *cert. denied,* 449 U.S. 1088, 101 S.Ct. 880, 66 L.Ed.2d 815 (1981).

Further, Huang worked with a sketch artist in the development of a composite sketch of the assailant that, the district court found, bore a "striking resemblance in many respects" to Alex Wong. As to certainty, Huang apparently made a tentative identification of Wong after the first lineup, but said she was "not very sure." Huang displayed no doubts after the second lineup, or in her subsequent testimony. In commenting upon Huang's testimony at the pretrial suppression hearing, the district court observed that Huang was "a person of rather strong character" who was not "easily influenced by anyone," and concluded that Huang's certainty was the result of her own in-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

dependent recollection. Finally, the length of time between the crime and the confrontation (ten months before the lineup and thirty-one months before the in-court identification), while a factor militating against reliability, may be outweighed by other indicia of reliability. *See United States v. Jacobowitz,* 877 F.2d 162, 168 (2d Cir.) (ten-month interval), *cert. denied,* 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989); *United States v. Williams,* 596 F.2d 44, 49 (2d Cir.) (thirty-two month interval), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979).

*2. The Hampton Street Robbery and Linda Pang's Identification of Tung Tran.*

a. *The Incident.*

On January 23, 1990, members of the Green Dragons robbed an apartment at 40–*1361 15 Hampton Street in Queens, acting on a tip that the apartment was the location of an underground gambling spot. The night of the robbery, Sonny Wong met Chen I. Chung at one of the gang's apartments. Chen I. Chung said that he had sent Brian Chan, Alex Wong, Steven Ng, Joseph Wang, Chiang T. Cheng, and several others to rob the apartment; Sonny Wong believed that Chung also might have mentioned Danny Ngo or Tung Tran. The Green Dragons went to the apartment that night, and forced their entrance shortly after 11 p.m.

Once inside, the gang forced Cheng Chen (one of the apartment's occupants), his mother, and his cousin to undress, and proceeded to ransack the apartment. For the next two hours, Cheng Chen was held in one room at gunpoint, during which time he heard various sounds coming from other rooms in the apartment, including the screams of his wife, Linda Pang. After the gang members left, Chen found his wife naked and crying in another room. Pang, who was in the bathroom when the gang members entered the apartment, had been forced out of the bathroom by a gang

member. For the next two hours, Pang saw approximately five or six robbers, several with guns and at least one with a knife, as she was taken at gunpoint from room to room in the apartment. While in her bedroom, Tung Tran raped Pang at knifepoint. The robbers stole cash and jewelry from the apartment, as well as Chen's ATM card and access number.

Later that night, Sonny Wong saw Danny Ngo, Joseph Wang, Alex Wong, Tung Tran, Brian Chan, and Roger Kwok at one of the gang's apartments, sorting out proceeds from the robbery of the Hampton Street apartment. Aleck Yim, who was also present at the apartment, recalled that Tung Tran, Steven Ng, Brian Chan, and "other Green Dragon [m]embers" were present and discussed the robbery.

b. *Identification Procedures and Ruling Below.*

Pang provided an identification of Tung Tran as a participant in the Hampton Street robbery, and Tran moved unsuccessfully to suppress the identification prior to trial. Because Tran contends that the district court erroneously ruled, following that hearing, that Pang would be allowed to testify at trial, the next three paragraphs of this opinion address the testimony at the pretrial suppression hearing.

At the end of January 1990, Pang reviewed approximately 100 loose photographs at the police station, but did not recognize anyone in the photos from the robbery. One week later, the police brought Pang additional photos to review in her home. Pang, Chen, his mother, and a roommate took turns reviewing approximately thirty photos. Although Chen and the roommate each made an identification, Pang failed to recognize anyone from the robbery. Approximately one month later, Pang attended a police lineup of five individuals, but failed to make an identification.

On June 12, 1990, Detectives Charles Judson and Peter Blum of the Nassau County Police Department met with Chen and Pang at a coffee shop to show them

40 F.3d 1347
(Cite as: 40 F.3d 1347)

photo arrays. Judson met with Chen at one table and showed him one set of photos, while Blum sat with Pang at a separate table and showed her a second set. Chen identified Tung Tran and two other participants from this set. Pang identified Brian Chan from the second set. Pursuant to instructions, Chen and Pang then signed their names to the backs of the photographs that they had identified, and initialled the backs of photographs that they had not selected. The two tables then exchanged photographs.

When Blum laid this second set of photos before Pang, she "stared" at them, "obviously fixating on one photograph and her eyes were full of tears. She began to cry." Blum put the photos away and tried to console her for two or three minutes, because "it was obvious she was reliving the incident." When Pang had composed herself, Blum again laid out the photos. Pang then pointed to a picture of Tung Tran. Blum turned the picture over and had her sign it, and then initial the remaining photographs. Pang signed above her husband's signature, which he had placed on the reverse side of the photograph after his prior identification of Tran.

*1362 One week after viewing photos in the coffee shop, Pang viewed additional photographs but did not recognize anyone. On October 18, 1990, in a meeting held at the office of one of the Assistant United States Attorneys handling this case, Detective Blum again showed Pang the photos she had viewed in the coffee shop. Pang again identified the photograph of Tung Tran.

Tran's motion to suppress Pang's identification testimony was based upon the contention that the identification procedures employed by the police were impermissibly suggestive. Because of the court's concern that Chen's signature on the back of Tung Tran's photograph might have bolstered Pang's identification, the court heard testimony from Chen and Pang, as well as Judson and Blum, about the suggestiveness of the procedures employed. Pang testified

that she initially looked at the second set of pictures "for one or two minutes, and then ... felt very uncomfortable." After she composed herself, she looked at the pictures for a "few minutes," and then identified Tran. The writing on the back of the pictures meant "[n]othing much" to her. She did not notice her husband's signature beneath her signature when she signed the back of Tran's photograph. The court also questioned Pang about the circumstances under which she had seen her assailant on the night of the robbery. Pang testified that she had seen him face-to-face and looked him "in the eye" for about a minute in "[v]ery clear" lighting.

The district court denied Tung Tran's motion to suppress Pang's identification, concluding that Pang had not been influenced by the presence of her husband's signature on the back of Tran's photo. The court said:

In listening carefully to all of this witness' testimony on direct and cross, and also to her answers to my questions[,] I am prepared to believe her, that she didn't notice her husband's signature. This very unassuming, somewhat shy young woman finds it very difficult even now to say what happened to her the night that is at issue here that she was raped. She's prepared to discuss [that night] in almost any other terms, except when she's finally asked repeatedly to say exactly what happened to her.

I have little difficulty believing that seeing that photograph some months after the rape renewed in her all of the horror of the experience, and that when she did turn it over to sign her name, that that would have been the kind of quick action where she wasn't particularly paying attention to any of the other names on it. I'm prepared to believe her in this regard.

At trial, Chen identified Chiang T. Cheng, Steven Ng, and Brian Chan as among the robbers that night.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

Pang also identified Cheng, Ng, and Chan at trial, as well as Tung Tran and Danny Ngo. Prior to trial, the defendants requested, and obtained, an *in limine* ruling to preclude the government from introducing evidence that Pang was raped during the Hampton Street robbery.

c. *Tran's Contentions on Appeal.*

[7] On appeal, Tran renews his contention that the pretrial procedure was suggestive. Tran also argues that because Pang was ordered to keep her head down by the robbers, she did not have an independently reliable basis for the identification. We disagree.

The district court's conclusion that Pang's agitation kept her from noticing her husband's signature on Tran's photo is a finding of fact based on the court's observation of the witness' demeanor, and is not clearly erroneous. Moreover, "police suggestiveness does not require the suppression of an identification if the witness was not thereby influenced, as, for example, when the witness's identification was already positive." *Jarrett*, 802 F.2d at 41–42. The evidence is undisputed that Pang identified Tran's photograph before it was turned over for her to affix her signature on the reverse side, and thus before she had any opportunity to view her husband's signature. Thus, her identification was firm before the asserted "suggestiveness" came into play.

In addition, although our conclusion that Pang's identification of Tran was not affected by any suggestive police procedure eliminates the need to inquire into the independent reliability of Pang's identification, *see* *1363 *Jacobowitz*, 877 F.2d at 168, we note that it exhibits very strong indicia of reliability. Pang had an ample opportunity to view Tran, and the incident understandably held her full attention. *See Neil*, 409 U.S. at 200 & n. 7, 93 S.Ct. at 383 & n. 7. Pang displayed complete certainty about her identification. Under these circumstances, neither the fact that Pang had not previously provided a description of Tung Tran, nor the fact that her photo identification occurred six months after the incident (and her in-court identification twenty-five months after the incident) renders her identification unreliable. *See Jacobowitz*, 877 F.2d at 168. Finally, while Tran argues that Pang's pretrial failure to identify anyone before or after viewing the photo arrays in the coffee shop is an indication that she has no independent recollection of the robbery, it is just as likely (or more likely, given Pang's opportunity to view the intruders) to be a manifestation of extreme conscientiousness as a witness. *See Neil*, 409 U.S. at 201, 93 S.Ct. at 383.

B. *Juvenile Delinquency Act Claims.*

The Juvenile Delinquency Act (the "JDA"), 18 U.S.C. §§ 5031 *et seq.*, regulates the exercise of federal jurisdiction over juvenile defendants. Section 5032 of the JDA establishes two different certification requirements for juvenile delinquency proceedings in federal courts:

(1) a "need certification" provision, requiring certification by the Attorney General that there is a need for the proceedings to take place in federal rather than state court; and (2) a "record certification" provision, requiring delivery to the federal court of any prior juvenile court records or certification by the juvenile court that there are no such records.

United States v. Doe, 13 F.3d 302, 303 (9th Cir.1993).

[8] The need certification provision directs that a juvenile alleged to have committed an act of juvenile delinquency [FN3] may not be prosecuted in a federal district court unless the Attorney General certifies to the court that: (1) state courts either do not have or refuse to assume jurisdiction over the juvenile; (2) the state does not have "available programs and services adequate for the needs of juveniles;" or (3) the offense charged is a violent felony, or is one of several enumerated narcotics- and firearm-related offenses, and there is a substantial federal interest in the case or the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

offense to warrant the exercise of federal jurisdiction. 18 U.S.C. § 5032. Certification is a prerequisite to the exercise of federal jurisdiction over juveniles. *See United States v. Baker,* 10 F.3d 1374, 1396 (9th Cir.1993), *cert. denied,* 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994); *United States v. Chambers,* 944 F.2d 1253, 1258–60 (6th Cir.1991), *cert. denied,* 502 U.S. 1112, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992); *United States v. Juvenile Male,* 923 F.2d 614, 618 (8th Cir.1991); *United States v. Brian N.,* 900 F.2d 218, 222 n. 8 (10th Cir.1990); *United States v. Hoo,* 825 F.2d 667, 669 n. 1 (2d Cir.1987), *cert. denied,* 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988). If the Attorney General does not certify the case, "such juvenile shall be surrendered to the appropriate legal authorities of [the] State." § 5032.

> FN3. The JDA defines a "juvenile" as "a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday...." 18 U.S.C. § 5031. "Juvenile delinquency" is defined as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." *Id.*

[9][10] While proper certification confers jurisdiction upon the district court, it does not determine whether the government must proceed against the defendant as a juvenile, with the extra procedural protections afforded by the JDA, or as an adult in a criminal prosecution. *See id.; Chambers,* 944 F.2d at 1261. A federal district court may convene itself as a juvenile court under the JDA. *See Brian N.,* 900 F.2d at 222. When a juvenile who is not a previous offender is alleged to have committed a violent felony or one of several specified narcotics-related offenses, the Attorney General may make a motion to transfer the juvenile to adult proceedings. § 5032. This motion

may be granted if, after \*1364 a hearing, the district court finds that "such transfer would be in the interest of justice" considering, *inter alia,* the juvenile's age, background, prior delinquency record, and maturity. *Id.; see also United States v. Elwood,* 993 F.2d 1146, 1149 (5th Cir.1993). For previous offenders charged with committing crimes after the age of sixteen that involve the threat, use, or substantial risk of use of physical force, or enumerated narcotics-related offenses, transfer to the district court is automatic. § 5032.

[11] The record certification provision specifies that:

> Any proceedings against a juvenile under this chapter or as an adult *shall not be commenced* until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing that the juvenile has no prior record, or that the juvenile's record is unavailable and why it is unavailable.

*Id.* (emphasis added). Courts have read the mandatory language of this provision to establish the certification of records as a prerequisite to the exercise of federal jurisdiction. *See Doe,* 13 F.3d at 304; *United States v. M.I.M.,* 932 F.2d 1016, 1019–20 (1st Cir.1991); *Juvenile Male,* 923 F.2d at 620; *Brian N.,* 900 F.2d at 222–23. Under the JDA, juvenile proceedings commence with the filing of an information. *See Doe,* 13 F.3d at 304; *M.I.M.,* 932 F.2d at 1019; *Brian N.,* 900 F.2d at 221; *In re Martin,* 788 F.2d 696, 698 (11th Cir.), *cert. denied,* 478 U.S. 1009, 106 S.Ct. 3306, 92 L.Ed.2d 719 (1986).

*3. Jurisdiction over Juvenile Offenses of Wong and Ngo.*

In convicting Alex Wong of substantive RICO and RICO conspiracy violations, the jury found Alex Wong had committed five predicate acts: (1) the murder and/or conspiracy to murder Mon Hsiung Ting

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

and Anthony Gallivan at the Tien Chiau Restaurant on July 16, 1989 (racketeering act no. 2); (2) the conspiracy to murder Carol Huang, a witness to the Tien Chiau shootings, which occurred between October 1990 and November 19, 1990 (racketeering act no. 6); (3) the robbery at 40–15 Hampton Street on January 23, 1990 (racketeering act no. 9); (4) the extortion of the High Pearl Restaurant during the spring of 1989 (racketeering act no. 14); and (5) the bribery of a public official during August 1990 (racketeering act no. 21). Wong was also convicted of conspiring to commit murder to maintain or increase his position in a RICO enterprise for his participation in the plot to murder Carol Huang. Wong had his eighteenth birthday on October 25, 1990. With the sole exception of the conspiracy to murder Carol Huang, Wong committed all of the charged RICO predicate acts while a juvenile. Nevertheless, the government never certified this case for prosecution in the district court pursuant to the JDA or moved to have Wong transferred to adult status.

After his conviction, Wong moved to dismiss the substantive RICO and RICO conspiracy counts on the ground that he was not an adult during the commission of either crime. Wong argued that the definition of "pattern of racketeering activity," which requires "at least two acts of racketeering activity," 18 U.S.C. § 1961(5), would not support a RICO or RICO conspiracy conviction absent proof that the defendant had committed two or more predicate acts as an adult. Because the government did not move to transfer Wong's case to adult status pursuant to the JDA, Wong argued, his activities prior to his eighteenth birthday were to be deemed acts of juvenile delinquency outside the jurisdiction of the federal courts and could not constitute RICO predicate acts.

In an oral opinion rendered July 17, 1992, the district court denied Wong's motion, holding that substantive RICO and RICO conspiracy were "continuing crimes," and that Wong's commission of a single predicate act as an adult was sufficient to establish federal jurisdiction over Wong to be tried as an adult.

[12] Similarly, in convicting Danny Ngo of substantive RICO and RICO conspiracy violations, the jury found that he had committed three predicate acts: (1) conspiracy to murder the leader of the rival gang known as the "Tung On" at the 888 Restaurant in Queens in February 1987 (racketeering act no. 7); (2) the robbery at 40–15 Hampton *1365 Street on January 23, 1990 (racketeering act no. 9); and (3) conspiracy to commit extortion and attempted extortion of Jack Tran in August 1990 (racketeering act no. 12). Ngo did not turn eighteen until May 24, 1988, after the occurrence of the conspiracy to murder the Tung On leader. Apparently because Ngo was a juvenile at the time of this offense, a separate count of the indictment charging Ngo with participation in the conspiracy was dismissed prior to trial, although the indictment continued to include the crime as a predicate act of the RICO counts. Ngo evidently did not raise this argument before the district court. Because his argument implicates subject matter jurisdiction over his case, however, we are obliged to address it. See *Alexander v. Anheuser–Busch Cos.*, 990 F.2d 536, 538 (10th Cir.1993); *Leonhard v. United States*, 633 F.2d 599, 618 n. 27 (2d Cir.1980), *cert. denied*, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); Fed.R.Crim.P. 12(b)(2).

[13] On appeal, Wong and Ngo contend that their acts as juveniles are not subject to federal jurisdiction absent certification by the Attorney General and a motion by the government to transfer the case to adult status pursuant to the JDA. They argue that because certain discrete offenses were completed while they were juveniles, the district court had no jurisdiction over those acts as RICO predicate acts. Wong also argues that: (1) because he did not commit two predicate acts required to establish a "pattern of racketeering," *see* § 1961(5), after his eighteenth birthday, and because the acts that he committed while a juvenile are properly considered acts of juvenile delin-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

quency, his convictions for substantive RICO and RICO conspiracy violations must be reversed; and (2) his pre-eighteen acts did not constitute "racketeering activity," as defined in the RICO statute, because they were not "punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). For the reasons that follow, we conclude that Wong and Ngo were properly convicted on RICO counts that included predicate acts that they committed before the age of eighteen.

[14] The JDA pertains to juveniles who are "alleged to have committed an act of juvenile delinquency." § 5032. "Juvenile delinquency" is defined as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." § 5031; see supra note 3. The relevant "act" for purposes of determining federal jurisdiction under § 5032 is the crime charged in the indictment—here, the substantive RICO and RICO conspiracy offenses alleged therein—rather than the discrete predicate acts underlying those charges. Cf. United States v. Welch, 15 F.3d 1202, 1207 n. 5 (1st Cir.1993) ("The term 'alleged act,' as used in § 5031, means the alleged offense, not each separate act comprising the offense."), cert. denied, 511 U.S. 1076, ——, 114 S.Ct. 1661, 1863, 128 L.Ed.2d 377 (1994). Thus, to procure federal jurisdiction over a case, the Attorney General must certify to the court that the offense charged, rather than any of the acts comprising that offense, is a crime that may be prosecuted under § 5032. See Baker, 10 F.3d at 1394 (general nature of charged conspiracy to distribute marijuana, rather than defendant's violent overt acts, determines whether offense was "crime of violence"). Accordingly, to determine whether the JDA governs a prosecution, a court should look to the defendant's age at the time of the offense or offenses charged in the indictment.

