**Exhibit A**

1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - X

3    UNITED STATES OF AMERICA,    :   90-CR-1019
                                  :
4                                 :
                                  :
5         -against-              :   United States Courthouse
                                  :   Brooklyn, New York
6                                 :
                                  :
7                                 :
     ALEX WONG,                   :   April 8, 2016
8                                 :   12:00 p.m.
               Defendant.         :
9    - - - - - - - - - - - - - - X

10        TRANSCRIPT OF CRIMINAL CAUSE FOR RE-SENTENCING
11         BEFORE THE HONORABLE RAYMOND J. DEARIE
               UNITED STATES DISTRICT JUDGE
12
                  A P P E A R A N C E S:
13
     For the Government: ROBERT L. CAPERS, ESQ.
14                       United States Attorney
                         Eastern District of New York
15                       271 Cadman Plaza East
                         Brooklyn, New York 11201
16                  BY:  DOUGLAS M. PRAVDA, ESQ.
                         Assistant United States Attorney
17
     For the Defendant:  EPSTEIN & WEIL
18                       225 Broadway
                         Suite 1203
19                       New York, New York 10007
                    BY:  LLOYD EPSTEIN, ESQ.
20

21   Court Reporter:     Marie Foley, RMR, CRR
                         Official Court Reporter
22                         Telephone: (718) 613-2596
                           Facsimile: (718) 613-2648
23                         E-mail: Marie_Foley@nyed.uscourts.gov

24   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
25
```

*Proceedings*                                                                2

1          (In open court; defendant enters.)

2          COURTROOM DEPUTY:  We are on this afternoon for a

3  resentencing.  This is USA versus Alex Wong, Docket No.

4  90-CR-1019.  I believe we're on Superseder 4.  Mr. Wong is

5  defendant number 9.

6          Can I ask the attorneys, please, to note their

7  appearance beginning with counsel for government?

8          MR. PRAVDA:  Good afternoon, Your Honor.  Doug

9  Pravda for the United States.

10          THE COURT:  Good afternoon.

11          MR. EPSTEIN:  Lloyd Epstein for Mr. Wong.  Good

12  afternoon, Your Honor.

13          THE COURT:  Good afternoon.

14          Mr. Wong, good afternoon.

15          THE DEFENDANT:  How are you doing, sir?

16          THE COURT:  All right.  Are we ready at long last to

17  proceed?

18          MR. EPSTEIN:  Yes.

19          THE COURT:  All right.  Mr. Wong, any number of

20  papers that have been filed in connection with this

21  resentencing, have you had a chance to review them with

22  counsel?

23          THE DEFENDANT:  Yes, I have.

24          THE COURT:  And indeed there's been an addendum more

25  recently filed by the Probation Department dated, I think,

*Proceedings*                                                              3

1    just for the record, dated April 23rd, 2015.  I received --

2              MR. EPSTEIN:  Your Honor, I think it's April 23rd,

3    2014?

4              COURTROOM DEPUTY:  2015.

5              MR. EPSTEIN:  '15, correct.  I'm losing track of the

6    years.

7              THE COURT:  I'm right and you're wrong?

8              MR. EPSTEIN:  Yes, I'm definitely wrong and you're

9    definitely right.

10             THE COURT:  I like that.

11             I received, of course, any number of submissions

12   from counsel.  Mr. Epstein's lengthy submission of June 3rd,

13   2015, with memorandum of law.  I have received your letter,

14   Mr. Wong.  I received more recently Mr. Epstein's letter of

15   April 5, 2016, the Government's letter of September 28, 2015,

16   and most recently the Government's letter of April 6, 2016,

17   covering letters from a number of family members associated

18   with the victims of the crime, which I read with great

19   earnest.  They're quite something and perhaps in ways you

20   would not anticipate.

21             Otherwise, I'm ready to proceed.  Mr. Epstein, I

22   turn it over to you.

23             MR. EPSTEIN:  Thank you very, very much, Your Honor.

24             Your Honor, Mr. Pravda reminded me I also submitted

25   a letter of October 1st, 2015, which contained Mr. Wong's work

*Proceedings*                                                             4

1   performance.

2           THE COURT:  Yes, I have that as well.

3           MR. EPSTEIN:  Your Honor, it's funny that I made a

4   mistake on the date because this case has been going on for a

5   long time.  I first represented Mr. Wong in this courthouse,

6   say, approximately 25 years ago.  My hair was a little

7   different then.  Your hair was a little different then.