Wong and Ngo began committing the RICO offenses charged in counts one and two of the indictment while they were juveniles, but continued to do so after their eighteenth birthdays. Because the RICO offenses

were not "committed by a [defendant] prior to his eighteenth birthday," § 5031, these offenses are not subject to the requirements of the JDA.

[15][16] It is well established that federal courts have jurisdiction over conspiracies begun while a defendant was a minor but completed after his eighteenth birthday. "The [JDA] does not ... prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he is charged while still a minor...." United States v. Spoone, 741 F.2d 680, 687 (4th Cir.1984), cert. denied, *1366469 U.S. 1162, 105 S.Ct. 917, 83 L.Ed.2d 929 (1985); see also Welch, 15 F.3d at 1207 n. 5 ("the [JDA] cannot be read to preclude an adult conspiracy prosecution simply because the accused's participation in the conspiracy began while he was under age eighteen"); United States v. Maddox, 944 F.2d 1223, 1233 (6th Cir.1991) ("one who enters a conspiracy prior to his eighteenth birthday can be tried as an adult if he continues in the conspiracy after that time"), cert. denied, 502 U.S. 950, ——, 112 S.Ct. 400, 610, 116 L.Ed.2d 349 (1991), —— U.S. ——, 112 S.Ct. 948, 117 L.Ed.2d 117, 502 U.S. 1113, 112 S.Ct. 1219, 117 L.Ed.2d 456, 504 U.S. 924, 112 S.Ct. 1978, 118 L.Ed.2d 577, 504 U.S. 961, 112 S.Ct. 2317, 119 L.Ed.2d 236 (1992), modified, 12 F.3d 599 (6th Cir.1993), cert. denied, 510 U.S. 1206, 114 S.Ct. 1328, 127 L.Ed.2d 675 (1994); United States v. Harris, 944 F.2d 784, 785–86 (10th Cir.1991) (same), cert. denied, 502 U.S. 1044, 112 S.Ct. 903, 116 L.Ed.2d 804 (1992); United States v. Doerr, 886 F.2d 944, 969 (7th Cir.1989) (same) (quoting United States v. Cruz, 805 F.2d 1464, 1475 (11th Cir.1986) (quoting Spoone, 741 F.2d at 687), cert. denied, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204, 482 U.S. 930, 107 S.Ct. 3215, 96 L.Ed.2d 702 (1987)); United States v. Gjonaj, 861 F.2d 143, 144 (6th Cir.1988) (same) (quoting Spoone, 741 F.2d at 687). Because conspiracy is a continuing crime that "endures until its objectives are either completed or abandoned," United States v. Lovell, 16 F.3d 494, 497 (2d Cir.1994), a federal court may as-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

sume jurisdiction over a defendant " 'upon a "threshold demonstration of post-eighteen conspiracy activity." ' " *Maddox,* 944 F.2d at 1233 (quoting *Gjonaj,* 861 F.2d at 144 (quoting *Cruz,* 805 F.2d at 1476)).

This concept has been analogized to contract "ratification" doctrine: just as a minor legally incapable of entering a contract may nonetheless be found to have "ratified" a contract by taking actions after attaining majority consistent with an intent to be bound by it, *see, e.g., Leasing Serv. Corp. v. Vita Italian Restaurant, Inc.,* 171 A.D.2d 926, 927, 566 N.Y.S.2d 796, 797–98 (3d Dep't 1991); *Restatement (Second) of Contracts* § 380(1) (1981), so a defendant may ratify his pre-eighteen participation in a conspiracy by continued participation after attaining majority. *See Welch,* 15 F.3d at 1211–12 (defendant's post-eighteen participation ratified pre-eighteen involvement in conspiracy); *Maddox,* 944 F.2d at 1233 (same).

[17] Both substantive RICO and RICO conspiracy offenses are continuing crimes. *See United States v. Moscony,* 927 F.2d 742, 754 (3d Cir.) (substantive RICO is continuing offense analogous to conspiracy), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991); *United States v. Rastelli,* 870 F.2d 822, 838 (2d Cir.) (RICO conspiracy not complete until purposes accomplished or abandoned), *cert. denied,* 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989). It follows that Wong's conviction for conspiring to murder Carol Huang and Ngo's robbery and extortion convictions establish the requisite post-eighteen conduct to furnish the district court with jurisdiction over the substantive RICO and RICO conspiracy charges of which they were convicted.

Wong contends, however, that under the JDA he "cannot be held liable for pre-eighteen conduct," *Maddox,* 944 F.2d at 1233, and thus his pre-majority acts cannot serve as the basis for criminal liability under RICO. *See also United States v. Odom,* 13 F.3d 949, 957 (6th Cir.) (same, citing *Maddox,* 944 F.2d at 1233), *cert. denied,* 511 U.S. 1094, 114 S.Ct. 1859,

128 L.Ed.2d 481 (1994), 513 U.S. 836, 115 S.Ct. 116, 130 L.Ed.2d 62 (1994). Because the indictment charged Wong with only one predicate act as an adult, Wong further claims that the government failed to establish the "pattern" of racketeering activity required to support a conviction for a substantive RICO or RICO conspiracy violation. These contentions are without merit.

Both *Maddox* and *Odom* affirmed convictions for conspiracies that bridged the pertinent defendant's eighteenth birthday. In *Odom,* the court decided only that evidence of pre-eighteen conduct was admissible, adding the gratuitous observation that such conduct could not support criminal liability. *See* 13 F.3d at 957. Neither case posed or addressed the RICO issue that we must address. Further, nothing in the text of the JDA would divest the district court of jurisdiction*1367 over Wong and Ngo's pre-eighteen predicate acts. This court has held that a defendant can be held criminally liable for pre-eighteen conduct so long as the prosecution begins after the defendant is twenty-one years of age, thereby precluding application of the JDA. *See Hoo,* 825 F.2d at 669–70 (collecting cases). As noted earlier, the JDA regulates jurisdiction with respect to the charged offense (here, substantive RICO and RICO conspiracy), not the individual acts comprising the offense. Thus, "once having established that certain acts of the offense occurred after the defendant's eighteenth birthday, the entire case may be tried in accordance with the adult rules of procedure and evidence." *Cruz,* 805 F.2d at 1477; *see also Welch,* 15 F.3d at 1211; *Doerr,* 886 F.2d at 969–70.

[18][19] Further, this court has held in the statute-of-limitations context that jurisdiction over a single RICO predicate act confers jurisdiction over other predicate acts, including some that could not be prosecuted separately. Because the limitations period is measured from the point at which the crime is complete, *see United States v. Persico,* 832 F.2d 705, 713 (2d Cir.1987) (citing *Toussie v. United States,* 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

(1970)), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995,
100 L.Ed.2d 227, 488 U.S. 982, 109 S.Ct. 532, 102
L.Ed.2d 564 (1988), a defendant may be liable under
substantive RICO for predicate acts the separate
prosecution of which would be barred by the applic-
able statute of limitations, so long as that defendant
committed one predicate act within the five-year li-
mitations period. *See id.* at 714; *see also United States
v. Salerno,* 868 F.2d 524, 534 (2d Cir.) (same, citing
*Persico,* 832 F.2d at 714), *cert. denied,* 491 U.S. 907,
109 S.Ct. 3192, 105 L.Ed.2d 700, 493 U.S. 811, 110
S.Ct. 56, 107 L.Ed.2d 24 (1989). Similarly, a defen-
dant is liable for participation in a RICO conspiracy
for predicate acts the separate prosecution of which
would be time-barred, so long as that defendant has
not withdrawn from the conspiracy during the limita-
tions period. *See Salerno,* 868 F.2d at 534; *Persico,*
832 F.2d at 713. While statutes of limitation are de-
signed to serve different ends than the JDA, *cf. Welch,*
15 F.3d at 1211 & n. 12, the continuing nature of
RICO offenses and the interest in avoiding multiple
prosecutions for a single course of criminal conduct
indicate that a similar result is warranted here.

[20] Finally, Wong argues that because the gov-
ernment did not move to transfer his case to adult
status, his pre-eighteen acts should properly have been
considered acts of juvenile delinquency, and thus did
not constitute "racketeering activity" as defined in the
RICO statute because they were not "punishable by
imprisonment for more than one year." 18 U.S.C. §
1961(1). We disagree.

Section 1961(1)(A) includes within the definition
of "racketeering activity" any act or threat involving,
*inter alia,* murder, robbery, extortion, or bribery
"which is chargeable under State law and punishable
by imprisonment for more than one year." Each of
Wong's pre-eighteen predicate acts was a felony pu-
nishable under New York law by imprisonment for
more than one year [FN4] except the extortion and con-
spiracy to extort the High Pearl Restaurant, which was
charged under 18 U.S.C. § 1951. A person who vi-

olates § 1951 may be "imprisoned not more than
twenty years." *Id.*

FN4. The conduct underlying Wong's
pre-eighteen predicate acts satisfy the ele-
ments of the following crimes under New
York law, carrying the specified potential
sentences: second degree murder (for the
Tien Chiau Restaurant murders), a class A–I
felony, *see* N.Y.Penal Law § 125.25, fifteen
years to life; second degree conspiracy (for
the conspiracy underlying the Tien Chiau
Restaurant murders and the conspiracy to
murder Carol Huang), a class B felony, *see
id.* § 105.15, six to twenty-five years; first
degree robbery (Hampton Street robbery), a
class B felony, *see id.* § 160.15, one to
twenty-five years; fourth degree conspiracy
(Hampton Street robbery), a class E felony,
*see id.* § 105.10, one to four years; third de-
gree bribery (bribery of a public official), a
class D felony, *see id.* § 200.00, one to seven
years. *See generally id.* § 70.00 (establishing
sentences).

[21] The possibility that, as a juvenile, Wong
would have avoided incarceration is "wholly irrele-
vant," *United States v. Coonan,* 938 F.2d 1553, 1564
(2d Cir.1991), *cert. denied,* 503 U.S. 941, 112 S.Ct.
1486, 117 L.Ed.2d 628 (1992), to the question
whether *1368 the underlying conduct satisfies the
definition of racketeering activity set forth in §
1961(1)(A). The statutory definition is met if the
charged conduct *generally* is punishable by one year
of incarceration under state law. *See Coonan,* 938 F.2d
at 1564 (§ 1961(1)(A) "merely describes the type of
generic conduct which will serve as a RICO predicate
and satisfy RICO's pattern requirement."); *United
States v. Friedman,* 854 F.2d 535, 566 (2d Cir.1988)
("New York's rules governing double jeopardy and
consecutive sentencing do not affect the generic defi-
nition of the crime of bribery."), *cert. denied,* 490 U.S.
1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *United*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

_States v. Paone,_ 782 F.2d 386, 393 (2d Cir.1986) ("The [RICO] statute is meant to define, in a more generic sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge."), _cert. denied,_ 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987).

[22][23] We conclude that the defendant's age at the time the substantive RICO or RICO conspiracy offense is completed is the relevant age for purposes of the JDA, and that an adult defendant may properly be held liable under RICO for predicate offenses committed as a juvenile. Accordingly, the district court properly had subject matter jurisdiction over the substantive RICO and RICO conspiracy counts that incorporated the predicate acts committed by Wong and Ngo as juveniles.

4. _Transfer of Roger Kwok's Juvenile Court Records._

Roger Kwok was arrested on November 19, 1990. Because he was then only seventeen years old (he was born April 5, 1973), the government charged him in a separate juvenile complaint with conspiracy to commit murder and assault with a dangerous weapon in aid of racketeering. At the same time, the United States Attorney certified that the crimes charged against Kwok were violent felonies and that there was a substantial federal interest in the case to warrant the exercise of federal jurisdiction. _See_ § 5032. Kwok was arraigned on the juvenile complaint on November 20, 1990, before Magistrate Judge John L. Caden in the Eastern District of New York.

Before the arraignment, Pretrial Services presented the court, Kwok, and the government with a pretrial services report which recited that in August 1989, Kwok had been convicted of grand larceny in state court and sentenced to five years probation. The government further discussed the prior convictions during Kwok's November 26, 1990 detention hearing before Magistrate Judge Allyne R. Ross.

On December 19, 1990, the government filed a juvenile information against Kwok charging him with attempt to commit assault with a dangerous weapon to maintain or increase his position in a criminal enterprise, the Green Dragons, in violation of 18 U.S.C. § 1959(a)(6). The same day, the government filed a motion to transfer Kwok's case to adult status for criminal prosecution. On January 7 and 8, 1991, the government filed its memorandum of law and affidavit, respectively, in support of its motion to transfer. The memorandum detailed Kwok's prior convictions in arguing that transfer to adult status might be mandatory in his case under § 5032.

On January 11, 1991, the district court held a conference to address whether the government had properly filed the juvenile information and whether Kwok would be transferred to adult status. At that conference, the government provided the court with a certified copy of the records regarding Kwok's prior state court conviction. The court then arraigned Kwok on the juvenile information. After examining the court records firsthand at the state court, defense counsel subsequently conceded that Kwok's prior conviction was for a violent felony. The trial court then determined that the transfer of Kwok to adult status was mandatory.

Kwok argues that the government did not comply with the requirement of § 5032 that "proceedings against a juvenile under this chapter shall not be commenced until any prior juvenile court records of such juvenile have been received by the court." Essentially, Kwok contends that use of the term "prior *1369 juvenile court records" in § 5032 mandates the delivery of official court records prior to the filing of the information.

While the language of the record certification provision of § 5032 is amenable to a strict interpretation, _see, e.g., Doe,_ 13 F.3d at 304–05 (certification by

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

assistant United States Attorney that government knew of no prior juvenile court record pertaining to defendant, rather than certification by clerk of juvenile court, failed to satisfy jurisdictional requirement), most courts have read the records certification provision to require only good faith efforts by the government to provide the court with documentation of a juvenile's prior record (or to the effect that no such record exists or is available).

In *United States v. Parker,* 956 F.2d 169 (8th Cir.1992), the Eighth Circuit concluded that certification from a state court judge and several assistant district attorneys from various jurisdictions stating that the juvenile had no prior record satisfied the record certification provision, although the language of the statute calls for such certification to be made by "the clerk of the juvenile court." The court stated: "[W]e decline to stand on technicalities. We hold that the government adequately complied with the statutory requirements of section 5032...." *Id.* at 170.

Courts have similarly demonstrated flexibility with respect to the requirement for need certification. *See United States v. Gonzalez–Cervantes,* 668 F.2d 1073, 1077–78 (9th Cir.1981) (need certification stating that San Diego County refused to assume jurisdiction over case, when certification should have concerned Imperial County, where crime occurred, did not deprive court of jurisdiction, although mistake constituted "substantive inaccuracy"); *United States v. Dennison,* 652 F.Supp. 211, 213 (D.N.M.1986) (failure to certify, in accordance with § 5032, that "substantial federal interest" existed in case did not deprive court of jurisdiction because juvenile information filed same day revealed gravity of offense and that federal jurisdiction was exclusive).

The cases cited by Kwok are not to the contrary. In *M.I.M.,* the First Circuit held that proceedings may not commence against a juvenile "until the court receives *at least a good faith proffer* of the juvenile records, or a certificate as to their absence or unavai-

lability." 932 F.2d at 1019 (emphasis added). The court found dismissal of the proceedings appropriate, however, because *no* juvenile records "were delivered to the district court until the morning of the suppression hearing in th[at] case." *Id.* In *Juvenile Male,* there was an entire failure to comply with the record certification requirement. 923 F.2d at 620. Similarly, in *Brian N.,* the Tenth Circuit found dismissal appropriate when the government "failed to make *any effort* to provide the records to the court at the time the information was filed," although the government "knew of the existence of these juvenile defendants' court records." 900 F.2d at 223 (emphasis added).

[24][25] The record certification provision should be read to afford the government a limited amount of flexibility. Such a reading is especially appropriate in view of the provision's legislative history. The record certification provision was added to § 5032 in 1984, as part of the Comprehensive Crime Control Act of 1984. *See* Pub.L. No. 98–473, § 1201(c), 98 Stat. 1837, 2150 (1964). The Senate Report describing this new section commented:

> In many respects, determination of whether a young offender is to be treated as a juvenile or an adult and of the appropriate disposition of juveniles adjudicated delinquent depends on the nature of the juvenile's prior record. Too often, however, juvenile proceedings are undertaken without the benefit of such information. This new paragraph stresses that these records be obtained beforehand whenever possible. The Committee intends, however, that this new provision's requirements are to be understood in the context of a standard of reasonableness. Thus, if reasonable efforts to obtain a juvenile's records have been made, certification of their unavailability is permissible. Also, the Committee intends that this new requirement be applied with a degree of flexibility so that stages of proceedings to which such records are not relevant are not delayed pending arrival of the records. Thus, it is appropriate that a hearing concerning a *1370 transfer for prosecution

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
**(Cite as: 40 F.3d 1347)**

await the arrival of a juvenile's court records, since they are highly relevant to the transfer decision. However, it would also be appropriate to commence delinquency proceedings (provided the government had not moved for a transfer for prosecution) but stay the subsequent dispositional hearing pending receipt of the records by the court, since such records are relevant to the proper disposition of the offender, but not to the initial delinquency adjudication.

S.Rep. No. 225, 98th Cong., 2d Sess. 391 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3531.

We conclude that the requirements of the record certification provision have been satisfied in this case. The government provided the court below with notice of Kwok's juvenile record (in the form of a pretrial services report) prior to arraignment, and long before the information was filed. Further, the government provided the district court with a certified copy of the juvenile court records prior to the court's determination of the government's motion to transfer Kwok to adult status. Kwok does not argue that he was prejudiced by the delay in the introduction of the official records. *Cf. Parker,* 956 F.2d at 170 ("We note that [the defendant] was not prejudiced by the district court's finding that no juvenile records exist because this finding militates against transfer."). Although the government should always endeavor to supply the district court with official juvenile court records prior to the filing of an information, we conclude that the government adequately complied with the requirements of § 5032, and the district court had subject matter jurisdiction over the case against Kwok.