8           I was retained by Mr. Wong's aunt, who actually it

9   turned out to be his mother, to represent him at sentencing

10  and later on appeal, and when I stood before Judge Raggi at

11  sentencing, I was representing a wild, impulsive, and quite

12  violent teenager who had really done almost everything in his

13  power to suppress and destroy a little boy inside who was

14  crying for help.

15          I stand here today representing a middle-aged man

16  who is profoundly ashamed and ruthlessly critical of himself

17  for what he had done as a teenager.  When I stood before Judge

18  Raggi 25 years ago, it was in a courtroom that was empty of

19  Mr. Wong's family.  When he joined the Green Dragons as a 13

20  year old, he really had no contact with his family over the

21  next almost 15 years, and certainly at the time of trial, his

22  family thought he was working in New Jersey at some job.

23  Today, he has 15 people sitting here in the courtroom.  I

24  can't pronounce their names, they're almost all Chinese names,

25  but I can tell you he has an aunt, two aunts, two uncles, and

*Proceedings*                                                    5

1   a whole load of cousins who are sitting in the back of the

2   courtroom.

3            When I began thinking about what I was going to say

4   to the Court, I wanted to tell the Court that this is a case

5   not only about pain, but it's also a case about hope; it's

6   about hope that the Bureau of Prisons placed in Alex.  When he

7   was at Marion, they provided him programs.  There was really

8   no reason to think he would take advantage of them.  It's

9   about the love that his family provided him at a time that

10  they really had no reason to believe he would ever be able to

11  return anything to them.

12           I was hoping to tell the Court that it's not only a

13  case about hope, a case about rehabilitation, and a case about

14  redemption.  And frankly, as of Tuesday, I had about a

15  20-minute speech that I wanted to make to the Court.  Then a

16  few nights ago I received the letters from the families of the

17  victims and I think I was very moved by them in many different

18  ways, and I began to think about the statements made by

19  Counselor Macintosh, who was Mr. Wong's counselor at New

20  Canaan, who said that Mr. Wong is very, very different from

21  the person who he anticipated meeting, that he anticipated

22  meeting a hardened gang member and he met somebody who made it

23  his business to actually make peace among the gangs.  Then I

24  realized when I read the letters that I've actually said

25  everything that I can possibly say about Mr. Wong, that no one

*Proceedings*                                                    6

1    really wants to hear what I have to say anymore, just like

2    nobody really wants to hear what Dr. Goldstein or Dr.

3    Steinberg has to say or Ms. Cahill, the mitigation specialist.

4    I think all of us are in the position, really like Mr.

5    Macintosh, I think everybody really wants to hear from Mr.

6    Wong, and I'm hoping that the Court will take today's hearing

7    as an opportunity not only to listen to Mr. Wong, but actually

8    to engage him so the Court understands exactly who the Court

9    is about to re-sentence.

10           I'm here to answer any questions that the Court may

11   have during the proceeding.  If the Government makes any

12   arguments, and I don't anticipate they will, which I think are

13   unfair, I hope for the opportunity to speak to them.  But I

14   feel that this proceeding is a little different and it really

15   should be about Mr. Wong.  And with that said, I'd like to ask

16   for Mr. Wong to have an opportunity to speak.

17           THE COURT:  Ordinarily at this point I hear from the

18   Government.

19           MR. EPSTEIN:  Or that is --

20           THE COURT:  I'm happy to do that.  Mr. Pravda?

21           MR. PRAVDA:  Thank you, Your Honor.

22           I think it's important to start with the underlying

23   crime because I know that the Court has heard the details in

24   the Government's sentencing submission and I'm sure from its

25   own review of the transcript, but I think it's important not

*Proceedings*                                                    7

1    to lose sight of the underlying offense that brings us here

2    today and particularly how it connects to the statements of

3    the victims that the Court referenced earlier today.