*5. Kwok's Speedy Trial Claim under the JDA.*

The Juvenile Delinquency Act incorporates a speedy trial provision, which provides in relevant part that:

If an alleged delinquent who is in detention pending trial is not brought to trial within thirty days from the date upon which such detention was begun, the information shall be dismissed ..., unless the Attorney General shows that additional delay was caused by the juvenile or his counsel, or consented to by the juvenile and his counsel, or would be in the interest of justice in the particular case. Delays attributable solely to court calendar congestion may not be considered in the interest of justice.

18 U.S.C. § 5036.

Kwok was detained overnight after his arrest on November 19, 1990. Magistrate Judge Caden entered a formal order of detention on November 20. On December 26, 1990, Kwok filed a motion to dismiss for failure to comply with § 5036, styled as a "cross-motion" in response to the government's December 19 motion to transfer Kwok to adult status. At a status conference on January 11, 1991, Judge Raggi heard oral argument on Kwok's motion. Kwok argued that because he had not been brought to trial within thirty days of his detention, his case should be dismissed. The government responded that: (1) delays prior to the filing of the motion to transfer were not culpable because they were caused by the Justice Department's review of Kwok's case to decide whether certification for federal prosecution was appropriate; and (2) the motion to transfer Kwok to adult status tolled the speedy trial clock.

The district court rejected the government's first proffered justification, stating that: "The defendant has the right to be treated by the executive branch as required by [the JDA]." The court then concluded, however, that the government had filed its transfer motion on the twenty-ninth day of the speedy trial period, and that the government's transfer motion tolled the speedy trial clock under the "interest of justice" exception set forth in § 5036. The court implicitly concluded that the speedy trial clock began to run upon the defendant's first appearance before a judicial officer (here, after arraignment on the com-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

plaint on November 20, 1990), as is the case under the Speedy Trial Act. *See* 18 U.S.C. § 3161(c)(1).

On appeal, Kwok renews his argument, contending that: (1) the speedy trial clock begins running from the time a defendant is incarcerated, not the time he first appears before a judicial officer, and thus the government's *1371 motion was made on the thirtieth day of the period; and (2) the government's motion was inadequate to toll the speedy trial clock, because the government merely filed a bare notice of motion that failed to set forth any facts that could serve as the basis of a valid transfer under § 5032, thereby engaging in "stalling tactics."

[26] Kwok is correct that the thirty-day speedy trial period begins to run on the date a juvenile is taken into federal custody. *See United States v. Romulus, 949 F.2d 713, 716 (4th Cir.1991), cert. denied, 503 U.S. 992, 112 S.Ct. 1690, 118 L.Ed.2d 403 (1992); United States v. Doe, 882 F.2d 926, 927–28 & n. 3 (5th Cir.1989); United States v. Doe, 642 F.2d 1206, 1207–08 (10th Cir.), cert. denied, 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981); United States v. Sechrist, 640 F.2d 81, 83–85 (7th Cir.1981). But see United States v. Andy, 549 F.2d 1281, 1283 (9th Cir.1977)* (period begins to run on earlier of date government certifies or should have certified case for prosecution in federal court, or date upon which government formally assumes jurisdiction over juvenile). This determination calls only for a one-day correction, however, with the result that the government filed the motion to transfer on the thirtieth day of Kwok's detention.

[27][28][29] The period of time between December 19, 1990, when the government moved to transfer Kwok, and January 31, 1991, when the district court determined that transfer to adult status was mandatory because of Kwok's prior larceny convictions, was properly excluded as in the interest of justice. *See Romulus, 949 F.2d at 716* (period between filing motion to transfer and district court's favorable

decision "properly excluded under the interest-of-justice exclusion"); *cf. Baker, 10 F.3d at 1397* (upholding determination that government's motion to continue trial date was "in the interest of justice"); *United States v. J.D., 525 F.Supp. 101, 107 (S.D.N.Y.1981)* (period after filing motion to transfer to adult status excludable under Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(F)). Once the district court had granted the motion, Kwok was no longer "an alleged delinquent" for purposes of the JDA, and thus § 5036 was no longer applicable to him. *See Romulus, 949 F.2d at 716.*

Nothing in either the Federal Rules of Criminal Procedure or the Criminal Rules of the Eastern District of New York suggests that a motion would not be deemed filed on the date the notice of motion is filed. *See* Fed.R.Crim.P. 47 (motion "may be supported by affidavit"); E.D.N.Y.Crim.R. 3(b) (notice of motion and "any supporting affidavits" to be filed with clerk). Further, we perceive no record support for Kwok's argument that the government did not make the motion in good faith. Indeed, the district court stated that the government had proceeded "in a reasonably expeditious manner," and had presented a "serious" motion to transfer.

We conclude that the speedy trial provision of the JDA was not violated, and that the district court therefore did not err in refusing to dismiss the case.

*C. Adequacy of Jury Instructions and Sufficiency of Evidence Supporting RICO Charges under Reves v. Ernst & Young.*

All defendants-appellants were convicted of violating 18 U.S.C. § 1962(c) and (d). Section 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct or participate, directly or*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

*indirectly, in the conduct of such enterprise's affairs* through a pattern of racketeering activity or collection of unlawful debt.

*Id.* (emphasis added). <u>Section 1962(d)</u> renders it unlawful for any person "to conspire to violate" § <u>1962(c)</u>.

Joseph Wang and Danny Ngo contend that in light of *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1992), which was decided during the pendency of this appeal, the jury instruction explicating the language of § 1962(c) that is emphasized in the above quotation requires reversal. This argument would benefit all defendants-appellants, since all were convicted of violations of § 1962(c) and (d). *See supra* note 1. Wang and Ngo also claim that the evidence *1372 was insufficient to convict them under the *Reves* standard.

*Reves* addressed the RICO liability of the outside auditor for a farmer's cooperative regarding an excessive evaluation of the cooperative's assets in the cooperative's financial statements. The Court ruled that the auditors were not liable under § 1962(c), *see* 507 U.S. at —— – ——, ——, 113 S.Ct. at 1168–69, 1174, and held "that 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Id.* 507 U.S. at ——, 113 S.Ct. at 1173. The "operation or management" standard was deemed to express the "requirement" that a § 1962(c) defendant play "*some* part in directing the enterprise's affairs." *Id.* 507 U.S. at ——, 113 S.Ct. at 1170.

The court added that "liability under § 1962(c) is not limited to upper management," *id.* 507 U.S. at ——, 113 S.Ct. at 1173, because: "An enterprise is 'operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." Adverting to

discussion at oral argument concerning "low-level employees," *id.* 507 U.S. at ——, 113 S.Ct. at 1173 n. 9, the Court stated: "We need not decide in this case how far § 1962(c) extends down the ladder of operation because it is clear that [the outside auditor] was not acting under the direction of the Co-op's officers or board." *Id.*

The challenged jury instruction in this case addressed the requirement of § 1962(c) that a defendant "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" as follows:

This requires proof that there is a meaningful connection between the defendant's illegal acts and the affairs of the enterprise. The government is not required to prove that the defendant participated in the management or control of the enterprise or that he shared in its profits. The government is, however, required to prove that the defendant knowingly and intentionally engaged in racketeering acts in some way related to the affairs of the enterprise or that the defendant was able to commit the racketeering acts solely by virtue of his position or involvement in the affairs of the enterprise.

Wang argues that this charge impermissibly reflects the standard propounded by this circuit in *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981), and that *Scotto* has been overruled by *Reves*. In *Scotto*, we stated that:

We think that one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise.

*Id.* Although *Reves* does not mention *Scotto*, "we

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
**(Cite as: 40 F.3d 1347)**

have recently recognized that the Supreme Court's holding in *Reves* ... is irreconcilable with the relevant portion of our decision in *Scotto*." *United States v. Viola,* 35 F.3d 37, 40 (2d Cir.1994) (citing *Napoli v. United States,* 32 F.3d 31, 34 (2d Cir.1994).

The instruction challenged in this case is vulnerable as echoing *Scotto,* although it focuses on different § 1962(c) language than does *Scotto.* We have addressed similar instructions in the aftermath of *Reves* in *United States v. Thai,* 29 F.3d 785 (2d Cir.1994), *cert. denied,* 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994), *Napoli,* and *Viola.*

In *Thai,* we rejected a challenge to the conviction and underlying instruction because the challenging defendant "was not at the bottom of the management chain" and was thus included within the "ladder of operation" to which § 1962(c) extends. *Id.* at 816. We then added the following:

> In any event, we note that no defendant objected to the trial court's RICO instruction in this regard, and thus we would not reverse on account of any error in light of the later-decided *Reves* unless it were plain error. *See United States v. Weiner,* 3 F.3d 17, 24 (1st Cir.1993) (reviewing § 1962(c) charge only for plain error because "*Reves* resolved a split between circuits ... so the objection could easily have *1373 been made at trial"); *see generally United States v. Tillem,* 906 F.2d 814, 825 (2d Cir.1990) (applying plain-error standard even when error in the instruction was established only by a decision rendered after the date of the trial); *United States v. Scarpa,* 913 F.2d 993, 1019-20 (2d Cir.1990) (same). Plain error is error so egregious as to result in a miscarriage of justice. *See, e.g., United States v. Tillem,* 906 F.2d at 825. If there was error in these instructions, it surely was not plain error.

*Id.; cf. Napoli,* 32 F.3d at 37 (defendants "could have brought to this Court's attention that other cir-

cuits disagreed with our analysis in *Scotto* and that the Supreme Court had granted certiorari in *Reves* to resolve the split among the circuits on the construction of section 1962(c)").

Certiorari was granted in *Reves* on February 24, 1992, well before the commencement of the trial of this case. *See Reves,* 502 U.S. 1090, 112 S.Ct. 1159 (1992). No objection was taken at trial to the instruction challenged on this appeal. Wang asserts, however, that he requested a charge "that conducting or participating in the enterprise involved participation in the 'ongoing management or operation of the enterprise.'" This instruction was proposed as an elaboration of the court's instruction regarding the § 1962(c) "pattern of racketeering activity." While the proposed instruction made reference to the relationship of predicate acts to the "management or operation" of a RICO enterprise, there is no claim or showing that the proposed instruction was accompanied by an objection to the instruction challenged on appeal, and the proposed instruction did not focus upon the *Reves* issue.

Fed.R.Crim.P. 30 provides that: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Applying this rule, we have made it clear that a "defendant's 'requested instructions do not substitute for specific objections to the court's instructions.' " *United States v. Locascio,* 6 F.3d 924, 942 (2d Cir.1993) (quoting *United States v. Tannenbaum,* 934 F.2d 8, 14 (2d Cir.1991) (quoting *United States v. Graziano,* 710 F.2d 691, 696 n. 8 (11th Cir.1983), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984))), *cert. denied,* —— U.S. ——, ——, 114 S.Ct. 1645, 1646, 128 L.Ed.2d 365 (1994). Accordingly, we do not regard Wang's proposed instruction as satisfying the requirements of Rule 30.

In *Viola,* departing in this respect from *Thai* and

40 F.3d 1347
(Cite as: 40 F.3d 1347)

*Napoli,* we applied a "modified plain error rule" because *Reves* was deemed a "supervening Supreme Court decision overturning settled circuit precedent [i.e., *Scotto* ]." *Viola,* 35 F.3d at 42. We understand the concerns implicit in *Viola,* for it is unclear what purpose is served by a rule requiring a party to object in district court to an instruction that is required by settled circuit precedent simply because the Supreme Court has undertaken to review the instruction. That is, until the Supreme Court rules otherwise, the district court would be obliged to follow our precedent, even if that precedent might be overturned in the near future.

[30][31] In any event, it is clear that the convictions in this case should be affirmed whether normal plain error analysis or the *Viola* "modified plain error" rule is applied. The impact of that rule is to shift the burden to the government to establish that the challenged instruction did not affect the defendant's substantial rights, *see id.,* i.e., did not result in " 'a miscarriage of justice which denied the defendant a fair trial.' " *United States v. Scarpa,* 913 F.2d 993, 1020 (2d Cir.1990) (quoting *United States v. Civelli,* 883 F.2d 191, 194 (2d Cir.), *cert. denied,* 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989)). For the reasons that follow, we are satisfied that the government has met this burden.

Defendants-appellants were all intimately involved in the criminal activities of the Green Dragons. Indeed, they were required to leave their homes and take up residence in apartments with their gang compatriots as a condition of acceptance in the organization. *Reves* makes it clear that a defendant can act under the direction of superiors in a RICO enterprise and still "participate" in the operation*1374 of the enterprise within the meaning of § 1962(c). *See Reves,* 507 U.S. at —— & n. 9, 113 S.Ct. at 1173 & n. 9.

In *Viola,* the only case in which we have reversed a RICO conviction for plain error on account of *Reves,* the acquitted defendant had no awareness of the overall criminal activities of the RICO enterprise, and was described as "not on the ladder [of operation of the RICO enterprise] at all, but rather, as [the principal's] janitor and handyman, ... sweeping up the floor underneath it." *Viola,* 35 F.3d at 43.

By contrast, all the defendants-appellants in this case were thoroughly indoctrinated participants in the criminal activities of the Green Dragons. The two who have challenged the sufficiency of the evidence to support their RICO convictions in light of *Reves,* Ngo and Wang, had been active members of the Green Dragons since January 1987 (Ngo) and the spring of 1988 (Wang) at the time of their apprehension on November 19, 1990. All of the defendants-appellants were found to have committed a range of predicate acts, and were convicted of one or more crimes at the core of the criminal activities of the Green Dragons, in addition to their RICO convictions.

Joseph Wang was responsible with Alex Wong for collecting extortion money from various restaurants; when the manager of the Tien Chiau Restaurant refused to pay, Wang, along with Wong, was responsible for killing him. After the killing, Wang "moved up the ladder" in the gang, and began planning crimes. Danny Ngo was responsible for operating one of the gang's apartments and controlling the activities of the seven or eight gang members who lived there.

Alex Wong collected extortion money from restaurants, shot the manager of the Tien Chiau Restaurant, and helped organize the effort to locate the witness who had identified him in the shooting. Tung Tran instructed other members of the Green Dragons to murder Tina Sham, who had testified against a Green Dragons member at a preliminary hearing in state court, and Tommy Mach, who happened to be with Tina Sham when the Green Dragons apprehended her. Brian Chan drove one of the gang's cars, participated in kidnapping Tina Sham and Tommy

40 F.3d 1347
(Cite as: 40 F.3d 1347)

Mach, and instructed another Green Dragons member to "beat up" members of the White Tigers gang. Chen I. Chung was the gang's street leader.

Roger Kwok, Chiang T. Cheng, and Steven Ng, although lower in the gang's hierarchy, operated under the direction of their superiors over an extensive period of involvement in the affairs of the Green Dragons. Kwok carried out the murders of Tina Sham and Tommy Mach. Cheng was convicted of three murders in connection with the gang's activities. Ng was convicted of a conspiracy to commit murder in furtherance of the Green Dragons' operations.

In view of this intensive and continuing involvement in the operations of the Green Dragons, ordinarily (as in the case of most criminal organizations) under the overall direction of the enterprise's leadership, we perceive no miscarriage of justice in the RICO convictions in this case. We therefore conclude that *Reves* poses no bar to affirmance of the RICO convictions rendered in this case. Nor is there any basis to regard the trial evidence as insufficient to support the RICO convictions of Wang and Ngo.

D. *Sufficiency of the Evidence to Establish a Pattern of Racketeering.*

[32] Ngo contends that his many predicate acts were too widely separated in "time [and] subject matter" to constitute a § 1962(c) "pattern of racketeering activity." This argument is frivolous. To establish that predicate acts are sufficiently "related" and "continuous" to establish a "pattern of racketeering activity" under § 1962(c), see *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239–43, 109 S.Ct. 2893, 2900–03, 106 L.Ed.2d 195 (1989), it is only necessary that the criminal acts " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)) (now repealed).

[33] The predicate acts that the jury found to have been proved against Ngo were *1375 conspiracy to murder a Tung On leader in February 1987, conspiracy to commit and commission of the Hampton Street armed robbery in January 1990, and conspiracy to extort and attempted extortion in August 1990. While Ngo's activities varied in type, all were designed to earn money for, or increase the prestige of, the Green Dragons, all involved the same cast of characters, and all continued for a sustained period. This evidence would easily permit a jury to find a § 1962(c) pattern of racketeering activity.

E. *Suppression of Evidence from Electronic Surveillance.*

As part of the investigation of the Green Dragons, the FBI and NYPD engaged in a series of court-authorized wiretaps that monitored calls to and from several telephones used by members of the Green Dragons. On appeal, Steven Ng argues that the district court should have suppressed tapes obtained pursuant to the wiretaps because they were not timely sealed, as required by 18 U.S.C. § 2518(8)(a).[FN5]

FN5. Section 2518(8)(a) provides in pertinent part:

Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom....

Two of the court orders at issue authorized wiretaps until December 1990. After the Green Dragons

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

were arrested on November 19, 1990, the related tapes were sealed on November 23, 1990 (the "November 23 Tapes"). The third disputed order expired on November 11, 1990. The related tapes were sealed on November 14, 1990 (the "November 14 Tapes").

Invoking *United States v. Ojeda Rios*, 495 U.S. 257, 263–67, 110 S.Ct. 1845, 1849–52, 109 L.Ed.2d 224 (1990) (unjustified delay in sealing tapes bars their use as evidence), Ng argues that the delays in this case should have barred admission of the wiretap evidence. This court has held that a sealing " 'within one or two days' " will normally be deemed immediate within the meaning of § 2518(8)(a), *United States v. Maldonado–Rivera*, 922 F.2d 934, 949 (2d Cir.1990) (quoting *United States v. Vazquez*, 605 F.2d 1269, 1278 (2d Cir.1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979), 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980)), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984, 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991), and that longer delays require suppression "unless the government furnishes an explanation for the delay that is 'satisfactory' within the meaning of the statute." *Id.*; *see supra* note 5. Where the delay is between two and five days, we have indicated that the government should submit with the tapes an *in camera* explanation for the delay, *see United States v. Massino*, 784 F.2d 153, 158 (2d Cir.1986), although an explanation submitted at the time of a defendant's motion to suppress will be considered. *See United States v. Pitera*, 5 F.3d 624, 627 (2d Cir.1993), *cert. denied*, 510 U.S. 1131, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994).