4            So, in July of 1989 when Alex Wong was 16 years old

5    and a member of the Green Dragons, the leader of the Green

6    Dragons at that time, Chen I. Chung, ordered the murder of the

7    manager of the Tien Chiau Restaurant because the manager had

8    refused to pay extortion money.  Mr. Wong volunteered to

9    commit that murder as a way to prove himself to the group.  He

10   and another Green Dragon member, also a juvenile, named Joseph

11   Wang went into the restaurant that night and they shot the

12   manager of the restaurant nine times.  It wasn't so much a

13   murder as it was an execution.  And following that, Your

14   Honor, Mr. Wong turned his gun on the customers and the

15   waiters at that restaurant trying to leave no witnesses

16   behind.  He shot Anthony Gallivan once in the heart; he died

17   instantly.  He shot Greg Hyde in the spine; Greg Hyde

18   paralyzed from the waist down.  He shot a waiter, Shih Chen

19   Chen in the arm; the waiter was wounded, but survived.

20           Following that, Mr. Wong about a year later was

21   arrested actually by the state, not on these charges, but on

22   gun possession charges because he had a .25-caliber loaded

23   firearm.  While he was at Rikers, the state actually brought

24   charges in connection with this murder before the federal

25   government did, and Mr. Wong soon learned that the main

*Proceedings*                                                          8

1   witness against him, the one eyewitness to the shooting who

2   was able to identify him, was a woman named Carol Huang who

3   was Greg Hyde's wife.  Carol Huang picked him out of a lineup.

4   Mr. Wong then spent the next five months while at Rikers

5   Island desperately trying to find out information about Carol

6   Huang's identity and desperately extorting his Green Dragons

7   any number members to kill her so that she could not testify

8   against him.  He was captured on prison recordings making

9   statements extorting them to kill her saying things like, "If

10  she doesn't show up, I have a hundred percent chance of

11  acquittal."

12          These tapes were played during the trial and Judge

13  Raggi, who presided over the trial, commented at sentencing

14  that, and Your Honor I'm quoting, this is actually on page 5

15  of the Government's brief:  "This is a case in which use of

16  the word chilling is easy for the Court, but if there is

17  evidence that was chilling in this case, it was listening to

18  the tape-recordings of Wong urging his fellow Green Dragons

19  members to kill Carol Huang for the simple reason that she

20  could identify him as one of the people who committed murder

21  in the restaurant that night."

22          And that, Your Honor, is something that was crucial

23  to Judge Raggi when she decided at the time not to depart from

24  the then-mandatory sentencing guideline recommendation of life

25  imprisonment, and she specifically cited his willingness to

*Proceedings*                                                          9

1    kill another human being, to take a third life in order to

2    avoid any kind of punishment for his crimes.

3            Now, some of that conduct, Your Honor, the effort to

4    kill Carol Huang happened after the defendant turned 18.  Now,

5    we're in a situation where Miller creates kind of an odd

6    standard because it requires the Court to consider now the

7    defendant's age and his level of maturity at the time of trial

8    of the crime, and the reason it's weird is because we're not

9    looking at him now, we're supposed to look at him back when he

10   was 18 and decide based on the information that we now have is

11   he somebody who, I guess, was a victim of the immaturity of

12   youth or someone --

13           THE COURT:  I would never use the word "victim" in

14   this context, but I understand your point.

15           MR. PRAVDA:  Thank you, Your Honor.

16           And so, the evidence that we have to look to is

17   actually fairly limited, but it consists of his prison record.

18   I just want to go through that for the Court a little bit.  I

19   did this in my sentencing submission, but I think it's worth

20   emphasizing because this is among, quite frankly, one of the

21   worse prison disciplinary records that I've seen in this case.

22   He's been in jail about 25 years.  He's had 28 separate

23   disciplinary violations, many of which are quite severe.

24           So, in 1994, '95, he tried to stab a prison employee

25   with three pens that he had tied together; he was 22 years old

*Proceedings*                                                              10

1    at the time.  The same year, three shanks were recovered from

2    his cell in prison.  In 1996, he stabbed another inmate in the

3    chest with a sharp instrument; he was 24 years old at the

4    time.  In 1997, he stabbed another inmate with a six-inch

5    sharpened plastic weapon; he was 25 years old at the time.  In

6    1998, a shank was found in his cell; he was 26 years old at

7    the time.  And in 2008, ten years later, he assaulted an

8    officer.  Now, admittedly, the facts of that are not as severe

9    as that sounds because he threw a cup of hot water on this

10   officer, but his cell was searched and they found a

11   nine-inch-long homemade weapon; that was when he was 36.

12          So, when we look at this history, this is not

13   somebody who jumps out as satisfying the Miller definition

14   that his crime committed as a juvenile reflect the transient

15   immaturity of youth.  This is somebody whose conduct, stabbing

16   other inmates, possessing dangerous weapons, continued for

17   years beyond when he turned 18 and in one of the most highly

18   controlled environments that he could be in, because he was

19   largely in maximum security prison facilities during these

20   times.