[34] As previously noted, the authorizing order for the November 14 Tapes expired on November 11, 1990. Monday, November 12 was Veterans' Day, a legal holiday. The tapes were thus sealed within two business days of the expiration of the authorizing order. We have recognized that weekends and holidays present legitimate obstacles to the sealing of tapes. *See, e.g., United States v. Gallo*, 863 F.2d 185, 193 (2d Cir.1988), *cert. denied*, 489 U.S. 1083, 109

S.Ct. 1539, 103 L.Ed.2d 843 (1989); *United States v. McGrath*, 622 F.2d 36, 42–43 (2d Cir.1980). Because the sealing of the November 14 Tapes was delayed only two business days and there was no suggestion of bad faith, deliberate disregard of the statute, or tampering, there was no basis for their exclusion. *See Pitera*, 5 F.3d at 626; *Gallo*, 863 F.2d at 193.

[35] With respect to the November 23 Tapes, Ng argues that the arrest of the defendants-appellants should have triggered the government's obligation to seal the tapes because 18 U.S.C. § 2518(5) precludes interception*1376 "for any period longer than is necessary to achieve the objective of the authorization." We believe that Judge Raggi properly decided this issue in favor of the government when it was presented below. As the district court noted, a "number of individuals who were targets of this investigation" were not apprehended on November 19, 1990, and thus the objective of the surveillance had not yet been attained on that date. *See United States v. Badalamenti*, 794 F.2d 821, 824–25 (2d Cir.1986) (authorized period did not end with last interception because government intended to resume monitoring wiretap during authorized period if its ongoing investigation indicated need to do so). The same rationale applies here. In any event, one of the intervening days between November 19 and November 23 was Thanksgiving Day, so the November 23 Tapes were filed on the third business day following the November 19 arrests. No case is made for their suppression on this record.

*F. Anonymous Jury.*

Prior to trial, the government moved for the empanelling of an anonymous jury. In support of its motion, the government argued that the evidence presented at trial would establish that the Green Dragons were a violent gang with a history of interfering with the judicial process, that gang members continued to seek to silence potential witnesses against them, and that press coverage of the case would be extensive. The district court granted the motion over the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

defendants' objection, concluding that the reasons proffered by the government were sufficient to warrant the use of an anonymous jury. Accordingly, the district court limited voir dire so as not to disclose the names, addresses, or places of employment of members of the venire, kept jurors together at the courthouse during luncheon recesses, and had jurors transported to and from the courthouse.

Chen I. Chung and Brian Chan contend that the district court's decision to empanel an anonymous jury interfered with their ability to conduct voir dire and to exercise peremptory challenges in a meaningful manner, thus violating the Sixth Amendment right to an impartial jury. They further argue that the court failed to take precautions to ensure that the jurors did not infer that their anonymity was necessitated by the dangerousness of those on trial, thus violating their Fifth Amendment right to the presumption of innocence. We are not persuaded.

[36] Empanelling an anonymous jury undoubtedly has serious implications for a defendant's interest in effectively conducting voir dire and in maintaining the presumption of innocence. *See United States v. Thomas,* 757 F.2d 1359, 1363–64 (2d Cir.1985), *cert. denied,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985), 479 U.S. 818, 106 S.Ct. 67, 88 L.Ed.2d 54 (1986). We have nevertheless recognized that because fears of retaliation may affect the jury's ability to render an impartial verdict, "[j]ustice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken." *Id.* at 1364; *see also Thai,* 29 F.3d at 801; *United States v. Amuso,* 21 F.3d 1251, 1264 (2d Cir.1994), *cert. denied,* 513 U.S. 932, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994). These competing individual and institutional interests are reasonably accommodated, and the use of an anonymous jury is constitutional, when there is "strong reason to believe the jury needs protection" and the district court "tak[es] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are pro-

tected." *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991) (collecting cases), *cert. denied,* —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *see also United States v. Vario,* 943 F.2d 236, 239 (2d Cir.1991), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). Within these parameters, the trial court is accorded broad discretion to determine whether to empanel an anonymous jury. *See Paccione,* 949 F.2d at 1192; *cf. Maldonado–Rivera,* 922 F.2d at 971 (trial court has broad discretion to undertake security measures to protect jury from harm or intimidation).

[37] The record in this case amply supports the district court's conclusion that the jury needed protection. The government's pretrial proffer on this issue, borne out by evidence at trial, indicated that the Green *1377 Dragons had an extensive history of interfering with the judicial process. For example, the Green Dragons murdered Tina Sham and Tommy Mach because Sham had once testified against a gang member, in furtherance of Chen I. Chung's policy of killing witnesses. In addition, after shooting the owner of the Tien Chiau Restaurant in retaliation for his failure to pay for protection, Alex Wong shot at several customers, killing one and paralyzing another, in an apparent attempt to eliminate potential witnesses. When Wong was arrested in connection with the Tien Chiau shootings, the Green Dragons undertook to locate the sole eyewitness to the shootings in order to kill her before she testified. More recently, after Sonny Wong had begun cooperating with the government in this case, Kin Fei Wong, the overall leader of the gang, spoke with other gang members about his attempts to locate Sonny Wong's family in an apparent attempt to use them to coerce Sonny Wong's silence.

[38] The Green Dragons' demonstrated willingness to obstruct justice warranted the use of an anonymous jury, especially in view of evidence that Kin Fei Wong and other members of the Green Dragons remained at large with the means to harm jurors. *See Paccione,* 949 F.2d at 1192–93; *Thomas,* 757 F.2d at

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

1365. Furthermore, at the time of the government's motion the case had received a significant amount of coverage from the print and broadcast media, and the government reasonably predicted that additional press coverage would accompany the trial. The prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment. *See Vario,* 943 F.2d at 240.

[39] We also conclude that the district court took adequate precautions to safeguard the defendants-appellants' constitutional rights. Although the district court precluded disclosure of the jurors' names, addresses, and employers, the court questioned prospective jurors about their familiarity with the case, the defendants and the crime scenes, and inquired about their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service, and other matters. This extensive voir dire adequately explored prospective jurors' "bias as to issues in the case[ ] and as to the defendant[s]," *United States v. Barnes,* 604 F.2d 121, 140 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), and "was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair and impartial jury." *United States v. Tutino,* 883 F.2d 1125, 1133 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

[40] Chan complains that when Judge Raggi told the jurors at the outset of trial that government transportation would be provided to them because of their "anonymous" status, no explanation was provided to allay the jurors' potential concerns about that status. No request was made for such an explanation, so the issue was waived. *See Vario,* 943 F.2d at 241. Further, when the jurors inquired about having to eat lunch in the courthouse when other juries were permitted to go to nearby restaurants, Judge Raggi explained that it would not be possible for twelve jurors and six alternates to be accommodated at restaurants during the

one-hour lunch break that she scheduled, without any reference to their anonymous status. These incidents provide no basis to conclude that this status prejudiced the jury's deliberations to the disadvantage of defendants-appellants.

G. *Admission of Evidence of Uncharged Criminal Activities.*

During the trial, the government introduced wiretap evidence and live testimony concerning a fight between the Green Dragons and a rival Asian gang, known as Born to Kill ("BTK"), at the Mars Club in Manhattan during June 1990. Sonny Wong testified that he had gone to the club with Danny Ngo, Tung Tran, Brian Chan, Joseph Wang, and several other members of the Green Dragons. Brian Chan and Tung Tran remained outside watching the entrance to prevent other gangs from entering, while the others went into the club. Inside, the Green Dragons encountered BTK members and a fight ensued. During the melee, Wang was *1378 struck in the face with a beer bottle and (along with other Green Dragon members) ran for the exit. Once outside, he retrieved a gun from the gang's parked car and began firing at BTK members as they departed from the club.

Objection was made to the introduction of this evidence on the grounds that it was proof of an uncharged crime, cumulative, and prejudicial. *See* Fed.R.Evid. 403, 404(b). The government countered that the evidence was not cumulative because it "establish[ed] the membership of these individuals in the Green Dragons," and was some of the first evidence admitted concerning Ngo's participation in the enterprise.

The district court ruled that the evidence was admissible to prove the existence and nature of the Green Dragons "enterprise" and the participation of defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b). The court determined that although other evidence had been admitted regarding the defendants' violent conduct,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

the challenged evidence was not cumulative because "there is no piece of evidence that the government has proffered that I do not expect will be subject to challenge, if not here during the evidentiary phase of the trial, [then] during summations of counsel." The court then implicitly rejected the defendants' challenge to the evidence under Rule 403, stating that, "I will always listen to objections, because ... if [the testimony about the fight] gets too far afield, I would limit it under [Rule] 403."

On appeal, Joseph Wang and Brian Chan challenge the admission of this testimony, claiming that it was cumulative and unfairly prejudiced them by demonstrating their propensity to use guns and to engage in gunfights. We disagree.

[41] A district court has broad discretion regarding the admissibility of evidence and its rulings will be disturbed only for an abuse of that discretion. *See United States v. Brady,* 26 F.3d 282, 286 (2d Cir.) (collecting cases), *cert. denied,* ___ U.S. ___, 115 S.Ct. 246, 130 L.Ed.2d 168 (1994). No such abuse appears here. Evidence is "relevant" if it has "any tendency" to prove or disprove a fact of consequence in the trial. Fed.R.Evid. 401. As the district court recognized, this evidence was probative of the existence, organization, and nature of the RICO enterprise, a central allegation in the indictment. Accordingly, "the fact that it may also have been probative of a separate uncharged crime is irrelevant." *United States v. Coiro,* 922 F.2d 1008, 1016 (2d Cir.), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *see also Brady,* 26 F.3d at 287–88; *United States v. Clemente,* 22 F.3d 477, 483 (2d Cir.), *cert. denied,* 513 U.S. 900, 115 S.Ct. 258, 130 L.Ed.2d 178 (1994).

[42] With respect to Rule 403, the district court acted well within its discretion in concluding that the evidence was neither cumulative nor unduly prejudicial. The record reflects that the district court carefully considered the evidence already in the record and

reasonably concluded that the existence and nature of the Green Dragons enterprise was not yet so firmly established as to render this evidence surplusage. Indeed, Wang's counsel consistently referred to the organization during cross-examination as the "so-called" Green Dragons, indicating that the existence of the enterprise remained in dispute. *Cf. Brady,* 26 F.3d at 287 & n. 7 (evidence of ongoing war between rival gangs properly admitted because existence of war remained in dispute). Moreover, the wiretap evidence concerning this incident was one of only two intercepted conversations in which Ngo took part, and thus was useful in connecting Ngo to the Green Dragons organization. Finally, we cannot say that the significant probative value of this evidence was "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403.

[43] Brian Chan now criticizes the district court for its failure to limit the evidence to omit references to the use of guns (thus restricting the testimony to the initial fistfight). However, Chan never requested that the testimony be limited in this fashion, although he had ample opportunity to do so during a government proffer at a sidebar conference, and this argument must be deemed waived. Judge Raggi explicitly stated that the relevance of this evidence was to *1379 show that "what started as fisticuffs turned into a resort to firearms," and this comment elicited no response or objection from any defense counsel.

*H. The Murder of Jin Lee Soek.*

[44] Tung Tran and Brian Chan were both convicted of the murder of Jin Lee Soek on or about February 27, 1990 to maintain or increase their position in a RICO enterprise, the Green Dragons, in violation of 18 U.S.C. § 1959(a)(5). This murder was also a predicate act underlying their substantive RICO and RICO conspiracy convictions. Brian Chan now contends that the court improperly allowed government witness Sonny Wong to present hearsay testimony regarding the murder of Jin Lee Soek. Chan further contends that the evidence was insufficient to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

support his conviction for the murder. We reject both claims.

Shortly after 5:30 p.m. on February 27, 1990, Peerapol Busapavanij was sitting in the front seat of his car on Ketcham Street in Elmhurst, repairing his seat belts. Busapavanij saw a car drive by him, and saw someone jump out of the car and go down the street. He then heard some shots, turned and saw a man firing a gun, and then saw the same car back up, pick up the gunman, and drive away. When police responded to the scene, they found Jin Lee Soek dead from two bullet wounds to the head. Analysis of gunpowder residue indicated that one of the bullets had been fired from a distance of approximately two feet. Busapavanij had noted the car's license number, and reported it to the police. It was assigned to a 1984 grey Mercury registered to Brian Chan. Also, a police detective interviewed Danny Kim, a young Korean male and a witness to the crime.

On the evening of the murder, Sonny Wong was standing in the doorway of a shop in Elmhurst when he saw Brian Chan and Tung Tran in Chan's Mercury chasing four young Asian men who ran in the direction of Ketcham Street in Elmhurst. Later that evening, Sonny Wong met Chan, Tran, and other members of the gang at a pool hall. Chan told Sonny Wong that he had spotted members of BTK, a rival gang, in their area and that he and Tran had given chase. Chan told Wong that "he was sitting on the car door and he shot at one of the guys that was running." Later that same evening, Wong had a conversation with Tony Kim, a leader in the Korean Power ("KP") gang. On March 6, 1990, Chan was arrested for the murder of Soek.

At trial, Sonny Wong testified about events surrounding the state prosecution of Chan for the murder of Soek. Wong testified that Chan told him that there was only one witness against Chan in the case, a member of the KP. Wong then began to testify about a subsequent meeting at a restaurant between Tony Kim and a number of KP members and Wong, who was

accompanied by a number of Green Dragons members. After a defense objection to the testimony on hearsay grounds, the district court instructed Wong to testify only as to what he had said during the conversation without mentioning what Tony Kim had said, reiterating an instruction given by the court a few minutes earlier. The relevant portion of Sonny Wong's testimony is reproduced in the margin. [FN6] In substance, *1380 Wong testified that he had told Kim that Chan was in jail and that one of Kim's "kids" was going to be a witness against Chan. Wong told Kim to tell his "kid" not to testify; that Kim should "know the rules" that gangsters do not testify against one another; and that after Chan was released from custody, Kim could do "[w]hatever he wants to do" with Chan. After Chan's case was dismissed and Chan was released, Chan told Sonny Wong that "the government had to drop the case because the witness did not show up." Aleck Yim also testified that Chan told him that the person who was "supposed to testify against him disappeared." In addition, a police detective testified that after Brian Chan's arrest, the detective was unable to locate Danny Kim.

> FN6. Q: What did you say during the course of this meeting, Mr. Wong?
>
> A: I told Tony Kim that Brian was in jail and that his kid is testifying as a witness against him.
>
> MR. SCHOENBACK: [Chan's trial counsel]: Objection, your honor.
>
> THE COURT: I will allow him to testify to what he said at the meeting.
>
> MR. SCHOENBACH: If I may, I would object on hearsay grounds to what underlies the statement.
>
> THE COURT: Ladies and gentlemen, it is

not being received for the truth of the statement, but for the fact that it was said and for whatever evidence is then adduced as to what follows. Go ahead.

....

Q: Mr. Wong, when you say that his kid was testifying, whose kid are you referring to?

A: Tony Kim's kids [sic].

Q: What else did you say to Tony Kim, Mr. Wong?

A: I told him to tell his kid not to go up and testify.

Q: Did you say anything else to Mr. Kim about that?

A: I told him that he should know the rules involving gangsters going up to take the stand.

Q: What rules are those, Mr. Wong?

A: That we were to take care of ourselves, not to go to the police.

Q: Did you say anything to Mr. Kim about how it could be taken care of?

A: To tell how it could be taken care of?

Q: Yes.

A: I told him to tell his kid not to go up and take the stand, to iron things out, and he would talk to Brian himself.

Q: Did you say anything else about what would happen after Brian came out, Mr. Wong?

A: It's up to him.

Q: Up to who?

A: Tony Kim.

Q: Meaning what? What did you mean by that?

A: Whatever he wants to do.

Q: To whom, Mr. Wong?

A: To Brian Chan.

Q: Approximately how long was this meeting, Mr. Wong?

A: Over an hour.

Q: Did anything happen regarding Brian Chan's case after this meeting?

A: Yes.

Q: How do you know?

A: I went to court with [Brian Chan's] lawyers that day when he—when his case was dismissed.

....

Q: Did you talk to Brian Chan after that, Mr. Wong?

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

A: Yes.

Q: What did he say to you after that?

A: He told me the government had to drop the case because the witness did not show up.

[45] Chan contends that Sonny Wong's testimony was merely a device through which the prosecution introduced the hearsay testimony of Tony Kim and (via Tony Kim) Danny Kim. Chan argues that although Wong ostensibly testified as to his own statements, his testimony was a transparent attempt to incorporate information supplied by the KP members, and thus constituted inadmissible hearsay under our decision in _United States v. Check_, 582 F.2d 668, 678–86 (2d Cir.1978).

We disagree. In _Check_, the government elicited the testimony of a police detective regarding conversations in which he had engaged with an informant who did not testify. Although the detective did not repeat the words the informant had used, his testimony clearly incorporated "inadmissible hearsay information obviously supplied by and emanating from the informant." _Id._ at 678; _see also United States v. Reyes_, 18 F.3d 65, 69 (2d Cir.1994); _Mason v. Scully_, 16 F.3d 38, 42–43 (2d Cir.1994).

Sonny Wong's testimony, however, did not incorporate any information derived from either Tony Kim or Danny Kim. Wong told Kim what Brian Chan had told Wong, i.e., that a KP member was to testify against Chan. Wong told Kim not to have his "kid" testify, and that Kim could do as he pleased with Chan afterwards. There was no testimony regarding any response by Kim to these remarks. Wong's testimony would have been little different, from an evidentiary point of view, if he had been recounting the contents of a letter he had written to Tony Kim. The significant

inference for the jury to draw was not, as Chan contends, that "the witness had already convinced the Korean Power gang that Brian Chan was guilty of the murder." Rather, the relevant inferences were all to be drawn from statements made by members of the Green Dragons themselves.

Significantly, Wong did not tell Kim that Chan did not commit the murder; nor did Chan tell either Sonny Wong or Aleck Yim that he had not committed the crime. Prior to this incident, the Green Dragons were on good terms with the KP, and presumably it would have been in the best interests of the Green Dragons to deny Chan's involvement if they could truthfully have done so. From the absence of any effort to deny the charge, the jury could infer that the Green Dragons, not the KP members, thought that Chan was guilty. Wong's statements about the meeting*1381 with Tony Kim were thus properly admissible as statements of a coconspirator during the course and in furtherance of the conspiracy. _See_ Fed.R.Evid. 801(d)(2)(E). The government's summation underlines this reading of the evidence. The summation made reference only to Wong's portion of the conversation, and did not invite the jury to infer anything from Tony Kim's participation in the conversation.