21          Three times during his incarceration, including as

22   recently as 2009, the BOP recommended disciplinary transfers

23   to move him to more secure facilities because they felt that

24   the facilities that he was in were inadequate to provide

25   sufficient control, and this is when he was already in maximum

*Proceedings*                                                                    11

1   security facilities.

2          Now, I will say, first of all, that the statements

3   from the BOP counselor are quite commendable.  He's

4   essentially not had disciplinary incidents the last five or

5   six years, nor anything that rises to a level of what I was

6   talking about earlier, and he's to be commended for that.

7   That's to his credit.  But Miller is not about rewarding

8   somebody simply for turning the corner.  We expect people to

9   behave in prison.  We don't reward them for simply complying

10  with the rules of the institution that they're in.  And I

11  think an important contrast, Your Honor, Joseph Wang, who was

12  also a juvenile member of the Green Dragons who was with Mr.

13  Wong that night and who also participated in shooting the

14  victim, he's had one disciplinary incident in his 25 years in

15  custody.  That's a significant difference between somebody who

16  claims could potentially reflect the transient immaturity of

17  youth versus somebody who continued to engage in violent

18  conduct for many, many years after he turned 18.

19         Now, I spent a lot of time, Your Honor, talking to a

20  number of the victims in this case, and particularly the

21  Gallivans, and I will tell you that writing the letters that

22  they sent to you was so incredibly difficult for them.  The

23  sentencing was originally supposed to take place last fall and

24  I first had the opportunity to speak with them last fall and I

25  had a number of follow-up conversations with them.  I provided

*Proceedings*                                                        12

1   them with the sentencing submission, with Mr. Epstein's

2   permission.  I also provided them, at their request, with the

3   psychological reports that were done on Mr. Wong that were

4   filed under seal with this court, and again and again and

5   again they kept asking me how do we know that his remorse is

6   genuine; how do we know that he's a reformed individual; if he

7   gets out, how do we know that he's not going to hurt some

8   other family the way that we've been hurt?

9           And the letter, I think, from Tony Gallivan's wife

10  was just so incredibly moving.  It's so rare, I think, as a

11  prosecutor, I certainly never had this experience before,

12  where we see so starkly the consequences of some of the crimes

13  that we prosecute, especially something 25 years after the

14  fact.  You know, Judge Raggi commented at sentencing that Tony

15  Gallivan's wife's testimony about the murder was going to stay

16  with her for quite some time.  This letter that she submitted

17  to the Court is going to stay with me for quite some time.

18          One thing I also want to bring to the Court's

19  attention, there was one other case in this district where

20  somebody was re-sentenced pursuant to Miller.  That was a case

21  in front of Judge Glasser in 2014.  The defendant was named

22  Dwayne Stone, and in that case, the defendant requested a

23  40-year re-sentence, from life in prison to 40 years, and the

24  Government did not object to that sentence.  And, that was a

25  scenario where a drug and gang member had killed a rival gang

*Proceedings*                                                    13

1   member who was on his turf, had been in prison for about nine

2   years at the time and, as Judge Glasser commented at

3   sentencing, had had a largely quiet disciplinary history.  He

4   had one incident with a knife, but other than that, his

5   disciplinary history had been exemplary.  And I contrast that

6   with this case where you have victims who engage in no

7   criminal conduct, who were killed for reasons that had simply

8   that they were eating in a restaurant that night or they

9   refused to pay protection money that they shouldn't have had

10  to pay, and contrast that with what happened in the Stone case

11  and you have a situation where that defendant had a clean,

12  relatively, disciplinary history and this defendant certainly

13  did not.

14          And, so, for all those reasons, Your Honor, the

15  Government is asking that the defendant be sentenced to life,

16  notwithstanding the credit and the commendation that he

17  certainly deserves for making efforts to try to change his

18  life around and to having a cleaner record for the past number

19  of years than he had for the prior number of years before

20  that.

21          THE COURT:  All right.  Sir, I should note for the

22  record before I turn to Mr. Wong I've read, of course, all the

23  relevant portions of the trial testimony, as well as the

24  original presentence report, as well as the minutes of Judge

25  Raggi's sentencing proceeding, as you might expect.

*Proceedings*                                                    14

1          All right.  Mr. Wong, what would you like to say?

2          THE DEFENDANT:  Your Honor, I -- I'm a little

3    overwhelmed, so please bear with me.