Chan argues that there was insufficient evidence to support his conviction for Soek's murder because: (1) although the grey Mercury was registered to Chan, other members of the gang had driven the car; and (2) Chan's statement to Sonny Wong that he had been sitting on the door of the car when he shot at the rival gang members was inconsistent with both Busapavanij's eyewitness testimony and autopsy reports indicating that the injuries had been inflicted at close range. We are persuaded, however, that there was adequate evidence from which a jury, drawing all permissible inferences in favor of the government, could rationally conclude that Chan was guilty beyond a reasonable doubt. _See United States v. Chang An-Lo_, 851 F.2d 547, 553–54 (2d Cir.), _cert. denied_,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988).

Around the time of the homicide, Sonny Wong had seen Brian Chan and Tung Tran speed off towards Ketcham Street chasing a group of young Asian males. Chan's car was identified as the vehicle used by the killer to flee the scene of the murder. Later that evening, Chan boasted about having shot at a rival gang member. Significantly, Brian Chan never told either Sonny Wong or Aleck Yim that he had been wrongly accused and was not responsible for the murder. Finally, Sonny Wong testified to the efforts of Chan and his Green Dragons cohorts to prevent the testimony of a KP witness against Chan regarding the Soek murder, and despite Chan's argument to the contrary, we have concluded that this evidence was admissible against him.

I. *Downward Departures.*

Chen I. Chung, Roger Kwok, Chiang T. Cheng, and Alex Wong assert that the district court erred in refusing to grant them downward departures. Essentially, Chung, Kwok, and Cheng argue that they were entitled to downward departures because of the lack of guidance they received during their upbringing. Wong claims that the district court erred in rejecting his argument that his case falls outside the "heartland" of the sentencing guidelines for RICO/homicide prosecutions because the Sentencing Commission did not consider the special problems of youth gang members in writing the guidelines. Their claims lack merit.

[46] A sentencing court's refusal to depart downward from the indicated guideline sentencing range is ordinarily not appealable. *See United States v. Piervinanzi,* 23 F.3d 670, 685 (2d Cir.), *cert. denied,* 513 U.S. 900, 115 S.Ct. 259, 130 L.Ed.2d 179, 513 U.S. 904, 115 S.Ct. 267, 130 L.Ed.2d 185 (1994). This rule does not apply, however, when the sentencing court mistakenly believed that it lacked the authority to depart. *See id.; United States v. Lawal,* 17 F.3d 560, 563 (2d Cir.1994).

[47] This court has not recognized "youthful lack of guidance" as a valid basis for downward departure. *See United States v. Haynes,* 985 F.2d 65, 68 (2d Cir.1993).[FN7] Moreover, the district court explicitly considered granting such a departure to Chang and Kwok, but declined to do so as an exercise of discretion. Although recognizing that such departures might be warranted in some cases, the court found that the hardships suffered by these defendants when growing up were not so severe as to mitigate the murders that they committed. The district court also explicitly declined to grant a downward departure to Chung, but did not specifically advert to any lack of youthful guidance in doing so because that ground was not argued to the court. We are without authority to review the court's decision not to depart downward in imposing these sentences.

> FN7. An amendment to the Sentencing Guidelines effective November 1, 1992 (and thus not applicable to this case) explicitly provides that "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds" for granting a downward departure. USSG § 5H1.12, p.s.

*1382 Alex Wong contends that youth gang cases are not within the "heartland" of the RICO statute because youth gang members are more amenable to psychological counseling and rehabilitation than adults. Wong claims that this distinction was not adequately taken into consideration by the Sentencing Commission when formulating the Guidelines, and that his case should be remanded for consideration of whether a downward departure is appropriate in this case. *See* 18 U.S.C. § 3553(b); *United States v. Skinner,* 946 F.2d 176, 179 (2d Cir.1991).

[48] We are unpersuaded. The Sentencing Commission has specifically considered age as a factor in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

sentencing, and has determined that it "is not ordinarily relevant" in determining whether a downward departure is appropriate. *See* USSG § 5H1.1, p.s. Moreover, it is well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(D) (1988). It is therefore unnecessary and inappropriate to carve out a separate "youth gang" exception to the sentencing guidelines for RICO/homicide prosecutions.

[49] In this case, the district court explicitly acknowledged that a defendant's potential for rehabilitation was "a factor for consideration" in sentencing. However, the court determined that Wong's prospects for rehabilitation were too speculative to warrant a departure. In doing so, the court carefully weighed the evidence before it, including wiretap evidence in which Wong spoke about "using his psychiatric counseling to his advantage" in sentencing. The district court acted well within its discretion in making this determination.

*J. Imposition of Fines.*

The district court imposed concurrent fines of $250,000 on each defendant for each count of conviction except for Steven Ng, who was fined $175,000. [FN8] The court imposed these fines despite indications in presentence reports that at least some of the defendants did not have adequate financial resources to pay a fine. In sentencing Tung Tran, the district court explained its rationale for imposing fines on indigent defendants:

> FN8. Chan and Tran erroneously believe that the district court imposed a fine of $250,000 for each count of conviction, for fines totalling several millions of dollars. However, the $250,000 fines imposed on each of them represent the total fine for all their offenses.

Let me say with respect to the fine that at the present time it does not appear that you or most of the defendants in this case are in any position to pay a fine, but because of the serious harm that the victims suffered in this case, and because of my understanding that they can appeal to the attorney general for some kind of dispensation from fines that are collected, I impose a fine. I would not want anyone to buy a lottery ticket, get lucky and then not have to pay the fine, and that's why I impose it.

[50] Alex Wong, Brian Chan, and Tung Tran challenge the fines imposed by the district court. They essentially argue that a fine is inappropriate because their presentence reports established that they had no present ability to pay and, because of their sentences to life imprisonment, would not become able to pay a fine at some future time. Defendants-appellants cite this court's decision in *United States v. Rivera*, 971 F.2d 876 (2d Cir.1992), in which we vacated a $17,500 fine imposed on a defendant whose presentence report indicated that he had no ability to pay a fine, but had been interpreted by the sentencing judge as recommending a fine. *Id.* at 895. We remanded for resentencing "[i]n view of the confused state of the record on this issue." *Id.* We also stated that: "If the defendant is indigent, a fine should not be imposed absent evidence in the record that he will have the earning capacity to pay the fine after release from prison." *Id.* (citing *United States v. Seminole*, 882 F.2d 441, 443 (9th Cir.1989)).

The pertinent guideline provisions are USSG § 5E1.2(a) and (f), which provide:

(a) The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.

....

*1383 (f) If the defendant establishes that (1) he is not able and, even with the use of a reasonable in-

40 F.3d 1347
(Cite as: 40 F.3d 1347)

stallment schedule, is not likely to become able to pay all or part of the fine required by the preceding provisions, or (2) imposition of a fine would unduly burden the defendant's dependents, the court may impose a lesser fine or waive the fine. In these circumstances, the court shall consider alternative sanctions in lieu of all or a portion of the fine, and must still impose a total combined sanction that is punitive. Although any additional sanction not proscribed by the guidelines is permissible, community service is the generally preferable alternative in such instances.

[51][52][53] It is clear that a fine may constitutionally be imposed upon an indigent defendant, who may assert his continuing indigence as a defense if the government subsequently seeks to collect the fine. *See United States v. Torres,* 901 F.2d 205, 247–48 (2d Cir.) (collecting cases), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). It is also clear that USSG § 5E1.2(f) authorizes, but does not mandate, the imposition of a lesser fine or waiver of any fine in the case of an indigent defendant. *See* § 5E1.2, comment. (n. 3). In addition, § 5E1.2(a) imposes upon the defendant the burden of establishing indigence, *see United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991), which may be satisfied either by independent evidence or by reference to the defendant's presentence report. *See Rivera,* 971 F.2d at 895 (citing *United States v. Labat,* 915 F.2d 603, 606 (10th Cir.1990)).

[54] Our precedents, however, appear to direct that the discretion vested in sentencing courts by § 5E1.2(f) to waive a fine where indigence is shown should generally be executed in favor of such a waiver. Consistently, we do not believe that these precedents should be read to authorize the imposition of a fine despite a showing of present and future inability to pay, based upon some remote fortuity like the possibility that a defendant will win a lottery. We have already noted our statement in *Rivera* that a fine "should not be imposed" in the absence of some evi-

dence of the defendant's future ability to pay it. 971 F.2d at 895. In *United States v. Stevens,* 985 F.2d 1175 (2d Cir.1993), we remanded for resentencing when the district court imposed a $2,000,000 fine despite a presentence report that the defendant was indigent, directing that the district court provide the defendant "an opportunity to come forward with evidence of his inability to pay and ... consider the appropriate factors in determining whether or not to impose a fine and if so, in what amount." *Id.* at 1188. In *United States v. Rivera,* 22 F.3d 430 (2d Cir.1994), while approving the fine imposed in that case, we stated that a "sentencing court may not base the imposition of a fine upon its mere suspicion that the defendant has funds." *Id.* at 440 (citing *Stevens,* 985 F.2d at 1188). On the other hand, an inference that a defendant has funds may be drawn from circumstantial evidence, *see United States v. Orena,* 32 F.3d 704, 716 (2nd Cir.1994), bearing in mind that the defendant must sustain the burden of establishing indigence. *See* USSG § 5E1.2(a).

The proper balance was struck, in our view, by the Third Circuit in *United States v. Seale,* 20 F.3d 1279 (3d Cir.1994). The court stated in that case: "In attempting to predict future ability to pay, district courts must be realistic and must avoid imposing a fine when the possibility of a future ability to pay is based merely on chance." *Id.* at 1286 (collecting cases). The court imposed a fine, however, because the defendants in that "highly publicized crime" might be able to generate future income "from books or movies about [the] crime." *Id.*

[55] *Seale* does not provide an entirely satisfactory resolution of the issue, because it appears that the government would be unable to move for an amendment of sentence in the unlikely event that any of the defendants-appellants did win a lottery. *See* 18 U.S.C. §§ 3572(c), 3573. We nonetheless conclude that the district court improperly based one or more of the fines that it imposed in this case upon that possibility. In view of the cross-adoption of appeal arguments by

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 1347
(Cite as: 40 F.3d 1347)

defendants-appellants, *see supra* note 1, we vacate the fines imposed in this case and remand for their reconsideration.

*1384 K. *Other Claims.*

The defendants raise a host of other challenges to their convictions. Chen I. Chung contends that the district court: (1) improperly restricted cross-examination of Sonny Wong concerning allegedly coercive official conduct in securing Wong's cooperation; and (2) committed reversible error by requesting that the government clarify on redirect examination an ambiguity in testimony elicited during cross-examination.

Danny Ngo contends that: (1) he was a "peripheral defendant" and should have been tried separately; and (2) there was insufficient evidence to support his convictions for (a) conspiracy to murder the leader of the Tung On gang, (b) the robbery of the Hampton Street apartment, (c) the attempted extortion of Jack Tran, and (d) the conspiracy to commit assault upon the White Tigers.

Joseph Wang argues that: (1) there was insufficient evidence to support his convictions for the robbery of the Hampton Street apartment and for conspiracy to rob the Long Island Dumpling Restaurant; (2) the district court erred in admitting an allegedly inflammatory photograph of the crime scene at the Tien Chiau Restaurant that featured a large pool of blood; and (3) there was insufficient evidence to prove that he participated in the Tien Chiau Restaurant murders to maintain or increase his participation in a RICO enterprise within the meaning of 18 U.S.C. § 1959.

Brian Chan contends that: (1) the district court improperly admitted enlarged photographs of the bodies of Tina Sham and Tommy Mach; and (2) there was insufficient evidence to support his conviction for bribing a public official. Tung Tran contends that there was insufficient evidence to support his convic-

tion for the attempted extortion of Jack Tran.

Steven Ng argues that the cumulative impact of the introduction of three pieces of evidence—testimony that he was present at the restaurant where Tina Sham and Tommy Mach were abducted, a recording of an intercepted conversation introduced on the request of Ng's counsel in which Sonny Wong and Ng discussed the Sham/Mach homicides, and testimony (admitted only against Tung Tran) that Tran had threatened Sonny Wong in court—denied him due process of law.

We have carefully considered each of these remaining contentions and find them to be without merit.

Conclusion

We affirm the judgments of conviction and the sentences imposed in this case except as to the monetary fines. We vacate the fines and remand for their reconsideration.

C.%2 (N.Y.),1994.
U.S. v. Wong
40 F.3d 1347

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT F

STEPHEN J. RACKMILL
CHIEF PROBATION OFFICER

EASTERN DISTRICT OF NEW YORK
PROBATION OFFICE

BROOKLYN, NEW YORK

July 22, 1992

USA

vs.

Joseph Wang

75 CLINTON STREET, ROOM 405
BROOKLYN 11201-4201
718-330-2626

U.S. COURTHOUSE
2 UNIONDALE AVENUE
UNIONDALE, NY 11553-1258
516-485-7140

U.S. COURTHOUSE
300 RABRO DRIVE
HAUPPAUGE 11788
516-582-1105

Michael Padden, Esq.
The Legal Aid Society - FDSU
50 Court Street, Suite 1103
Brooklyn, NY 11201

Docket No.: 92-CR-1019(S-6)-5

Dear Sir:

The above-named defendant will be sentenced by U.S. District Judge ___Reena J. Raggi___ on ___9/25/92___ at ___10:00___ A.M./P.M., at the U.S. Courthouse, 225 Cadman Plaza East, Brooklyn, New York.

To Defense Counsel:

Please advise your client immediately upon receipt of this notice of the time and place of sentence. Enclosed you will find two copies of the presentence report. It is your responsibility to give a copy of the report to your client and to share and discuss the contents of the report with your client. If he or she is in custody, please arrange to meet with your client as soon as possible. The presentence report is a confidential Court document not to be shared with third parties. However, you and your client may retain your copies.

To Government Counsel:

The presentence report is being submitted to you for your review.

To Government and Defense Counsel:

Pursuant to the local rule of this Court, within ten days after disclosure of the presentence report, counsel for the defendant and counsel for the Government must make any known objections to the presentence report and/or sentencing guideline computations, or any other factors that it is felt should be brought to the attention of the Court. The Probation Department requires that objections be made in writing, and the correspondence containing the objections must be contemporaneously served on opposing counsel and the probation officer who prepared the presentence report. Upon receipt of your position, the probation officer will consider revising the presentence report/guideline computations in view of any specific objections. If the report is revised, the revisions will be made in an addendum to the presentence report which will be mailed to you. If there are any unresolved objections, the probation officer will respond to them via an addendum, which will be mailed to you.

Any application to adjourn sentencing must be made to the sentencing judge, on notice to opposing counsel.

Very truly yours,

cc: Loretta E. Lynch, Esq., AUSA

mr

Enclosures

STEPHEN J. RACKMILL
Chief U.S. Probation Officer

By_____

PROB-EDNY-7/92

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| vs. | ) | PRESENTENCE INVESTIGATION REPORT |
| | ) | |
| JOSEPH WANG | ) | DOCKET NO. 92-CR-1019(S-6)-05 |

**Prepared for:** The Honorable Reena J. Raggi
U. S. District Judge

**Prepared by:** Donald S. Vinci
U. S. Probation Officer

| Assistant U.S. Attorney | Defense Counsel |
|---|---|
| Loretta E. Lynch, Esq. | Michael Padden, Esq. |
| Margaret Giordano, Esq. | Legal Aid Society |
| Catherine Palmer, Esq. | 50 Court Street, Suite 1103 |
| | Brooklyn, New York 11201 |
| | (718) 330-1200 |

**Sentence Date:** September 25, 1992 at 10:00 a.m.

**Offense:**

| Count 1: | 18 USC 1962(c), RACKETEERING, A CLASS A FELONY. |
|---|---|
| Count 2: | 18 USC 1962(d), CONSPIRACY TO ENGAGE IN RACKETEERING, A CLASS A FELONY. |
| Count 5: | 18 USC 1959(a)(5), CONSPIRACY TO COMMIT MURDER, A CLASS C FELONY. |
| Count 6: | 18 USC 1959(a)(1), MURDER IN AID OF RACKETEERING ACTIVITY, A CLASS A FELONY. |
| Count 7: | 18 USC 1959(a)(1), MURDER IN AID OF RACKETEERING ACTIVITY, A CLASS A FELONY. |
| Count 17: | 18 USC 1959(a)(6), CONSPIRACY TO COMMIT ASSAULT WITH A DANGEROUS WEAPON DURING A RACKETEERING ACTIVITY, A CLASS E FELONY. |
| Count 27: | 18 USC 1951, CONSPIRACY TO COMMIT EXTORTION, A CLASS C FELONY. |
| Count 28: | 18 USC 1951, EXTORTION, A CLASS C FELONY. |

**Release Status:** In custody since November 19, 1990.

**Detainers:** None

**Other Defendants:**

Chen I. Chung - Awaiting Sentence      Danny Ngo - Awaiting Sentence
Brian Chan - Awaiting Sentence         Steven Ng - Awaiting Sentence
Chiang T. Cheng - Awaiting Sentence    Roger Kwok - Awaiting Sentence
Alex Wong - Awaiting Sentence

**Date Report Prepared:** July 22, 1992      **Report Revised:** (Yes/No)
                                             **Date:**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA)
                   )
        vs.         )     PRESENTENCE INVESTIGATION REPORT
                   )
    JOSEPH WANG    )     DOCKET NO.  92-CR-1019(S-6)-05

---

**Prepared for:**  The Honorable Reena J. Raggi
                  U. S. District Judge

**Prepared by:**   Donald S. Vinci
                U. S. Probation Officer

Assistant U.S. Attorney       Defense Counsel
Loretta E. Lynch, Esq.        Michael Padden, Esq.
Margaret Giordano, Esq.       Legal Aid Society
Catherine Palmer, Esq.        50 Court Street, Suite 1103
                               Brooklyn, New York 11201
                               (718) 330-1200

**Sentence Date:**  September 25, 1992 at 10:00 a.m.

**Offense:**    Count 1:  18 USC 1962(c), RACKETEERING,
                   A CLASS A FELONY.
          Count 2:  18 USC 1962(d), CONSPIRACY TO ENGAGE IN
                   RACKETEERING, A CLASS A FELONY.
          Count 5:  18 USC 1959(a)(5), CONSPIRACY TO COMMIT
                   MURDER, A CLASS C FELONY.
          Count 6:  18 USC 1959(a)(1), MURDER IN AID OF
                   RACKETEERING ACTIVITY, A CLASS A FELONY.
          Count 7:  18 USC 1959(a)(1), MURDER IN AID OF
                   RACKETEERING ACTIVITY, A CLASS A FELONY.
        Count 17: 18 USC 1959(a)(6), CONSPIRACY TO COMMIT
                   ASSAULT WITH A DANGEROUS WEAPON DURING A
                   RACKETEERING ACTIVITY, A CLASS E FELONY.
        Count 27: 18 USC 1951, CONSPIRACY TO COMMIT EXTORTION,
                   A CLASS C FELONY.
        Count 28: 18 USC 1951, EXTORTION, A CLASS C FELONY.