4          THE COURT:  Take your time.  Speak into the

5    microphone so I could hear you.

6          THE DEFENDANT:  Hello?

7          THE COURT:  Yes.

8          THE DEFENDANT:  I understand why I'm here today.  I

9    am grateful that I have a chance to even speak to you today.

10   But I first want to say something to the victims and the

11   victims' family.  I am sorry for the grief and sadness that I

12   caused all those years ago, and I'm sorry that we're going to

13   bring this up again after so long.

14         Your Honor, I'm not the same person that I was

15   sentenced under Raggi.  I have changed.  Back then I was a

16   reckless, immature, thoughtless young man that didn't really

17   understand anything, and I didn't really understand the pain

18   that I caused until my parents both died.  That's when I start

19   understanding the pain and the grief that I caused to the

20   victims' family.

21         I understand what I did was wrong.  I understand

22   Miller is the reason now that we are before this court, but I

23   started changing a long time before Miller.  When I was in

24   Marion and going through my parents' death, I started

25   changing.  I see my ways was wrong.

*Proceedings*                                                            15

1          Excuse me.

2          I am ashamed of what I done, sir.  I know I

3    embarrassed my family, my parents, the community.  As a

4    Chinese-American, first generation born, I embarrassed them.

5    Instead of helping my community, I terrorized them, and I'll

6    never forget that.  Through it all, it was my family, the

7    strength they gave me, I started this change and I seen what I

8    tried to find in the street all along I had in my family.

9          Your Honor, I just want a second chance to prove to

10   my family and to all the people that believe in me that they

11   were right, that I was the person that Judge Raggi sentenced

12   me to.  I've been a burden to them for the last 25 years, my

13   family and to the country.  I would like to be an asset.  My

14   second half of my life, I would like to help them, the people

15   that helped me.

16         I'm sorry.

17         THE COURT:  It's all right.

18         THE DEFENDANT:  Your Honor, if you give me a second

19   chance, I know I have a duty to the people that concerns

20   Miller, to my family, to all the counselors, all the doctors

21   that helped me along the way, that didn't give up hope on me.

22   I know I will do the right thing and I just ask for mercy,

23   please.

24         I have so much other stuff I wanted to tell you.

25   It's just hard to articulate myself.  I just wish you could

*Proceedings*                                                    16

1   see my heart is so pure that I have -- I feel so bad reading

2   Ms. Gallivan's letter.

3            THE COURT:  Takes your breath away, doesn't it?

4            THE DEFENDANT:  Yes.

5            THE COURT:  How someone can be so decent under those

6   circumstances and so forgiving.

7            THE DEFENDANT:  Yes.

8            THE COURT:  Tells you something about them.  Also

9   tells you something, I suggest, about the people you killed

10  and the quality of their lives.

11           THE DEFENDANT:  I understand I ruined their lives,

12  their family's lives, and I'll never forgive myself for that

13  and I know whatever I say can't bring them back, but I can

14  only change the future and try to do better.

15           THE COURT:  Well -- I'm sorry, is he finished?

16           MR. EPSTEIN:  I asked Mr. Wong the same question,

17  Your Honor.  I think he's finished.

18           THE COURT:  Okay.  I don't want to rush anybody.

19           Before we go any further, having been convicted at

20  trial, I should remind Mr. Wong, not that I need to remind

21  counsel, that he has a right to appeal my sentence, as does

22  the Government, should either of you feel that I'm acting

23  unreasonably.  And of course the fees and expenses associated

24  with that appeal, assuming you cannot afford them, would be

25  paid by the court under the authority of the Criminal Justice

*Proceedings*                                                    17

1    Act.

2              Well, this has been a struggle for everyone.  Your

3    lawyer has done a magnificent job of putting together a

4    package of information and advocacy that puts you in the best

5    possible light.  Mr. Pravda's remarks, I've heard them before

6    of course in writing, but I understand his need to state them

7    by way of emphasis to the Court and to have a full record not

8    only of the Government's bottom line, but of their thinking in

9    it, because no one could take real issue with what the

10   Government's to say.  Or the letter I got from one of the

11   families of the victims, who strenuously objected to any

12   consideration in moderating your sentence, and who could blame

13   them.  I'm not talking about the grief that you caused.  I'm

14   talking about the grief that you're causing in their lives and

15   continue to cause, probably to their last breath.