**Release Status:**  In custody since November 19, 1990.

**Detainers:**  None

**Other Defendants:**
   Chen I. Chung - Awaiting Sentence   Danny Ngo - Awaiting Sentence
   Brian Chan - Awaiting Sentence     Steven Ng - Awaiting Sentence
   Chiang T. Cheng - Awaiting Sentence Roger Kwok - Awaiting Sentence
   Alex Wong - Awaiting Sentence

Date Report Prepared: July 22, 1992    Report Revised:  (Yes/No)
                                     Date:

*Identifying Data*

*Date of Birth:  January 5, 1973*
*Age:    19*
*Race:   Asian*
*Sex:    Male*


*S.S. #:   Unknown*
*FBI #:    84648MA7*
*USM #:    30026-053*
*Other ID#:   NYSID #6279846P*


*Education:      10th grade*
*Dependents:     None*
*Citizenship:    Taiwan*


*Legal Address:   80-29 161st Street*
*                 Jamaica, Queens, NY 11432*

*PART A.   THE OFFENSE*

### *Charge(s) and Conviction(s)*

1.  *The defendant was found guilty by jury verdict on April 4, 1992 to Counts 1, 2, 5, 6, 7, 17, 27 and 28 of a 35 count superseding indictment.*

2.  *Count 1 charges that between January 1986 and November 19, 1990, he and others engaged in acts of racketeering in violation of 18 USC 1962(c). Within Count 1, the defendant was convicted on the following racketeering acts.*

3.  *RICO Acts 2A and 2B charge that the defendant and others conspired in July 1989 to murder Mon Hsiung Ting and then carried out the murder on July 16, 1989, in violation of 18 USC 1959(a)(5) and (a)(1).*

4.  *RICO Act 2C charges that the defendant and others murdered Anthony Gallvan on July 16, 1989, in violation of 18 USC 1959(a)(1).*

5.  *RICO Acts 9A and 9B charge that the defendant and others conspired in January 1990 to rob a home in Queens, New York and then committed the robbery on January 23, 1990, in violation of 18 USC 1962(c) and (d).*

6.  *RICO Act 11 charges that the defendant and others conspired between August 1990 and September 1990 to rob a restaurant in Long Island, New York, in violation of 18 USC 1962(c).*

7.  *RICO Acts 15A and 15B charge that the defendant and others conspired between January 1990 and November 19, 1990 to extort money from the Grand Elmhurst Restaurant and extorted money within the previously mentioned dates, in violation of 18 USC 1951.*

8.  *Counts 5, 6, and 7 charge that the defendant and others conspired in July 1989 to murder Mon Hsiung Ting and Anthony Gallivan, then carried out the murders on July 16, 1989, in violation of 18 USC 1959(a)(5) and (a)(1).*

9.  *Count 17 charges that between November 12, 1990 and November 19, 1990, the defendant and others conspired to assault with dangerous weapons, certain individuals identified as the White Tigers, a rival gang, in violation of 18 USC 1959(a)(6).*

10. *Counts 27 and 28 charge that the defendant and others conspired between January 1990 and November 19, 1990 to extort money from the Grand Elmhurst Restaurant and extorted money within the previously mentioned dates, in violation of 18 USC 1951.*

11. The defendant was not named in the remaining counts of the
superseding indictment.

### The Offense Conduct

12. In late 1985, the GREEN DRAGONS gang was formed by Kin Fei
Wong (aka Foochow Paul), as an off-shoot of the Manhattan
based Asian gang known as the Fook Ching. He is the overall
"Dai Lo" (leader, organizer) or "Big Brother" of the GREEN
DRAGONS and subsequently, a base of operations was
established in Queens, New York. Their territory became the
predominantly Chinese sections of Elmhurst and Flushing,
Queens. Kin Fei Wong often spent a great deal of his time
outside of the United States and had delegated day to day
operational authority to senior members of the gang. They
would report to Kin Fei Wong, through telephone, the
progress and activities of the gang. In late 1986, the
street leader of the GREEN DRAGONS was a member known as
E.T. When E.T. was killed in November of 1986 by a rival
Asian gang, The Tong On, in a restaurant shooting, Chen I.
Chung (aka Tony Chan) became the street leader of the gang.
He was then also referred to by the junior members of the
GREEN DRAGONS as "Dai Lo".

13. The GREEN DRAGONS recruited young Asian males from the
schools and playgrounds of Queens, promising them money and
prestige in exchange for their loyalty. Most of these young
men moved out of their families' homes and into GREEN DRAGON
apartments or "safe houses" where they lived with other
GREEN DRAGON members and were supervised by more senior
GREEN DRAGONS. During the course of the investigation the
GREEN DRAGONS maintained at least three such safe houses.

14. Information about the instant offense arose from ongoing
investigations of violent Chinese gangs in the New York City
area by the Federal Bureau of Investigation and the New York
City Police Department. The GREEN DRAGONS gang, a
racketeering enterprise, were involved in extortion and acts
of violence to maintain hegemony in the area claimed by the
gang in Queens, New York.

15. Much of the knowledge about the defendants' criminal
activity is derived from information from confidential
informants. One such informant (CS-1) identified the
following defendants as members of the GREEN DRAGONS: CHEN
I. CHUNG (aka Tony Chan), SIU MAN WONG (aka Sonny Wong),
TUNG TRAN (aka Tony Tran), BRIAN CHAN, JOSEPH WANG, ROGER
KWOK, and DANNY NGO. According to CS-1, CHEN I. CHUNG is
one of the leaders of the gang, and SIU MAN WONG is
immediately below him in the hierarchy of the gang.

16. A second confidential informant (CS-2) was a member of the
gang and is another source of information. He advised that
the Fook Ching Gang, from which the GREEN DRAGONS split in
the mid-1980's, is the arch-rival of the gang and that

members of the GREEN DRAGONS had standing orders to fight and shoot members of the rival gang. CS-2 also disclosed that while he was a member of the GREEN DRAGONS, gang members regularly extorted money, known as protection money, from Chinese restaurants in Queens and from illegal gambling casinos in Manhattan's Chinatown. CS-2 reported that gang members routinely carried guns when collecting protection money or when encounters with rival gang members were likely. CS-2 also advised that the GREEN DRAGONS maintained safe houses in Queens where weapons were stored and where plans for the gang's criminal activities were discussed.

17. During the course of the investigation, FBI agents and members of the New York City Police Department conducted physical surveillance of gang members and obtained court authorization for electronic surveillance of the telephones subscribed to by Cheng I. Chung, and for telephones in safe houses maintained by the defendants. Between August 1990 and November 1990, agents overheard conversations relating to extortion, robbery, murder, kidnapping and assault. The following information provides an overview about each of the criminal activities the defendants were involved in.

### The Attempted Murder of the "Tung On" Gang Leader
(Count 1 - RICO Act 7, Count 2, Count 15)

18. In November 1986, GREEN DRAGON member Sonny Wong was present at a party with several other GREEN DRAGONS at the Foliage Restaurant in Queens, New York. Members of a rival gang, the Tung On, entered the restaurant and shot and killed a Green Dragon known as E.T., who at that time was the operational or street leader of the gang. In February of 1987, Chen I. Chung informed Sonny Wong that the Tung On gang had killed E.T. and that the GREEN DRAGONS had to avenge his death by killing the Tung On's leader. Sonny Wong, Danny Ngo, and 3 other newer members of the GREEN DRAGONS were ordered by Chen I. Chung, and another GREEN DRAGON Wing Dong Moi, to go to a party where the Tung On leader was thought to be and to kill him. Following this directive, Sonny Wong, Danny Ngo, and other GREEN DRAGONS Billy Kim, Chris Chu and Johnny Walker met Chen I. Chung at one of the gang apartments, where Chen I. Chung gave them all guns. Sonny Wong and the other GREEN DRAGONS then drove to the party, but did not go in due to a large police presence outside. They later saw several Tung On members eating at the 888 Restaurant on Roosevelt Avenue in Queens, New York. Sonny Wong then called the GREEN DRAGON apartment and spoke to Wing Dong Moi, who instructed Wong to go into the restaurant and kill the Tung On leader. Subsequently, Sonny Wong, Danny Ngo and the other GREEN DRAGONS went into the 888 Restaurant. Sonny Wong and Billy Kim fired their guns at the Tung On table, hitting two Tung On members and wounding two patrons. According to agents, a total of 12 shots were fired by the two. The GREEN DRAGONS then returned to their apartment on Ridgewood Avenue in Queens.

### The Murder of Chung Pui Yan
*(Count 1 - RICO Acts 1A, 1B, Count 2, Count 4)*

19. Sonny Wong was released from prison, after being acquitted for the murder of two Fook Ching members in March of 1989. He was subsequently advised by Cheng I. Chung in May 1989 that the owner of the Broadway Noodle Restaurant, Chung Pui Yan, had killed a senior GREEN DRAGON member during an extortion attempt. In actuality, on January 3, 1988, an employee of Chung Pui Yan's restaurant shot and killed GREEN DRAGON member, Yan Sin Cheng, after a group of GREEN DRAGONS attempted to leave the Broadway Noodle Restaurant without paying for their meals. The employee was not charged with any criminal activity.

20. Pursuant to Chen I. Chung's orders, GREEN DRAGONS Tung Tran (aka Tony Tran) and Chiang T. Cheng (aka Jay) drove to the vicinity of the Broadway Noodle Restaurant on May 2, 1989. Tung Tran then entered the restaurant, shot and killed Chung Pui Yan, while Chiang T. Cheng waited in the getaway car. They then returned to Chen I. Chung's Woodhaven, New York residence where Chen I. Chung questioned them about the murder in Sonny Wong's presence.

### The Murder of Mon Hsiung Ting and Anthony Gallivan
*(Count 1 - RICO Acts 2A, 2B, 2C, 21, Count 2, Count 5, Count 6, Count 7)*

21. In July of 1989, Chen I. Chung ordered the murder of the manager of the Tien Chiau Restaurant, Mon Hsiung Ting, because he had refused to pay protection money to the GREEN DRAGONS. Alex Wong volunteered to commit the murder in order to prove himself within the gang. Chen I. Chung gave Alex Wong and Joseph Wang specific instructions on how to commit the murder. On July 16, 1989, Chiang T. Cheng drove Alex Wong and Joseph Wang to the restaurant. Both Alex Wong and Joseph Wang went inside the restaurant and shot Mon Hsiung Ting nine times at close range, and he died later that day. A patron of the restaurant, Anthony Gallivan, was struck in the back by a stray bullet and was killed instantly. Another patron, Greg Hyde, was shot and suffered spinal damage, causing partial paralysis from the waist down. In total, Alex Wong and Joseph Wang fired 12 shots. All of the murder participants then returned to a safe house and reported on the murder to Chen I. Chung and Sonny Wong.

22. Subsequently, Alex Wong was identified by a female witness and was arrested by local authorities. During his detention at Rikers Island, he attempted to bribe a corrections officer in order to ensure that he received preferential treatment. This was discovered during the wiretap of the GREEN DRAGON telephone lines. Alex Wong was eventually transferred to a different section of Rikers Island and his scheme did not come to fruition.

### The Murder of Kin Tai Chan
(Count 1 - RICO Acts 3A, 3B, Count 2, Count 8, Count 9)

23.    In June of 1989, during one of Kin Fei Wong's visits to the United States, he was shot and wounded while leaving a house in Queens, New York.  Sonny Wong along with Tung Tran, as well as other GREEN DRAGONS, acted as Kin Fei Wong's bodyguards during his nights in the hospital, staying in the hospital room with two guns hidden inside telephone books. While Kin Fei Wong was recuperating from his wounds, he, Sonny Wong and Chen I. Chung discussed the circumstances of the shooting.  They believed the shooting had been ordered by Kin Tai Chan (aka "Ah Tai"), the leader of a rival Asian gang called the Fook Ching, which Kin Fei Wong had once been close with.  They were business rivals, competing for the lucrative heroin trade in New York City.  Kin Fei Wong informed Sonny Wong and Chen I. Chung that he wanted the GREEN DRAGONS to kill Kin Tai Chan and offered the GREEN DRAGONS a reward for the murder.

24.    Shortly after these conversations, Sonny Wong and Chen I. Chung began surveillance of Kin Tai Chan and located an illegal gambling establishment in Queens frequented by Kin Tai Chan.  Later, Sonny Wong and Chen I. Chung decided that the GREEN DRAGONS should follow Kin Tai Chan to a less crowded location to kill him.  Sonny Wong conveyed this information to other GREEN DRAGONS along with a description of Kin Tai Chan and his vehicle.  On August 23, 1989, Sonny Wong was summoned by Chen I. Chung to a meeting with Chiang T. Cheng and Steven Ng.  Upon his arrival, Sonny Wong was told by Chiang T. Cheng and Steven Ng that they had located a woman believed to be Kin Tai Chan's wife and followed her to his residence.  Chiang T. Cheng and Steven Ng subsequently drove to the residence and saw Kin Tai Chan standing outside.  The two pulled up beside Kin Tai Chan, and Steven Ng exited the vehicle and said, "you know what this is for", and then shot Kin Tai Chan in the head with a .380 semi-automatic pistol.  Kin Tai Chan was shot an additional nine times in the body.

### The Murder of Tina Sham and Tommy Mach
(Count 1- RICO Acts 5A, 5B, 5C, 5D, 5E, Count 2, Count 11, Count 12, Count 13)

25.    Tina Sham and Tommy Mach's murders were ordered by Chen I. Chung and committed by GREEN DRAGONS Roger Kwok, Brian Chan, Tung Tran and Aleck Yim because Tina Sham had, in their view, testified against the GREEN DRAGONS in a New York State court proceeding.  Tina Sham was the former girlfriend of a GREEN DRAGON named Johnny Walker, and the sister of Trini Sham, a GREEN DRAGON incarcerated in New York State since 1986 for attempted murder.

26.    In January of 1987, Sonny Wong and other GREEN DRAGONS responded to a call from a friend of Sonny's named Cindy

Pak. She told Sonny that she and some friends were at a
roller-skating rink in Queens when two young Asian boys,
members of another gang, "bothered" them. Upon the arrival
of the GREEN DRAGONS at the skating rink, they questioned
the two boys and determined that they were members of the
rival gang, the Fook Ching. Sonny Wong and the other GREEN
DRAGONS then took the two boys to an apartment, where they
were beaten. Tina Sham was present in the apartment when
the GREEN DRAGONS and the two Fook Ching boys arrived, but
left shortly thereafter. A few months later, the bodies of
the two Fook Ching members were discovered by police in
Westchester County, New York. Months later, several GREEN
DRAGONS and Sonny Wong were arrested and charged with the
murders. Tina Sham testified in a probable cause hearing
with New York State about what she had seen and heard in the
apartment the day the Fook Ching members were brought there.
Several GREEN DRAGONS, including Sonny Wong, were indicted
for the murder of the two Fook Ching members. Chen I.
Chung, Chen Long Li and several others were also arrested
but not indicted. Sonny Wong was acquitted at trial.

27.     After Sonny Wong was released from jail in the spring of
        1989, he had several conversations with Chen I. Chung
        wherein, Chen I. Chung stated that because Tina Sham had
        testified against the GREEN DRAGONS, she should be killed.
        Sonny Wong next saw Tina Sham in February 1990, when he was
        eating with other GREEN DRAGONS in the Crown Palace
        Restaurant in Queens, New York. Tina Sham was eating lunch
        with her then boyfriend, Tommy Mach. At that time, Chen I.
        Chung directed several GREEN DRAGON members to approach Tina
        Sham and Tommy Mach's table to confirm her identity, and see
        if Tommy Mach was carrying a gun. Tommy Mach was not a
        member of any gang, nor was he armed in any fashion. Chen
        I. Chung then ordered the GREEN DRAGONS to return to their
        table, which they did. Tina Sham and Tommy Mach proceeded
        to the cash register and prepared to leave. At that time,
        Chen I. Chung turned to the other GREEN DRAGONS and stated
        in substance, "you know what to do". GREEN DRAGONS Aleck
        Yim, Tung Tran, Brian Chan and Roger Kwok followed Tina Sham
        and Tommy Mach out of the restaurant and kidnapped the two
        at gunpoint in the parking lot.

28.     Later that evening, Sonny Wong met with Roger Kwok, Tung
        Tran and Brian Chan to be briefed about the day's events.
        Brian Chan drove a bounded Tina Sham and Tommy Mach to a
        wooded area, in Long Island, New York. Upon reaching the
        wooded area Aleck Yim, Roger Kwok and Brian Chan took Tina
        Sham and Tommy Mach into the woods, while Tung Tran remained
        with the car. Under the orchestration of Aleck Yim, Roger
        Kwok was directed to execute Tina Sham and Tommy Mach, who
        were at this point forced into a kneeling position. Roger
        Kwok shot Tina Sham and Tommy Mach, at point blank range, in
        the head areas. Aleck Yim followed through by firing
        multiple shots into the victims bodies.

29. Sonny Wong subsequently received a call from Trini Sham, in prison, and was asked to help locate his missing sister, Tina Sham. Sonny Wong stated that he did not know where she was but agreed to help locate her. Sonny Wong never called Trini Sham again.