16             But it does warrant noting at the same time these

17   letters that I received from others, a woman whose life you

18   conspired to end in murder tells me, in no uncertain terms,

19   that Alex Wong should have a chance to live a normal life and

20   return to the society.  I read it over and over again.  Were

21   it not otherwise consistent with what she said in the bulk of

22   her letter, I would have assumed it was a typo.  Imagine such

23   a woman who brings that level of understanding to this case.

24             And of course the letter of Christine Gallivan we

25   will all remember for a long, long time to come.  I have

*Proceedings*                                                          18

1   consulted with a number of my colleagues about this sentence

2   and then I got this letter and I just, they all expressed

3   their views, weren't all necessarily consistent, and I felt

4   obligated to return to them after I got this letter.  In a way

5   it doesn't -- it just describes in very graphic terms the

6   enormity of your conduct and the suffering and yet she says:

7   "I find no joy in another human's suffering.  I bear no anger

8   or hate toward Alex Wong and his group.  My desire is not

9   about seeking revenge or restitution.  It's about doing and

10  getting the right result.  I will leave Alex Wong to his god

11  and me to mine."

12          I had to take a breath when I read that letter.  As

13  I said, it tells us a lot about Christine Gallivan.  I suggest

14  it tells us a lot about the man you murdered.

15          So, there's not going to be any rewarding here, with

16  all due respect, Mr. Pravda.  He's not going to be rewarded.

17  The exercise is just punishment and the just sentence and

18  measuring fairly his level of culpability.  We know he's

19  culpable.  You weren't a child at age 16.  You knew what you

20  were doing.  It's not like some little two year old who sticks

21  his finger in the light socket not knowing what's going to

22  happen.  You knew what you were doing and it's hard to be

23  sympathetic.

24          And everything you've done since that program,

25  E-CODE I think it's called.

*Proceedings*                                                    19

1          MR. EPSTEIN:  Yes.

2          THE COURT:  I take note of.

3          As Judge Raggi noted, the potential was there and

4    now we've seen the manifestation to some extent of that

5    potential, but in a way, it doesn't matter.  I don't care, at

6    some length, because that's how you spent your time.  Good for

7    you, you made good use of your time.  It has some relevance I

8    suggest on the question that Christina Gallivan answers her

9    letter with:  "Can we be sure that if given any consideration

10   by this court you won't visit this callus, senseless, wanton

11   violence on someone else?"  And you know what the answer is?

12   No, we can't.  We can't.

13         Judge Raggi didn't have the record I have and she

14   was not prepared, although receptive to the argument to her

15   credit, not prepared to take the gamble.  Am I going to

16   gamble?  You bet.  You bet you I'm going to gamble.  I have a

17   little more information than Judge Raggi had.  I have a lot

18   more information.  And in that sense, what you've done since

19   E-CODE suggests to me that you have the intelligence, no

20   question.  You have the motivation, it seems so.  Whether you

21   have the strength of character and the discipline that you

22   didn't have then to live a law-abiding life under difficult

23   circumstances, let's face it, once you're out, I don't know.

24   Your activities suggest that perhaps you do, and I note that

25   most of them were undertaken before you had any hope of having

*Proceedings*                                             20

1    this sentence revisited.  I take note of that.

2            What I want to focus on is culpability.  Not what

3    you've done.  Good for you, you made good use of your time.

4    How do we measure your culpability?  Because the science has

5    progressed, as everyone acknowledges, even to their credit,

6    the science has progressed.  As the Supreme Court said:

7    "Mandatory life without parole for a juvenile precludes

8    consideration of his chronological age and its hallmark

9    features.  Among them are maturity, impetuosity and failure to

10   appreciate risks and consequences.  It prevents taking into

11   account the family and home environment that surrounds him."

12           Well, that's an apt statement in this case because I

13   have to take into consideration the whole picture, and I take

14   note of the fact that at the age of 13 or 14, you were

15   recruited into what may be characterized as your first family.

16   I mean no disrespect to your father or your mother.  Your

17   father, from everything I gather, was a hard-working man who

18   did everything he could to provide for you, and you in turn,

19   for your earlier years, were a good student, did everything

20   you were supposed to do, and then you went astray at a young

21   age and took this turn, took this turn.