### Conspiracy to Murder a Female Witness
#### (Count 1 - RICO Act 6, Count 2, Count 14)

30. As previously noted, on July 16, 1989, Alex Wong and Joseph Wang were involved in the double homicide of Mon Hsiung Ting and Anthony Gallivan at the Tien Chiau Restaurant. Alex Wong was arrested on New York State murder charges related to these homicides in May of 1990. The primary witness against Alex Wong was a female customer of the restaurant who witnessed the shooting. Between October and November 1990, Brian Chan and Tung Tran advised Sonny Wong that Alex Wong had informed them of the name and address of this witness. Alex Wong wanted the GREEN DRAGONS to kill this witness. However, the plans were not followed through because of the GREEN DRAGONS fear that they were under police surveillance.

### The Murder of Jin Lee Seok
#### (Count 1 - RICO Act 4, Count 2, Count 10)

31. On February 27, 1990, Brian Chan informed Sonny Wong that he, Tung Tran and Roger Kwok had been driving through Elmhurst, Queens when they spotted two people they believed to be members of the Vietnamese gang, Born to Kill. According to eyewitness accounts, the two suspected Born to Kill members were attempting to flee on foot. Brian Chan was observed chasing Jin Lee Seok, while shooting at him at the same time. Jin Lee Seok was struck by a bullet and fell to the ground. Brian Chan then approached Jin Lee Seok and killed him with another shot at close range. Sonny Wong was later telephoned by one of the leaders of the gang Korean Power, and told that the person killed had been a member of the Korean Power gang.

### The Kidnapping of a "Fook Ching" Member
#### (Count 1 - RICO Act 8, Count 2, Count 16)

32. On September 30, 1990, Sonny Wong learned that some of the members of the rival gang Fook Ching were attempting to collect money from a restaurant in Elmhurst, Queens that the GREEN DRAGONS regularly extorted. Sonny Wong, Tung Tran, and Brian Chan drove to the vicinity of the restaurant and saw three members of the Fook Ching gang outside. They kidnapped one of the Fook Ching members and drove around Queens with him for several hours, while Sonny Wong, using his mobile phone, discussed with Chen I. Chung the feasibility of killing the Fook Ching member. Chen I. Chung instructed Sonny Wong to bring the Fook Ching member to one of the GREEN DRAGON safe houses. Thereafter, the Fook Ching

member was held at the safe house while Chen I. Chung and Chen Long Li argued about what course of action to take. Chen I. Chung wanted to demand a huge ransom, while Chen Long Li wanted to deliver the Fook Ching member to an associate of the GREEN DRAGONS who wanted to beat or kill him. Ultimately, Sonny Wong released the Fook Ching member in Chinatown and warned him to stay out of Queens.

### The Robbery and Rape in Queens
### (Count 1 - RICO Acts 9A, 9B)

33.   On January 23, 1990, Chen I. Chung informed Sonny Wong that he knew of a Mah Jongg game (a type of gambling) through his cousin, Allan Lin, and that he planned to have the GREEN DRAGONS rob the game's participants. Allan Lin had shown Chen I. Chung the apartment where the game was played and described the game as medium stakes, meaning $10,000 to $20,000. In addition, Allan Lin described the layout of the apartment and said it would be easy to get inside the apartment. Later in the evening, Tung Tran, Brian Chan, Steven Ng, Alex Wong, Chiang T. Cheng and Joseph Wang went to 40-15 Hampton Street in Queens and robbed the patrons of the Mah Jongg game. They were armed with two guns and a knife. There were three to four Mah Jongg gaming tables in the apartment, and they stole $8,000 to $9,000 in cash as well as several items of jewelry. The occupants of the apartment, an older woman, her son, his wife and a female cousin were forced to strip naked during the robbery. According to eyewitness accounts, Tung Tran and Chiang T. Cheng took the wife into a separate room and repeatedly raped her. In addition, Steven Ng sexually assaulted the cousin. The GREEN DRAGONS spent approximately one hour in the apartment.

### The Robbery in Yorktown
### (Count 1 - RICO Acts 10A, 10B, Count 2)

34.   In September of 1990, Chen I. Ching's cousin Allan Lin advised Chen I. Chung of a Chinese family residing at 2108 Vancortland Circle in Yorktown, New York, who had a large sum of cash in their house. On September 7, 1990, Chen I. Chung took Brian Chan, Chiang T. Cheng, Terrence Sales and "Tony" to the residence. The latter three were armed with guns and robbed the occupants of the house of over $20,000 in cash. Chiang T. Cheng, Terrence Sales and Tony were arrested at the scene, however, Chen I. Chung and Brian Chan escaped. Chen I. Chung related all of this information to Sonny Wong and asked Sonny Wong to contact lawyers for those who had been arrested.

### The Conspiracy to Rob the Long Island Dumpling Restaurant
### (Count 1 - RICO Act 11, Count 2)

35.   In August and early September 1990, Chen I. Chung informed Sonny Wong that he was planning to have the GREEN DRAGONS

rob the Long Island Dumpling Restaurant in Long Island, New York. Chen I. Ching told Sonny Wong that on certain nights high stakes gambling occurred at the restaurant after hours. Chen I. Chung had several members of the GREEN DRAGONS survey the restaurant. Later in September 1990, Chen I. Chung advised Sonny Wong that he had put off the robbery because he thought the GREEN DRAGONS were being followed by the police.

<u>The Green Dragon Extortion Scheme</u>

(Count 1, – RICO Acts 12A, 12B, 13A, 13B, 14A, 14B, 15A, 15B,16A, 16B, 17A, 19, Count 2, Count 3, Count 21, Count 22, Count 23, Count 24, Count 25, Count 26, Count 27, Count 28, Count 29, Count 30, Count 31, Count 32, Count 35.)

36. Sonny Wong was in charge of the extortion activity for the Green Dragons. They collected from 15 to 20 locations in Queens, with the amount of extortion depending upon the size of the establishment and the amount of business it conducted. Under Sonny Wong's supervision, Tung Tran, Roger Kwok, Brian Chan, Chiang T. Cheng and younger members of the GREEN DRAGONS would collect money once a week and turn the money over to Sonny Wong and Chen I. Chung. Sonny Wong would then pay the other gang members, pay off the rent and utilities of the Green Dragon apartments, and would keep some of the money. Chen I. Chung also used the money to pay gang expenses.

37. All of the establishments that the GREEN DRAGONS extorted money from were Asian owned businesses. These acts were purposeful in that the Green Dragons believed that Asians would be most intimidated by the gang's violence and reluctant to report the crime to the police. The following are the businesses that the GREEN DRAGONS extorted money or services from:

38. <u>High Pearl Restaurant</u>    The GREEN DRAGONS approached the restaurant in 1989 and demanded protection money of $100 per week. The owner of the restaurant gave them a $1,000 one-time payment. Thereafter, the GREEN DRAGONS would regularly eat in the restaurant and not pay the bill, instead signing the checks with their name and the GREEN DRAGON symbol.

39. <u>Newport Seafood Restaurant</u>    The usual amount of extortion money collected from this restaurant was $180 per week. On September 9, 1990, Sonny Wong sent Kenneth Cheng and three newly recruited GREEN DRAGONS and other GREEN DRAGONS to the restaurant to collect money, but the manager refused to pay them. Subsequently, they telephoned Sonny Wong who later went to negotiate with the owner.

40. <u>Grand Elmhurst Restaurant</u>  The GREEN DRAGONS began collecting $50 per week from this restaurant in May of 1989. In February of 1990, the GREEN DRAGONS raised the amount to $100 per week.  They also regularly ate in the Grand Elmhurst Restaurant and did not pay the bill, instead signed the checks with their names and the GREEN DRAGON symbol.

41. <u>Crown Palace</u>  The GREEN DRAGONS collected $100 per week from this restaurant and had been doing so since 1989.  In addition, they also regularly ate in the restaurant and received a 20% discount.

42. <u>Hoi Kong Harbor</u>  Tung Tran and Roger Kwok regularly collected $280 per week from this restaurant.

43. <u>Fukien Native Association</u>  Pursuant to instructions from Kin Fei Wong, Chen Long Li would regularly collect protection money from an illegal gambling establishment operated by the Fukien Native Association.  The GREEN DRAGONS received $800 per week from this rival gambling den.

44. <u>Jack Tran</u> Jack Tran is the manager of a travel agency in Chinatown and was approached by GREEN DRAGONS, Tung Tran, Brian Chan, Danny Ngo and Chiang T. Cheng in August of 1990. The GREEN DRAGONS sought to collect a $9,000 debt Jack Tran owed to another individual, and an additional $6,000 as their cut for the collection.  They confronted Jack Tran and threatened to harm him if the money was not paid immediately.  Jack Tran made a tape recording of the extortion attempt, which was turned over to the New York City Police Department.

45. <u>Fa Chung Fa Nightclub:</u>  In the early fall of 1990, Kin Fei Wong directed Chen I. Chung and Sonny Wong to collect protection money from the Fa Chung Fa Nighclub in Queens, New York.  Pursuant to Kin Fei Wong's instructions, Chen I. Chung and Sonny Wong met with the manager of the club, who ultimately agreed to pay the Green Dragons $300 per week. Subsequently, Roger Kwok and others collected the money on a weekly basis.

<u>The Planned Assault on the White Tigers</u>
(Count 17)

46. On November 18, 1990, Sonny Wong received word that his cousin, GREEN DRAGON, Kenneth Cheng had been accosted by the GREEN DRAGON's rivals the White Tigers.  Sonny Wong contacted Tung Tran, Brian Chan, Robert Deja and a younger GREEN DRAGON named David Chattoo and went in search of the White Tigers.  They were unsuccessful that evening.  The next day, November 19, 1990, Sonny Wong directed several GREEN DRAGONS to assemble at a safe house on Ithaca Street in Brooklyn.  He and Chen I. Chung told the GREEN DRAGONS to go to the Hits Record store, where the White Tigers could be found, and to smash the store's interior with baseball bats.

In addition, any White Tiger members found in the store were
to be beaten and those who tried to leave were to be shot.
Subsequently the GREEN   DRAGONS were all arrested by F.B.I.
agents and N.Y.P.D. officers before they could execute their
plan.

47. After the arrest of the GREEN DRAGONS, searches were
conducted at GREEN DRAGON apartments located in Woodhaven,
Flushing, and Elmhurst, New York.  A total of 15 firearms,
many with their serial numbers defaced, were recovered from
these apartments.  In addition, 3 automobiles were seized
that belonged to the GREEN DRAGONS.

## Adjustment for Obstruction of Justice

48. The probation officer has no information suggesting that
defendant impeded or obstructed justice.

## Adjustment for Acceptance of Responsibility

49. The defendant has made no statement regarding his
involvement in the offense.

## Offense Level Computation

50. Count 2 is the conspiracy to commit the same acts that
constitute Count 1, and therefore are grouped under
Guideline 3D1.2(b).

### Counts 1 and 2 - (RICO)

51. Base Offense Level:  The guideline for an 18 USC 1962
offense is 2E1.1(a)(2), which specifies that the base
offense level is determined by the underlying racketeering
activity.   The offense level computations for the underlying
racketeering acts are as follow:

**Counts 1 and 2:  Racketeering Acts 2A and 2B - Conspiracy to
Murder and Murder of Mon Hsiung Ting (Paragraph 21)**

It is noted that RICO Acts 2A and 2B involve the same victim
and same act and therefore are grouped under Guideline
3D1.2(a).

52. Base Offense Level:  The guideline which corresponds to this
offense level is Guideline 2A1.1(a), which provides a base
offense level of 43 for offenses involving murder.     _43_

53. Specific Offense Characteristics:  None.                    _0_

54. Adjustment for Role in the Offense:  None.                  _0_

55. Victim Related Adjustment:  None.                           _0_

56. Adjustment for Obstruction of Justice:  None.              _0_

57. *Adjusted Offense Level (Subtotal):*                                      <u>43</u>

**Counts 1 and 2:  Racketeering Act 2C – Murder of Anthony Gallivan (Paragraph 21)**

58. *Base Offense Level:  The guideline which corresponds to this offense is Guideline 2A1.1(a), which provides a base offense level of 43 for offenses involving murder.*      <u>43</u>

59. *Specific Offense Characteristics:  None.*                                <u>0</u>

60. *Adjustment for Role in the Offense:  None.*                              <u>0</u>

61. *Victim Related Adjustment:  None.*                                       <u>0</u>

62. *Adjustment for Obstruction of Justice:  None.*                           <u>0</u>

63. *Adjusted Offense Level (Subtotal):*                                      <u>43</u>

**Counts 1 and 2:  Racketeering Act 9A and 9B – Conspiracy to Commit Robbery and Armed Robbery of 40-15 Hampton Street (Paragraph 33)**

*It is noted that RICO Acts 9A and 9B involve the same victim and same act and therefore are grouped under Guideline 3D1.2(a).*

64. *The Probation Department has determined that an ex post facto issue would exist if the Guidelines in effect at the time of sentence were employed. Therefore, per guidance found in U.S. v. Adeniyi 912 F.2d 615 (2d Cir. 1990) and Miller v. Florida 482 U.S. 423, the offense level for this racketeering act was computed based on guidelines in effect at the time the offense was committed.*

65. *Base Offense Level:  The guideline which corresponds to this offense is 2B3.1(a), which provides a base offense level of 20.*      <u>20</u>

66. *Specific Offense Characteristics:  While committing the offense, the defendants were armed with two guns and a knife.  Per Guideline 2B3.1(b)(2)(C), the offense level is increased by 3 levels.*      <u>3</u>

67. *During the commission of the crime, the defendants raped a female victim inflicting serious bodily injury as defined by Application Note 1(j) of Guideline 1B1.1.  Per Guideline 2B3.1(b)(3)(B), the offense level is increased by 4 levels.*      <u>4</u>

68. *Adjustment for Role in the Offense:  None.*                              <u>0</u>

69. *Victim Related Adjustment:  None.*                                       <u>0</u>

70. *Adjustment for Obstruction of Justice:  None.*                           <u>0</u>

71.  Adjusted Offense Level (Subtotal):                          27

**Counts 1 and 2:  Racketeering Act 11 - Conspiracy to Commit Robbery of Long Island Dumpling Restaurant (Paragraph 35)**

72.  The Probation Department has determined that an _ex post facto_ issue would exist if the Guidelines in effect at the time of sentence were employed.  Therefore, per guidance found in _U.S. v. Adeniyi_ 912 F.2d 615 (2d Cir. 1990) and _Miller v. Florida_ 482 U.S. 423, the offense level for this racketeering act was computed based on guidelines in effect at the time the offense was committed.

73.  Base Offense Level:  The guideline which corresponds to this offense is 2X1.1(C), which states that if a conspiracy is expressly covered by another offense guideline section apply that guideline.  In this case, Guideline 2B3.1(a) is applied, which provides a base offense level of 20.          20

74.  Specific Offense Characteristics:  None.                    0

75.  Adjustment for Role in the Offense:  None.                  0

76.  Victim Related Adjustment:  None.                           0

77.  Adjustment for Obstruction of Justice:  None.               0

78.  Adjusted Offense Level (Subtotal):                          20

**Counts 1 and 2:  Racketeering Acts 15A and 15B - Extortion Conspiracy and Extortion of Grand Elmhurst Restaurant (Paragraph 36, 37 and 40)**

It is noted that RICO Acts 15A and 15B involve the same victim and same act and therefore are grouped under Guideline 3D1.2(a).

79.  The Probation Department has determined that an _ex post facto_ issue would exist if the Guidelines in effect at the time of sentence were employed.  Therefore, per guidance found in _U.S. v. Adeniyi_ 912 F.2d 615 (2d Cir. 1990) and _Miller v. Florida_ 482 U.S. 423, the offense level for this racketeering act was computed based on guidelines in effect at the time the offense was committed.

80.  Base Offense Level:  The guideline for an 18 USC 1951 offense is 2E1.5.  That guideline refers to Guideline 2B3.2(a) for offenses involving extortion, which provides a base offense level is 18.
          18

81.  Specific Offense Characteristics: None.                     0

82.  Adjustment for Role in the Offense:  None.                  0

83.  Victim Related Adjustment:  None.                    <u>0</u>

84.  Adjustment for Obstruction of Justice:  None.        <u>0</u>

85.  Adjusted Offense Level (Subtotal):                   <u>18</u>

<u>Multiple RICO Act Adjustment</u>

86.  To achieve a combined offense level for Counts 1 and 2, the
     grouping and unit system of Guidelines 3D1.2 and 3D1.4 are
     used.  Racketeering Acts 2A and 2B, Racketeering Acts 9A and
     9B, and Racketeering Acts 15A and 15B are grouped per
     Guideline 3D1.2(a).

                                                          <u>UNITS</u>

87.  Racketeering Acts 2A and 2B
     Adjusted Offense Level......................43        <u>1</u>

88.  Racketeering Act 2C
     Adjusted Offense Level......................43        <u>1</u>

89.  Racketeering Acts 9A and 9B
     Adjusted Offense Level......................27        <u>0</u>

90.  Racketeering Act 11
     Adjusted Offense Level......................20        <u>0</u>

91.  Racketeering Acts 15A and 15B
     Adjusted Offense Level......................18        <u>0</u>

92.  Total Number of Units........................2

93.  Increase in the Offense Level (See Guideline 3D1.4):  <u>2</u>

94.  Greater of the Adjusted Offense Levels Above..43

95.  Total Offense Level for Counts 1 and 2:               <u>45</u>

<u>Calculations for Counts 5, 6 and 7</u>

96.  Since Counts 5, 6 and 7 constitute conspiracy and the actual
     acts, they are grouped per 3D1.2(a).

97.  As counts 5, 6 and 7 relate to the same conduct that
     constitutes Count 1 - Racketeering Acts 2A, 2B and 2C,
     therefore the calculations are the same (see paragraph 52
     through 56) and are incorporated here by reference.

98.  Adjusted Offense level (Subtotal):                    <u>43</u>

### Calculations for Count 17

99. Base Offense Level:  The guideline for an 18 USC 1959(a)(6) offense is 2E1.3(a)(2), which indicates that the offense level applicable to the underlying crime be used to determine the base offense level.  The underlying crime is assault, which refers to Guideline 2A2.2(a) and provides a base offense level of 15.                                    <u>15</u>

100. Specific Offense Characteristics:  None.                <u>0</u>

101. Adjustment for Role in the Offense:  None.              <u>0</u>

102. Victim Related Adjustment:  None.                       <u>0</u>

103. Adjustment for Obstruction of Justice:  None.           <u>0</u>

104. Adjusted Offense Level (Subtotal):                      <u>15</u>

### Calculations for Count 27 and 28

105. Since Counts 27 and 28 constitute conspiracy and the actual act, they are grouped per 3D1.2(a).

106. As Counts 27 and 28 relate to the same conduct that constitutes Count 1 – Racketeering Acts 15A and 15B, the calculations are the same (see paragraphs 79 through 84) and are incorporated here by reference.