22           So, as I say, the science seems to be

23   well-established at this point.  Doesn't necessarily mean, of

24   course, that these general statements about the maturity of

25   the human mind, the abilities of adolescents and young adults

1   and indeed even people in their early 20s to fully appreciate

2   the consequences of their actions, to fully assess the

3   seriousness of their conduct, to resist the urging of peers

4   and their so-called adult supervisors.  The science tells us

5   that that's a gradual process and that people at young ages

6   have not yet developed fully to that point.  You're not 14, as

7   the defendants in Miller.  You were 16, 16-and-a-half.  There

8   are others doing life who were just over that 18 year mark.

9   Mr. Pravda mentions that in his letter.  I must say it

10  troubles me.  It troubles me.

11          So, the question is how do we justly assess your

12  level of culpability at that time, given the science as we

13  know it now?  And I and my colleagues had great difficulty and

14  long conversations about it, and to that extent, we looked to

15  what you've done, both good and bad, you went into the prison

16  population.  You were the hellion you were with when you went

17  into that restaurant, and you were for some time.  But there

18  was a change.  There was a change, quite markedly, ultimately,

19  a significant change.  And it does give us hope that although

20  you perhaps did not fully comprehend and assess the full range

21  of consequences of what you did, that the maturity that you

22  present with now is real and the restraint that you claim to

23  be capable of is real.

24          With that in view, I will moderate the sentence.  I

25  will moderate the sentence, although I must say I do it with a

*Proceedings*                                              22

1   lot of difficulty.  These crimes were just horrid.

2            And reading these victims' letters, the few that we

3   have, some we couldn't contact from what the Government tells

4   me, just tears at your heart, tears at your heart.  And I hope

5   they don't misinterpret it.  They've been generous in what

6   they've said and the license, if you will, that they've given

7   me.  I don't regard it as license.

8            I'm satisfied that you're remorseful, and I hope

9   that remorse is enough to motivate you when you need it.

10  James Gallivan's letter, brother of the deceased - these are

11  tremendous people - he concludes:  "I'm glad I do not have to

12  make that decision."  Well, I do, and I do it with great

13  difficulty.

14           I'm going to impose a sentence of 35 years on Counts

15  1 and 2 to run concurrently ten years, technically speaking,

16  on count, I think it's Count 14.  Is it not?

17           Same special assessment, of course.  No fine.

18           Now, that's just the beginning.  I condition you

19  have five years supervised release on Counts 1 and 2 with

20  three years on Count 14 to run concurrently.  That's just the

21  beginning.  I want as a condition of your supervised release

22  strict compliance with a program of therapy, counseling,

23  whether it be for drugs, anger, job qualifications, whatever

24  it is.

25           You're going to go on a very short leash.  You

*Proceedings*                                                    23

1   understand that?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  You pull at that leash and disappoint

4   me, I will not hesitate for one minute to admit I made a

5   mistake.

6            You understand what I'm saying?

7            THE DEFENDANT:  I won't let you down, Your Honor.

8            THE COURT:  Don't let them down.  Don't let the

9   folks behind you down, your community that you should have

10  served.  I'm warning you.

11           The conditions of supervised release are full

12  remedial program including counseling of whatever sort the

13  Court shall deem appropriate in consultation with the

14  Probation Department.  And to the extent you become able at

15  some point in the future, as I trust you will if your

16  representations and undertakings are sincere, able to

17  contribute to the cost of it, you do just that.  And in that

18  regard, I will require you to make full financial disclosure

19  to the court when requested.

20           You know, my only -- one of the heaviest weights I

21  take back to chambers is there are a lot of young men in a lot

22  of communities, not just the Asian-American community, a lot

23  of young men, and, you know, my greatest fear is that they

24  will misread what I've done today.  You were a youngster.  You

25  were dumb, stupid and violent.  You've grown up, I trust.

*Proceedings*                                              24

1   Find a way sometime to do what you can to convince these young

2   people about where to turn and how.  If you really want to

3   make amends, save some lives.

4            Anything else?

5            MR. PRAVDA:  Not from the Government, Your Honor.

6   Thank you.

7            MR. EPSTEIN:  No, Your Honor.  Thank you, very much.

8            (Defendant remanded.)

9            (Time noted:  12:48 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25