107. Adjusted Offense Level (Subtotal):                      <u>18</u>

### Multiple Count Adjustment

108. Counts 1 and 2 are grouped, per Guideline 3D1.2(b).  Counts 5, 6, 7, 27 and 28 are grouped with Counts 1 and 2 per Guideline 3D1.2(b).

|  | UNITS |
|---|---|
| 109. Counts 1, 2, 5, 6, 7, 27 and 28 Adjusted Offense Level.....:.................45 | <u>1</u> |
| 110. Count 17 Adjusted Offense Level.......................15 | <u>0</u> |
| 111. Total Number of Units........................ | <u>1</u> |

112. Increase in Offense Level (See Guideline 3D1.4):       <u>0</u>

113. Greater of the Adjusted Offense Levels Above..45

114. Combined Adjusted Offense Level (Subtotal):            <u>45</u>

115. Adjusted for Acceptance of Responsibility:  None.       <u>0</u>

116. <u>Total Offense Level</u>                                      <u>45</u>

PART B.   THE DEFENDANT'S CRIMINAL HISTORY

### Convictions/Adjudications

| Date of Arrest | Offense/Court | Disposition | Guidelines/Points |
|---|---|---|---|
| 117. 1/5/89 (Age 16) | Attempted Criminal Possession of a Weapon, Criminal Court, Queens, New York | 2/23/89: 5 years Probation | 4A1.1(c) 4A1.2(e)(2) |
| | | | 1 |

On January 5, 1989, at approximately 7:25 p.m., two New York City Police Officers noticed four people sitting in a rented 1988 Oldsmobile in Queens, New York.   The occupants of the car all seemed to be young.   One officer motioned for the driver, Chen Cheung, to come to the officer.   Cheung exited the vehicle and walked away from one of the officers.   The other officer then followed the defendant.

As one of the officers approached the car, he looked through the vehicle's windows and noticed the butt of a gun sticking out from underneath the front seat.   The 3 occupants were ordered out of the car and included Joseph Wang, Tran Lung, and an unidentified juvenile.

During a search of the vehicle, a .38 caliber Taurus revolver was recovered from under the front seat floor area and another .38 caliber Taurus revolver was recovered from under the front passenger seat.   Both guns were loaded.  As a result of the instant offense, violation charges are pending.

### Criminal History Computation

118. The offense above results in a subtotal criminal history score of 1.                                                                  1

119. At the time he committed the instant offense, the defendant was on probation from the sentence imposed on February 23, 1989.   Pursuant to Guideline 4A1.1(d), 2 points are added. 2

120. The total of the criminal history points is 3.   According to the sentencing table (Chapter 5, Part A), 3 criminal history points establish a criminal history of II.

## Pending Charges

121. On July 29, 1990, the defendant was arrested in Queens, New York on Criminal Possession of a Weapon, Possession of Defaced Weapons, and Assault charges. According to the court records, the defendant and three others possessed a defaced .38 caliber revolver during an assault on another individual. On November 21, 1990, this case was transferred to Queens Supreme Court, indictment number 4402-90 and is pending. A bench warrant was issued on March 25, 1992 for failure to appear in court.

122. On November 20, 1990, a violation warrant was issued by the Queens Probation Department following the defendant's arrest on local charges on July 20, 1990. As of this date, the warrant remains active and violation charges are pending.

## Other Arrests

| Date of Arrest | Charge/Court | Disposition |
|---|---|---|
| 123. 7/5/88 (Age 15) | Juvenile Offender (Attempted Murder II); Criminal Possession of Firearm. Queens Supreme Court | 12/19/88: Dismissed |

As described in the local presentence report, the defendant was one of a group of individuals who fired 5 shots from a handgun at the complainant's occupied vehicle. The gun was not recovered and the defendant was charged with Attempted Murder II. At the time of this offense, the defendant was approximately 15 years old.

## PART C. OFFENDER CHARACTERISTICS

### Family Ties, Family Responsibilities, and Community Ties

124.

REDACTED

125. **REDACTED**

126. **REDACTED**

127. **REDACTED**

*Physical Condition*

128. **REDACTED**

*Education and Vocational Skills*

129. **REDACTED**

*Employment Record*

130. **REDACTED**

131. **REDACTED**

132. **REDACTED**

133. **REDACTED**

134. **REDACTED**

135. **REDACTED**

*Financial Condition: Ability to Pay*

136. **REDACTED**

137. **REDACTED**

*PART D. SENTENCING OPTIONS*

## Custody

*Statutory Provisions:*

138. **Counts 1 and 2:** *The maximum term of imprisonment on each count is life. 18 USC 1963.*

   **Count 5:** *The maximum term of imprisonment is 10 years. 18 USC 1959(a)(5).*

   **Counts 6 and 7:** *The maximum term of imprisonment on each count is life. 18 USC 1959(a)(1).*

   **Count 17:** *The maximum term of imprisonment is 3 years. 18 USC 1959(a)(6).*

   **Counts 27 and 28:** *The maximum term of imprisonment on each count is 20 years. 18 USC 1951.*

139. **Guideline Provisions:** *Based on a total offense level of 45 and a criminal history category of II, the guideline imprisonment range is life.*

## Supervised Release

*Statutory Provisions:*

140. **Counts 1, 2, 6 and 7:** *A term of supervised release of not more than 5 years may be imposed on each count. 18 USC 3583(a) and 3583(b)(1).*

   **Counts 5, 27 and 28:** *If a term of imprisonment is imposed, a term of supervised release of not more than 3 years may be imposed on each count. 18 USC 3583(a) and 3583(b)(2).*

   **Count 17:** *If a term of imprisonment is imposed, a term of supervised release of not more than 1 year may be imposed. 18 USC 3583(a) and 9583(b)(3).*

*Guideline Provisions:*

141. *Counts 1, 2, 6 and 7:* Pursuant to Guidelines 5D1.1(a) and 5D1.2(b)(1), a term of supervised release of at least 3 but not more than 5 years is required.

   *Counts 5, 27 and 28:* Pursuant to Guidelines 5D1.1(a) and 5D1.2(b)(2), a term of supervised release of at least 2 but not more than 3 years is required.

   *Count 17:* Pursuant to Guidelines 5D1.1(a) and 5D1.2(b)(3), a term of supervised release of 1 year is required.

   *Probation*

   *Statutory Provisions:*

142. *Counts 1, 2, 6 and 7:* Because the counts are Class A felonies, the defendant is ineligible for probation on each count. 18 USC 3561(a)(1).

   *Counts 5, 17, 27 and 28:* The defendant is ineligible for probation on Counts 1, 2, 6 and 7 because these counts are Class A felonies. Consult 18 USC 3561(a)(1). Since the defendant must be sentenced to imprisonment on Counts 1, 2, 6 and 7, he is ineligible for a probation sentence on Counts 5, 17, 27 and 28, per 18 USC 3561(a)(3).

   *Fines*

143. *Statutory Provisions:* The maximum fine is on each count is $250,000. (Total fine $2,000,000) 18 USC 3571(b)(3).

144. Per 18 USC 3013, a special assessment of $50 is mandatory on each of the 8 counts for a total of $400.

145. **Guideline Provisions:** The fine range for the instant offense is from $25,000 to $250,000 per Guideline 5E1.2(c)(3).

146. Subject to the defendant's ability to pay, the Court shall
     impose an additional fine amount that is at least sufficient
     to pay the costs to the Government of any imprisonment,
     probation, or supervised release ordered.  Section 5E1.2(i).
     The most recent advisory from the Administrative Office of
     the United States Courts suggests that a monthly cost of
     $1,492 be used for imprisonment, a monthly cost of $115.30
     for supervision, and a monthly cost of $991 for community
     confinement.

                              RESPECTFULLY SUBMITTED:

                              STEPHEN J. RACKMILL
                              CHIEF U.S. PROBATION OFFICER

Prepared by: *Donald S. Vinci*
             DONALD S. VINCI

Approved by: *[signature]*
             CYNTHIA LAWYER
             SUPERVISOR

iej

# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK
#### PROBATION OFFICE

Brooklyn, New York
August 21, 1992

75 CLINTON STREET, ROOM 405
BROOKLYN 11201-4201
718-330-2626

U.S. COURTHOUSE
2 UNIONDALE AVENUE
UNIONDALE, NY 11553-1258
516-485-7140

U.S. COURTHOUSE
300 RABRO DRIVE
HAUPPAUGE 11788
516-582-1105

STEPHEN J. RACKMILL
CHIEF PROBATION OFFICER
RECEIVED
AUG 25 1992
By

Michael Padden, Esq.
Legal Aid Society
225 Cadman Plaza
Room 237 - South Wing
Brooklyn, New York  11201

USA v. Joseph Wang
Docket No.:  90-CR-1019(S-6)-5
For Sentence: September 25, 1992

Dear Mr. Padden:

\\_\_X\_\\    We carefully considered your objections to the presentence report/guideline computations, and decided not to revise the report. Your objections are being made known to the sentencing judge via an addendum (attached) to the presentence report.

\\_\_\_\\    After careful consideration of your objections to the presentence report/guideline computations, we have decided to revise the report in view of your comments. The specific changes which were made are noted below, and a copy of the revised report is attached. If any of your objections remain unresolved, they will be made known to the sentencing judge via an addendum attached to the enclosed presentence report.

Changes in Presentence Report/Guideline Computations:

_____

_____

_____

STEPHEN J. RACKMILL
Chief U.S. Probation Officer

*Donald S. Vinci*

DONALD S. VINCI
U.S. Probation Officer

DSV:eig

cc:  The Honorable Reena Raggi
     U.S. District Judge

     Catherine E. Palmer
     Assistant U.S. Attorney

## ADDENDUM TO THE PRESENTENCE REPORT

### OBJECTIONS

### BY THE GOVERNMENT

The Government has no objections.

### BY THE DEFENDANT

A copy of defense counsel's letter dated August 7, 1992, is attached.

Counsel's first objection pertains to paragraph 8 of the presentence report which includes Counts 5, 6, and 7. The information in paragraph 8 reads as though the defendant was charged with the conspiracy to murder Mon Hsiung Ting, the murder of Mon Hsiung Ting, the conspiracy to murder Anthony Gallivan and the murder of Anthony Gallivan. However, we note that Defense Counsel is correct in stating that the defendant did not conspire to murder Anthony Gallivan. It should also be noted that the defendant was only held accountable for the murder of Anthony Gallivan when the calculations were completed.

Counsel's next three objections pertain to factual information and we defer to the Government with respect to the accuracy of this information.

Counsel's final objections pertain to personal history information of the defendant, and we therefore concede counsel's statements.

We note that these objections do not result in any changes in the
guideline calculations.

Respectfully submitted,

STEPHEN J. RACKMILL
Chief U.S. Probation Officer

By:   DONALD S. VINCI
      U.S. Probation Officer

Approved:

CYNTHIA LAWYER
Supervising U.S. Probation Officer

Date:   August 21, 1992

eig



# THE LEGAL AID SOCIETY

CRIMINAL DEFENSE DIVISION • FEDERAL DEFENDER SERVICES UNIT
EASTERN DISTRICT OF NEW YORK
225 Cadman Plaza East, Brooklyn, New York 11201
Tel.: (718) 330-1200   Fax: (718) 855-0760

*Executive Director and*
*Attorney-in-Chief*
Archibald R. Murray

*Chief of Operations*
Leonard F. Joy

*Attorney-in-Charge*
Thomas J. Concannon

August 7, 1992

Honorable Reena Raggi
United States District Judge
Eastern District of New York
United States District Courthouse
225 Cadman Plaza East
Brooklyn, New York  11201

   RE: <u>U.S.A. vs Joseph Wang, 92 CR 1019 (S-6) (RR)</u>

Dear Judge Raggi:

   I am writing to you on behalf of my client, Joseph Wang, scheduled for sentencing on September 25, 1992 at 10:00 a.m.  I have received the pre-sentence report prepared by the U.S. Probation Department and reviewed it with my client.  There are several matters contained therein that bear comment as follows:

   par.8--Counts 5, 6, and 7 did not charge a conspiracy to murder Mon Hsiung Ting and Anthony Gallivan.  Count 5 charged a conspiracy to murder Mon Hsiung Ting.  Count 6 charged the murder of Mon Hsiung Ting.  Count 7 charged the murder of Anthony Gallivan.  There was no charge of conspiracy to murder Anthony Gallivan.

   par.21--There was no evidence at trial, other than the testimony of Sonny Wong that Joseph Wang said in his presence that he had also shot the manager of the Tien Chiau Restaurant, that Joseph Wang even fired a shot in the restaurant.  No eyewitness identified him as having fired a shot or even having a weapon in his hand.  In fact, the witness Carol Huang testified that only Alex Wong shot the manager and fired in the direction of the restaurant patrons.

   par.66--There was no testimony at trial that Joseph Wang ever possessed any of the weapons present at the incident at 40-15 Hampton Street.  The eyewitnesses identified individuals and the weapons they each possessed.  In fact no eyewitness ever said that Joseph Wang was even in the apartment.  The only evidence linking

Joseph Wang to this incident was the testimony of Sonny Wong that Joseph Wang had been sent to the location and that he was present later on with others who had brought back property from the location.

par.67--As stated in par.33, eyewitness accounts identified those individuals involved in the rape and did not include Joseph Wang.

par.121--When a bench warrant was issued on March 25, 1992 for Joseph Wang's failure to appear in Queens Supreme Court he was already in custody as a result of the federal prosecution. Therefore, his absence was not a voluntary one.

par.124--

# REDACTED

par.127--

# REDACTED

par.131--

# REDACTED

I realize that these comments do not affect the Guideline calculation in Mr. Wang's case. They are made in the interest of the accuracy of a document that will follow him to the institution in which he is designated to serve his sentence.

More importantly I use this letter to alert Your Honor to my intention to move for a downward departure from the calculated Guideline sentence range.

At a total offense level of 45, two levels above the highest Guideline level as a result of grouping of offenses, Joseph Wang faces a sentence of life imprisonment. Joseph Wang is nineteen years old. He was sixteen years old at the time of the murders of Mon Hsiung Ting an Anthony Gallivan, the crimes that resulted in the highest Guideline level. While I have no intention of minimizing the tragedy of these murders or the seriousness of the other crimes that Joseph Wang has been convicted of, I still believe it appropriate to ask Your Honor to consider a downward departure from this Guideline level in the interests of justice given Joseph Wang's age and circumstances.

As indicated in the pre-sentence report (par.124) Joseph Wang was brought to this country from Taiwan in 1983. He was 10 years old at the time and within two years his mother died. Mr. Wang has told me that his mother's death had a severe impact on him. He apparently had a very strong relationship with her that was not equally shared with his father. As a result of her death he became very depressed and withdrawn. This led to a lack of focus which

gave him difficulty in studying and led to his dropping out of school in the tenth grade. This may not excuse the associations he formed or the behavior he engaged in the years that followed but it may serve to explain it in part. Essentially he was a young man adrift in a society and culture very different from that in which he was born and raised. Without a mother who he loved very much and a father whose own values and lifestyle were growing more alien to Joseph as he saw more of life on the streets of New York, he lacked the guidance that quite possibly could have prevented the predicament that he is now in. Instead he became more dependant on others more closely in age and similarly situated for direction.

I realize that this may seem at first to be a lame excuse for his involvement in the sometimes terrifying acts that were the subject matter of this prosecution but I am compelled to offer it not just as his attorney but as a result of my personal experience with Joseph Wang. The Joseph Wang that I have known since I was assigned to represent him in November of 1990 is simply not the Joseph Wang that I heard testimony about from Sonny Wang and others during his trial. The Joseph Wang that I have come to know has always been a polite, respectful, intelligent and thoughtful young man. It may be just another side of him but it is one that Your Honor has not been made aware of to date, although I do believe that your perceptions of him during the trial would reflect a marked contrast to most of the co-defendants. The fact that such another side even exists should, I respectfully submit, cause Your Honor to question the appropriateness of a life sentence for this young man. While he certainly must atone for the crimes he was convicted of, I submit that incarceration for the rest of his life is an unnecessarily harsh sentence. I still believe that Joseph Wang possesses the potential to lead a productive and useful life for himself and others and that a life sentence would be a complete waste of already too wasted potential.

Realizing that Your Honor needs a legal basis to depart below the sentence proscribed by the Guidelines more than just an emotional appeal, I submit that the lack of guidance in his young age mentioned earlier provides such a basis. In fact in United States v. Floyd 945 F.2d 1096 (9th Cir. 1991) the Ninth Circuit Court of appeals upheld a downward departure based precisely on a defendant's youthful lack of guidance as a mitigating circumstance not adequately considered under the guidelines and undercutting "the seriousness of the defendant's criminality in the commission of the offense." Id. at 1099.

"A district court is authorized to impose a sentence below the normally applicable Guidelines range if it finds that there exists a []..... mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." United States v. Gonzales, 945 F.2nd 525, 526 (2d. Cir. 1991) (quoting 18 V.S.C. § 3553 (b)). This power is also described in Guideline § 5K2.0.

Given the complex factors involved both in this case and in Joseph Wang's life I submit that the Sentencing Commission could never have adequately considered everything that should be in determining an appropriate sentence in a case like this. Not just the cultural and behavioral factors involved but the unique form of peer pressures, as described by the governments own witnesses at times, that were brought to bear on someone in Joseph Wang's position create issues that only Your Honor is in a position to be deciding when sentencing Joseph Wang.

I only ask that Your Honor consider my observations about my client in making what must be a most difficult decision as a judge and hope that you too will feel that sentencing Joseph Wang to life imprisonment is just not what justice requires.

Thank you for your attention to this matter.

Sincerely,

MICHAEL P. PADDEN, ESQ.
Associate Attorney
(718) 330-12

cc:   Catherine E. Palmer
      AUSA

      Donald S. Vinci
      USPO

      Joseph Wang

MPP:jir